# Exhibit A

## SHEARMAN & STERLING LLP

599 LEXINGTON AVENUE | NEW YORK | NY | 10022-6069

WWW.SHEARMAN.COM | T +1.212.848.4000 | F +1.212.848.7179

October 3, 2012

<u>Via E-Mail and FedEx</u>

Antonia M. Apps
Richard C. Tarlowe
John T. Zach
Assistant United States Attorneys
United States Attorney's Office
Southern District of New York
One Saint Andrew's Plaza
New York, NY 10007

Re:   *United States v. Newman*, Cr. No. 12-121 (RJS)

Dear Ms. Apps and Messrs. Tarlowe and Zach:

In accordance with Judge Sullivan's Order of June 29, 2012, Todd Newman hereby gives notice of his intent to provide expert testimony. Mr. Newman may call at trial two expert witnesses, Professor Gregg A. Jarrell, Ph.D., and J. Armand Musey. The experts' qualifications, methodology and a summary of the substance of their expected testimony are set forth below. The experts' expected testimony is based on the case as defined by the Superseding Indictment dated August 28, 2012, and the Final Bill of Particulars dated August 29, 2012. Mr. Newman reserves the right to call additional witnesses or amend these disclosures as circumstances warrant, based on unanticipated developments, as well as in response to the government's forthcoming digests concerning its summary witnesses and the evidence offered in the government's case-in-chief at trial.

I.      <u>Professor Gregg A. Jarrell, Ph.D.</u>

Mr. Newman expects to call Professor Jarrell as an expert witness with respect to trading analysis, information available in the market that was consistent with the alleged nonpublic "inside tips," and the functioning of the securities markets, as detailed below.

A.      Qualifications

Professor Jarrell is a Professor of Economics and Finance at the University of Rochester's William E. Simon Graduate School of Business Administration ("Simon School"),

SHEARMAN & STERLING LLP IS A LIMITED LIABILITY PARTNERSHIP ORGANIZED IN THE UNITED STATES UNDER THE LAWS OF THE STATE OF DELAWARE, WHICH LAWS LIMIT THE PERSONAL LIABILITY OF PARTNERS.

Page 2

where he has served as a member of the faculty since 1988. Professor Jarrell has an MBA from the University of Chicago (1976). He also has a Ph.D. in Business Economics from the University of Chicago (1978), with major concentrations in Industrial Organizations and Finance.

Professor Jarrell has served as the director of the Simon School's Managerial Economics Research Center (1988-1990) and as director of the Bradley Policy Research Center (1990-1994). He has taught courses covering, among other subjects, the operation of financial markets, the economics of mergers and acquisitions, valuation analysis for businesses and securities, the response of stock prices to public information, and financial regulation of securities markets. Professor Jarrell has authored or co-authored more than two dozen articles and studies in scholarly journals on these and other topics. He has received twelve Superior Teaching Awards.

In addition to his academic experience at the Simon School, Professor Jarrell served on the SEC Advisory Committee on Tender Offer Policy as an expert in mergers and acquisitions (1983). He then served as the Chief Economist for the SEC in Washington, D.C. (1984-1987). During that time, Professor Jarrell also co-taught a course on securities regulation as an Adjunct Professor at the Georgetown University School of Law (1985-1986). Professor Jarrell has served as an expert witness in a number of trials, including as a testifying expert in three insider trading trials, one of which was in the Southern District of New York. Professor Jarrell's *curriculum vitae*, which includes a list of the cases during the past four years in which he has testified as an expert witness at deposition or trial, is enclosed as Exhibit 1.

B.      Review Undertaken by Professor Jarrell

Professor Jarrell was asked to review and analyze the allegations that Mr. Newman engaged in insider trading or entered into a conspiracy to commit insider trading, *i.e.*, that Mr. Newman traded, or caused others to trade, in securities based on material nonpublic information obtained in breach of a duty, or that Mr. Newman conspired to accomplish the same. In so doing, Professor Jarrell reviewed the Indictment and Superseding Indictment, the Criminal Complaint, the Complaint filed by the SEC, the final Bill of Particulars and prior government letters providing particulars. Professor Jarrell, in conjunction with persons working under his direction and supervision, also reviewed voluminous information regarding the public companies at issue, including more than 11,000 news stories and media reports and hundreds of Wall Street analyst reports and public information releases from the companies, such as earnings releases and transcripts of conference calls with investors. With respect to Mr. Newman's trading, Professor Jarrell reviewed position data from March 2006 through November 2010 and trading data from January 2007 through November 2010 for the portfolio that Mr. Newman managed on behalf of Diamondback Capital Management, LLC ("Diamondback"). Professor Jarrell also reviewed various communications that relate to the government's allegations.

Professor Jarrell was asked to examine and summarize Mr. Newman's overall pattern of securities trading during the time period noted above, including the number of companies whose stocks Mr. Newman traded, the number of transactions and frequency of Mr. Newman's trading,

and the profitability of Mr. Newman's portfolio. Professor Jarrell was asked to summarize Mr. Newman's trading in the stocks referenced in the final Bill of Particulars and to provide opinions with respect to that trading as set forth below in the discussion of individual stocks.

With respect to Dell, Inc. ("Dell") and Nvidia Corporation ("Nvidia"), Professor Jarrell also was asked to summarize relevant public information available in the market during the periods when Mr. Newman is alleged to have traded on nonpublic information. Professor Jarrell was asked to opine as to whether the content of the alleged nonpublic "tipped" information was contained within the total mix of information available to the marketplace prior to the relevant earnings announcements by the companies.

The materials on which Professor Jarrell has relied are included within either the government exhibits produced to Mr. Newman on September 21, 2012 or the defense exhibits that are being produced today. A list of the particular exhibits within those two sets on which Professor Jarrell has relied is enclosed with this letter as Exhibit 2. Mr. Newman reserves the right to supplement this list and to modify or expand the topics on which he currently anticipates calling Professor Jarrell to testify in response to the government's proof at trial.

C.      Professor Jarrell's Expected Testimony

    *1.*      *Mr. Newman's Overall Trading Activity*

Professor Jarrell will describe the number of securities issuers that Mr. Newman traded during the time period from 2006 through 2010. With respect to frequency of trading, he will explain the number of transactions and average daily transaction value of the transactions Mr. Newman executed during the review period. He will further explain that Mr. Newman's trades in Dell and Nvidia that have been challenged by the government represented only a small fraction of Mr. Newman's overall trading activity.

    *2.*      *Sources of Publicly Available Information*

Professor Jarrell will also describe the many sources of news and other public information which are available to investors regarding publicly traded companies. With respect to Dell and Nvidia, for example, Professor Jarrell will describe sell-side research firms and reports that were issued by them during and prior to the time period of the government's allegations. Professor Jarrell will also explain that certain product and component pricing information is publicly available. In addition, Professor Jarrell will describe the specific unit, market share, and other data about technology companies that is published by certain research firms. Professor Jarrell will summarize types of information that research providers publish about public companies such as Dell and Nvidia, and ways that that information is useful in financial analysis.

    *3.*      *Overview of Reported Company Financial Figures*

Professor Jarrell will explain, in summary form, relevant components of a public company's income statement and how they are calculated.

Page 4

    4.   Dell:

Professor Jarrell will review and summarize Mr. Newman's trading patterns in Dell during the period 2006 through 2009, and explain the frequency with which he held long and short positions in Dell outside of the periods during which there are allegations that he traded on inside information. Professor Jarrell will discuss the profits and losses attributable to Mr. Newman's trading in Dell and will respond to any profit and loss evidence put forward by the government.

        a.   F4Q08:

Professor Jarrell will review and summarize Mr. Newman's trading, including analyzing Mr. Newman's profit and loss, in the quarter leading up to Dell's February 28, 2008 earnings announcement. Professor Jarrell will note how the short position that Mr. Newman took in Dell at the time of the government's allegations compares to the short positions that he had taken in Dell during January and earlier in February 2008.

Professor Jarrell also will compare the alleged tipped information with relevant information contained in news articles and analyst research reports that was in the market during the quarter leading up to Dell's earnings announcement on February 28, 2008. He will explain that information containing the substance of the alleged tips was substantially similar to information contained within the mix of information that was already in the market prior to Dell's February 28, 2008 announcement.

        b.   F1Q09:

Professor Jarrell will review and summarize Mr. Newman's trading, including analyzing Mr. Newman's profit and loss, in Dell during the time period of the government's allegations in F1Q09, both before and after receiving alleged tips. Professor Jarrell will opine that Mr. Newman's trading pattern is inconsistent with having inside information about an upcoming positive earnings announcement. Professor Jarrell will note that Mr. Newman's challenged purchases of Dell stock during May 2008 were consistent with the overall long position of his portfolio. He will comment on the significance that a reasonable investor could place on the earnings announcements of other technology companies and certain other information that was publicly announced during this time period, and that Mr. Newman's trading was consistent with that public information.

Professor Jarrell will also compare the alleged tipped information with relevant information contained in news articles and analyst research reports that was in the market during the quarter leading up to Dell's earnings announcement on May 29, 2008. He will conclude that information containing the substance of the alleged tips was substantially similar to information contained within the mix of information that was already in the market prior to Dell's May 29, 2008 announcement. Professor Jarrell will note a run up in Dell's stock price prior to Dell's earnings announcement, and comment on the market's expectation of a positive announcement as reflected in the stock price. He will also comment on discrepancies between the alleged

Page 5

tipped information, on the one hand, and the information known to the alleged source of the Dell information and the actual reported information, on the other hand.

c.    F2Q09:

Professor Jarrell will review and summarize Mr. Newman's trading, including analyzing Mr. Newman's profit and loss, in Dell during the time period of the government's allegations in F2Q09, both before and after receiving alleged tips. Professor Jarrell will opine that Mr. Newman's trading pattern is inconsistent with having inside information about an upcoming negative earnings announcement. Professor Jarrell will further observe that Mr. Newman's challenged short sales of Dell stock were consistent with the overall short position of his portfolio prior to Dell's August 2008 earnings announcement. He will also note the significance that a reasonable investor could place on certain public information that was announced during this time period, and that Mr. Newman's trading was consistent with that public information.

Professor Jarrell will also compare the alleged tipped information with relevant information contained in news articles and analyst research reports that was in the market during the quarter leading up to Dell's earnings announcement on August 28, 2008. He will explain that information containing the substance of the alleged tips was substantially similar to information contained within the mix of information that was already in the market prior to Dell's August 28, 2008 announcement. He will also comment on discrepancies between the alleged tipped information, on the one hand, and the information known to the alleged source of the Dell information and the actual reported information, on the other hand. Professor Jarrell will also comment on differences between Mr. Newman's trading and the trading of one or more alleged co-conspirators.

d.    F3Q09:

Professor Jarrell will review and summarize Mr. Newman's trading, including analyzing Mr. Newman's profit and loss, in Dell during the time period of the government's allegations in F3Q09, both before and after receiving alleged tips. Professor Jarrell will also note that Mr. Newman lost money after purchasing stock allegedly based on tips of positive inside information. Professor Jarrell will opine that Mr. Newman's trading pattern is inconsistent with having inside information about an upcoming positive earnings announcement.

Professor Jarrell will also compare the alleged tipped information with relevant information contained in news articles and analyst research reports that was in the market during the quarter leading up to Dell's earnings announcement on November 20, 2008. He will explain that information containing the substance of the alleged tips was substantially similar to information contained within the mix of information that was already in the market prior to Dell's November 20, 2008 announcement.

e.    2Q10:

Professor Jarrell will review and summarize Mr. Newman's trading, including analyzing Mr. Newman's profit and loss, in Dell during the time period of the government's allegations in

F2Q10, both before and after receiving alleged tips. Professor Jarrell will also note that Mr. Newman's challenged purchases of Dell stock were consistent with the overall long position of his portfolio prior to Dell's August 2009 earnings announcement. Professor Jarrell will also comment on differences between Mr. Newman's trading and the trading of one or more co-conspirators prior to the earnings announcement.

Professor Jarrell will also compare the alleged tipped information with relevant information contained in news articles and analyst research reports that was in the market during the quarter leading up to Dell's earnings announcement on August 27, 2009. He will explain that information containing the substance of the alleged tips was substantially similar to information contained within the mix of information that was already in the market prior to Dell's August 27, 2009 announcement.

5. *Nvidia:*

Professor Jarrell will review and summarize Mr. Newman's trading in Nvidia during the period 2006 through 2009, including outside of the period during which there is an allegation that he traded on inside information. Professor Jarrell will discuss the profits and losses attributable to Mr. Newman's trading in Nvidia and will respond to any profit and loss evidence put forward by the government. Professor Jarrell will also summarize Mr. Newman's trading, including analyzing Mr. Newman's profit and loss, in the quarter leading up to Nvidia's May 7, 2009 earnings announcement.

Professor Jarrell will also compare the alleged tipped information with relevant information contained in news articles and analyst research reports that was in the market during the quarter leading up to Nvidia's earnings announcement on May 7, 2009. He will explain that information containing the substance of the alleged tips was substantially similar to information contained within the mix of information that was already in the market prior to Nvidia's May 7, 2009 announcement. Professor Jarrell will also comment on differences between Mr. Newman's trading and the trading one or more co-conspirators prior to the earnings announcement.

6. *Altera:*

Professor Jarrell will review and summarize Mr. Newman's holdings in Altera during the period 2006 through 2009. Professor Jarrell will also compare certain alleged tips with information contained in the market during that time period, and will opine that the substance of those alleged tips was substantially similar to information contained within the mix of information that was already in the market during that time period.

7. *AMD:*

Professor Jarrell will review and summarize Mr. Newman's holdings in AMD during the period 2006 through 2009, including outside of the period during which there are allegations of obtaining inside information. Professor Jarrell will explain that Mr. Newman never had holdings of AMD at the time of any of the company's earnings announcements during the periods when Mr. Newman is alleged to have nonpublic information.

Page 7

    8.    *Ingram Micro:*

Professor Jarrell will review and comment upon Mr. Newman's holdings and position sizes in Ingram Micro during the period 2006 through 2009.

    9.    *Intel:*

Professor Jarrell will review and summarize Mr. Newman's holdings in Intel during the period 2006 through 2009, including outside of the period during which there are allegations of obtaining inside information. He will also summarize Mr. Newman's trading around Intel earnings announcements between September 2007 and December 2009. Professor Jarrell will also compare, and show discrepancies between, Mr. Newman's trading in Intel with that of Level Global. In addition, Professor Jarrell will compare estimated earnings results published in sell-side research reports to Intel's reported earnings.

    10.    *PMC Sierra:*

Professor Jarrell will review and summarize Mr. Newman's holdings in PMC Sierra during the period 2006 through 2009, including outside of the period during which there are allegations of obtaining inside information. Focusing on the period June and July 2008, Professor Jarrell will analyze the alleged tips provided to Mr. Newman and discuss how they are inconsistent.

    11.    *Sun Microsystems:*

Professor Jarrell will review and summarize Mr. Newman's holdings in Sun Microsystems during the period 2006 through 2009, including outside the period during which there are allegations of obtaining inside information. Professor Jarrell will also comment on Mr. Newman's trading after purportedly being tipped. Professor Jarrell will focus on the time period from September to November 2007 and compare the purported tips to the results the company reported. Professor Jarrell will also compare Mr. Newman's trading to the alleged tips provided to Mr. Newman and show how they were inconsistent.

    12.    *Texas Instruments:*

Professor Jarrell will summarize Mr. Newman's holdings in Texas Instruments between April 2009 and October 2009, the period during which Mr. Newman was allegedly provided with inside information. Professor Jarrell will also explain that Mr. Newman held over only one earnings announcement during this period, when he sustained a loss. Focusing on the period May and July 2009, Professor Jarrell will compare the alleged tips provided to Mr. Newman and show how they were inconsistent.

    13.    *TSMC:*

Professor Jarrell will review and summarize Mr. Newman's holdings in TSMC during the period 2006 through 2009, including outside of the period during which there are allegations of

Page 8

obtaining inside information.  With respect to the period February 2009 to May 2009, Professor Jarrell will compare Mr. Newman's trading to alleged inside information he received.  Professor Jarrell will explain that the trading was inconsistent with the alleged inside information.

>    14.    *Volterra:*

Professor Jarrell will compare the alleged tips of inside information, on the one hand, with information provided by company executives and relevant sell-side firms, on the other hand.  Professor Jarrell will explain that the substance of the alleged tips was substantially similar to the mix of information that was already in the market.

>    15.    *Western Digital:*

Professor Jarrell will review and summarize Mr. Newman's holdings in Western Digital during the period 2006 through 2009, including outside of the period during which there are allegations of obtaining inside information.  Professor Jarrell will describe Mr. Newman's holdings around Western Digital's earnings announcements during the period of April 2009 to October 2009 when Mr. Newman was allegedly receiving inside information.  Professor Jarrell will explain that Mr. Newman held over only one earnings announcement during this period, when he sustained a loss.  With respect to the first and second quarters of 2009, Professor Jarrell will also compare the accuracy of certain of the allegedly tipped information to information obtained from other research sources, and compare both sources of information to the accuracy of the information received in the alleged tips.

*       *       *

In addition to the foregoing, Professor Jarrell may testify concerning summary charts detailing phone calls, trading, and various pieces of public information.  We expect that such testimony will be in the nature of summary, rather than expert, testimony.

II.   <u>J. Armand Musey, CFA</u>

Mr. Newman also expects to call J. Armand Musey as an expert witness with respect to research processes employed by professional securities analysts.

>    A.    Qualifications

Mr. Musey is founder and President of Summit Ridge Group, LLC, a consulting firm that performs valuation and strategy analysis for investors.  Mr. Musey has a BA from the University of Chicago (1989), an MBA from the J.L. Kellogg Graduate School of Management at Northwestern University (1995), an MA from Columbia University (2009) and a JD from

Page 9

Northwestern School of Law (2011).[1]  He is a Chartered Financial Analyst and a former holder of Series 7, Series 63, and Series 24 licenses.

Mr. Musey's professional background includes more than 12 years of equity research, investment banking and consulting experience.  He led the equity research team at Salomon Smith Barney (now Citigroup Securities) that covered satellite communications and the communications tower industries.  In that capacity, he received the Institutional Investor "All American" ranking in two consecutive years.  Prior to his time at Salomon Smith Barney, Mr. Musey was a Managing Director and the head of the equity research team covering the satellite industry at Banc of America Securities.  While employed at Banc of America Securities, he received the Institutional America "All American" #3 ranking, was ranked #1 by Greenwich Associates survey of institutional investors and received the *Wall Street Journal* "Best on the Street" ranking for stock picking.  Prior to being employed by Banc of America Securities, Mr. Musey was employed as a Senior Analyst who oversaw the satellite communications research coverage group for C.E. Unterberg, Towin.  Prior to his time at C.E. Unterberg, Mr. Musey was an associate analyst at Merrill Lynch and Co., and was an investment banking associate for Nesbitt Burns and for PaineWebber Inc.  Mr. Musey's *curriculum vitae* is enclosed as Exhibit 3.

B.    Summary of Basis for Opinions

Mr. Musey will be called to explain the role within the securities markets of sell-side equity research analysts and their counterparts with whom they interface on the buy side.  In particular, Mr. Musey will explain the manner in which securities analysts obtain and analyze information, including as follows:

- analysts often create detailed financial models that record historical information regarding companies' financial performance and predict financial results in future quarters;

- analysts do not confine themselves to official statements of the companies they cover, but attempt to verify the accuracy of the information the company provides and predict how the company will perform in the future by pursuing a wide range of research avenues;

- analysts customarily obtain information from a wide variety of sources, including corporate officers, investor relations, lower level company employees, competitors, resellers, suppliers, and customers;

- public companies provide information about themselves to the marketplace in a variety of forums, in addition to public announcements and SEC filings, ranging from speeches and individual or group meetings with the company's senior

---

[1] While Mr. Musey holds a JD, he will not opine on the law of insider trading or any other law.  His testimony will be based on his experience as an equity research analyst.

executives and/or investor relations officers during conferences to booths at trade shows staffed by sales persons who work for the company;

- research consultants and research firms provide useful information about companies that often is based on publicly available sources and data provided to the consultants and/or firms by public companies;

- it is not unusual for analysts to discuss their models with investor relations, and for investor relations to provide them feedback on where they think their models might be off target;

- it is customary and common to contact lower level employees to discuss their views of their company's business;

- unofficial sources of information, such as lower level employees, suppliers, competitors, resellers and customers, often will to speak to analysts because they expect during the course of the dialogue to gain useful industry information; and

- analysts obtain and share analysis and information with other analysts, both on the sell-side and the buy side, in order to themselves obtain information that will be useful in their analysis.

Mr. Musey will explain terminology relevant to this case which is frequently used by securities analysts. In particular:

- the process of obtaining information in the various ways referenced above is customarily referred to as a doing a "check" or a "channel check," a commonly used industry terms that does not carry in itself any negative connotation;

- in the absence of greater specificity, Mr. Musey's initial assumption about references to "checks" is that they are "channel checks" customers, suppliers, resellers, or others;

- it is customary for analysts to refer to people with whom they discuss pertinent information as "contacts" or "sources;" analysts and other industry professionals frequently refer to individuals with whom they speak with these terms both as short hand and so as not to divulge their sources of information, which would undermine their competitive advantage;

- the term "data point" is a commonly used industry term that may refer to any piece of information an analyst gathers that is pertinent to his or her evaluation of a covered company; and

- the term "edge" is commonly used to refer to an analyst's ability to ferret out information that gives the analyst a competitive advantage over his or her peers; the term does not in itself carry any negative connotation.

Page 11

        Mr. Musey will explain that an analyst's job is to mine his or her resources, including "checks," "contacts," models, filings, announcements, and other sources of information to develop an evaluation of a covered company.  Frequently, while pieces of information are not themselves sufficient to form a conclusion as to how a company or its stock price will perform, the accumulation of such pieces of information combined with the analyst's expertise in evaluating them may be sufficient.

        Mr. Musey will also describe the process by which, each quarter, investors focus on corporate earnings announcements that gauge the progress of companies compared to expectations, with some companies also providing guidance for upcoming quarters.  He will explain that public companies provide the market with advance notice about the date that they will announce and explain their earnings, and that an entire industry of Wall Street analysts has developed around the ritual of the quarterly earnings season.  Mr. Musey will describe what "consensus" means as it is used on Wall Street, and will explain the process by which, in attempts to better anticipate earnings surprises, unofficial "whisper" forecasts of earnings circulate among traders and investors.

        Mr. Musey will explain that market participants discuss companies' valuation and expected earnings on an ongoing and constant basis, and that such conversations contain a significant amount of speculation, gossip and rumor.  He will state that it is not unusual for such discussions to occur outside of business hours, including at night and on the weekends.  He will describe the routine circulation within the market of a significant amount of seemingly specific, nonpublic information that turns out to be manufactured or untrue, and the resulting difficulty in being alerted to the possibility that information being circulated could constitute material, nonpublic information.  He will also note that he inherently would expect information that is disclosed by an employee of a company's investor relations department to be authorized.

        Regards,

        _[signature]_

        SHEARMAN & STERLING LLP
        Stephen Fishbein
        John A. Nathanson
        Lindi Beaudreault

        *Attorneys for Defendant Todd Newman*

cc:     All Counsel of Record

# Exhibit 1

**Exhibit 1**

**GREGG A. JARRELL**                                                    **October 2012**

| | |
|---|---|
| Business Address: | Forensic Economics, Inc. |
| | 95 Allens Creek Rd. |
| | Building 2, Suite 303 |
| | Rochester, NY 14618 |
| | 585.385.7440 |
| | |
| Home Address: | 2500 East Avenue |
| | Apartment 7U |
| | Rochester, NY 14610-3143 |
| | 585.734.9621 |
| | |
| Email Address: | Gregg@thejarrells.com |

## EDUCATION

Ph.D.        University of Chicago: Business Economics, 1978.
            Major Concentration: Industrial Organization, Finance.

M.B.A.        University of Chicago: Economics, 1976.
            Major Concentration: Economics and Finance.

B.S.        University of Delaware: Business Administration, 1974.

## EMPLOYMENT

UNIVERSITY OF ROCHESTER, William E. Simon Graduate School of Business
        Administration, Rochester, New York (July 1988 - Present)
        Professor of Finance and Economics.

UNIVERSITY OF ROCHESTER,  William E. Simon Graduate School of Business
        Administration, Rochester, New York (July 1988 - July 1994)
        Professor of Finance and Economics
        Director of Bradley Policy Research Center (1990 - 1994)
        Director of the Managerial Economics Research Center (1988 - 1990).

THE ALCAR GROUP, INC.,
        Skokie, Illinois (July 1988 - July 1990)
        Senior Vice President.

THE ALCAR GROUP, INC.,
Skokie, Illinois (July 1987 - July 1988)
Senior Vice President, Director of Research.

UNIVERSITY OF ROCHESTER, William E. Simon Graduate School of Business
Administration, Rochester, New York (January 1987 - June 1987)
AT&T Foundation Resident Management Fellow.

U.S. SECURITIES AND EXCHANGE COMMISSION,
Washington, D.C. (April 1984 - January 1987)
Chief Economist.

GEORGETOWN UNIVERSITY LAW SCHOOL,
Washington, D.C. (July 1985 - July 1986)
Adjunct Professor.

LEXECON, INC.,
Chicago, Illinois (April 1983 - March 1984)
Senior Economist.

UNIVERSITY OF CHICAGO, Center for the Study of the Economy and the State,
Chicago, Illinois (August 1981 - April 1983)
Post-Doctoral Research Fellow.

UNIVERSITY OF ROCHESTER, Graduate School of Management (renamed William E. Simon
Graduate School of Business Administration, November 1986),
Rochester, New York (July 1977 - August 1981)
Assistant Professor of Economics.


## PROFESSIONAL EXPERIENCE

MEMBER, U.S. SEC ADVISORY COMMITTEE ON TENDER OFFER POLICY,
(February 1983 - July 1983)
Expert on Economic Effects of Tender Offers.

FEDERAL TRADE COMMISSION,
Washington, D.C. (December 1981 - January 1983)
Consultant.

HUFF & HUFF, INC., Environmental Consultants,
Chicago, Illinois (January 1977 - December 1982)
Consultant.

UNIVERSITY OF CHICAGO, Graduate School of Business,
Chicago, Illinois (October 1975 - June 1977)
Teaching and Research Assistant.

Page 2 of 11

## PROFESSIONAL AFFILIATIONS

CHAIRMAN OF THE BOARD:    The Albert Abela Corporation (1999 - 2000).

MEMBER OF COUNCIL:    Council of the Albert Abela Family Foundation (1999 - 2000).

ASSOCIATE EDITOR:    *Journal of Corporate Finance and Governance* (1993 - 2000).

ASSOCIATE EDITOR:    *Journal of Financial and Quantitative Analysis* (1992 - 1996).

MEMBER:    American Economic Association.

MEMBER:    American Law and Economics Association.

MEMBER:    Financial Management Association.

MEMBER, BOARD OF DIRECTORS:    United Shareholders Association (1991 - 1993).

## AREAS OF SPECIALIZATION

Finance (Economics of Corporate Control, Operation and Regulation of Financial Markets).

Industrial Organization (Applied Price Theory, Economics of Regulation, Transfer Pricing).

Applied Econometrics.

## ACADEMIC HONORS AND FELLOWSHIPS

Superior Teaching Award, University of Rochester, Second-Year Class of 2011.

Superior Teaching Award, University of Rochester, Second-Year Class of 2010.

Superior Teaching Award, University of Rochester, First-Year Class of 2009.

Superior Teaching Award, University of Rochester, Second-Year Class of 2008.

Superior Teaching Award, University of Rochester, First-Year Class of 2008.

Superior Teaching Award, University of Rochester, Second-Year Class of 2007.

Superior Teaching Award, University of Rochester, Second-Year Class of 2006.

Superior Teaching Award, University of Rochester, First-Year Class of 1999.

Superior Teaching Award, University of Rochester, Second-Year Class of 1995.

Superior Teaching Award, University of Rochester Executive Development Program, Class of 1995.

Superior Teaching Award, University of Rochester Executive Development Program, Class of 1984.

Superior Teaching Award, University of Rochester Executive Development Program, Class of 1980.

Beta Gamma Sigma.

University of Chicago Fellowship (1976 - 1977).

Earhart Fellowship in Industrial Organization (1975 - 1976).

## PUBLISHED RESEARCH PAPERS

"The Impact of the Options Backdating Scandal on Shareholders," with Gennaro Bernile, *Journal of Accounting and Economics*, 47 (1-2), 2-26 (March 2009).

"Expected Inflation and the Constant-Growth Valuation Model," with Michael Bradley, *Journal of Applied Corporate Finance*, 20 (2), 35-47 (Spring 2008).

"Corporate Leadership Structure: On the Separation of the Positions of CEO and Chairman of the Board," with James A. Brickley and Jeffrey C. Coles, *The Journal of Corporate Finance*, 3, 189-220 (June 1997).

"Corporate Focus and Stock Returns," with Robert Comment, *The Journal of Financial Economics*, 37 (1) (January 1995).

"The Returns to Acquiring Firms in Tender Offers: Evidence from Three Decades," with Annette Poulsen, Readings in Mergers and Acquisitions, edited by Patrick Gaughan, Blackwell Publishers, 1994, 284-295.

"The Market for Corporate Control: The Empirical Evidence Since 1980," with James A. Brickley and Jeffry M. Netter, Readings in Mergers and Acquisitions, edited by Patrick Gaughan, Blackwell Publishers, 1994, 296-316.

"The Irrelevance of Margin Eligibility: Evidence from the Crash of '87," with Paul J. Seguin, *The Journal of Finance*, 48 (4) (September 1993).

"An Overview of the Executive-Compensation Debate," *Modernizing US Securities Regulation: Economic and Legal Perspectives*, Kenneth Lehn and Robert W. Kamphuis, Jr., eds., The Center for Research on Contracts and The Structure of Enterprise, University of Pittsburgh, (December 1992).

"The Relative Signaling Power of Dutch-Auction and Fixed-Price Self-Tender Offers and Open-Market Share Repurchases," with Robert Comment, *The Journal of Finance*, 46 (4) (September 1991).

"A Proposal to Stabilize Stock Prices:  A Comment," with Paul J. Seguin, *Journal of Portfolio Management*, (Winter 1989).

"Stock Trading Before the Announcement of Tender Offers:  Insider Trading or Market Anticipation," with Annette Poulsen, *The Journal of Law, Economics, and Organization*, 5 (2), 225-248 (Fall 1989).

"The Returns to Acquiring Firms in Tender Offers:  Evidence from Three Decades," with Annette Poulsen, *Financial Management*, (Autumn 1989).

"The Market for Corporate Control: The Empirical Evidence Since 1980," with James A. Brickley and Jeffry Netter, *The Journal of Economic Perspectives*, 1, 49 - 68 (Winter 1988). Reprinted in The Modern Theory of Corporate Finance, edited by Clifford W. Smith, Jr., second edition, 1989, McGraw-Hill, New York.

"Dual-Class Recapitalizations as Antitakeover Mechanisms:  The Recent Evidence," with Annette Poulsen, *The Journal of Financial Economics*, 20 (1/2), 129-152 (January/March 1988).

"Two-Tier and Negotiated Tender Offers: The Imprisonment of the Free-Riding Shareholder," with Robert Comment, *The Journal of Financial Economics*, 19, 283-310 (December 1987).

"Financial Innovation and Corporate Mergers," The Merger Boom, Proceeding of a Conference, held in October 1987, sponsored by the Federal Reserve Bank of Boston.

"Shark Repellents and Stock Prices: The Effects of Antitakeover Amendments Since 1980," with Annette Poulsen, *Journal of Financial Economics*, 19, 127-168 (September 1987).

"Hostile Takeovers and the Regulatory Dilemma: Twenty-Five Years of Debate," with John Pound, *The Midland Corporate Finance Journal*, 5 (2) (Summer 1987).

"Regulating Hostile Takeover Activity: An Interpretive History of the US Experience," with Annette Poulsen and John Pound, Proceedings: Auckland and Sydney (June 1986) *Takeovers and Corporate Control: Towards a New Regulatory Environment*, The Centre for Independent Studies, 19-36 (July 1987).

"Studying Firm-Specific Effects of Regulation with Stock Market Data: An Application to Oil Regulation," with Rodney T. Smith and Michael Bradley, *The Rand Journal of Economics*, (Winter 1986).

"Shark Repellents and Poison Pills: Stockholders Protection - from the Good Guys or the Bad Guys?," with Annette Poulsen, *The Midland Corporate Finance Journal*, 4 (2) (Summer 1986).

"The Demand for Electric Utility Regulation," Electric Power: Deregulation and the Public Interest, edited by John Moorhouse, 1986.

"The Impact of Product Recalls on the Wealth of Sellers," with Sam Peltzman, *Journal of Political Economy*, 93 (3) (June 1985).

"The Wealth Effects of Litigation by Takeover Targets: Do Interests Diverge in a Merge?" *The Journal of Law and Economics*, 28, 151-177 (April 1985).

"Change at the Exchange: The Causes and Effects of Deregulation," *The Journal of Law and Economics*, 27, 273-312 (October 1984).

"On the Existence of an Optimal Capital Structure of the Firm: Theory and Evidence," with Michael Bradley and E. Ham Kim, *The Journal of Finance*, 39, 857-877 (July 1984).

"Do Targets Gain from Defeating Tender Offers?" with Frank Easterbrook, *New York University Law Review*, 59, 277-300 (May 1984).

"Economic Trade-offs of Coal Mining on Prime Farmland," with Linda Huff, Sherry Jarrell and David Smith, *Landscape Planning*, 10, 131-146 (1983).

"State Anti-Takeover Laws and the Efficient Allocation of Corporate Control: An Economic Analysis of Edgar v. Mite," *The Supreme Court Economics Review*, Vol. II (1983).

"The Economic Effects of Federal Regulation of the Market for New Security Issues," *The Journal of Law and Economics*, 24, 613-675 (December 1981).

"The Economic Effects of Federal and State Regulations of Cash Tender Offers," with Michael Bradley, *The Journal of Law and Economics*, 23 (2) (October 1980).

"Regulation and Accounting for Assets in the Electric Utility Industry: Pro-Producer Regulation Through Asset Inflation," *The Journal of Accounting and Economics*, 1, 93-116 (Summer 1979).

"The Demand for State Regulation of the Electric Utility Industry," *The Journal of Law and Economics*, 21, 269-295 (October 1978).

## OTHER PUBLISHED ARTICLES

"Comment on 'Terminal Value, Accounting Numbers, and Inflation' by Gunther Friedl and Bernhard Schwetzler," with Michael Bradley, *Journal of Applied Corporate Finance*, 23 (2), 113-115 (Spring 2011).

"A Trip Down Memory Lane: Reflections on Section 203 and Subramanian, Hersovici, and Barbetta," *The Business Lawyer*, 65, 779-787 (May 2010).

"Takeovers and Leveraged Buyouts," The Fortune Encyclopedia of Economics, edited by David R. Henderson, Warner Books, 1993.

"The 1980's Takeover Boom and Government Regulation," *Regulation*, 44-53 (Summer 1992).

"The Longer-Term Relation Between Accounting Performance and Stock Returns," with Frank Dorkey, Bradley Research Center, Working Paper, William E. Simon Graduate School of Business Administration, University of Rochester (August 1992).

"Calculating Proper Transfer Prices," with Frank Torchio, *Public Utilities Fortnightly*, (January 1991).

"Turf Wars: The SEC May Have Struck Out Over Shareholders' Rights, But It Could Still Win on Proxy Reform," *Institutional Investor* (December 1990).

"On the Underlying Motivations for Corporate Takeovers and Restructurings," Corporate Reorganization Through Mergers, Acquisitions, and Leveraged Buyouts," edited by Gary Libecap, 1988.

"Risky Products, Risky Stocks," with Paul Rubin and R. Dennis Murphy, *Regulation*, 1, 35 (1988).

"Hostile Takeovers and Boesky: The New Push for Regulation," with John Pound, *International Herald Tribune*, May 31, 1987.

"Evidence on Gains from Mergers and Takeovers," with Michael Bradley, Knights, Raiders and Targets: The Impact of the Hostile Takeover, edited by John C. Coffee, Jr., Louis Lowenstein and Susan Rose-Ackerman, 1987.

"Are Takeovers Hostile to Economic Performance?" with John Pound and Ken Lehn, *Regulation*, p. 25 (September/October 1986).

"Motivations for Hostile Tender Offers and the Market for Political Exchange," with Annette Poulsen, Contemporary Policy Issues, 1986.

"Inside the SEC's Panel on Takeovers," *Directors & Boards*, (Fall 1983).

"SEC Advisory Committee on Tender Offers," Report plus separate statement with Frank H. Easterbrook (July 1983) .

"Regulation of the Electric Utility Industry: A Historical Perspective and Empirical Study,"
NBER Conference Paper Series, Paper No. 67 (October 1980).

## PUBLISHED OPINION EDITORIALS

"A Victory for Shareholders," *The Wall Street Journal*, op. ed., December 1, 1993.

"Take the Long View on Executive Pay," *The Wall Street Journal*, op. ed., August 28, 1992.

"SEC Crimps Big Board's Future," *The Wall Street Journal*, op. ed., June 19, 1992.

"SEC Lets Bush Off the Hook for November 15 Stock Plunge," *The Wall Street Journal*, op. ed.,
January 16, 1992.

"For a Higher Share Price, Focus Your Business," *The Wall Street Journal*, op. ed., May 13,
1991.

"En-Nobeling Financial Economics," *The Wall Street Journal*, op. ed., October 17, 1990.

"Shareholders Secret Victory," *The Wall Street Journal*, op. ed., June 22, 1990.

"Beware Cleaning Up After the Elephants," *The Wall Street Journal*, op. ed., October 17, 1989.

"The Paramount Import of Becoming Time-Warner: A Present-Value Lesson for the Lawyers,"
*The Wall Street Journal*, op. ed., July 13, 1989.

"Brady Panel Sold Innovation Short," *The Wall Street Journal*, op. ed., October 19, 1988.

"The Pitfalls of Cleaning Up Raiders," with John Pound, *International Herald Tribune*, op. ed.,
pg. 11, May 29 1987.

"SEC Now is on Target," with John Pound, *The Wall Street Journal*, op. ed. March 26, 1987.

"Takeover Threats Don't Crimp Long-Term Planning," with Ken Lehn, *The Wall Street Journal*,
op. ed., p. 32, May 1, 1985.

## SEC OFFICE OF THE CHIEF ECONOMIST PUBLICATIONS

"Stock Trading Before the Announcement of Tender Offers: Insider Trading or Market
Anticipation?" with Annette Poulsen, Securities and Exchange Commission, Office of the
Chief Economist (February 24, 1987).

"The Effects of Dual-Class Recapitalizations on the wealth of Shareholders," with Annette
Poulsen, Securities and Exchange Commission, Office of the Chief Economist
(November 1986).

"The Effects of Poison Pills on the Wealth of Target Shareholders," with Michael Ryngaert, Securities and Exchange Commission, Office of the Chief Economist (October 23, 1986).

"Shark Repellents: The Role and Impact of Antitakeover Charter Amendments," with Michael Ryngaert and Annette Poulsen, Securities and Exchange Commission, Office of the Chief Economist (September 7, 1985).

"Institutional Ownership, Tender Offers, and Long-Term Investments," with Ken Lehn and Wayne Marr, Securities and Exchange Commission, Office of the Chief Economist (April 19, 1985).

"The Economics of Any-or-All, Partial, and Two-Tier Tender Offers," with Robert Comment, Hugh Haworth and Annette Poulsen, Securities and Exchange Commission, Office of the Chief Economist (April 19, 1985).

"The Impact of Targeted Share Repurchases (Greenmail) on Stock Prices," with Michael Ryngaert, Securities and Exchange Commission, Office of the Chief Economist (September 11, 1984).


TESTIMONIAL EXPERIENCE (LAST FOUR YEARS)

Deposition of Gregg A. Jarrell in re: TRADOS Incorporated Shareholder Litigation, in the Court of Chancery of the State of Delaware, Civil Action No. 1512-VCL (April 5, 2012).

Deposition of Gregg A. Jarrell in re: McMahan Securities Co. L.P. v. Kleinberg, Kaplan, Wolff & Cohen, P.C., David Parker and Martin D. Sklar, in the Supreme Court of the State of New York, County of New York, No. 111952/08 (March 30, 2012).

Deposition of Gregg A. Jarrell in re: Lehman Brothers Equity/Debt Securities Litigation, in the United States District Court, Southern District of New York, No. 08 Civ. 5523 (LAK) (March 13, 2012).

Testimony of Gregg A. Jarrell in re: In the Matter of Donald L. Koch and Koch Asset Management LLC, before the Securities and Exchange Commission Administrative Proceeding, File No. 3-14355 (January 13 and 17, 2012).

Deposition of Gregg A. Jarrell in re: Citigroup Inc. Securities Litigation, in the United States District Court, Southern District of New York, Master File No. 07 Civ. 9901 (SHS) (January 4, 2012).

Testimony of Gregg A. Jarrell in re: Irex Corporation v. Mitchell Partners, Ltd., et al., in the Court of Common Pleas of Lancaster County, Pennsylvania, Civil Action - Law and Equity, No. CI-2007-01322 (December 15, 2011).

Deposition of Gregg A. Jarrell in re: Merck & Co., Inc. Vytorin/Zetia Securities Litigation, in the United States District Court, District of New Jersey, Civil Action No. 2:08-cv-2177 (DMC) (JAD) (November 11, 2011).

Deposition of Gregg A. Jarrell in re: Chrysalis Ventures III, L.P., et al. v. Mobile Armor, Inc., et al., in the Court of Chancery of the State of Delaware, Arbitration No. 001-A-2001-VCLASTER (November 3, 2011).

Deposition of Gregg A. Jarrell in re: Citigroup Inc. Securities Litigation, in the United States District Court, Southern District of New York, Master File No. 07 Civ. 9901 (SHS) (September 23, 2011).

Deposition of Gregg A. Jarrell in re: SLM Corporation Securities Litigation, in the United States District Court, Southern District of New York, Case No. 08 Civ. 1029 (WHP) (July 20, 2011).

Deposition of Gregg A. Jarrell in re: Fairfax Financial Holdings Limited and Crum & Forster Holdings Corp., v. S.A.C. Capital Management, LLC, et al., before the Superior Court of New Jersey, Law Division: Morris County, Docket No. MRS-L-2032-06 (June 29-30, 2011).

Deposition of Gregg A. Jarrell in re: Constar International Inc. Securities Litigation, in the United States District Court, Eastern District of Pennsylvania, Master File No. 03cv05020 (June 15, 2011).

Deposition of Gregg A. Jarrell in re: SLM Corporation Securities Litigation, in the United States District Court, Southern District of New York, Case No. 08 Civ. 1029 (WHP) (April 28, 2011).

Testimony of Gregg A. Jarrell in re: United States of America v. Raj Rajaratnam, in the United States District Court, Southern District of New York, S2-09-CR-1184 (RJH) (April 8, 14-15, 18, 2011).

Deposition of Gregg A. Jarrell in re: Johnson & Johnson v. Guidant Corporation, in the United States District Court, Southern District of New York, 06 Civ. 7685 (RJS) (March 30, 2011).

Deposition of Gregg A. Jarrell in re: Federal National Mortgage Association Securities Litigation in the United States District Court, District of Columbia, Consolidated Civil Action No. 1:04-CV-01639 (February 17-18, 2011).

Deposition of Gregg A. Jarrell in re: Alstom SA Securities Litigation, before the United States District Court, Southern District of New York, Master File No. 03-CV-6595(VM) (October 15, 2010).

Deposition of Gregg A. Jarrell in re: Casey's General Stores, Inc. v. Alimentation Couche-Tard Inc., and ACT Acquisition Sub, Inc. and Alimentation Couche-Tard Inc. and ACT Acquisition Sub, Inc., v. Casey's General Stores, Inc. and Robert J. Myers, Kenneth Haynie, William C. Kimball, Johnny Danos, Diane C. Bridgewater, Jeffrey M. Lamberti, Richard A. Wilkey and H. Lynn Horak, before the United States District Court, Southern District of Iowa, Central Division, Case No. 4:10-cv-265 (August 12, 2010).

Deposition of Gregg A. Jarrell in re: Citadel Broadcasting Corporation, et al., before the United States Bankruptcy Court, Southern District of New York, Case No. 09-17442 (BRL) (May 10, 2010).

Deposition of Gregg A. Jarrell in re: Maxim Integrated Products, Inc. Securities Litigation, before the United States District Court, Northern District of California, San Jose Division, Case No. C-08-00832-JW (February 12, 2010).

Deposition of Gregg A. Jarrell in re: eBay Domestic Holdings, Inc. v. Craig Newmark and James Buckmaster, before the Court of Chancery of the State of Delaware, C.A. No. 3705-CC (August 28, 2009).

Deposition of Gregg A. Jarrell in re: Countrywide Financial Corporation Securities Litigation, before the United States District Court for the Central District of California Western Division, Lead Case No. CV 07-05295 MRP (MANx) (July 15, 2009).

Deposition of Gregg A. Jarrell in re: International Rectifier Corporation Securities Litigation, before the United States District Court Central  District of California, Case No. CV 07-02544-JFW (VBKx) (June 12, 2009).

Deposition of Gregg A. Jarrell in re: Scientific-Atlanta, Inc. Securities Litigation, before the United States District Court Northern District of Georgia Atlanta Division, Civil Action No. 1:01-CV-1950-RWS (March 31, 2009).

Deposition of Gregg A. Jarrell in re: Rohm and Haas Company v. The Dow Chemical Company, et al., before the Court of Chancery of the State of Delaware in and for New Castle County, C.A. No. 4309-CC (March 5, 2009).

Deposition of Gregg A. Jarrell in re: State of New Jersey, et al. v. Tyco International, Ltd., et al., before the United States District Court for the State of New Hampshire, Civil No. 03-1337-B, MDL No. 1335 (October 23-24, 2008).

# Exhibit 2

**Professor Gregg A. Jarrell Relies on the Following Government Exhibits**

| | | |
|---|---|---|
| GX122 | GX819 | GX2501 |
| GX138 | GX820 | GX2601 |
| GX182 | GX1010 | |
| GX183 | GX1200 | |
| GX184 | GX1201 | |
| GX187 | GX1222 | |
| GX204 | GX1307 | |
| GX206 | GX1354 | |
| GX214 | GX1355 | |
| GX223 | GX1357 | |
| GX224 | GX1358 | |
| GX230 | GX1363 | |
| GX244 | GX1364 | |
| GX250 | GX1401 | |
| GX601 | GX1550 | |
| GX636 | GX1553 | |
| GX711 | GX1555 | |
| GX713 | GX1602 | |
| GX810 | GX1806 | |
| GX811 | GX1807 | |
| GX812 | GX1812 | |
| GX813 | GX1813 | |
| GX816 | GX1968 | |
| GX818 | GX2113 | |

## <u>Professor Gregg A. Jarrell Relies on the Following Defense Exhibits</u>

Various Reports within the
Range DX8100-8499

DX343

DX405

DX471

DX675

DX1050

DX2168

DX2189

DX3046

DX6259

DX6260

DX6262

DX6595

DX6623

DX6632

DX6646

DX6679

DX6726

DX7500

DX7522

DX7525

DX7937

DX8530

DX8532

# Exhibit 3

*Updated 10/01/2012*

# J. Armand Musey, CFA
Summit Ridge Group, LLC
535 Fifth Avenue, 4th Floor
New York, NY 10017
+1.646.843.9850
amusey@SummitRidgeGroup.com

## Professional Summary

- Expert in the satellite communication industry and related media and telecommunications topics, financial analysis, business valuation including spectrum valuation and orbital slot valuation, equity research and related corporate governance issues.
- Deep understanding of a range of satellite, media and telecom issues and the complex relationships underlying the sector's competitive dynamics.
- Unique blend of 16 years of equity research (top-ranked sell-side analyst), investment banking and consulting experience.
- Completed dozens financial valuation, strategy analysis, business development and business plan creation assignments in the communications industry; experience in 18 financing and M&A transactions.

## Work Experience

| | | |
|---|---|---|
| 2007 – Present | **SUMMIT RIDGE GROUP, LLC** | New York, NY |

*Founder/President  (part-time while mountain climbing and in law school: 2007-2011)*
- Perform valuation and strategy analysis within the satellite, media and telecom industries.
- Projects include investment analysis for institutional investors, transaction support for companies, and litigation support/expert witness testimony for major law firms.
- Supplement large firms' skills on complex deals needing additional senior level expertise.

| | | |
|---|---|---|
| 2003 – 2007 | **NEAR EARTH LLC** | New York, NY |

*President*
- Built Near Earth LLC, as one of two partners, into a leading boutique investment bank focused on serving companies and investors in the satellite, media and telecommunications industry.
- Provided M&A, capital raising and valuation-related consulting services on 15 assignments ranging from seed capital to a $1.4B acquisition for a Fortune 50 company.

| | | |
|---|---|---|
| 2001 – 2003 | **SALOMON SMITH BARNEY (CITIGROUP SECURITIES)** | New York, NY |

*Director – Senior Satellite Communications and Wireless Tower Industry Analyst*
- Headed five-person equity research team, covering the satellite communication and the communication tower industries.
- Institutional Investor "All American" ranking (2001 and 2002).
- Ranked at or near the top of other major surveys of equity research analysts.

| | | |
|---|---|---|
| 1999 – 2001 | **BANC OF AMERICA SECURITIES** | New York, NY |

*Managing Director – Senior Satellite Communications Industry Analyst*
- Headed five-person equity research team covering the satellite industry.
- Institutional Investor "All American" #3 Ranking (2000); #1 by Greenwich Associates survey of institutional investors (2000); Wall Street Journal "Best on the Street" ranking for stock picking.

| | | |
|---|---|---|
| 1998 – 1999 | **C.E. UNTERBERG, TOWBIN** | New York, NY |

*Senior Analyst – Satellite Communications Industry*
- Headed four-person equity research team covering the satellite communications industry.
- Conducted primary research for 11 companies.
- Published industry/company strategic outlooks, created financial models and earnings forecasts, and conducted valuations of companies.

| 1997 – 1998 | **MERRILL LYNCH & CO** | New York, NY |

*Industry Analyst – Satellite Communications Industry*
- Assisted senior analyst in initiating and maintaining financial research coverage for 11 companies in the satellite communications industry.
- Given primary coverage responsibility for a company after only nine months.

| 1995 – 1997 | **INVESTMENT BANKING** | New York, NY |

*Nesbitt Burns, Associate  (1996-1997)*
*PaineWebber, Associate (1995)*
- Member of corporate finance generalist teams.
- Produced marking pitch books and executed a variety of public and private market corporate finance transactions.

## Education

| 2009 – 2011 | **NORTHWESTERN UNIVERSITY SCHOOL OF LAW** | Chicago, IL |

Juris Doctor (JD) degree; Cum Laude, June 2011
- Member of highly competitive two-year JD program.
- Internship (Summer 2011): U.S. Bankruptcy Court (S.D.N.Y.). – Hon. Robert E. Gerber.
- Semester in Paris at Sciences Po.
- Senior Research Honors: "Broadcasting Licenses: How the Traditional Property Rights Model Informs the Spectrum Rationalization Challenge."

| 2007 – 2009 | **COLUMBIA UNIVERSITY** | New York, NY |

Masters of Arts degree; Modern European Studies, May 2009
- Pursued interests in history and philosophy between mountaineering expeditions.

| 1992 – 1995 | **KELLOGG SCHOOL OF MANAGEMENT** | Evanston, IL |
| | **NORTHWESTERN UNIVERSITY** | |

Master of Business Administration degree, June 1995
- Majored in Finance and Marketing; 3.7/4.0 GPA.

| 1985 – 1989 | **UNIVERSITY OF CHICAGO** | Chicago, IL |

Bachelor of Arts degree in Sociology with Honors, June 1989
- Significant coursework in Economics and Mathematics.
- Varsity track and cross country team (four years). Elected Captain, 1987.

## Other Professional Background

- Credentials: New York State Bar Admission; Federal Communications Bar Association; Chartered Financial Analyst (CFA) charter holder; Former holder of Series 7 (general securities agent), Series 63 (securities agent state law) and Series 24 (securities firm principal) designations (until 2009).
- Professional activities: Member of the New York Society of Security Analysts - Chair of the Corporate Governance Committee (2007-2009), vice-chair (2005-2007). Member of the CFA Institute.

## Interests

- Sports/Hobbies: Enjoy rock and ice climbing, running, and philosophy. Avid mountain climber – Completed the "7 Summits" (climbing the highest peak on each continent) with a summit of Mt. Everest in May 2008. Completed Chicago Marathon (2003, 2005) and New York City Marathon (2004, 2006).
- Board Memberships: Riverside Symphony (2008-2011); The Foucault Society (2004-2009) - also served as Foucault Society board treasurer.

## Selected Equity Research Publications

While working in a research capacity from 1997 to 2003, I published analysis on the industry virtually every week, usually multiple times a week. Below are some of my major publications. I was the senior analyst and lead author on all of the reports except where noted.

1) *IPTV -- The Future of Television?*, Near Earth LLC, July 2006 (41 pages)
2) *Analysis of the Fixed Service Satellite Industry*, Near Earth LLC, July 2006 (38 pages)
3) *Analysis of the GEO Satellite Manufacturing Industry*, Near Earth LLC, July 2006 (27 pages)
4) *DBS Industry Update; Revisiting the Hughes EchoStar Merger,* Salomon Smith Barney, June 13, 2002. 39 pages.
5) *Equity in the Balance, Aligning Balance Sheet Risk with Equity Valuations*, Salomon Smith Barney, May 23, 2002. 50 pages.
6) *The Guide to Fixed Satellite Service*, Salomon Smith Barney, November 2001. 136 pages
7) *DARS Duopoly; The Dawn of a New Age in Radio*, Banc of America Securities, October 1999. 107 pages.
8) *The Big 3; Hughes, Loral and Orbital Sciences - The Role of Diversified Satellite Operators at the Turn of the Millennium*, Banc of America Securities, October 1999. 336 pages.
9) *The Satellite Book*, C.E. Unterberg Towbin, First Quarter 1999. 54 pages.
10) *The Satellite Report 1999*, C.E. Unterberg Towbin, April 1999. 457 pages
11) *Pegasus Communications*, C.E. Unterberg Towbin, January 19, 1999. 53 pages.
12) *The Global Satellite Marketplace*, Merrill Lynch, April 1998 246 pages. Thomas W. Watts was the senior analyst on this report.
13) *Hughes Electronics; SatCom Blue Chip*, Merrill Lynch, March 20, 1998. 83 pages. Thomas W. Watts was the senior analyst on this report.
14) *CD Radio, Inc.* Merrill Lynch, July 14, 1998. 10 pages. Thomas W. Watts was the senior analyst on this report.

## Periodicals

1) *"From the Group Up"*, Near Earth LLC. Monthly Newsletter from November 2005 to April 2007.
2) "Heard From the Street", Via Satellite Magazine. Monthly column from late 1999 until early 2003.
3) *The Satellite Model Book*, Salomon Smith Barney, Second Quarter 2001 -- Third Quarter 2002.
4) *Payload Monthly*, Banc of America Securities. October 1999 -- February 2001. 50-100 pages.
5) *The Bus Tour; A Quantitative Overview of the Satellite Industry*, Banc of America Securities, Third Quarter 1999 -- First Quarter 2000. 150-200 pages per edition
6) *Hotbird Monthly; Monthly Satellite Industry Update*, CE Unterberg, Towbin December 1999-Aril 2000. 30-50 pages per edition.

## Previous Expert Witness Testimony

1. In re: Adjustment of Rates and Terms for Preexisting Subscription and Satellite Digital Audio Radio Services; Docket 2006-1, CRB DSTRA.
   Provided expert witness testimony on behalf of Sirius Satellite Radio and XM Satellite Radio (now merged into SiriusXM Satellite Radio) before the U.S. Copyright Royalty Board in their royalty dispute with Sound Exchange.

2. Gross v. SES Americom; 307 F.Supp.2d 719 (2004).
   Provided written expert witness testimony centering on valuation of an orbital slot and its viability for development to support litigation arising from alleged post-merger obligations.