

One World Financial Center
27th Floor
New York, NY 10281
(212) 796-6330

**MORVILLO LLP**

1101 17th Street, NW
Suite 1006
Washington, DC 20036
(202) 470-0330

www.morvillolaw.com

WRITER'S CONTACT INFORMATION
Gregory Morvillo
(212) 796-6340
gmorvillo@morvillolaw.com

December 5, 2012

**Via ECF Filing**

Re:   *United States v. Todd Newman, et al., S2 12 CR 121 (RJS)* **(Docket No. 181)**

To Whom it May Concern:

At the request of Judge Sullivan, I am filing the enclosed letter brief as a memoranda so that it is available on the docket.

Respectfully submitted,

Gregory Morvillo / DSK

Gregory Morvillo



One World Financial Center
27th Floor
New York, NY 10281
(212) 796-6330

**MORVILLO LLP**

1101 17th Street, NW
Suite 1006
Washington, DC 20036
(202) 470-0330

www.morvillolaw.com

WRITER'S CONTACT INFORMATION
GREGORY MORVILLO
(212) 796-6340
GMORVILLO@MORVILLOLAW.COM

December 4, 2012

**Via Electronic Mail**

The Honorable Richard J. Sullivan
United States District Court
Southern District of New York
500 Pearl Street, Room 640
New York, NY 10007

Re:     *United States v. Todd Newman, et al.*, S2 12 CR 121 (RJS)

Dear Judge Sullivan:

      Defendant Anthony Chiasson respectfully submits this letter in response to the government's offer of marked exhibits GX 438 and GX 927 which include communications between Level Global employees. These are classic hearsay. The government has offered them pursuant to the coconspirator exception to the hearsay rule. For the reasons stated below, the government is wrong and these exhibits should not be admitted.

      On their face, these exhibits reflect ambiguous, out-of-court statements by Michael Alessi and David Ganek, neither of whom have or will testify. As such, they are hearsay. *See* Rule 802. Mr. Adondakis's testimony on this point could not be clearer: he did not tell Mr. Ganek the source of the Dell information at issue. *See* Transcript ("Tr.") at 1955:17-19 ("Q: What, if anything, did you tell Mr. Ganek about Sandy Goyal's source within Dell? A: I never told him about it").[1] Because he is a government sponsored witness whose testimony flies

---

[1] *See also* Tr. 2017:9-14 ("Q. Let's refer to Mr. Ganek specifically. I'd like to read two, if I may. 'Chiasson and Ganek were both interested in the Dell information when Adondakis
(Continued...)

The Honorable Richard J. Sullivan
December 5, 2012
Page 2

directly in the face of the government's espoused theory, it should be dispositive on this issue. Mr. Adondakis is the only coconspirator witness to either have worked at Level Global and/or had any contact with Mr. Ganek, and he testified multiple times that he did not inform his boss of the source of the allegedly improper information. As a consequence, these exhibits are not admissible as the statements of an unindicted coconspirator. *See* Rule 801(d)(2)(E).

### A.   The Legal Standard.

Under the prevailing law in the Second Circuit, a party attempting to offer out-of-court statements pursuant to Rule 801(d)(2)(E) must demonstrate that "there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made during the course and in furtherance of the conspiracy." *United States v. Zhao Wu Chen*, 322 Fed. Appx. 43, 46 (2d Cir. 2009) (quoting *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)). To prevail, the government must prove the test by a preponderance of the evidence. *Id.* The government has failed to establish that Mr. Ganek was involved in any criminal conspiracy, and/or that any of his statements in the relevant exhibits were made in furtherance of the alleged conspiracy.

### B.   The Government's Position.

In its December 4, 2012 letter to the Court (the "Gov't Letter"), the government sets out the basis for its conclusion that Mr. Ganek is a coconspirator.

First, the government points to two specific interactions that it contends evidence Mr. Ganek's involvement in the conspiracy, both in August 2008. As explained below, there are serious questions as to whether the Court should credit Mr. Adondakis's version of these events.

Second, the government points to four "circumstances" that it alleges allow the Court to draw the inference that Mr. Ganek knew or consciously avoided the fact that "the information" was from sources within Dell or Nvidia. Gov't Letter at 5. The circumstances are as follows: (1) the timing of the updates; (2) the "specificity" of the information that Mr. Ganek received from Mr. Adondakis, among others; (3) the alleged "absence of any analysis regarding so-called 'macro' events or other reasons for trading in the stocks other than the specific numbers discussed in the electronic exchanges above;" and (4) the level of detail that Mr. Ganek received regarding checks. As explained below, in light of Mr. Adondakis's testimony, all of the evidence is more susceptible to an innocent explanation than a finding that Mr. Ganek joined a criminal conspiracy. *Id.*

---

told them because the information came directly from contacts at Dell.' Is that true as to Mr. Ganek or not true? A. No, it's not true."); 2630:14-18 ("Q. You never disclosed in that 40-minute conversation your source, the source of your information, Mr. Goyal, isn't that true? A. I didn't disclose it to Mr. Ganek. . .").

The Honorable Richard J. Sullivan
December 5, 2012
Page 3

### C. The Evidence Shows Mr. Ganek was not a Coconspirator.

The foundation of the government's argument that Mr. Ganek was a member of the conspiracy essentially rests on two events – a meeting on August 11, 2008 and a telephone call on August 27, 2008. The government's conclusions with regard to those events are firmly undercut by the totality of the other evidence in the record, including their own witness's testimony.

#### 1. The August 11, 2008 Meeting

The government first points to an alleged meeting on August 11, 2008 between Mr. Ganek, Mr. Chiasson, and Greg Brenner. According to Mr. Adondakis's testimony, he met Messrs. Chiasson and Brenner on August 11, 2008, and shared with them what has been referred to as the Dell Expected Value. *See* Tr. at 1774:1-1778:13; 2304:18-2307:16; *see also* GX 446. Mr. Adondakis claims that certain information included in the analysis came from Sandy Goyal's Dell source by way of Jesse Tortora. *Id.* Mr. Adondakis testified that immediately following this meeting, Messrs. Chiasson and Brenner brought the analysis into Mr. Ganek's office and met with Mr. Ganek. *Id.*

Mr. Adondakis's testimony ends there, and along with it all probative value in regards to Mr. Ganek's membership in the conspiracy. Mr. Adondakis did not testify about the substance of the alleged meeting because he was not a participant.

Perhaps more importantly, however, Mr. Adondakis's claim with regard to this alleged meeting is at best, the subject of debate.[2] During cross examination, Mr. Adondakis conceded or called into serious question whether there was any meeting at all. *See* Tr. at 2633. The August 11 meeting, even if it occurred, proves nothing about Mr. Ganek's membership in the alleged conspiracy and cannot be used to establish his membership.

#### 2. The August 27, 2008 Telephone Call.

The government's evidence relating to the August 27, 2008 telephone call is equally unpersuasive. Mr. Adondakis testified that Mr. Ganek was a participant in an August 27, 2008 telephone call during which Dell was discussed. Nothing about this call proves that Mr. Ganek joined the alleged conspiracy.

---

[2] Documentary evidence that has not yet been admitted demonstrates that Mr. Ganek was at his home in Southampton that day, not in Level Global's office. *See* DX 9598; DX 9599.

The Honorable Richard J. Sullivan
December 5, 2012
Page 4

All that need be said about this call is that Mr. Adondakis testified that he never told Mr. Ganek the source of his Dell information, generally, and in particular on the August 27, 2008.

> Q. You never disclosed in that 40-minute conversation your source, the source of your information, Mr. Goyal, isn't that true?
> A. I didn't disclose it to Mr. Ganek...
> Q. [D]id you ever disclose [your source] to anyone on that 40-minute call from the Hamptons?
> A. The source itself or the information?
> Q. The source.
> A. No, I didn't disclose the source.

Tr. 2630: 19-23. The government's theory that Mr. Ganek was a coconspirator is contradicted by its own witness.

### D. The Government's Four Circumstances

The remainder of the government's support for its claim is insufficient to carry a preponderance burden.

#### 1. The Timing of the Updates

The government claims that the mere fact that Mr. Ganek received "multiple updates before... companies announced their earnings" is sufficient to demonstrate he was aware that these updates included material nonpublic information. But the record is rife with evidence to the contrary. In fact, the record is replete with evidence establishing that receipt of updates on a company before it reports its earnings is an industry standard and something the entire industry relies upon to trade. *See, e.g.*, GX 531; GX 935; DX 215; DX 370; DX 1077; Tr. at 2196; 2215; 2223; 2347.

#### 2. The "Nature" of the Information

The government also contends that certain information that reached Mr. Ganek was so specific that Mr. Ganek must have known that it constituted material nonpublic information. In particular, the Government contends that Mr. Adondakis's writings setting forth his predictions on Dell's upcoming earnings release could not have been written without the use of material nonpublic information. Additionally, the government has pointed to specific documents received by Mr. Ganek in which the word "check" was used to refer to a research source as evidence that Mr. Ganek joined the conspiracy. The testimony and evidence in the record undermines these contentions.

The Honorable Richard J. Sullivan
December 5, 2012
Page 5

First, both Mr. Adondakis and Mr. Tortora were shown documents referencing specific gross margin predictions and related guidance that they conceded were not illegally sourced but were in fact the product of legitimate sell-side reports, conversations with authorized company representatives, and modeling. *See, e.g.*, Tr. at 742:6-743:23; 893:25-895:9; 956:18-957:6; 985:12-22; 1507:2-1508:6; 2029:3-2032:20; 2197:13-22; 2215:1-2216:2; *see also* GX 935; DX 1111; DX 9105; DX 9909. The presence of such predictions in documents received by Mr. Ganek is not, without more, evidence that he joined a conspiracy.

Second, the government's letter highlights certain exhibits which it alleges inculpate Mr. Ganek.[3] The government is moved by Mr. Ganek's receipt of emails containing the words "check, "call," or "contact" and suggests that the mere use of these words means that Mr. Ganek knowingly joined a criminal conspiracy. Letter at 1-4. Testimony and evidence in the record belie these contentions.

Mr. Adondakis' testimony established that the term check and its progeny are entirely banal.

> Q. Now check, the word in itself, doesn't convey that the information at issue is improper, right?
> A. Yes, I believe that to be true.
> Q. And in fact, it's a general term that is used throughout the industry, isn't that right?
> A. That's right.
> Q. And it can mean channel checks, for example, isn't that right?
> A. Yes.
> Q. It can mean legitimate checks with a company, isn't that right?
> A. Yes.
> Q. It is used in sell side research reports frequently, right?
> A. I believe so, yes.
> Q. And we saw one of those with Mr. Tortora referencing a check on Dell, right?
> A. We did see it.

---

[3] The government went beyond this argument in court on December 3, 2012. It stated that certain information, such as predicted gross margin percentage, is of such a nature that "somebody who is experienced in the industry and is as sophisticated as David Ganek would know that you can't just get . . ." (Tr. at 2552:25-2553:3). The government has provided no evidence either in court or in its Letter about what an experienced investor would or would not know when provided with estimated gross margin numbers. Conversely, both Defendants have entered in legions of documents where specific gross margin numbers are given for various companies from public sources leading into a company's announcement.

The Honorable Richard J. Sullivan
December 5, 2012
Page 6

Tr. at 2458:12-2459:3. That Mr. Ganek received research labeled "checks" does not support the government's contention that he is a coconspirator. Similarly, that Mr. Ganek or others referred to contacts, even contacts at a company, is alone insufficient to embroil a person in an alleged conspiracy.

### 3. The Absence of Macro Analysis

The government shockingly contends that "the absence of any analysis regarding so-called 'macro' events or other reasons for trading in the stocks other than the specific numbers discussed in the [letter's enumerated] electronic exchanges" supports its contention that Mr. Ganek was a coconspirator. Gov't Letter at 4. There have been multiple days of testimony by multiple witnesses that have discussed this exact issue and its import to this case.

#### a. The Dell Macro Analysis

Once again, the government's own witnesses upend its argument. As an example, Mr. Adondakis described the macro theme in a note two weeks before Dell's August 28, 2008, earnings release. *See, e.g.*, GX 461-A. Mr. Adondakis wrote that although Dell's sales volumes were increasing:

> MUCH OF THE GROWTH HAS BEEN DRIVEN BY LOWER MARGIN CONSUMER BUSINESS. AT THE SAME TIME, PRICING HAS BEEN CHALLENGED DUE TO A WEAKER MIX FROM MACRO. I THINK THIS SETS UP FOR A DISAPPOINTMENT W/ POTENTIAL FOR DOWNSIDE TO EPS ON A MARGIN RESET... CHECKS HAVE REVEALED THAT DELL AND HP ARE DROPPING PRICES DUE TO MACRO AND THIS SHOULD ALSO PRESSURE GM.

*Id.*[4]

Moreover, the record contains documents and testimony that establishes the very real trading thesis Level Global used and that the government claims is absent. For instance, Mr. Adondakis summarized a sell-side report he received on August 14, 2008 as follows:

---

[4] On direct examination Mr. Adondakis stated that he invented the reasons presented by the report. Tr. at 1789:13-18. However, on cross-examination, Mr. Adondakis acknowledged that many of the facts cited in the exhibit were in fact accurate, and therefore could have formed the basis for trading strategies based on macro factors. Tr. at 2495-2502.

The Honorable Richard J. Sullivan
December 5, 2012
Page 7

"Midwest retail check, July retail, PC below plan, Dell reducing pricing significantly in ads for U.S. retailers. . . . thinks the company will run into margin issues over the next several quarters as it prices aggressively to win channel share" Tr. at 2310:25-2311:9 (referencing GX 457). Notably, Mr. Adondakis then testified that this was Level Global's trading thesis: "Q: And that's the position you all were taking, correct? A. Yes." Tr. at 2311:10-11.

        b.      The Nvidia Macro Analysis

Similarly, an analysis of communications regarding Nvidia demonstrates that there was a clear and legitimate thesis for the trade, separate from any information provided by Mr. Adondakis. Specifically, in April 2009 the news that Nvidia would beat its revenue guidance permeated the market and was reflected in Nvidia's stock price, a fact that Mr. Adondakis conceded on cross examination.

> Q. And why did you understand Mr. Chiasson to interpret the Pacific Crest report as a reason to start selling Nvidia now?
> A. It seems – actually, he doesn't say. He does say up above.
> Q. What does he say?
> A. He said it's getting pretty well out there now.
> Q. What did you understand that to mean?
> A. I understood it to mean that he thinks that the good news is getting out there on Nvidia and maybe it's time to sell.
> Q. Is that the baked-in idea that we talked about?
> A. It is.

Tr. 2349:19-2350:4. The stock increased in value in advance of Nvidia's earnings call because the market expected the reported revenue number to exceed guidance.

Now, the government points to the fact that Mr. Adondakis's information was consistent with the trades that Mr. Ganek made and claims that this consistency is evidence of Mr. Ganek's membership in an alleged criminal conspiracy. But there is *no evidence* demonstrating that Mr. Ganek knew that Mr. Adondakis's information was illegally sourced. Rather, there was a clear and legitimate thesis for the Nvidia trades in question. The Government cannot use these facts to establish that Mr. Ganek joined a criminal conspiracy.

    4.    **The Level of Detail**

Finally, the government argues that "the level of detail about which Mr. Ganek is apprised as to Mr. Adondakis's 'checks' on the companies" supports the view that he was a member of a conspiracy. As explained in part B above, the government's cooperating witness has testified that the term checks is not in and of itself problematic. The government's contention that Mr. Ganek was occasionally interested in Mr. Adondakis's checks does not

The Honorable Richard J. Sullivan
December 5, 2012
Page 8

establish by a preponderance of the evidence that he was a member of a conspiracy. This is particularly true where there is *no evidence*, as demonstrated by the government's cooperating witness's testimony, that Mr. Ganek knew that the checks were providing Mr. Adondakis with improperly obtained information.

The government's position with regard to Mr. Ganek's coconspirator status for the NVDA transactions is based on the use of such language in assorted emails. While this language is not probative of membership in the alleged conspiracy, its value is further called into question by Mr. Adondakis's taped admissions to his friends—and related testimony—that he did not tell anyone about Danny Kuo's NVDA information. *See* DX 9342T; Tr. 2110-2111. Mr. Ganek did not know about the allegedly improper NVDA information.[5]

---

[5] Finally, the government's fallback position that Mr. Alessi's statements should be admitted regardless of Mr. Ganek's status as a coconspirator (*see* Letter at 1) only invites additional confusion, as his statements, viewed in a vacuum without any response from Mr. Ganek, are confusing, at best. The government is mistaken to the extent that it is arguing Mr. Alessi's status as a coconspirator allows for the introduction of the entirety of his conversation with Mr. Ganek. In the Second Circuit, "to be in furtherance of the conspiracy, a statement must be more than a merely narrative description by one co-conspirator of the acts of another." *U.S. v. SKW Metals & Alloys, Inc.*, 195 F.3d 83, 88 (2d Cir 1999) (citation omitted). "The statements must prompt the listener to respond in a way that promotes or facilitates the carrying out of a criminal activity. However, the statements need not be commands, but are admissible if they provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy." *Id.* Mr. Ganek's attempt to reach out to an employee for what he believed to be entirely legitimate information concerning a position Mr. Ganek invested in no way promotes the criminal conspiracy, nor does it provide reassurance, foster trust, or inform Mr. Alessi or others about the status of the conspiracy of which Mr. Ganek was not a member. The discussion at issue is akin to "mere idle chatter" between co-workers which does not qualify for the exception to the hearsay rule. *See U.S. v. Paone*, 782 F.2d 386, 290 (2d Cir 1986)

The Honorable Richard J. Sullivan
December 5, 2012
Page 9

      For the reasons set out in this letter, Mr. Chiasson respectfully submits that the government has failed to establish by a preponderance of the evidence that Mr. Ganek was a member of the alleged conspiracy.

                                    Respectfully submitted,

                                    *Gregory Morvillo/JKV*
                                    Gregory Morvillo

cc: All counsel of record