UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------  x
                                                              :
UNITED STATES OF AMERICA,                                     :
                                                              :
            - v. -                                            :
                                                              :
TODD NEWMAN,                                                  :        No. 12-CR-00121 (RJS)
                                                              :
                                                              :
                                                              :
                        Defendant.                            :
                                                              :
------------------------------------------------------------  x
```

## DEFENDANT TODD NEWMAN'S SENTENCING MEMORANDUM

Stephen Fishbein
John A. Nathanson
Sara A. Ricciardi
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022-6069
Tel: 212-848-4000

*Attorneys for Defendant Todd Newman*

## TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ....................................................................................... 1

II.   WE REQUEST THAT THE COURT SENTENCE MR. NEWMAN TO A
      SENTENCE SIGNIFICANTLY BELOW THE GUIDELINES RANGE, WHICH
      WOULD BE SUFFICIENT BUT NOT GREATER THAN NECESSARY TO
      MEET THE ENDS OF SENTENCING .......................................................................... 4

      A.    THE OFFENSE ................................................................................................ 4

            1.    Background ............................................................................................ 4

            2.    Hiring Jesse Tortora .............................................................................. 4

            3.    Putting the Trades at Issue into Context .............................................. 7

            4.    Mr. Newman Received Only a Small Portion of the Profit on the
                  Trades at Issue ...................................................................................... 8

            5.    Mr. Newman's Role in the Offense ...................................................... 10

      B.    SENTENCING GUIDELINES .......................................................................... 13

            1.    Gain Calculation ................................................................................... 13

            2.    Guidelines Calculation ......................................................................... 14

      C.    MR. NEWMAN'S BACKGROUND AND CHARACTER ................................ 15

            1.    Mr. Newman's Early Background .......................................................... 16

            2.    Mr. Newman's Secondary Education and Work History ........................ 16

            3.    Mr. Newman's Personal History............................................................ 19

      D.    DETERRENCE.................................................................................................. 27

      E.    OTHER RELEVANT INSIDER TRADING SENTENCES.............................. 29

      F.    SERIOUSNESS OF THE OFFENSE AND RESPECT FOR THE LAW .......... 31

III.  FINANCIAL EXPOSURES ......................................................................................... 33

      A.    CRIMINAL FORFEITURE ............................................................................ 33

      B.    CRIMINAL FINE/PENALTY.......................................................................... 34

C.      RESTITUTION ................................................................................. 35

        1.      Diamondback Is Not a Victim Under the MVRA .................................... 36

        2.      Legal Fees ......................................................................... 40

        3.      Compensation .......................................................................... 43

        4.      Goodwill and Business Reputation ........................................... 46

IV.   BAIL PENDING APPEAL ....................................................................... 50

        A.      Mr. Newman Is Neither a Flight Risk Nor a Danger to the Community .............. 50

        B.      Mr. Newman's Appeal Presents a "Substantial Question" of Law ..................... 51

V.    CONCLUSION ....................................................................................... 56

# TABLE OF AUTHORITIES

**Page**

## CASES

*Chiarella v. United States,*
    445 U.S. 222 (1980).................................................................................................. 52

*Dirks v. SEC,*
    463 U.S. 646 (1983)................................................................................ 52, 53, 55

*Hughey v. United States,*
    495 U.S. 411 (1990).................................................................................................. 44

*In re Local #46 Metallic Lathers Union,*
    568 F.3d 81 (2d Cir. 2009)................................................................................. 36

*Marrero v. City of Haileah,*
    625 F.2d 499 (5th Cir. 1980) ........................................................................... 46

*SEC v. Lyon,*
    605 F. Supp. 2d 531 (S.D.N.Y. 2009)........................................................ 54

*SEC v. Obus,*
    No. 06 CIV 3150, 2010 WL 3703846 (S.D.N.Y. Sept. 20, 2010).............................. 53, 54, 55

*SEC v. Obus,*
    No. 10-4749 (2d Cir. Mar. 29, 2011)........................................................ 53, 54

*SEC v. Obus,*
    693 F.3d 276 (2d Cir. 2012)........................................................................ 53, 54

*SEC v. Patel,*
    61 F.3d 137 (2d Cir. 1995)............................................................................... 13

*SEC v. Rajaratnam,*
    822 F. Supp. 2d 432 (S.D.N.Y. 2011).......................................................... 13

*SEC v. Razmilovic,*
    822 F. Supp. 2d 234 (E.D.N.Y. 2011) ......................................................... 13

*Skilling v. United States,*
    130 S. Ct. 2896 (2010).............................................................................. 43, 44

*State Teachers Ret. Bd. v. Fluor Corp.,*
    592 F. Supp. 592 (S.D.N.Y. 1984)............................................................. 52, 53

iii

*United States ex rel. The St. Regis Mohawk Tribe v. President R.C.*,
    451 F.3d 44 (2d Cir. 2006)........................................................................ 54

*United States v. Abuhamra*,
    389 F.3d 309 (2d Cir. 2004)...................................................................... 50

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006).............................................. passim

*United States v. Amato*,
    540 F.3d 153 (2d Cir. 2008)...................................................................... 46

*United States v. Anderson*,
    533 F.3d 623 (8th Cir. 2008) .................................................................... 33

*United States v. Archer*,
    671 F.3d 149 (2d Cir. 2011)........................................................ 36, 37, 38

*United States v. Bahel*,
    662 F.3d 610 (2d Cir. 2011)............................................................. 43, 44

*United States v. Battista*,
    575 F.3d 226 (2d Cir. 2009)........................................... 38, 42, 45, 47

*United States v. Bengis*,
    631 F.3d 33 (2d Cir. 2011)........................................................................ 38

*United States v. Boccagna*,
    450 F.3d 107 (2d Cir. 2006)...................................................................... 48

*United States v. Carboni*,
    204 F.3d 39 (2d Cir. 2000)........................................................................ 48

*United States v. Cassese*,
    428 F.3d 92 (2d Cir. 2005)............................................................... 54, 55

*United States v. Contorinis*,
    692 F.3d 136 (2d Cir. 2012)...................................................................... 33

*United States v. Crawley*,
    533 F.3d 349 (5th Cir. 2008) .................................................................... 43

*United States v. Donaghy*,
    570 F. Supp. 2d 411 (E.D.N.Y. 2008) .................................................... 48

*United States v. Garcia*,
    459 F. App'x 68 (2d Cir. 2012) ................................................................ 32

*United States v. Giancola,*
  754 F.2d 898 (11th Cir. 1985) ................................................ 51

*United States v. Gupta,*
  No. 11 Cr. 907 (JSR), 2012 WL 5246919 (S.D.N.Y. Oct. 24, 2012) ................................ 36, 38

*United States v. Gupta,*
  No. 11 Cr. 907 (JSR), 2013 WL 662954 (S.D.N.Y. Feb. 25, 2013) ........................................ 42

*United States v. Handy,*
  753 F.2d 1487 (9th Cir. 1985) ................................................ 51

*United States v. Handy,*
  761 F.2d 1279 (9th Cir. 1985) ................................................ 51

*United States v. Hucks,*
  No. 11 Cr. 326, 2013 WL 654397 (E.D. Pa. Feb. 20, 2013) .................................................. 48

*United States v. Kuruzovich,*
  No. 09 Cr. 824 (DC), 2012 WL 1319805 (S.D.N.Y. Apr. 13, 2012) .......................... 36, 37, 38

*United States v. Levis,*
  No. 08 Cr. 181 (TPG), 2011 WL 497958 (S.D.N.Y. Feb. 10, 2011) ........................................ 41

*United States v. Libera,*
  989 F.2d 596 (2d Cir. 1993) ................................................ 54

*United States v. Madden,*
  No. 09 Cr. 799 (RWS), 2011 WL 4359933 (S.D.N.Y. Sept. 19, 2011) ................................ 35

*United States v. Miller,*
  753 F.2d 19 (3d Cir. 1985) ................................................ 51

*United States v. Milstein,*
  481 F.3d 132 (2d Cir. 2007) ................................................ 47

*United States v. Paul,*
  634 F.3d 668 (2d Cir. 2011) ................................................ 37, 38

*United States v. Peltz,*
  433 F.2d 48 (2d Cir. 1970) ................................................ 55

*United States v. Rajaratnam,*
  802 F. Supp. 2d 491 (S.D.N.Y. 2011) ................................................ 52, 53

*United States v. Randell,*
  761 F.2d 122 (2d Cir. 1985) ................................................ 50, 51

*United States v. Sachakov*,
    No. 11 Cr. 120 (JBW), 2013 WL 101287 (E.D.N.Y. Jan. 8, 2013)..........................................32

*United States v. Sapoznik*,
    161 F.3d 1117 (7th Cir. 1998) ...............................................................................................44

*United States v. Schwartz*,
    No. 06 Cr. 2 (JBA), 2006 WL 1662899 (D. Conn. May 25, 2006) .........................................42

*United States v. Simmonds*,
    235 F.3d 826 (3d Cir. 2000).....................................................................................................49

*United States v. Skowron*,
    839 F. Supp. 2d 740 (S.D.N.Y. 2012).......................................................................39, 40, 44, 47

*United States v. Torres*,
    703 F.3d 194 (2d Cir. 2012).....................................................................................................34

*United States v. Weitzman*,
    No. 09 Cr. 989 (LTS), 2010 WL 3912735 (S.D.N.Y. Sep. 15, 2010) ......................................41

*United States v. Whitman*,
    No. 12 Cr. 125, 2012 WL 5505080 (S.D.N.Y. Nov. 14, 2012) ...................................52, 53, 55

*United States v. Zangari*,
    677 F.3d 86 (2d Cir. 2012).......................................................................................................45

*Webster v. Moquin*,
    175 F. Supp. 2d 315 (D. Conn. 2001) ......................................................................................46

## STATUTES

15 U.S.C. § 1117(a) (1)-(2).................................................................................................48

15 U.S.C. § 78ff(a)...............................................................................................................54

18 U.S.C. § 1346..................................................................................................................44

18 U.S.C. § 3143(b) .............................................................................................................50

18 U.S.C. § 3553.........................................................................................................27, 28, 31

18 U.S.C. § 3572.........................................................................................................34, 35

18 U.S.C. § 3663A...................................................................................................... passim

# OTHER AUTHORITIES

Appellee Brief, *SEC v. Obus*,
  No. 10-4749 (2d Cir. June 28, 2011) ..................................................................... 54

Order, *United States v. Contorinis*,
  No. 09 Cr. 1083 (RJS) (S.D.N.Y. Jan. 7, 2013) ........................................................ 33

Order, *United States v. Scolaro*,
  No. 11 Cr. 429 (WHP) (S.D.N.Y. May 18, 2011) ................................................... 41

Richard A. Frase, *A More Perfect System: Twenty-five Years of Guidelines Sentencing Reform
  (Punishment Purposes)*, 58 Stan. L. Rev. 67 (Oct. 2005) ....................................... 28

SEC Brief, *SEC v. Obus*,
  No. 10-4749 (2d Cir. Mar. 29, 2011) ..................................................................... 54

Sentencing Transcript, *United States v. Contorinis*,
  No. 09 Cr. 1083 (RJS) (S.D.N.Y. Dec. 17, 2010) ................................................... 15

Sentencing Transcript, *United States v. Drimal*,
  No. 10 Cr. 56 (RJS) (S.D.N.Y. Aug. 31, 2011) ................................................ 31, 35

Sentencing Transcript, *United States v. Emanuel Goffer*,
  No. 10 Cr. 56 (RJS) (S.D.N.Y. Oct. 7, 2011) ......................................................... 35

Sentencing Transcript, *United States v. Gupta*,
  No. 11 Cr. 907 (JSR) (S.D.N.Y. Oct. 24, 2012) ..................................................... 28

Sentencing Transcript, *United States v. Kimelman*,
  No. 10 Cr. 56 (RJS) (S.D.N.Y. Oct. 12, 2011) ....................................................... 35

Sentencing Transcript, *United States v. Kurland*,
  No. 10 Cr. 69 (VM) (S.D.N.Y. May 21, 2010) ........................................................ 35

Sentencing Transcript, *United States v. Whitman*,
  No. 12 Cr. 125 (JSR) (S.D.N.Y. Jan. 24, 2013) ...................................................... 30

U.S. Sentencing Guidelines Manual ....................................................... 1, 14, 34

United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing* (2004) ...... 28, 29

Defendant Todd Newman respectfully submits this Sentencing Memorandum for the Court's consideration in connection with his sentencing, scheduled for May 2, 2013.

## I.    PRELIMINARY STATEMENT

On December 17, 2012, following a five week trial, Mr. Newman was convicted of one count of conspiracy to commit securities fraud and four counts of securities fraud.  Count One alleged that Mr. Newman, Anthony Chiasson, Jon Horvath, and others conspired to trade in the securities of various technology companies on the basis of material, nonpublic information from late 2007 until 2009.  (*See* Superseding Indictment ¶¶ 1-31, *United States v. Newman, et al.*, No. 12 Cr. 121 (RJS) (S.D.N.Y. Aug. 28, 2012) ("Superseding Indictment").)  Counts Two through Four, based on the same factual allegations underlying the conspiracy charged in Count One, alleged that Mr. Newman executed securities transactions in Dell, Inc. ("Dell") based in whole or in part on material, nonpublic information.  (*Id.* ¶¶ 32-33.)  Count Five, also based on the same factual allegations underlying the conspiracy charged in Count One, alleged that Mr. Newman executed securities transactions in Nvidia Corporation ("Nvidia") based in whole or in part on material, nonpublic information.  (*Id.*)

On March 21, 2013, the United States Probation Office provided its draft Presentencing Investigation Report ("Draft PSR") to the parties.  In the Draft PSR, the Probation Office calculated that Mr. Newman's total adjusted offense level is 26, with a Criminal History Category of I, (Draft PSR ¶¶ 44-56), which results in an advisory Sentencing Guidelines range of 63 to 78 months.  U.S. Sentencing Guidelines Manual ch. 5, pt. A.  Mr. Newman agrees with the Probation Office's Guidelines calculation.  For the following reasons, however, Mr. Newman respectfully requests that the Court impose a sentence that is significantly below the Guidelines range.

- Mr. Newman's role in the offense distinguishes him from other insider trading defendants sentenced before this Court and others in this District. The evidence at trial made clear that the relationships through which the inside information was transmitted to Mr. Newman were established and husbanded by Mr. Newman's analyst, Jesse Tortora. Mr. Tortora brought them with him when he joined Diamondback Capital Management, LLC ("Diamondback"), and took them with him when he left. Mr. Newman, meanwhile, was a successful portfolio manager before Mr. Tortora came to Diamondback and continued to be successful apart from the information Mr. Tortora provided. When Mr. Tortora left Diamondback, Mr. Newman did not seek out Mr. Tortora's sources of information; indeed, the conduct about which the government put on evidence at trial ended in 2009, at least a year prior to the FBI's search of Diamondback in late November 2010 that precipitated Mr. Newman's termination. In sum, while the jury found that Mr. Newman traded, and conspired to trade, on inside information, Mr. Newman was not the moving force for this offense.

- While our gain calculation and the government's gain calculation vary slightly, both parties agree that Mr. Newman's at-issue trading generated roughly $4 million in profits for the Diamondback fund for which Mr. Newman was a portfolio manager. Mr. Newman's Guidelines range is calculated on this basis. Mr. Newman, however, personally received only approximately 12% of that figure, yet the Guidelines treat him exactly the same as someone who received 100% of the gains. We submit that this is a relevant consideration for the Court. In this case, the gain amount represents roughly 70% of the "points" (18/26) on which the Guidelines are predicated. To the extent that the gain is intended to be a measure of culpability – often thought of as a measure of "greed" – it stands to reason that someone who actually receives less money should be deemed less culpable than someone who receives more. In addition, from the perspective of general deterrence, it makes sense that a lesser sentence is more likely to be sufficient to deter a crime that generates a lesser number of dollars to the perpetrator.

- With respect to general deterrence more broadly, we submit that a sentence below the Guidelines is sufficient to meet that particular end of sentencing. We are not aware of evidence supporting the proposition that in white collar cases a sentence of two years, for example, has less of a deterrent effect than a sentence of five years. Judge Rakoff has noted that the literature suggests the opposite – that sentence severity is not a significant factor in deterrence, although the certainty of receiving punishment for the commission of an offense is. Mr. Newman's case is one in a very long (and continuing) line of insider trading cases in this District, and any punishment to him will be another indication of the relative certainty of punishment for insider traders. Nothing suggests that a sentence within the Guidelines range as opposed to one below it will enhance that deterrent impact.

- We certainly do not dispute the seriousness of the crime of insider trading. A sentence below the Guidelines range, however, will not undermine the message that this crime is serious or otherwise decrease respect for the law. This Court

and others, when considering the question of respect for the law, have pointed to factors such as obstruction of justice or perjury in determining whether a defendant has shown particular disdain for the law. Those factors are not present here. Moreover, other courts, most recently Judge Rakoff in *United States v. Whitman*, have given insider trading defendants in analogous circumstances jail terms significantly below the one contemplated by the Guidelines here (and below the Guidelines range in their own cases) while presumably satisfying themselves that they were upholding a respect for the law. Finally, in considering a just punishment, courts have accounted for the collateral consequences – such as destruction of reputation and SEC sanctions – in determining what jail term, in addition to those other penalties, would be sufficient. Mr. Newman has suffered and will suffer considerable collateral consequences, and we urge the Court to take that into account in determining the length of any prison term.

- As this Court and many others have recognized, in imposing a sentence the Court is doing so not on a crime but on an individual human being. The Court, then, must necessarily ask itself who is Todd Newman? Mr. Newman is a kind, decent and gracious man who practices the quiet virtues in his domestic and community lives. He is a rock of stability and support for his extended family, and a particularly doting and involved father of his 12-year-old daughter. Mr. Newman is not a high-liver, a wastrel, or a spendthrift. His life is not dominated by or focused on money. He spends his time quietly with his family, and is recognized in his neighborhood and community as a Pied Piper who organizes games for neighborhood kids and coaches his daughter's sports teams. He is the same reserved and dignified person whom his counsel has come to know and whom the Court observed during his trial. Mr. Newman's good character and good works are not flashy, but they are earnest and decent. Mr. Newman practices the quiet virtues, which may frequently be overlooked but should not be ignored at this most important time in judging him as an individual. In sentencing Mr. Newman, we submit that the Court, in taking Mr. Newman's character – and the full scope of his life – into account, should find that Mr. Newman warrants a below Guidelines sentence.

In sum, we submit that a sentence significantly below the applicable Guidelines range would be sufficient, but not greater than necessary, to promote the various ends of sentencing.

**II.    WE REQUEST THAT THE COURT SENTENCE MR. NEWMAN TO A SENTENCE SIGNIFICANTLY BELOW THE GUIDELINES RANGE, WHICH WOULD BE SUFFICIENT BUT NOT GREATER THAN NECESSARY TO MEET THE ENDS OF SENTENCING**

**A.    THE OFFENSE**

**1.    <u>Background</u>**

Todd Newman joined Diamondback as a portfolio manager on March 1, 2006. (Government Exhibit ("GX") 2257.) Mr. Newman was suspended from Diamondback in late November 2010 following the FBI's heavily publicized searches of Diamondback's offices. Mr. Newman resigned from Diamondback effective January 28, 2011.

While at Diamondback, Mr. Newman focused almost exclusively on trading technology stocks. Initially, he was allocated $50 million to trade by Diamondback. Mr. Newman's allocation increased over time and ultimately reached approximately $125 million. As a general matter, Mr. Newman was compensated based on the performance of the portfolio he managed. Of the 30% performance fee charged by Diamondback, Mr. Newman received 2/3rd to pay himself and his team (the remaining 1/3rd was retained by Diamondback, which also retained the entirety of the 2% management fee).

**2.    <u>Hiring Jesse Tortora</u>**

Like other Diamondback portfolio managers, Mr. Newman employed a small team to help him analyze stocks – particularly important given the number of stocks he followed and traded on a daily basis – and execute trades.

On September 4, 2007, Jesse Tortora joined Mr. Newman's team. (Trial Transcript ("Tr.") 136:5-6.) Mr. Tortora had previously been a senior analyst at Prudential Equity Group, LLC ("Prudential Equity"), researching and publishing reports about computer

hardware companies like Dell.  (Tr. 122:12-123:13, 128:2-3.)  Mr. Tortora's background

suggested he would be a good analyst and useful team member at Diamondback.  Mr. Tortora

was needed to assist Mr. Newman in following and researching a portion of the more than 300

companies that Mr. Newman regularly traded.  (*See* Tr. 1112:18-1113:13; Defense Exhibit

("DX") 1.)  Hiring Mr. Tortora allowed Mr. Newman to follow more companies in greater depth

and ultimately deploy the funds allocated to him more effectively.

           The evidence at trial, so far as it concerned Mr. Newman, consisted exclusively of

conduct that occurred after Mr. Tortora joined Diamondback.  Similarly, the conduct at issue at

trial ceased once Mr. Tortora left Diamondback in April 2010.  The improper information that

formed the basis of the charges against Mr. Newman was exclusively information that was

gathered by Mr. Tortora and passed to Mr. Newman.  Mr. Tortora's information came from

friends that he had known prior to joining Diamondback (and in certain instances, who were

providing improper information to Mr. Tortora before he went to Diamondback)[1] or were

sources that Mr. Tortora himself developed while at Diamondback.[2]  Mr. Tortora played a

---

[1]  According to Mr. Tortora, his sources of information included (a) Sam Adondakis, whom Mr. Tortora befriended at Prudential Equity (Tr. 123:21-24); (b) Lacey Higgins, who worked at Morgan Stanley and who had previously worked with Mr. Tortora at Prudential Equity (Tr. 1134:17-20); Higgins provided information about Intel Corporation ("Intel") to Mr. Tortora and Mr. Adondakis prior to Mr. Tortora joining Diamondback (Tr. 125:13-126:20, 1666:3-15); (c) Ron Dennis, who worked at CR Intrinsic, and who had previously worked at Waddell & Reed where he was Mr. Tortora's client while Mr. Tortora was at Prudential Equity (Tr. 280:20-281:15, 1133:25-1134:4); (d) Sandy Goyal, who worked for Mr. Tortora at Prudential Equity (Tr. 128:2-7); and (e) Jon Horvath, whom Mr. Tortora knew prior to joining Diamondback (Tr. 192:16-23, 1133:15-19).

[2]  In late 2007 after joining Diamondback, Mr. Tortora contacted Danny Kuo, who was at that time a research analyst at Bear Stearns, because Mr. Tortora thought that Mr. Kuo had good information based on reports that Mr. Kuo published for Bear Stearns's clients.  (Tr. 447:23-448:13.)  Mr. Tortora reached out to Mr. Kuo on his own – there was no evidence at trial that Mr. Newman asked him to do so – and Mr. Tortora and Mr. Kuo formed a friendship that was wholly independent of Mr. Newman.  Mr. Tortora then brought Mr. Kuo into the group of analysts that included Mr. Adondakis and others.  (Tr. 520:20-521:12.)  Mr. Kuo ultimately became a source

leading role in a group of research analysts who shared information, both legitimate and illegitimate according to both Mr. Tortora and Sam Adondakis, among themselves. These analysts were friends with one another, and several of them socialized regularly. (Tr. 520:20-521:12.) The analysts also shared collectively-gathered information with their respective portfolio managers. (Tr. 139:6-9.) The portfolio managers – Mr. Newman included – were not at the center of the group and did not participate in the group's establishment. None of the bosses knew each other or had any communication with one another or other members of the group except for the analyst that worked for them.

When Mr. Tortora left Diamondback in April 2010, he continued to communicate with many of the same individuals with whom he shared information that was deemed improper, including Messrs. Adondakis, Horvath, and Kuo. (Tr. 1134:23-1135:1.) Mr. Tortora and his group continued to share the same type of information that Mr. Tortora had previously forwarded to Mr. Newman. (Tr. 1135:2-4, 1137:7-16, 1139:4-8.) Mr. Newman, however, never had any communication with any of these individuals, directly or indirectly, following Mr. Tortora's departure from Diamondback. In sum, Mr. Tortora brought relationships to Diamondback and left Diamondback with those relationships. They were not Mr. Newman's relationships, and there was no evidence at trial that he had any direct communication with any involved person other than Mr. Tortora, or that he sought out any of Mr. Tortora's sources of information after Mr. Tortora left Diamondback. Indeed, there was no evidence at trial that Mr. Newman engaged in improper conduct between Mr. Tortora's departure in April 2010 and the searches in late November 2010 after which Mr. Newman was suspended.

---

for Mr. Tortora on Nvidia. (Tr. 480:7-15.) Mr. Tortora also decided to hire the firm Primary Global Research ("PGR") as a consultant – albeit approved by Mr. Newman – and he and Mr. Adondakis regularly spoke with individuals engaged by PGR who worked for public companies. (*See, e.g.*, Tr. 262:16-19, 269:21-22.)

### 3. <u>Putting the Trades at Issue into Context</u>

Mr. Newman was a highly successful portfolio manager – and was known as such within Diamondback – irrespective of the Dell and Nvidia trades at issue.  For the 10 months of 2006 that Mr. Newman was at Diamondback, he earned trading profits for Diamondback's investors of approximately $20 million.  (DX 4.)  For 2007, he earned approximately $36 million for investors (approximately $25 million of which was earned prior to the employment of Jesse Tortora).  (*Id.*)  For 2008, he earned approximately $31 million for investors.  (*Id.*)  For 2009, he earned approximately $24 million for investors.  (*Id.*)  As noted, Mr. Newman was suspended from Diamondback in 2010.

Focusing just on the conspiracy period – September 2007 through December 2009 – the profits on Mr. Newman's trading totaled approximately $80 million, so that the roughly $4 million in Dell and Nvidia profits at issue were only approximately 5% of the profits Mr. Newman generated.  (DX 4; DX 9; DX 24.)  That percentage shrinks considerably when the period is expanded to include the entirety of Mr. Newman's tenure at Diamondback from 2006 through 2010.  (*Id.*)

To further place the trades at issue in context, Mr. Newman traded hundreds of stocks each year (DX 1), and dozens each day (DX 2).  The trades on which the charges and trial focused accounted for only a very small percentage of the trades he made both in the periods directly at issue and overall.  Mr. Newman was a high-volume trader, who regularly held and traded dozens of stocks each day and generally held positions (with some exceptions) for only brief periods of time.  (Tr. 216:20-24.)  Mr. Newman traded securities of over 300 different companies in a given year.  (Tr. 3516:17-22; DX 1; DX 8529.)  While the government has argued (or suggested) that various other stocks were the subject of the conspiracy of which Mr.

Newman was found by the jury to be a member,[3] the government did not argue during trial or

allege in its bills of Particular or the Superseding Indictment that Mr. Newman's trading in those

stocks, or any other stocks beyond certain periods in Dell and Nvidia, was on the basis of inside

information.

      In sum, Mr. Newman was successful prior to Mr. Tortora's arrival at the firm and

continued to be successful afterwards even aside from the trading at issue.  Mr. Newman's

compensation was similar both before Mr. Tortora arrived at Diamondback and during Mr.

Tortora's tenure.  As detailed below, Mr. Newman did not live the kind of lifestyle that required

large additional amounts of cash.  In other words, while the government may argue to the

contrary, there is no evidence that greed or a desire for a more luxurious lifestyle played any role

in the conduct at issue.

### 4.     Mr. Newman Received Only a Small Portion of the Profit on the Trades at Issue

      As we explain in greater detail below, using our methodology to calculate trading

gains, Mr. Newman's at-issue trading generated $3,688,623.89 in profits.  Mr. Newman himself,

however, was paid only a small portion of those profits, and it is possible to demonstrate with

precision what that portion was.

      Like most hedge funds, Diamondback charged a management fee – 2% of assets

under management – and a performance fee – 30% of profits.  Mr. Newman received none of the

management fee.  Of the 30% performance fee, Diamondback retained $1/3^{rd}$ and the remaining

$2/3^{rd}$ (or 20% of the total profits) went to Mr. Newman to distribute to himself and his team.

---

[3]  At trial, the government introduced evidence about information in only four stocks in addition
to Dell and Nvidia – Altera Corporation (Tr. 448:14-459:19), Intel (Tr. 417:10-422:15, 426:11-
434:15), Advanced Micro Devices, Inc. (Tr. 443:5-445:19), and Texas Instruments, Inc. (Tr.
434:16-440:8) – and did not substantively discuss any of those stocks in its summation.

Below is a chart that lays out the portion of the profits on the trading at issue that Mr. Newman theoretically was paid, which totals $442,761.14.[4]

|  | Total Profits[5] | Diamondback Payout Amount (30%) | Mr. Newman Payout Amount (20%) | Mr. Newman Compensation Amount[6] |
|---|---|---|---|---|
| 2008 | $3,615,095.50 | $1,084,528.65 | $723,019.10 | $432,488.34 |
| 2009 | $73,528.39 | $22,058.52 | $14,705.68 | $10,272.80 |
| Total | $3,688,623.89 | $1,106,587.17 | $737,724.78 | $442,761.14 |

While we do not dispute that, for Guidelines purposes, the amount gained through Mr. Newman's trading is the technically correct "gain" measure, it is significant that Mr. Newman's Guidelines range is the same as that of another individual who put in his pocket the entirety of the $3,688,623.89, as opposed to $442,761.14,[7] or around 12% of that figure. Put

[4] There is no allegation or evidence that Mr. Newman traded in a personal account or any account other than for Diamondback.

[5] As we explain below, *see infra* Section II.B.1, we have calculated profits by assuming that all shares were sold within one day following the earnings announcement for that particular stock and quarter. There was a profit of $987,703 for the Dell May 2008 announcement and $2,627,392.50, including options trading, for the Dell August 2008 announcement. There is no change to the Nvidia profit calculations as that position was closed within one day of the Nvidia May 2009 announcement. The total difference in profits between our figures and the government's is $390,719.

[6] "Mr. Newman Compensation Amount" is equal to the product of "Mr. Newman Payout Amount" (20% of the Total Profits) and Mr. Newman's compensation share (the amount Todd personally took out of the compensation for which he had distribution authority). In 2008, this share was 59.817%; in 2009, it was 69.856%.

[7] If the government's total gain number of $4,079,342.89 is used instead of our slightly lower total gain number, the portion that would have flowed to Todd is slightly higher at $489,504.41.

differently, were Mr. Newman's Guidelines range calculated based on what he actually received, his total offense level would be reduced from 26 to 22, and his Guidelines range from 63/78 months to 41/51 months. While the government may argue that he "benefited" from these trades in addition to his compensation by enhancing his reputation or in some other abstract way, Mr. Newman would have had a very successful year in 2008 without the Dell trades, and the Nvidia trade did not help his profitability to a meaningful degree in 2009.

### 5.    <u>Mr. Newman's Role in the Offense</u>

We think it is important to consider Mr. Newman's role in the offense in fashioning a sentence. With respect to Dell, Mr. Newman was three steps removed from the source of the information (the chain went: Rob Ray-Sandy Goyal-Jesse Tortora-Todd Newman). With respect to Nvidia, he was four steps removed (the chain went: Chris Choi-Hyung Lim-Danny Kuo-Jesse Tortora-Todd Newman). In neither case did Mr. Newman have any contact with the source or even know his name. While the jury found that Mr. Newman knew that the insider breached a duty to his respective company in providing information, the breach of the duty was committed by the insider, not by Mr. Newman.

The Sentencing Guidelines, however, take no account of Mr. Newman's distance from the breach; the fact that he was not involved in inducing or soliciting the breach; the fact that there was no monetary benefit given to the insiders; or the fact that Mr. Newman had no knowledge of any benefit, monetary or otherwise, that went to the insiders in exchange for the information at issue. Under the Guidelines, Mr. Newman is treated the same way he would have been had he interacted with and induced the breach himself, and had he paid the insider for the information. His role, however, was very different, and that difference should be taken into account in fashioning a sentence.

In response, the government will undoubtedly argue that the evidence at trial demonstrated that Mr. Newman was at all times fully aware of, and helped orchestrate, the payments to Ruchi Goyal.  Based on our review of the Draft PSR, the government will also likely argue that the evidence established that Mr. Newman conceived of the idea to pay Mr. Goyal a bonus as a reward for the inside information that he provided to Mr. Tortora in 2008. The trial record, however, does not support those conclusions.

The evidence at trial makes clear that the arrangement to pay Ruchi Goyal was conceived of by Mr. Tortora and Mr. Goyal in September or October 2007.[8]  (Tr. 384:22-25 (Mr. Tortora testified, "I don't recall who came up with the idea, but I believe it came up in a discussion with Sandy and I"), 1425:2-5 (Mr. Goyal testified that "Jesse did" when responding to the government's question about who conceived of the idea of paying him through Diamondback).)  That was before Mr. Goyal had received (or believed he would receive) inside information from Rob Ray.  (Tr. 1521:1-3, 1523:2-12.)  In other words, when Mr. Tortora and Mr. Goyal first agreed to this arrangement, it was not for inside information but rather for Mr. Goyal giving assistance to Mr. Tortora on Dell and other stocks.  Mr. Goyal testified that in fact he provided legitimate assistance to Mr. Tortora, including information from Mr. Goyal's legitimate contacts at Dell as well as modeling and other services. (Tr. 1523:2-1524:4, 1526:1-1539:6.)

Mr. Tortora also testified that he told Mr. Newman about the arrangement to pay Mr. Goyal through Ruchi Goyal immediately after he and Mr. Goyal had conceived of the idea

---

[8] Mr. Tortora and Mr. Goyal did not testify that the reason that they arranged for payments to Ruchi Goyal, rather than to Sandy Goyal directly, was because Mr. Tortora (or Mr. Newman) wanted to conceal Mr. Goyal's identity or the fact that he was working as a consultant for Diamondback.  Rather, Mr. Goyal wanted to conceal the fact that he was being paid by a second entity because of his immigration status.  (Tr. 1425:6-18.)

(again, at a time when Mr. Goyal was not receiving information from Rob Ray).  (Tr. 385:1-8.)

However, the jury was not asked to determine whether or not Mr. Newman knew the nature of

the payments to Ruchi Goyal, and we submit that trial exhibits demonstrated that Mr. Newman

was unaware that Ruchi Goyal was not in fact a consultant or that she was a "front" for the

information coming from Mr. Goyal, even after Mr. Tortora says he was receiving information

from Rob Ray through Mr. Goyal.  (*See* GX 123, dated December 12, 2007 ("Let's discuss as

think we payong [sic] souza too much unless im missing something.  Want to sully [sic]

understand kc and ruchi info we getting"); *see also* Tr. 390:5-21 (Mr. Tortora testifying he did

not recall ever having a follow-up conversation with Mr. Newman regarding the email in GX

123).)[9]

   While Mr. Newman did approve the payments to Ruchi Goyal, those payments

were reviewed and approved by Diamondback's compliance department, as was the $100,000

bonus approved in December 2008 and paid in January 2009.  (Tr. 1320:7-14, 1324:8-1325:11,

GX 775; GX 776; GX 780; GX 780A; GX 781; GX 781A; GX 2269; GX 2270.)  With respect to

the bonus, while the documentary evidence shows that Mr. Newman thought he was approving a

bonus, both Mr. Goyal, (Tr. 1431:7-1432:12), and Mr. Tortora, (Tr. 404:3-17), indicated that the

$100,000 payment was partially a bonus for work performed (whether inside information or

otherwise) in 2008, as well as an advance on work Mr. Goyal was going to do in 2009.  Neither

Mr. Goyal nor Mr. Tortora testified that the $100,000 bonus was tied to Mr. Newman making

---

[9] Additionally, while the government attempted to make much of this point during trial, the
absence of written research from Ruchi Goyal was in no way suspicious.  Indeed, Mr. Tortora
openly discussed with Diamondback's compliance department that consultants – including Ruchi
Goyal – provided their information orally, (*see* GX 135 ("Our consulting services are generally
verbal, and not written.")), and Diamondback's chief compliance officer, Mark Hadlock, testified
that there was no policy that required consultants to provide written research, (*see* Tr. 1332:24-
1333:8).

profits in Dell trading in August 2008 (as indicated in the Draft PSR ¶ 23); and Mr. Tortora did

not testify that Mr. Newman "proposed" the concept of giving Mr. Goyal a bonus – in fact, the

idea for a bonus/advance was conceived by Mr. Tortora and Mr. Goyal.  (Tr. 403:12-404:17,

1431:7-1432:12.)

      **B.**      **SENTENCING GUIDELINES**

           **1.**      **Gain Calculation**

At trial, the government's overall gain calculation was as follows: $1,073,912

(May 2008 Dell) + $2,800,068.50 (August 2008 Dell) + $73,528.39 (April/May 2009 Nvidia) =

$3,947,508.89.  Additionally, although the government did not present evidence connecting Mr.

Newman's August 2008 Dell options position to the inside information received during that time

period, it is our understanding that the government has since calculated that Mr. Newman made

$131,834 in profits related to that options position, making the total overall gain $4,079,342.89.

We believe the government's overall figure to be slightly high, however, because

it includes trading gains realized on positions in Dell held more than 24 hours after the quarterly

public announcement of the information at issue (May 29, 2008 and August 28, 2008,

respectively).  The government's figures therefore include market movements based on factors

unrelated to the announcements of the information at issue.  *See SEC v. Patel*, 61 F.3d 137, 138-

40 (2d Cir. 1995) (affirming calculation of insider trading gains based on closing price of

company stock the day following public announcement); *SEC v. Rajaratnam*, 822 F. Supp. 2d

432, 435 (S.D.N.Y. 2011) (noting that the government and defendant agreed that "a 24-hour

period after the dissemination of the inside information" was a "reasonable period"); *see also*

*SEC v. Razmilovic*, 822 F. Supp. 2d 234, 260 n.22 (E.D.N.Y. 2011) (ruling that the government

must demonstrate that "the defendant's ill-gotten gain is causally connected to the fraud").  Our

expert, Professor Gregg Jarrell, has done an alternative calculation which cuts off the trading

period as of the close of the market on the day following the quarterly announcements (May 30 and August 29, 2008, respectively).  (*See* attached as Exhibit A supporting data showing our trading profit calculation.)  Unrealized profits on any positions still held as of that time are calculated by using the market-closing price.  We believe this to be the appropriate measure of gain, as it excludes profits that may have resulted from market or Dell-specific factors unrelated to the information at issue.  Using this alternative methodology, Professor Jarrell has calculated that the profit for the May period was $987,703, and the profit for the August period, excluding options trading, was $2,495,558.50.

Our overall gain calculation, which results in a slightly lower figure than the government's, is as follows: $987,703.00 (May 2008 Dell) + $2,495,558.50 (August 2008 Dell) + $131,834 (August 2008 Dell options) + $73,528.39 (April/May 2009 Nvidia) = $3,688,623.89. This overall figure is $390,719 lower than the government's figure of $4,079,342.89.  As noted above, our alternative figure does not alter the Guidelines analysis.

## 2.   <u>Guidelines Calculation</u>

We believe the Guidelines calculation is straightforward, as follows:

| | |
|---|---|
| §2B1.4 (insider trading): | 8 |
| §2B1.1(J) (gain > $2,500,000 < $7,000,000): | <u>+18</u> |
| Total Offense Level: | 26 |

At Criminal History Category I, level 26 translates into a Guidelines range of 63 to 78 months. U.S. Sentencing Guidelines Manual ch. 5, pt. A.

Based on the various other factors relevant to sentencing under Section 3553, however, we believe that Mr. Newman should receive a below-Guidelines sentence.

### C.     MR. NEWMAN'S BACKGROUND AND CHARACTER

One of the most important sentencing factors that the Court must consider – indeed the starting point – is Mr. Newman's history and characteristics.  As the Court said in sentencing another defendant found guilty of insider trading after trial:

> Those factors include, as we have discussed in great detail, the facts and circumstances of the life of the individual.  I am imposing a sentence on an individual who is unique, with a unique combination of experiences, decisions, just accidents of life, of good judgments, bad judgments, a lifetime worth of judgments.  And so naturally that is the starting point for any sentence.

Sentencing Transcript at 52, *United States v. Contorinis*, No. 09 Cr. 1083 (RJS) (S.D.N.Y. Dec. 17, 2010).  Judge Rakoff similarly stated, in a 2006 sentencing of a white collar defendant:

> [I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.  This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, the history and characteristics of the defendant.

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) (internal quotations omitted).

As detailed below, a review of Mr. Newman's character – amply supported through the many letters to the Court on his behalf – demonstrates that Mr. Newman is a fundamentally kind, generous, and decent human being.  He is a modest, quiet, and dignified man, who lives a modest, quiet, and dignified life.  He is intensely focused on his immediate and extended family, and is universally regarded by them as a rock of support and guidance.  In particular, his relationship with his daughter is a wonderful example of good and robust parenting – sadly, any jail sentence this Court may impose will have a profound effect on her as it will on other members of Mr. Newman's family.  Mr. Newman's good and generous character extends to his community, where he is a fixture at sporting and other events, including as a coach

for his daughter's teams, and where he exemplifies a warm, supportive, and patient mentor both to his daughter and to many other children in his community.

Simply put, when beginning to think about fashioning an appropriate sentence for Mr. Newman, we hope and trust that the Court will examine his character and find that it weighs heavily in Mr. Newman's favor.

### 1.     Mr. Newman's Early Background

Mr. Newman grew up in an average, middle-class, intact and loving household. He was born in Minneapolis and then moved to various places for his father's job before the family settled in Wilton, Connecticut when Mr. Newman was six years old. From then until he graduated from public high school in Wilton, he lived in comfortable but not lavish circumstances with his parents and two older siblings. Mr. Newman's father, Thomas Newman, was a sales manager for Mobil Oil for 32 years before managing an oil distribution company in New Hampshire. Thomas Newman died of brain cancer in 2004 at 69 years old, a severe blow to Mr. Newman and his family. Mr. Newman's mother, Irene ███████, was a homemaker. At the moment, she resides with Mr. Newman's sister and brother-in-law in Wilton following the sale of the family home. Mrs. Newman, 79, is in average health for her age.

### 2.     Mr. Newman's Secondary Education and Work History

After high school, Mr. Newman went to Skidmore College where he majored in accounting. Both in high school and college, Mr. Newman was heavily involved in sports. In high school, he was the third baseman on the varsity baseball team and the captain of the ski team, where he came in second in the state his senior year. In college, Mr. Newman played baseball all four years and was captain for the last two.

On graduation from Skidmore in 1986, Mr. Newman worked at two small accounting firms before attending an MBA program at Babson College, where he graduated in

1991.  As his sister writes in her letter,[10] Mr. Newman worked very hard to succeed, and he went to business school because he did not believe he had the credentials to get a job in the financial industry without additional schooling.  (*See* Letter from Kelly N. ███, Exhibit N.) Unfortunately, the economy was unsteady when Mr. Newman graduated, and he had a difficult time finding a full-time financial industry position, so he worked in temporary accounting jobs from 1991 to 1992 while he looked for something suitable.  From 1992 to 1993, he worked full-time as an accountant at Fleet Bank in Nashua, New Hampshire.

Mr. Newman's financial industry career began in earnest in 1993 when he took a job as a research analyst focusing on technology companies at Freedom Capital Management, a small money management firm in Boston.  In 1996, after working at Freedom for three years, Mr. Newman moved to New York City to take a job at Merrill Lynch as a research associate focusing on technology companies in the contract manufacturing sector.  Mr. Newman worked at Merrill Lynch for three years before moving back to Boston to begin an analyst job at a small start-up hedge fund called Sirios Capital.  While Mr. Newman continued to cover technology companies at Sirios, he also was responsible for covering insurance companies.  Mr. Newman worked at Sirios for approximately 2 1/2 years, the last 1 1/2 years of which he was asked to manage – that is, make investment decisions with respect to – a portion of Sirios's portfolio.  In 2002, he left Sirios and went to Tudor Capital Management, a larger investment manager also located in Boston, to work as a research analyst focusing on hardware, networking, software, and services companies.  Unlike at Sirios, Mr. Newman did not manage money at any time during his four-year tenure at Tudor.

---

[10] Attached as Exhibits B through II are the letters we have received in support of Mr. Newman.

In 2006, Mr. Newman was recruited to work at Diamondback as a portfolio manager.  He was 41 years old and, through extremely hard work and determination, had established a reputation as a superior technology analyst.  Diamondback gave Mr. Newman his first opportunity to manage a portfolio on his own.  His responsibility was to invest, primarily in the technology sector, a portion of the assets managed by Diamondback.  Mr. Newman was immediately successful, with good returns for Diamondback's investors from inception.  He continued as a Diamondback portfolio manager until the end of November 2010.  Following the execution of a search warrant by the FBI at Diamondback's offices on November 22, 2010, Mr. Newman was suspended by Diamondback.  He ultimately resigned on January 28, 2011.  Mr. Newman was arrested on January 18, 2012, approximately one year after he resigned.  Given the very public events that surrounded his suspension, termination, and arrest, Mr. Newman has not been able to work since he left Diamondback.  One of the tragedies of this case is that Mr. Newman is devoted to hard work, and – with his reputation destroyed – he has been unable to pursue his career for the last two-plus years.  Given that the SEC has also brought an action against Mr. Newman, it is highly likely that it will seek to bar him from the financial industry for life – even if an employer might want to hire him, doubtful as that may be under the circumstances, he would not be eligible for employment in the field in which he has flourished for most of his working life.  In other words, putting aside any other penalty, this case has already decimated an important part of Mr. Newman's life.

Throughout his career, Mr. Newman has been known by his friends and colleagues as an extremely hard and dedicated worker.  Mr. Newman was not handed a lucrative hedge fund position at a young age; rather, he worked tirelessly to rise in his profession to become a respected and successful portfolio manager.  After many years as a research analyst, he

reached his position at a more advanced age than many of his hedge fund peers.  As detailed in the following section, based on his success, Mr. Newman earned approximately $3.5 million in each of the three years 2007 to 2009.[11]  That was several times more than he had made in any prior position.

### 3.  Mr. Newman's Personal History

Mr. Newman married Jill ███████████ in 1993 while he was working in Boston. He and Jill have one child, who was born in 2000 and is now 12 years old.  Mr. Newman and Jill divorced in late 2011, although the decision to get divorced had been made many years before. It is an indication of just how close they are with their daughter that the three of them continue to live together in the same residence in Needham, Massachusetts.  They both believe that this unusual arrangement provides a stable environment for their daughter.  It is also an indication of the amicable nature of the relationship that Mr. Newman continues to share with Jill – their divorce was an instance of people growing apart, as opposed to anything traumatic occurring within the marriage.

That Jill still has positive feelings about Mr. Newman is amply illustrated in the letter she has written on his behalf:

> Todd and I have always led a simple, quiet life.  We spend all of our time with our daughter, our immediate families, and a very small inner circle of close friends. Todd has a loving relationship with his mother, brother and sister, and their respective families.  Todd is also still close with my immediate family.  Todd has had the same small group of friends for years.  In fact, many of Todd's closest friends he has had since early childhood.
>
> Todd does not drink, smoke, abuse prescription drugs, take illegal drugs, or gamble.  Todd rarely, if ever, swears.  Todd is respectful of people and does not speak ill of others.

---

[11] As explained below, *see infra* footnote 19, this does not include the approximately $2.2 million in deferred compensation that Mr. Newman earned across the years 2006 to 2008 that is currently a matter of dispute between Mr. Newman and Diamondback.

Neither Todd or I live in an extravagant house, or own a vacation home, belong to a country club, own a boat, wear expensive clothing or jewelry, or posses [sic] high-end furnishings or artwork.

Bi-annual family vacations have always been important for us to spend with [our daughter] and our parents and siblings.  In 12 years, [our daughter] has only been on an airplane on 3 occasions, and has never been out of the country.  Instead we chose to spend time with our immediate family in Connecticut and Pennsylvania, as well as ski in New England and vacation on the New Jersey shore.

We have devoted the last 12 years of our life to raising our daughter in a thoughtful and conservative manner.  Despite our divorce, we have continued to provide a loving home life for [our daughter].  We have done our best to spend quality time together, as the 3 of us, even after Todd and I decided to divorce, in addition to our individual time with her.  In fact, Todd is currently residing with [our daughter] and I in the original family home.  We have an atypical divorce in that both Todd and I still attend every basketball, lacrosse and soccer game, dance recital, school concert, parent-teacher conference, and holiday dinner with [our daughter].  Neither one of us could ever bear to exclude the other from partaking in any part of [our daughter's] life, even though our divorce agreement technically outlines a different kind of custody arrangement.  It may seem unusual to people that we behave in this manner, but it is what works for our daughter.

(*See* Letter from Jill A. ███████, Exhibit X.)  While perhaps not unprecedented, it is at least unusual for a divorced husband or wife to write so warmly about his or her former spouse.  That continued good feeling for Mr. Newman extends to Jill's family, as Jill indicates in her letter, and it bespeaks Mr. Newman's truly good character.  Jill's sister writes, "Todd and my sister have been and continue to be very supportive and generous to my family and me in times when I needed it.  Prior to my marrying my husband Tom, on two separate occasions when I was in between jobs, Todd had offered for me to live with he and my sister and support me until I could find another job.  I will be forever grateful for his support and generosity."  (*See* Letter from Kim ███████, Exhibit GG.)  Jill's parents describe Mr. Newman as "down-to-earth" and a "good person," descriptions that come up time and again in the letters, and they write:

Our granddaughter . . . is one of the most important things in our lives.  We cherish her and love her with all our hearts.  Even though Jill and Todd are divorced, they have worked very hard to provide [our granddaughter] with as normal a family life as possible.

> We are so proud of Jill and Todd in how they have handled themselves over the past several years, since their divorce, and what wonderful parents they are to our darling [granddaughter]. Todd is extremely close to his daughter and it is very apparent to us, that he loves her very, very much.

(*See* Letter from Bill ████████ and Joan ██████████, Exhibit II.)

A common theme to all the letters written on Mr. Newman's behalf is the extraordinary degree to which he is involved in his daughter's life. Jill writes, "[i]t is my strong belief that Todd's only source of joy and happiness is gained through time spent parenting our daughter. His love and commitment to her far surpasses that of a typical father-daughter relationship." (*See* Letter from Jill A. ████████, Exhibit X.) Indeed, the letters are heartbreaking in their description of what the loss of Mr. Newman in her life will mean to his daughter. Mr. Newman's mother writes that her granddaughter is "devoted to her dad and he, to her. They are a team and do everything together. It is a joy to watch. [She] is twelve years old and in her formative years and a separation from her dad would be disastrous for her. Todd has coached her sports teams and is the major participant in every phase of her life. As [she] recently said to me, 'my dad is the best thing in my life.' I might say the same." (*See* Letter from Irene ████████, Exhibit W.) Similarly, Mr. Newman's sister writes:

> Jill and Todd's divorce is not a typical situation. They have done everything physically imaginable to keep life the same for [their daughter]. But despite their wonderful parenting [their daughter] has become a more vulnerable child knowing her family structure is not the same. Todd, Jill and [C.N.][12] really still operate like a family that is not one of divorce; for [C.N.] to lose her father, to lose his presence in her life it would be devastating. Two lives would be ruined. Please try and imagine such a thing. [C.N.] being an only child, Todd is everything to her.

(Letter from Kelly N. ████, Exhibit N.)

---

[12] In accordance with Your Honor's Individual Practices for Sentencing Proceedings, we only include the initials of Mr. Newman's daughter, who is a minor.

A large part of Mr. Newman's relationship with his daughter centers around sports, which Mr. Newman excelled at and the love for which he has passed on to her.  Not only has he coached various of her sports teams, but he has taught her the fundamentals of many sports, in large part as a way to spend quality time with her.  It is also clear from the letters written by his friends, neighbors, and fellow community-members that Mr. Newman's mentoring has extended beyond his daughter to other children in his extended family, his neighborhood, and his daughter's school.  He gives freely of his time to engage in activities with his daughter and other children.  The letters are replete with praise for his interest in fostering good sportsmanship in children, something which he does in part through leading by example.  David ████, a fellow coach of their daughters' basketball team, writes:

> "The qualities that I saw in Todd [when we coached together] – kindness, patience, graciousness, and a genuine concern for the girls are the same qualities he has displayed every time I've seen him since. . . .  What impresses me most about Todd is his easy going manner and kindness.  Todd is the type of person who never has a bad thing to say about people, and always has a smile.  When we coached together, I was amazed at how positive Todd always was, and how he never changed his laid back, helpful manner right through the championship game."

(*See* Letter from David ████, Exhibit K.)  Mr. Newman's next-door neighbors, the ████████, similarly write about the positive influence that Mr. Newman has been in their lives and those of their children: "His gentle personality, smiling face and sincere genuine interest in the kids as individuals has caused all our children to hold him in high regard. . . .  Todd's small family has embraced our large one and our neighborly relationship has transformed into a strong friendship, fostered by Todd's engaging, active style.  Devoted describes Todd Newman well."  (*See* Letter from Nassib ████ and Maureen ████████, Exhibit F.)  Lisa ████, the parent of a friend of Mr. Newman's daughter, writes about how he cultivated a neighborhood network of friends for his daughter, particularly important for an only child: "Todd would spend hours

shooting hoops, playing football or taking the kids to the movie theater.  I believe this sense of

community helped make [his daughter] a stronger and more confident girl.  In turn, Todd created

an environment that was welcoming and nurturing for [a] neighbor boy" who Mr. Newman

included in his daughter's activities.  Ms. ████ sums up her assessment of Mr. Newman,

writing that "Todd has always shown great regard for all individuals and treats everyone with

respect and integrity.  Todd does not appear to differentiate between those who 'have' and those

who 'have not.'  I have always found Todd to be gracious and kind to other children and families

in the community."  (Letter from Lisa ████, Exhibit BB.)  And Mr. Newman's sister describes

these same characteristics when she writes, "[y]ou can drive by my brother Todd's home and see

him playing soccer, basketball, baseball, riding bikes with his daughter and the neighborhood

kids, until the sunsets.  Todd is the Pied Piper of his neighborhood and really loved by [his

daughter's] friends and their families."  (Letter from Kelly N. ███, Exhibit N.)  One of the

many beneficiaries of Mr. Newman's generous and kindly spirit is his 15-year-old niece: "My

Uncle Todd is one of the most caring, nonjudgmental people I know.  He's always supported and

encouraged me in everything I've done.  He's been to every dance recital, birthday party,

sporting event and graduation in my life."  (*See* Letter from M.N.,[13] Exhibit Y.)

        Most of the letters emphasize the impact that Mr. Newman's absence will have on

his daughter.  Not only is she exceptionally close to Mr. Newman, she is an only child, which

magnifies any absence as C.N.'s family is small and she does not have siblings to support her.

Mr. Newman's daughter is 12 years old, which means that she is approaching vulnerable

adolescent years where the support of her parents will be critical – a lengthy jail sentence,

however, could mean that Mr. Newman is essentially absent for those critical formative years

---

[13] In accordance with Your Honor's Individual Practices for Sentencing Proceedings, we only
include the initials of Mr. Newman's niece, who is a minor.

while she finishes junior high school and makes her way through high school.  While certainly a

secondary concern to his daughter's psychological well-being, Mr. Newman's sentencing will

also have a significant impact on the family's financial position.  Mr. Newman currently has

significant assets built from his years of work, but the potential financial penalties from the

criminal and SEC cases and the likelihood that insurers who have paid his legal bills will press

their "claw back" rights may completely wipe out those assets.[14]  And, undoubtedly, Mr.

Newman will not be available to earn an income, and Jill is not currently employed.  There is no

question that his extended family will help support C.N. financially if needed, but the family

financial condition will certainly be materially altered.  And, of course, there is no way that other

family members can make up for the psychological impact on C.N. from Mr. Newman's

incarceration.

       In addition to the care and attention he lavishes on his daughter, it is abundantly

clear from the letters and conversations Mr. Newman's counsel have had with family members

that he is simply a fundamentally decent person.  His sister writes, "Todd worked hard.  He

worked hard at everything in his life.  But he worked hardest at what he loved most, his family.

He has always been the one that has worked to keep us in line to follow through with keeping

---

[14] In addition to the potential for a criminal penalty, there is the likelihood of an SEC penalty that could be as much as triple the "gain" from the trading at issue (or approximately $12 million); while we may argue that the "gain" should be limited to what Mr. Newman actually received, the SEC has historically taken the position that the gain is the total amount of trading profit realized, even if most of those gains do not go to the defendant.  In addition to penalties, Mr. Newman is subject to forfeiture – as much as $737,724.78, or the amount of the gains at issue that Mr. Newman arguably "controlled."  *See infra* Section III.A.  In addition to criminal and civil penalties and forfeiture, Diamondback has requested restitution of $39 million, many times Mr. Newman's net worth.  As also noted, while it is not directly the product of his pending court cases, Mr. Newman is also subject to claims from insurers who have been paying his multi-million dollar legal defense bills under an insurance policy taken out by Diamondback on behalf of itself and its employees; the insurers are likely to argue that they are entitled to recoup those payments once his conviction becomes final.

our families tight.  He is the glue that keeps [his and his siblings'] families together."  (Letter from Kelly N. ███, Exhibit N.)  With respect to his relationship with his almost 80-year-old mother, she says, "Todd's sensitivity, honesty and generosity to me is legendary.  He has been more than supportive emotionally through the illness and death of his dad and through my two surgeries."  (*See* Letter from Irene ███, Exhibit W.)  His brother writes, "[w]hen I was out of work a few years ago, Todd would call me often to offer his support, visit me to keep my spirits up and ask me to sporting events.  He was very supportive to me during those tough times."  (*See* Letter from Tom ███, Exhibit Z.)  Mr. Newman treats others with compassion and respect, and he has done so throughout his life – as evidenced by the friendships he has maintained from each stage of his development, from grade school to the present.  Mr. Newman's friends and his family members paint a compelling picture of a modest individual who has worked extremely hard, is devoted to his extended family and his friends, and goes about his life in a quiet, dignified and modest way.  As an example, Mr. Newman served as a rock for his family when his father passed away from brain cancer in 2004.  As Mr. Newman's brother-in-law writes in his letter to the Court, "[t]he void that was left by the passing of Todd's father was large and I very much believe Todd took it upon himself to do whatever he could for his mother and siblings to ease the burden of that difficult loss."  (*See* Letter from Joseph V. ███, Exhibit M.)  Mr. Newman's sister writes of the emotional trauma of their father's passing: "We watched my Dad who we loved so much and who had given us the love of sports and the drive to succeed in our adult lives, merely fade away.  That changed us forever.  I remember that Todd's ex wife Jill swore that the day our father was diagnosed Todd was never the same again. I don't think anyone can understand the sorrow both my brothers and I still live with."  (*See* Letter from Kelly N. ███, Exhibit N.)

Modesty, decency and respect for others are values that Mr. Newman was taught as a child by his parents and that he and Jill have passed on to their daughter. While Mr. Newman earned a substantial income, he and his family do not live lavishly – they own no second home, boat, plane or other trappings sometimes associated with financial industry professionals. C.N. goes to public school, as Mr. Newman did. It is very telling that C.N., at 12, has only been on an airplane on three occasions because Mr. Newman and his family usually vacation together close to home. Mr. Newman's sister states in her letter:

> [I]n a world where parents have over spoiled, Todd and Jill have raised [their daughter] based on pure love and commitment of a proper upbringing. And despite the misconception of how a person in finance lives, they live a life of modesty. They live in a small beautiful home in a middle-income town and rarely travel[.] A yearly trip to the New Jersey Shore is what he enjoys the most. It gives him time to spend with [his daughter] riding bikes and swimming in the ocean. Quiet and unpretentious, just like Todd.

(*Id.*) It is also telling about his relationship with his family that, during the work week while he was at Diamondback, Mr. Newman stayed at his family home with his mother. Mr. Newman's sister goes on, "[m]y mom is turning 80 in April and you may or may not be aware of the fact that while Todd was at Diamondback he spent his weeknights in our childhood home to keep a watchful eye on mom. His love for my mother along with his nature not to live an extravagant lifestyle kept him at home." (*Id.*) That is simply not the mode of life that one typically thinks of when contemplating a hedge fund manager or Wall Streeter. But, based on the letters which are far more eloquent in their description of Mr. Newman than his attorneys ever could be, that is who he is and how he has always lived his life.

In sentencing Mr. Newman, the Court will be sentencing a human being; and a human being – not the conduct at issue – will be serving any jail sentence that the Court imposes. Todd Newman is a fundamentally good and decent human being, and he deserves consideration

as such when he is sentenced.  Mr. Newman is not flashy, and his good works and decency are of

the quiet sort that are less frequently honored than showier acts and charitable donations.  Mr.

Newman, simply put, is kind to people.  He is quiet, decent, and unpretentious.  Whether

coaching his child's sports teams or being an emotional rock for his family, he does the job of a

good friend, neighbor, and family member both quietly and cheerfully, with a gentle grace.  As

Mr. Newman's brother-in-law puts it, "[t]hroughout the 18 years that I have known Todd, he has

never swayed from his commitment to his family and selfless involvement with the lives of those

most important to him.  Todd's 'down-to-earth' mindset very much reflects the healthy outlook

and priorities he has on and in life."  (*See* Letter from Joseph V. ██, Exhibit M.)  At the end of

his trial, the Court noted that Mr. Newman had conducted himself with dignity during the

proceedings; indeed, quiet dignity is how Mr. Newman conducts himself generally, as the letters

written on his behalf universally attest.  In formulating a sentence for Mr. Newman, we ask that

you take into account his background and character – his whole person, the one that will actually

be sentenced – in addition to the conduct for which the jury convicted him.

### D.      DETERRENCE

There is no need for specific deterrence or protection of the public through

incapacitation, *see* Section 3553(a)(2)(C), in this case.  Aside from the conduct at issue here, Mr.

Newman has never had any brush with the law and there is no reason to believe that he will have

any in the future.  Mr. Newman's reputation in the financial industry has been ruined by the

public nature of the government's investigation and prosecution, and it is highly unlikely that

Mr. Newman will be hired in an investment management position in the future.  *See United

States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) ("With his reputation ruined by his

conviction, it was extremely unlikely that he would ever involve himself in future misconduct.").

Indeed, the SEC will undoubtedly seek an industry bar in the parallel SEC matter.  Thus, Mr. Newman will be institutionally prohibited from committing the same crimes again.

Many courts have discussed general deterrence, *see* Section 3553(a)(2)(B), in the context of insider trading cases.  There is little doubt that the Southern District's recent series of insider trading cases, which we believe currently stands at 77 arrests, 71 guilty pleas or convictions, and no acquittals, has "sent a message" and has had a significant impact on the securities industry.  While insider trading often has been described as "difficult to detect," the very large number of prosecutions suggests that the government has lately employed effective means of detection.

The relevance of this extensive string of arrests and convictions is that, as a general matter, deterrence is better achieved through the likelihood, rather than the length, of punishment.  *See, e.g.*, Richard A. Frase, *A More Perfect System: Twenty-five Years of Guidelines Sentencing Reform (Punishment Purposes)*, 58 Stan. L. Rev. 67, 80 (Oct. 2005) ("Research has found that offenders are more sensitive to the probability of punishment than to its severity. . . .  White-collar and regulatory offenders are more likely to be deterred, even by selective enforcement and modest penalties; such offenders have many lawful alternatives and much to lose from being convicted, regardless of the penalty.").  Judge Rakoff referenced this research in *Adelson*, 441 F. Supp. 2d at 514, writing that "there is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders."  This dovetails with Section 3553's "parsimony principle" which states that a "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" in Section 3553.  *See id.* at 515; *see also* United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing* 56 (2004) (noting that the Sentencing Guidelines were

written, in part, to "ensure a *short but definite* period of confinement for a larger proportion of these 'white collar' cases, both to ensure proportionate punishment and to achieve deterrence").

Judge Rakoff again noted the twin aims of general deterrence and the "parsimony principle" in his recent sentencing of Rajat Gupta.  *See* Sentencing Transcript at 54-55, *United States v. Gupta*, No. 11 Cr. 907 (JSR) (S.D.N.Y. Oct. 24, 2012).  In imposing a prison term of 24 months, rather than a term within the Guidelines range of 78 to 97 months, Judge Rakoff noted – among other factors – that, while no one knows with certainty what length of sentence deters insider trading, "a relatively modest prison sentence should be 'sufficient, but not more than necessary,' for this purpose."  *Id.* at 54.  Indeed, Judge Rakoff departed very significantly from the Guidelines despite what he considered extraordinary nature of Mr. Gupta's breach of duty to Goldman Sachs, the source of the relevant information: "Mr. Gupta, well knowing his fiduciary duties to Goldman Sachs, brazenly disclosed non-public information to Mr. Rajaratnam [ ] at the very time when our financial institutions were in immense distress and most in need of stability, repose, and trust. . . .  This was the functional equivalent of stabbing Goldman in the back."  *Id.* at 52.

In sum, from the general deterrence perspective, we submit that a sentence below the Guidelines range of 63 to 78 months would be "sufficient, but not more than necessary."

## E.    OTHER RELEVANT INSIDER TRADING SENTENCES

In fashioning a sentence for Mr. Newman, we think that it is important to think about his conduct in relation to other defendants who have been sentenced within the Southern District, of whom Rajat Gupta is but one example.

Unlike a number of other defendants who have appeared before this and other courts, Mr. Newman did not engage in obstructive conduct, either during or after the conspiracy period or at trial.  He did not use prepaid cellphones or otherwise take active steps to avoid

detection.  In fact, as the government made abundant use of at trial, the conduct at issue largely

played out over company email.

One recent case that we submit is particularly relevant to the Court's

consideration is *United States v. Whitman*.  There, the defendant was the proprietor and manager

of his own $100 million hedge fund.  He was convicted after trial of receiving and trading on

inside information from multiple sources over the course of years.  His Guidelines range was 51

to 63 months based on a gain of $935,306, and Judge Rakoff's obstruction finding was as

follows:

> So, I think he perjured himself.  I think, frankly, he repeatedly perjured himself.  I
> thought the evidence was quite overwhelming that this sophisticated defendant,
> whose own company had a very detailed inside information prohibitory policy,
> was willfully, blatantly aware that he was trading on inside information every step
> of the way, in all the respects found by the jury, and, in this Court's independent
> view, amply supported by the evidence.  And that his denials on the stand were
> directly contradicted not only by the testimony, but in some cases by highly
> specific information.

Sentencing Transcript at 5, *United States v. Whitman*, No. 12 Cr. 125 (JSR) (S.D.N.Y. Jan. 24,

2013).  Judge Rakoff nonetheless sentenced Mr. Whitman to 24 months based in large part on his

assessment of Mr. Whitman's character.  Judge Rakoff distinguished between individuals whose

Guidelines calculations may have been the same but one of whom "is essentially a grasping, evil,

crooked, despicable human being and [one of whom] is basically a good person but has made

some  intentional mistakes."  *Id.* at 28.  Judge Rakoff found that Mr. Whitman "was a, basically,

decent person in his personal and non-business dealings, but he was cavalier and crude in his

business dealings even when he wasn't breaking the law."  *Id.*  Mr. Newman compares favorably

to Mr. Whitman.  They managed a similar amount of money, although Mr. Newman was an

employee, not an owner, of his fund.  While Mr. Newman's gain was higher than Mr. Whitman's

– approximately $3.7 million as opposed to $935,306 – as we explained above, Mr. Newman

only took home 12% of those gains, or $442,761.14.  The most striking difference between the two is that Mr. Newman did not repeatedly perjure himself.  And Mr. Newman is a very good and decent man, and neither cavalier nor crude in his business or any other dealings.

### F.  SERIOUSNESS OF THE OFFENSE AND RESPECT FOR THE LAW

A sentence below the Guidelines range would suffice to reflect the seriousness of the offense, promote respect for the law, and provide just punishment.  *See* 18 U.S.C. § 3553(a)(1)(A).  We do not dispute that insider trading is a serious offense.  This Court has made clear on numerous occasions that insider trading, among other things, has a significant impact on people's confidence in the integrity of the markets.  In asking for a below-Guidelines sentence, Mr. Newman is not suggesting that this crime should be taken lightly.  Rather, given the circumstances present here and the impact this trial has already had on Mr. Newman's life, a sentence below the Guidelines range would suffice to promote respect for the law and provide just punishment in this case.

As already noted, a number of significant facts present in other insider trading cases are not present here:  Mr. Newman was three to four steps removed from the breach; he was not involved in inducing or soliciting the breach; he was unaware of any benefit given to the insiders in exchange for information; and he did not mislead regulators, perjure himself, or obstruct justice.

In short, there is an absence of facts that suggest a "serious lack of respect for the law."  *See, e.g.*, Sentencing Transcript at 48-49, *United States v. Drimal*, No. 10 Cr. 56 (RJS) (S.D.N.Y. Aug. 31, 2011) ("[T]his is a case that involved long-term conduct that was sophisticated.  It was clandestine.  It involved secret phones.  It involved payoffs to lawyers.  It involved a scheme as to how to mislead the SEC if they ever came sniffing around . . . .  So to suggest that the people involved in this crime had any respect for the law would be false.").  This

case did not involve secret or clandestine attempts to avoid detection;[15] there is also no evidence whatsoever that Mr. Newman attempted to interfere with the prosecution of this offense, or that he does not appreciate the seriousness of the charged crimes.  And, as noted, when determining whether a sentence promotes respect for the law, courts consider whether a defendant had previously displayed a lack of respect for the law by attempting to obstruct justice.  *See United States v. Garcia*, 459 F. App'x 68, 69 (2d Cir. 2012) (internal citations omitted) ("[I]n light of the fact that sentencing courts are to weigh the 'need for the sentence imposed . . . to promote respect of the law,' the district court did not abuse its discretion in taking into account . . . [that defendant] broke his electronic monitoring bracelet and fled from justice for over fourteen years.").  No such conduct is present here.

Moreover, there is no evidence that a sentence below the Guidelines range of 63 to 78 months will fail to adequately demonstrate the seriousness of the offense or promote respect for the law.  In sentencing Rajat Gupta and Douglas Whitman each to 24 months imprisonment – significantly below their Guidelines ranges – Judge Rakoff clearly did not believe that those sentences failed to accomplish these ends.  In addition, Mr. Newman has and will continue to suffer very significant collateral consequences of his prosecution.  *See, e.g.*, *United States v. Sachakov*, No. 11 Cr. 120 (JBW), 2013 WL 101287, at \*3 (E.D.N.Y. Jan. 8, 2013) (factoring the likelihood that defendant would lose his medical license as a result of his

---

[15] *See supra* Section II.A.5, discussing the Ruchi Goyal payments.  The government may also cite as an illustration of what it believes to be Mr. Newman's disregard for the law the violation of Diamondback's internal policy, instituted in May 2008, on speaking to company employees (which is relevant to communications between Mr. Tortora and Primary Global Research consultants).  According to the trial record, both Mr. Tortora and Mr. Newman acknowledged that they had read and understood this policy.  (*See* Tr. 1333:9-1334:6; GX 2271.)  However, Mr. Tortora, the government's star witness, testified that he did not believe that this policy went into effect until late 2009, after which he abided by it.  (*See* Tr. 1273:20-1275:1.)  There is no reason to believe that Mr. Newman had a contrary understanding.  In other words, the evidence does not demonstrate that there was a conscious intent to violate this policy.

conviction when fashioning an appropriate sentence).  His reputation has been destroyed in a

highly public way, and it is likely that he will receive a lifetime bar from the securities industry.

*See United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (finding that the sentencing

judge did not abuse his discretion when considering the insider-trading defendant's "atypical

punishment such as the loss of his reputation" and the "ongoing case against him from the

Securities and Exchange Commission").  Mr. Newman will in all likelihood incur significant

financial penalties in this and the SEC matter.

  In sum, when considering the question of a just and proper jail term, we submit

that it is important to look at the full range of punishments that Mr. Newman has suffered and

will suffer.  In that light, we believe that a jail term below the Guidelines range will be sufficient

to reflect the seriousness of the offense and promote respect for the law, but at the same time will

be no greater than necessary to meet the ends of sentencing.

## III.  FINANCIAL EXPOSURES

### A.  CRIMINAL FORFEITURE

  Following the Second Circuit's decision in *United States v. Contorinis*, the proper

amount of forfeiture is the portion of the gain which Mr. Newman actually received.  *See* 692

F.3d 136, 147-48 (2d Cir. 2012) (ruling that "the property must have, at some point, been under

the defendant's control or the control of his co-conspirators in order to be considered 'acquired'

by him").  In *Contorinis*, the defendant was assessed $12.65 million in forfeiture by the trial

court, which included all the proceeds of the defendant's at-issue trading on behalf of the fund

that he managed.  *Id.* at 141.  The Second Circuit reversed the trial court, and remanded for a

new forfeiture award consistent with its holding.  *Id.* at 148.  The defendant then settled with the

government for $427,875 – although it is unclear precisely what that figure represented, it was in

the neighborhood of the portion of the profits to the fund that went to the defendant as

performance-based compensation.  *See* Order, *United States v. Contorinis*, No. 09 Cr. 1083 (RJS) (S.D.N.Y. Jan. 7, 2013).  In *United States v. Torres*, the Second Circuit elaborated on its definition of "control" under *Contorinis*, noting that "because Contorinis did not control disbursements of the fund's profits, those total profits did not represent his own unlawful gain." 703 F.3d 194, 201-02 (2d Cir. 2012).

As calculated above, the portion of the profits on the trading at issue that Mr. Newman theoretically was paid, based on defendant's calculation of the profits gained, is $442,761.14.[16]  The portion of the profits on the trading at issue that Mr. Newman arguably "controlled" under *Torres* – or 20% of the profits that Mr. Newman had discretion to pay to his team, including himself – is $737,724.78.[17]

### B.    CRIMINAL FINE/PENALTY

Mr. Newman's current net assets are approximately $2,501,825.[18]  As noted in footnote 14 above, Mr. Newman faces a significant number of financial exposures both in this case and in the parallel SEC case.  The Guidelines provide for a penalty range of $12,500 to $28,600,000.  *See* U.S. Sentencing Guidelines Manual § 5E1.2(c)(2)-(4).  Given Mr. Newman's likely financial condition following the conclusion of the criminal and SEC cases, we submit that a criminal penalty is unwarranted.  18 U.S.C. § 3572 (listing factors that courts shall consider when imposing a criminal fine, including the "defendant's income, earnings capacity, and financial resources" and the "burden that the fine will impose upon the defendant, any person

---

[16] As noted above, if the government's total gain number is used, the portion that would have flowed to Mr. Newman is $489,504.41.

[17] If the government's total gain number is used, the portion that would have been under Mr. Newman's "control" is $815,868.58.

[18] This figure does not include the cash collateral of $750,000 deposited with the Court pursuant to the terms of Mr. Newman's bail.

who is financially dependent on the defendant, or any other person that would be responsible for the welfare of any person financially dependent on the defendant, relative to the burden that alternative punishments would impose").

In a number of other recent insider trading cases, no criminal fine was imposed. *See, e.g.*, Sentencing Transcript at 28, *United States v. Emanuel Goffer*, No. 10 Cr. 56 (RJS) (S.D.N.Y. Oct. 7, 2011); Sentencing Transcript at 54, *United States v. Drimal*, No. 10 Cr. 56 (RJS) (S.D.N.Y. Aug. 31, 2011); Sentencing Transcript at 51, *United States v. Kurland*, No. 10 Cr. 69 (VM) (S.D.N.Y. May 21, 2010). The "need to deprive the defendant of illegally obtained gains" is a factor that courts are required to consider when determining whether to impose a criminal fine, *see* 18 U.S.C. § 3572(a)(5), and Mr. Newman will already be required to forfeit the portion of the trading profits he received. Indeed, that a defendant will face other financial penalties is relevant to the decision of whether to impose a fine. *See* Sentencing Transcript at 31, *United States v. Kimelman*, No. 10 Cr. 56 (RJS) (S.D.N.Y. Oct. 12, 2011) ("I'm not going to impose a fine. I don't think Mr. Kimelman has the ability to pay a fine once I factor in the forfeiture order . . . ."); *see also United States v. Madden*, No. 09 Cr. 799 (RWS), 2011 WL 4359933, at *9 (S.D.N.Y. Sept. 19, 2011) ("In consideration of the significant amount of restitution and forfeiture Defendant will be paying, the fine in this case shall be waived.").

We submit that in light of the other financial and non-financial penalties that will be imposed on Mr. Newman in this and the parallel SEC cases, a fine is unnecessary.

## C.   RESTITUTION

Diamondback has asked for $39 million in restitution pursuant to the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A. We are not aware of any other individual or entity claiming restitution from Mr. Newman. Diamondback, however, is not a

"victim" under the MVRA.  Even were Diamondback a victim, restitution of its various claimed losses is outside the MVRA's scope.

### 1. Diamondback Is Not a Victim Under the MVRA

Initially, although Diamondback has undoubtedly incurred expenses over the course of these ongoing proceedings, it is not a "victim" under the MVRA, and therefore cannot claim entitlement to restitution.  The MVRA provides district courts with authority to award restitution to "victims of the offense of conviction," and courts in this circuit have limited those victims to the known or intended targets of the defendant's crime.  *See In re Local #46 Metallic Lathers Union*, 568 F.3d 81, 85 (2d Cir. 2009) (per curiam) (holding that the "scheme, conspiracy, or pattern of criminal activity" that allegedly injured the victim under the MVRA must be an element of the offense in order for the "conduct in the course of the scheme or conspiracy to be considered as a basis for determining compensable harm").  It is well-settled that the victims of insider trading are the companies whose inside information was misappropriated.  *United States v. Gupta*, No. 11 Cr. 907 (JSR), 2012 WL 5246919, at *3 (S.D.N.Y. Oct. 24, 2012) ("In the eye of the law, [defendant's] crime was to breach his fiduciary duty of confidentiality to Goldman Sachs; or to put it another way, Goldman Sachs . . . was the victim of [defendant's] crimes as charged.").  Because it is insufficient that a party's losses be the indirect result of the criminal offense for it to be deemed a victim, Diamondback cannot avail itself of the protections of the MVRA.  *See United States v. Archer*, 671 F.3d 149, 172 (2d Cir. 2011) (finding that a "victim" under the MVRA must suffer a harm that formed an "integral part of the single scheme . . . devised" by the defendant); *see also United States v. Kuruzovich*, No. 09 Cr. 824 (DC), 2012 WL 1319805, at *4 (S.D.N.Y. Apr. 13, 2012) (ruling that the defendant's former employer was a victim because "[t]he Company was the *target* of Kuruzovich's repeated

demands and threats for over two years and was most certainly harmed as a result") (emphasis added).

The MVRA defines victim, in relevant part, as:

[A] person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663A(a)(2).   Until recently, the Second Circuit rule was that "restitution was proper only if the conduct that caused the loss was an element of the crime."  *See United States v. Archer*, 671 F.3d 149, 170 (2d Cir. 2011).  Under this definition, Diamondback was not a victim because any alleged deceit of Diamondback was not an element of the crime for which Mr. Newman was convicted.  However, as the Second Circuit stated in *Archer*, this rule was somewhat expanded by its decision in *United States v. Paul*.  *Id.* (citing 634 F.3d 668, 670 (2d Cir. 2011)).  In *Paul*, the defendant was convicted of securities fraud for artificially inflating the price of a certain stock.  634 F.3d at 670-71.  The defendant profited from the fraud by posting the inflated shares as collateral for loans.  *Id.*  The institutions who made the loans, which were not repaid, demanded restitution.  *Id.*  The Second Circuit found that the loans "were admittedly a significant part of the greater fraud" and thus the "necessary causal nexus" existed between the defendant's conduct and the claimed losses.  *Id.* at 677.  The Court explained that the institutions were victims because "the loans were part of the scheme [the defendant] devised for profiting from his crime."  *Archer*, 671 F.3d at 171.

Following its decision in *Paul*, the Second Circuit decided *Archer*, a case involving the conviction of an attorney for immigration fraud based on his submission of numerous false visa applications in return for a fee.  At sentencing, the lower court ordered the defendant to refund the fee to each of his 234 clients.  *Id.* at 157-58.  On appeal, the Second

Circuit held that while the receipt of a fraudulent payment was not a required element for the

crime of visa fraud, the attorney's clients were still "victim[s]" for purposes of the MVRA

because the "the payments . . . were the mechanism through which [the defendant] profited from

his conspiracy and, thus, were an *integral part* of the single scheme." *Id.* at 172 (emphasis

added).

However, *Archer*'s "integral part" standard is not without limits and does not

imply that any foreseeable losses resulting from the defendant's conduct will cause the injured

party to be a victim for purposes of the MVRA. Instead, a review of Second Circuit opinions

demonstrates that restitution under the MVRA has only been awarded to those individuals who

were the known or intended targets of the defendant's scheme. *See, e.g.*, *Paul*, 634 F.3d at 668

(awarding restitution to a group of banks who were defrauded when they provided the defendant

margin loans); *United States v. Bengis*, 631 F.3d 33 (2d Cir. 2011) (awarding restitution to the

government of South Africa when they were denied the right to seize and sell illegally harvested

lobsters); *United States v. Battista*, 575 F.3d 226 (2d Cir. 2009) (awarding restitution to the

National Basketball Association for the defendant's misappropriation of confidential

information); *see also Kuruzovich*, 2012 WL 1319805, at *4 (concluding that the defendant's

former employer was the victim of the defendant's crime because "[t]he Company was the target

of Kuruzovich's repeated demands and threats for over two years and was most certainly harmed

as a result").

Diamondback is situated differently than the known and intended victims in the

above-cited cases. Here, the companies whose information was misappropriated were the

intended targets of the insider trading scheme, not Diamondback. *Gupta*, 2012 WL 5246919, at

*3. Indeed, while the offense conduct was undertaken, Diamondback was a beneficiary of the

scheme.  It was only after the scheme had ended, and after a public search of its premises by the FBI, that Diamondback suffered any of its claimed losses.  While the conduct occurred using the facilities of Diamondback, when assessing whether or not an entity is a *victim* of a crime, one must determine if the *harm* suffered formed an integral part of the criminal scheme.  In Diamondback's case, it did not.  Even assuming Diamondback's losses flowed from the commission of the charged crimes, those losses were incidental, and not the expected or intended result of the crime.

We recognize that the recent Southern District decision in *United States v. Skowron*, 839 F. Supp. 2d 740 (S.D.N.Y. 2012), is to the contrary.  *Skowron*, now pending before the Second Circuit, involved a hedge fund manager who worked for Frontpoint, an investment advisor owned by Morgan Stanley.  Judge Cote found that Morgan Stanley was a victim because it had been "directly harmed by the defendant's criminal conduct" and explained that "[d]eceiving his employer, Morgan Stanley, was an integral part of Skowron's scheme."  *Id.* at 746.  We agree that *Skowron* supports Diamondback's position, but respectfully submit that it was wrongly decided and, in any event, is distinguishable from the case at bar.

First, the decision in *Skowron* appears to have overlooked *Archer*'s "integral part" requirement when it awarded Morgan Stanley restitution for indirect losses stemming from the conviction of a former employee for two conspiracy schemes: insider trading and obstruction of justice.  *Id.* at 745.  To find that entities like Morgan Stanley and Diamondback are victims of insider trading ignores the common element of the Second Circuit's cases on the definition of "victim" under the MVRA: that such victims must be the known or intended targets of the defendant's scheme.  *Skowron* creates a new category of victims, namely employers of individuals convicted of crimes committed in the course of their employment.  As in *Skowron*,

the "targets" of the scheme here were the companies whose inside information was disclosed. Because Diamondback was not a known and intended target of the offense for which Mr. Newman was convicted, it cannot be deemed a "victim" under the MVRA.

Second, Judge Cote relied on Skowron's conviction for obstruction of justice to support Morgan Stanley's status as a victim, a circumstance not present here.  As Judge Cote explained, "Skowron's cover-up of his insider trading was a critical component of the scheme for which he was convicted" and Morgan Stanley was forced to launch its own internal investigation and cooperate with the SEC probe because Skowron maintained that he was innocent in communications with the company.  *Id.* at 745.  Morgan Stanley would clearly be the victim of obstruction of justice because Skowron intended to mislead his employer, knowingly forcing the company to incur investigatory expenses to reveal Skowron's insider trading scheme in the face of his contrary protestations.  *Id.* at 748 ("Lying to his employer was integral to Skowron's scheme to deceive the SEC.  Morgan Stanley's extensive legal and investigative costs during the period Skowron maintained his innocence were directly and foreseeably caused by Skowron's conspiracy to obstruct justice.").  Given that Mr. Newman was not charged with or convicted of obstruction of justice, Diamondback is differently situated than Morgan Stanley and *Skowron*'s reasoning is inapplicable.

In any event, even if Diamondback were a victim under the MVRA, for the reasons set forth below, we object to each category of its restitution claims.

## 2. <u>Legal Fees</u>

Under the MVRA, a court may include attorneys' fees in a restitution award if they are "incurred *during participation* in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4) (emphasis added).  In other words, to be compensable, a victim's attorneys' fees must directly relate to assisting the

40

government in its criminal prosecution, and cannot include any fees incurred in conducting a

sweeping internal investigation or in response to civil inquires.  *See United States v. Levis*, No.

08 Cr. 181 (TPG), 2011 WL 497958, at *2 (S.D.N.Y. Feb. 10, 2011) (awarding restitution only

for legal fees incurred to assist the United States Attorney's Office in its investigation and

prosecution of the defendant following the resolution of an SEC investigation and excluding fees

related to an internal investigation tangentially related to the criminal investigation); *United

States v. Weitzman*, No. 09 Cr. 989 (LTS), 2010 WL 3912735, at *1 (S.D.N.Y. Sep. 15, 2010)

(excluding from the restitution order civil litigation fees and fees only related "consequentially to

the investigation or prosecution of the criminal case").

   Diamondback claims to have incurred legal fees and related expenses totaling

approximately $10.2 million.  While some portion of that sum undoubtedly relates to

Diamondback's participation in the government's criminal investigation, we do not know what

portion.  Some of those fees may relate to investigations unrelated to (or unnecessary to)

Diamondback's work on matters related to Mr. Newman.  For example, another Diamondback

employee – Anthony Scolaro – was also arrested and convicted (and his guilty plea became

public) during the same general time frame covered by Diamondback's fee request.  *See* Order,

*United States v. Scolaro*, No. 11 Cr. 429 (WHP) (S.D.N.Y. May 18, 2011) (unsealing the

information, guilty plea, and plea agreement).  In addition, we understand Diamondback may

have conducted a review of its use of expert networks broadly (*i.e.*, beyond any possible use of

such networks relevant to Mr. Newman).  To the extent that Diamondback did a broad internal

investigation, we do not know that investigation's parameters or whether any resulting legal fees

were "incurred during participation" in the government's criminal investigation.  We also

understand that Diamondback paid for legal counsel for various individuals, but we do not know

whether or not fees associated with those representations are compensable.  *See United States v. Schwartz*, No. 06 Cr. 2 (JBA), 2006 WL 1662899, at *3 (D. Conn. May 25, 2006) (holding that costs and attorneys' fees incurred by third parties as a result of defendant's false statements to the IRS were "too removed from the conduct of conviction to constitute 'direct' and 'proximate' losses").  In sum, we simply do not have adequate means to determine whether or not the claimed legal fees are sufficiently related to Mr. Newman's conduct pursuant to the MVRA.

Furthermore, even if certain legal fees fall into categories compensable under the MVRA, there is a residual question about the *extent* to which such fees were "reasonably necessary."  *See United States v. Gupta*, No. 11 Cr. 907 (JSR), 2013 WL 662954, at *4 (S.D.N.Y. Feb. 25, 2013).  In *Gupta*, Judge Rakoff conducted a "careful" review of the 542 pages of billing records from Goldman Sachs's counsel.  *Id.* at *1.  After his review, Judge Rakoff reduced the $6.9 million bill by 10% because certain work performed by counsel was unrelated to the criminal investigation and certain work related to the criminal investigation was overstaffed and thus represented unnecessary fees.  *Id.* at *4 (holding that the work performed by counsel, "while perhaps perfectly appropriate on the assumption that Goldman Sachs wished to spare no expense on a matter of great importance to it [they nonetheless] exceeded what was reasonably necessary under the MVRA"); *see also United States v. Battista*, 575 F.3d 226, 234 (2d Cir. 2009) (noting that the district court "meticulously parsed out the fees and costs submitted" by the victim and affirming its rejection of fees "not directly related to the assistance . . . provided to the government in its investigation and prosecution of the criminal offenses").

We have not been afforded an opportunity to do a similar review here and in light of the extremely large bill charged to Diamondback by outside counsel, such a review is appropriate.

For these reasons, we object to Diamondback's claim for attorneys' fees.

### 3. Compensation

Diamondback requests the return of twenty-five percent of Mr. Newman's compensation for the years 2007 through 2010, amounting to $2,673,238, because Diamondback would have paid him nothing had it known that he was engaging in illegal activity.[19] To support its claim, Diamondback relies entirely on *Skowron*. *Skowron*, in turn, relies entirely on cases in the "honest services fraud" context, which we submit are inapposite.

The MVRA obligates the court to award restitution of losses to a victim's "property." 18 U.S.C. § 3663A(b)(1). The Second Circuit has held that an employer deprived of "honest services" is deprived of "property" – *i.e.*, the entitlement to honest services – under the MVRA, and thus is entitled to be compensated for the loss of that "property" in the form of returned compensation. *United States v. Bahel*, 662 F.3d 610, 648-49 (2d Cir. 2011) (ruling that defendant's conviction for honest services fraud qualified those wages paid as "as a result of [defendant's] offense" as reimbursable property under the MVRA). Honest services fraud, however, is limited to the narrow set of cases of "fraudulent schemes to deprive another of

---

[19] Diamondback has also refused to pay Mr. Newman approximately $2.2 million in deferred compensation that he earned across the years 2006 to 2008, as well as the value of additional investments made on his behalf as an equity interest holder by Diamondback. While Mr. Newman strongly disputes that Diamondback is entitled to receive any of his compensation as restitution under the MVRA, Diamondback is certainly not permitted to claim restitution of $2.6 million and at the same time withhold a similar amount in compensation and other investments that Mr. Newman earned and deferred pursuant to various written agreements with Diamondback. Yet Diamondback has ignored these amounts in its "calculation" of how much of Mr. Newman's income it believes it is entitled to have returned.

honest services through bribes or kickbacks supplied by a third party who had not been

deceived."  *Skilling v. United States*, 130 S. Ct. 2896, 2928 (2010).  Indeed, the two cases cited

by the Second Circuit in *Bahel* involved defendants who received bribes or kickbacks and

therefore could have been convicted of honest services fraud in accordance with the Supreme

Court's decision in *Skilling*.  *See United States v. Crawley*, 533 F.3d 349, 352-53 (5th Cir. 2008)

(ordering the defendant to pay a portion of his compensation after being convicted of violating

18 U.S.C. § 1346 for receiving kickbacks in exchange for awarding lucrative union contracts);

*United States v. Sapoznik*, 161 F.3d 1117, 1118 (7th Cir. 1998) (ordering convicted police chief

who received bribes in return for protecting illegal gambling to pay a portion of his

compensation in restitution).  Thus, in order for compensation to be considered "property"

reimbursable under the MVRA, a court must find that the defendant was convicted of, or at least

could have been convicted of, honest services fraud.  *See Bahel*, 662 F.3d at 648-49.

In *Skowron*, the defendant, a hedge fund manager, was convicted of insider

trading.  839 F. Supp. 2d 740, 742 (S.D.N.Y. 2012).  Despite not being convicted of honest

services fraud, and despite the absence of facts to suggest that he could have been convicted of

honest services fraud, the court nonetheless found that Skowron's conduct was tantamount to a

denial of his employer's right to honest services.  *Id.* at 750.  Relying on *Bahel*, the *Skowron*

court ordered defendant Skowron to pay back his employer twenty percent of his compensation.

*Skowron*, 839 F. Supp. 2d at 749-50.  As explained above, however, *Bahel* is inapposite here, as

it was in *Skowron*, because Mr. Newman was convicted of insider trading, and was not and could

not have been convicted of honest services fraud.  Unlike *Bahel*, where the defendant received

bribes in return for procurement contracts, Mr. Newman is not alleged to have received any bribe

or kickback.  Therefore, Mr. Newman's compensation is not Diamondback's "property" for

purposes of the MVRA and cannot be the subject of a restitution order.  *See Hughey v. United States*, 495 U.S. 411, 416 (1990) (holding that a court may not order restitution for losses caused by a crime for which the defendant was not convicted).

Separately, Diamondback did not suffer a loss compensable under the MVRA by paying Mr. Newman.  The MVRA requires a court to find that the victim "has suffered a physical injury or a pecuniary loss."  18 U.S.C. § 3663A(c)(1)(B); *United States v. Battista*, 575 F.3d 226, 229 (2d Cir. 2009) (explaining that the purpose of restitution is to restore the injured party "to the position he occupied before sustaining the injury" and adding that the statutory focus of the MVRA is "on the victim's loss and upon making victims whole").  Put differently, the MVRA "may not substitute" a defendant's "gains for the victim's actual losses."  *United States v. Zangari*, 677 F.3d 86, 92-93 (2d Cir. 2012).  Thus, where an employer compensates its employee with the very proceeds of the illegal act, proceeds which it otherwise would not have had but for the employee's illegal conduct, no loss is suffered.  *See id.*

Here, Mr. Newman was compensated with a portion of the profits he made trading for Diamondback's investors (Diamondback also retained a portion of those profits).  In other words, Diamondback paid Mr. Newman by passing through to him a portion of the profits Mr. Newman himself generated.  Had Mr. Newman not been employed – and thus had he not generated those profits – Diamondback would not have had the profits with which to compensate him.  Diamondback, therefore, was not "worse off" having paid Mr. Newman – in an alternative universe in which Diamondback had terminated Mr. Newman, Diamondback would never have received the funds which it passed to Mr. Newman – and thus ordering restitution of Mr. Newman's compensation would not "make Diamondback whole" but rather put it in a better position than it would have been absent Mr. Newman's profitable trading.

45

### 4.     <u>Goodwill and Business Reputation</u>

As its third and final category of requested restitution, Diamondback seeks

compensation for its lost "goodwill and business reputation."  Diamondback values that loss at

$26 million, which represents management fees that it says it would have earned but for Mr.

Newman.  In particular, Diamondback says that there were withdrawals of $1.3 billion in

investor funds from Diamondback at the first available redemption date following the FBI

searches of Diamondback's premises in November 2010.  Diamondback posits that those

redemptions would not have happened but for the searches, and that they were a foreseeable

result of Mr. Newman's conduct.

This is a novel theory of restitution.  As Diamondback itself recognizes, the

primary purpose of restitution is to "restore the victim to his or her prior state of well-being . . . ."

*United States v. Amato*, 540 F.3d 153, 156-57 (2d Cir. 2008).  Diamondback's theory of

restitution, however, is that certain investor withdrawals would not have happened but for the

government's heavily publicized search of Diamondback's offices and that Diamondback would

have collected management fees of at least $26 million had the withdrawals not occurred.  That

would not be "restoring" Diamondback to its prior state of well-being but rather would be

putting it in a state of well-being that never existed.  This is beyond the scope of restitution

contemplated by the MVRA, and Diamondback does not cite any similar case in which such

restitution was granted.

Diamondback, however, insists that its "goodwill and business reputation" are

"property" for purposes of the MVRA, 18 U.S.C. § 3663A(b)(1), damage to which can be

compensated through restitution.  Diamondback cites two cases to support its position that

goodwill and reputation are property interests, *see Marrero v. City of Haileah*, 625 F.2d 499 (5th

Cir. 1980); *Webster v. Moquin*, 175 F. Supp. 2d 315 (D. Conn. 2001), yet both define property in

46

circumstances outside the restitution context.  Indeed, the Second Circuit recently had the opportunity to recognize a victim's reputation as protected property for purposes of the MVRA but implicitly declined to do so.  *See United States v. Battista*, 575 F.3d 226, 234 (2d Cir. 2009) (although defendant's conduct "undoubtedly damaged the reputation" of the victim and such damage was "certainly significant," attorneys' fees associated with handling the fallout of the gambling scandal at issue were not compensable under the MVRA).  Likewise, it is noteworthy that victims that have sought restitution in similar cases, including the *Skowron* case on which Diamondback otherwise places such heavy reliance, have not also sought compensation for their associated reputational damage, presumably due to the lack of precedential support.  *See United States v. Skowron*, 839 F. Supp. 2d 740, 750 (S.D.N.Y. 2010) (while the court noted that Morgan Stanley – the victim for purposes of the MVRA – suffered injury to its reputation, the court was not asked for and did not order restitution for reputational harm).

   The one restitution case that Diamondback does cite for the proposition that "intangible property interests" such as goodwill and reputation are compensable under the MVRA, *United States v. Milstein*, 481 F.3d 132 (2d Cir. 2007), is readily distinguishable.  *Milstein* was a criminal trademark infringement case involving a scheme to repackage foreign versions of certain drugs and sell them as if they were the original product from the licensed manufacturers in the domestic market.  *Id.* at 132.  The Second Circuit upheld a restitution order providing that the defendant pay two manufacturers for lost sales that they would have made had the defendant purchased the drugs from them.  *Id.* at 137.  In that case, the Second Circuit found that trademarks are a form of property and that the "standard measure for determining the value to the victim of infringed trademarks is the victim's lost sales."  *Id.*  As an initial matter, a victim is not entitled to restitution merely because an intangible property interest has been damaged.

Indeed, recent cases interpreting *Milstein* have found that even though trademarks are a form of property covered by the MVRA, a victim whose trademark has been infringed is not necessarily entitled to restitution.  *See, e.g.*, *United States v. Hucks*, No. 11 Cr. 326, 2013 WL 654397, at *4 (E.D. Pa. Feb. 20, 2013) (holding that because the victim did not actually suffer any monetary loss as a result of the infringed trademarks, restitution was not warranted, as "restitution is intended to make victims whole and not to provide a windfall").  Diamondback's reliance on *Milstien* also ignores the fact that a victim in a trademark infringement case is the direct target of the crime for which the defendant was convicted, which is certainly not the case here.  Moreover, valuing a victim's loss in a trademark infringement case is a far more concrete and standardized determination than the lost management fee calculation Diamondback argues for here.  Indeed, this "standard measure" for determining the value of an infringed trademark is derived from statute, *see* 15 U.S.C. § 1117(a) (1)-(2), and Diamondback fails to cite any statute or case that uses loss of prospective management fees as the appropriate measure for valuing the loss of goodwill and reputation; there is nothing standard or ordinary about awarding $26 million in potential lost revenue to Diamondback.

   Moreover, Diamondback's request ignores the MVRA's prohibition on consequential damages.  *See United States v. Carboni*, 204 F.3d 39, 47 (2d Cir. 2000) (holding that a court's power to order restitution is limited to actual loss); *United States v. Donaghy*, 570 F. Supp. 2d 411, 428-29 (E.D.N.Y. 2008) (explaining that the MVRA's conception of loss "encompasses only actual losses directly resulting from the offense of conviction" and citing cases holding that consequential damages are not recoverable).  For purposes of the MVRA, consequential damages are "losses 'beyond those which naturally and directly flow' from the defendant's wrongdoing," *see United States v. Boccagna*, 450 F.3d 107, 120 (2d Cir. 2006)

(internal citations omitted), which is precisely what Diamondback seeks here.  Neither the loss of

goodwill or reputation nor the way in which Diamondback has measured that loss "naturally and

directly flow" from Mr. Newman's conviction for insider trading.  Mr. Newman was convicted

of a conspiracy which ended in 2009 (and the last trade charged was in early May 2009).

Tortora left Diamondback in April 2010.  The government conducted its search of Diamondback

in November 2010, and investors purportedly decided to redeem as of March 2011.  Even

assuming that the redemptions were due to publicity surrounding the search, investor

redemptions following the execution of a search warrant a year or more after the conduct at issue

ceased did not "naturally and directly flow" from Mr. Newman's conduct.  Indeed, had the

government chosen to proceed by subpoena instead of search warrant – an investigative tactic

determined solely by the government – there is no certainty that the result Diamondback

complains of would have occurred.

Because the consequential damages Diamondback seeks here are, at best,

indirectly related to Mr. Newman's conduct, they do not constitute property subject to restitution.

Indeed, even if a defendant's wrongdoing causes a victim's loss, for the loss to be defined as

property for purposes of the MVRA, it must relate directly to the defendant's conduct.  In *United

States v. Simmonds*, for instance, defendant was convicted of arson, and was ordered to pay in

restitution the value of two insurance premium discounts that victims lost as a result of having to

file an insurance claim.  235 F.3d 826, 833-34 (3d Cir. 2000) (internal quotations omitted).  The

Third Circuit concluded that the value of these insurance discounts – which represented the

amount of money victims would have saved had they not been forced to file an insurance claim –

should not have been included in the restitution calculation; although the lost discounts "[were]

unquestionably a result of the defendant's criminal conduct," they were consequential damages

that did not represent the value of "property" lost, damaged, or destroyed as a result of the defendant's crimes, as is required by the MVRA.  *Id.*  Similarly here, even assuming that Diamondback lost management fees as a result of its damaged reputation with investors, just as the victims in *Simmonds* lost their "no claim discount" as a result of diminished standing with their insurance company, these losses are not "property" for purposes of the MVRA because they are too indirectly related to the defendant's wrongdoing.  In fact, Diamondback's damaged reputation is even more indirectly related to the defendant's wrongdoing than were the lost discounts in *Simmonds* because, unlike here, the victims there were the direct target of the crime for which the defendant was convicted.

For these reasons, Diamondback's novel theory of restitution – and the enormous claim they make under it – should be rejected.

## IV.    BAIL PENDING APPEAL

The court "shall order the release" of a defendant pending appeal if he establishes (1) "by clear and convincing evidence that [he] is not likely to flee or pose a danger"; and (2) his "appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in. . . reversal [or] an order for a new trial."  18 U.S.C. § 3143(b); *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985).  Once the defendant has made "the required evidentiary showing, the statute establishes a right to liberty that is not simply discretionary but mandatory." *United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004).

### A.    MR. NEWMAN IS NEITHER A FLIGHT RISK NOR A DANGER TO THE COMMUNITY

Mr. Newman is neither a flight risk nor a danger to the community.  He was born in the United States and has lived here his entire life.  His mother, his siblings, and his young daughter all live in the United States.  The government consented to Mr. Newman's release

pending trial on a bail package that included a $3 million personal recognizance bond, surrender

of his passport, travel restrictions, and regular pretrial supervision.  That release was observed

without incident.  The Court continued Mr. Newman's release post-conviction and pending

sentencing, adjusting only the pretrial supervision level.  In addition, the government consented

to allow Mr. Newman to travel to South Carolina from December 26, 2012 until January 2, 2013

to visit friends, as well as to Maine from February 17, 2013 through February 23, 2013 for a trip

with his daughter. Again, these conditions were observed without incident.  In its Draft PSR, the

Probation Office confirms that there have been no issues with Mr. Newman's pretrial

supervision.  (Draft PSR ¶ 17.)

## B.   MR. NEWMAN'S APPEAL PRESENTS A "SUBSTANTIAL QUESTION" OF LAW

A substantial question is "'one which is either novel, which has not been decided

by controlling precedent, or which is fairly doubtful.'"  *Randell*, 761 F.2d at 125 (quoting *United*

*States v. Miller*, 753 F.2d 19, 23 (3d Cir. 1985)).  It has also been defined as a question that is

"fairly debatable," *id.* (quoting *United States v. Handy*, 753 F.2d 1487, 1490 (9th Cir. 1985)[20]),

or "a 'close' question or one that very well could be decided the other way."  *Id.* (quoting *United*

*States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985)).  The phrase "likely to result" in reversal

or a new trial does not mean the defendant is likely to prevail on appeal; rather, it means that the

question is sufficiently important that *if* it "is determined favorably to defendant on appeal, that

decision is likely to result in reversal or an order for a new trial.'"  *Id.* at 124-25.

---

[20] It appears that the *Handy* opinion quoted in *Randell* was amended on May 21, 1985, approximately three weeks after *Randell* was decided.  *See generally United States v. Handy*, 761 F.2d 1279 (9th Cir. 1985).  The Court in *Randall* appears to have acknowledged the forthcoming amendment in *Handy*, and confirmed that "[t]he amended opinion in *Handy* . . . does not depart from the definition of "substantial" as "fairly debatable" that was initially adopted in that case."  *Randell*, 761 F.2d at 125 n.2.  Indeed, the "fairly debatable" language is still used in the amended *Handy* opinion.  761 F.2d at 1281.

Here, Mr. Newman's appeal presents a substantial question of law concerning the Court's charge to the jury on the elements of insider trading. Specifically, the Court rejected Mr. Newman's proposed jury charge that a defendant must know that information he received originated with a corporate insider who disclosed it *in exchange for a personal benefit*. We respectfully submit that, in a criminal insider trading case, a tippee like Mr. Newman must know that the tipper received a personal benefit. The Court's jury charge omitted this requirement and was therefore in error. Certainly this is a substantial question on appeal.

The Supreme Court has long held that trading on material, nonpublic information provided by a company insider is not, by itself, a crime. *Dirks v. SEC*, 463 U.S. 646, 653 (1983) (citing *Chiarella v. United States*, 445 U.S. 222, 235 (1980)). Rather, trading on inside information is illegal only if the insider breached a fiduciary duty to shareholders and the tippee knows that the information was obtained improperly. *Dirks,* 463 U.S. at 660 ("Thus, some tippees must assume an insider's duty to the shareholders not because they receive inside information, but rather because it has been made available to them *improperly*."). An essential element of an "improper" disclosure giving rise to tippee liability is that the company employee engaged in self-dealing. *Id.* at 654. As summarized by the Supreme Court, "the test is whether the insider personally will benefit, directly or indirectly, from his disclosure. Absent some personal gain, there has been no breach of duty to stockholders. And absent a breach by the insider, there is no derivative breach [by tippees]." *Id.* at 662.[21]

_____

[21] The facts of *Dirks* illustrate this point. Dirks received confidential company information from a whistle-blower who was not authorized to release the information. 463 U.S. at 648-49. However, the insider's motive was not to benefit personally, but rather to expose fraud at the company. *Id.* at 667. Thus, while the disclosure may have violated duties of trust and confidence, it was not for a personal benefit. As such, Dirks was free to trade on the information (or to provide the information to his clients so that they could trade). *Id.*

Prior to the Court's decision below, the only three cases in the Southern District of New York to address the issue held that insider trading liability requires a tippee to know that the insider received a personal benefit. *United States v. Whitman*, No. 12 Cr. 125, 2012 WL 5505080 (S.D.N.Y. Nov. 14, 2012); *United States v. Rajaratnam*, 802 F. Supp. 2d 491, 498-99 (S.D.N.Y. 2011); *State Teachers Ret. Bd. v. Fluor Corp.*, 592 F. Supp. 592, 594 (S.D.N.Y. 1984). Each of these decisions found that, under *Dirks*, self-dealing is an essential element of a breach of fiduciary duty giving rise to insider trading liability and, as such, must be known to the defendant. *Whitman*, 2012 WL 5505080, at *5-6; *Rajaratnam*, 802 F. Supp. 2d at 498-99; *Teachers*, 592 F. Supp. at 594. As Judge Rakoff explained in *Whitman*:

> [I]f the only way to know whether the tipper is violating the law is to know whether the tipper is anticipating something in return for the unauthorized disclosure, then the tippee must have knowledge that such self-dealing occurred, for, without such a knowledge requirement, the tippee does not know if there has been an 'improper' disclosure of inside information.

2012 WL 5505080, at *6. In addition, because "derivative liability can attach only if the tippee recognizes that the relationship between tipper and tippee is such that the tippee has effectively become a participant after the fact in the insider's breach," the tippee must know each of the facts that gives rise to the tipper's liability in the first place. *Rajaratnam*, 802 F. Supp. 2d at 499 (quoting *Dirks*, 463 U.S. at 659); *Teachers*, 592 F. Supp. at 594-95 (same).

In rejecting *Whitman*, *Rajaratnam*, and *Teachers*, this Court relied on *SEC v. Obus*, 693 F.3d 276 (2d Cir. 2012). We respectfully submit that this reliance was misplaced because *Obus* is a civil case under the misappropriation theory of insider trading, in which the issue of a remote tippee's knowledge of personal benefit was not advanced by the parties nor decided by the court. The district court opinion in *Obus* makes no mention of any of the several tippees' knowledge (or lack of knowledge) of personal benefits. *SEC v. Obus*, No. 06 CIV 3150,

2010 WL 3703846 (S.D.N.Y. Sept. 20, 2010).  On appeal, the defendant-tippees did not contest

that the tipper received a personal benefit, *see* SEC Br. at 31 n.5, *SEC v. Obus*, No. 10-4749 (2d

Cir. Mar. 29, 2011), nor did they argue that liability required them to have knowledge of that

benefit.  Rather, defendants' position was that the tipper's disclosure was authorized and that the

SEC had failed to establish any breach of duty by the tipper.  Appellee Br. at 37-38, *SEC v.

Obus*, No. 10-4749 (2d Cir. June 28, 2011).[22]  Thus, the court in *Obus* was not presented with the

specific question at issue in this case and any commentary on that issue is not controlling.  *See

United States ex rel. The St. Regis Mohawk Tribe v. President R.C.*, 451 F.3d 44, 52 (2d Cir.

2006) (language quoted from previous decision was *dicta* because the court in that case was not

presented squarely with the issue now before the court).[23]

   Another important distinction between *Obus* and this case is that *Obus* is a civil

case.  Under the securities fraud statute a criminal conviction requires willfulness while civil

liability does not.[24]  The *Obus* court was well aware of the civil nature of the claims at hand,

---

[22] It is understandable that the parties in *Obus* did not focus their arguments on personal benefit
(or knowledge of personal benefit) because, historically, the Second Circuit has not required a
personal benefit in insider trading cases, like *Obus*, that are prosecuted under the
misappropriation theory.  *See United States v. Libera*, 989 F.2d 596 (2d Cir. 1993); *SEC v. Lyon*,
605 F. Supp. 2d 531, 548 (S.D.N.Y. 2009) ("the Second Circuit has declined to impose a
'benefit' requirement in misappropriation theory cases").  In describing the elements of insider
trading, the *Obus* court appears to have imported personal benefit as an element in
misappropriation cases.  *Obus*, 693 F.3d at 285.  But that does not mean that the Court was
presented with, or intended to decide, the issue of whether a tippee must know of the personal
benefit.

[23] Indeed, the Second Circuit's decision in *Obus* makes no mention of either *Rajaratnam* or
*Teachers*, the two prior lower court decisions squarely addressing the knowledge of benefit
issue.  Presumably, the Court would have at least acknowledged these decisions had it intended
to announce a contrary result.

[24] *See* 15 U.S.C. § 78ff(a) ("Any person who willfully violates any provision of this chapter" is
guilty of an offense); *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005) ("To begin, we
note that although civil liability follows from any violation of the securities laws regardless of

including in the context of describing the applicable scienter requirement.  *E.g.* 693 F.3d at 286

("Negligence is not a sufficiently culpable state of mind to support a section 10(b) civil

violation."); *id.* ("We read the scienter requirement set forth in *Hochfelder* . . . to apply broadly

to civil securities fraud liability . . . .").  By contrast, a willful violation, as required in criminal

cases, requires that the defendant understood that his actions were wrong.  *Cassesse*, 428 F.3d at

92 (willfulness is "'a realization on the defendant's part that he was doing a wrongful act'")

(quoting *United States v. Peltz*, 433 F.2d 48, 55 (2d Cir. 1970)).  Since *Dirks* defines the line

between proper and improper conduct in relation to whether there was a personal benefit to the

insider, a "willful" criminal violation requires that the defendant be aware of that fact.

       Finally, at least one Southern District court has already determined that *Obus* is

not controlling on the question of whether a jury in a criminal case should be instructed that a

tippee's knowledge of the personal benefit is an essential element of an insider trading

conviction.  Judge Rakoff's opinion in *Whitman* was issued after the *Obus* decision.  Judge

Rakoff cited *Obus* regarding the treatment of personal benefit in misappropriation cases, *see*

*Whitman*, 2012 WL 5505080, at *5 n.6, but did not construe *Obus* as affecting his analysis that

in a criminal case under the classical theory, the tippee must know that information was provided

in exchange for a personal benefit.

       For all of the foregoing reasons, Mr. Newman respectfully submits that he has

established a substantial appellate issue and should be released on bail pending his appeal.

---

whether the violation was willful, in order to establish a criminal violation of the securities laws,
the Government must show that the defendant acted willfully.").

**V.      CONCLUSION**

For the foregoing reasons, Mr. Newman respectfully requests that the Court impose a sentence that is significantly below the Guidelines range of 63 to 78 months, and for the other relief requested herein.


Dated:  New York, New York
         April 18, 2013

                                   Respectfully submitted,

                                   SHEARMAN & STERLING LLP


                                   By:  ___/s/ John A. Nathanson_____
                                        Stephen Fishbein
                                        John A. Nathanson
                                        Sara Ricciardi
                                        599 Lexington Avenue
                                        New York, NY 10022-6069
                                        Tel: 212-848-4000

                                        *Attorneys for Defendant Todd Newman*

# Exhibit A

**DELL Q1 - FIFO-Matched Newman Trading: May 16, 2008 - June 3, 2008**

| Ticker | Date | Time | Trans | Shares | Price | Purchase Price (outflow) | Date | Time | Trans | Shares | Price | Sale Price (proceeds) | Profit |
|--------|------|------|-------|--------|-------|--------------------------|------|------|-------|--------|-------|-----------------------|--------|
| DELL | 5/16/2008 | 9:35 AM | 1-Buy | 50,000 | 20.8051 | ($1,040,255) | 5/19/2008 | 2:13 PM | 2-Sell | 50,000 | 21.2430 | $1,062,150 | $21,895 |
| DELL | 5/16/2008 | 9:35 AM | 1-Buy | 25,000 | 20.8051 | ($520,128) | 5/19/2008 | 3:38 PM | 2-Sell | 25,000 | 21.1200 | $528,000 | $7,873 |
| DELL | 5/16/2008 | 9:35 AM | 1-Buy | 100,000 | 20.8051 | ($2,080,510) | 5/20/2008 | 9:36 AM | 2-Sell | 100,000 | 20.6961 | $2,069,610 | ($10,900) |
| DELL | 5/16/2008 | 9:35 AM | 1-Buy | 25,000 | 20.8051 | ($520,128) | 5/20/2008 | 9:47 AM | 2-Sell | 25,000 | 20.7305 | $518,263 | ($1,865) |
| DELL | 5/16/2008 | 9:58 AM | 1-Buy | 25,000 | 20.7938 | ($519,845) | 5/20/2008 | 9:47 AM | 2-Sell | 25,000 | 20.7305 | $518,263 | ($1,583) |
| DELL | 5/16/2008 | 9:58 AM | 1-Buy | 25,000 | 20.7938 | ($519,845) | 5/20/2008 | 9:51 AM | 2-Sell | 25,000 | 20.6813 | $517,033 | ($2,813) |
| DELL | 5/16/2008 | 10:58 AM | 1-Buy | 50,000 | 20.9034 | ($1,045,170) | 5/20/2008 | 9:51 AM | 2-Sell | 50,000 | 20.6813 | $1,034,065 | ($11,105) |
| DELL | 5/16/2008 | 11:20 AM | 1-Buy | 10,000 | 20.7800 | ($207,800) | 5/20/2008 | 9:51 AM | 2-Sell | 10,000 | 20.6813 | $206,813 | ($987) |
| DELL | 5/16/2008 | 11:49 AM | 1-Buy | 10,000 | 20.7585 | ($207,585) | 5/20/2008 | 9:51 AM | 2-Sell | 10,000 | 20.6813 | $206,813 | ($772) |
| DELL | 5/16/2008 | 11:57 AM | 1-Buy | 5,000 | 20.8300 | ($104,150) | 5/20/2008 | 9:51 AM | 2-Sell | 5,000 | 20.6813 | $103,407 | ($743) |
| DELL | 5/16/2008 | 11:57 AM | 1-Buy | 5,000 | 20.8300 | ($104,150) | 5/20/2008 | 10:02 AM | 2-Sell | 5,000 | 20.5200 | $102,600 | ($1,550) |
| DELL | 5/16/2008 | 1:04 PM | 1-Buy | 20,000 | 20.9050 | ($418,100) | 5/20/2008 | 10:02 AM | 2-Sell | 20,000 | 20.5200 | $410,400 | ($7,700) |
| DELL | 5/16/2008 | 2:46 PM | 1-Buy | 25,000 | 21.0751 | ($526,878) | 5/20/2008 | 10:02 AM | 2-Sell | 25,000 | 20.5200 | $513,000 | ($13,878) |
| DELL | 5/16/2008 | 2:46 PM | 1-Buy | 25,000 | 21.0751 | ($526,878) | 5/20/2008 | 11:52 AM | 2-Sell | 25,000 | 20.4876 | $512,190 | ($14,688) |
| DELL | 5/16/2008 | 3:13 PM | 1-Buy | 25,000 | 21.1312 | ($528,280) | 5/20/2008 | 11:52 AM | 2-Sell | 25,000 | 20.4876 | $512,190 | ($16,090) |
| DELL | 5/16/2008 | 3:22 PM | 1-Buy | 35,000 | 21.3911 | ($748,689) | 5/21/2008 | 2:47 PM | 2-Sell | 35,000 | 19.9400 | $697,900 | ($50,789) |
| DELL | 5/16/2008 | 3:22 PM | 1-Buy | 15,000 | 21.3911 | ($320,867) | 5/22/2008 | 10:04 AM | 2-Sell | 15,000 | 20.4300 | $306,450 | ($14,417) |
| DELL | 5/21/2008 | 9:35 AM | 1-Buy | 10,000 | 20.3742 | ($203,742) | 5/22/2008 | 10:04 AM | 2-Sell | 10,000 | 20.4300 | $204,300 | $558 |
| DELL | 5/21/2008 | 9:35 AM | 1-Buy | 15,000 | 20.3742 | ($305,613) | 5/23/2008 | 1:22 PM | 2-Sell | 15,000 | 21.2200 | $318,300 | $12,687 |
| DELL | 5/21/2008 | 9:41 AM | 1-Buy | 20,000 | 20.4596 | ($409,192) | 5/23/2008 | 1:22 PM | 2-Sell | 20,000 | 21.2200 | $424,400 | $15,208 |
| DELL | 5/21/2008 | 9:44 AM | 1-Buy | 15,000 | 20.4565 | ($306,848) | 5/23/2008 | 1:22 PM | 2-Sell | 15,000 | 21.2200 | $318,300 | $11,452 |
| DELL | 5/21/2008 | 9:44 AM | 1-Buy | 10,000 | 20.4565 | ($204,565) | 5/23/2008 | 3:55 PM | 2-Sell | 10,000 | 21.1900 | $211,900 | $7,335 |
| DELL | 5/21/2008 | 10:45 AM | 1-Buy | 15,000 | 20.3564 | ($305,346) | 5/23/2008 | 3:55 PM | 2-Sell | 15,000 | 21.1900 | $317,850 | $12,504 |
| DELL | 5/21/2008 | 10:45 AM | 1-Buy | 10,000 | 20.3564 | ($203,564) | 5/28/2008 | 9:33 AM | 2-Sell | 10,000 | 21.8667 | $218,667 | $15,103 |
| DELL | 5/21/2008 | 11:29 AM | 1-Buy | 15,000 | 20.3900 | ($305,850) | 5/28/2008 | 9:33 AM | 2-Sell | 15,000 | 21.8667 | $328,001 | $22,151 |
| DELL | 5/21/2008 | 11:29 AM | 1-Buy | 5,000 | 20.3900 | ($101,950) | 5/28/2008 | 9:37 AM | 2-Sell | 5,000 | 21.7466 | $108,733 | $6,783 |
| DELL | 5/21/2008 | 12:43 PM | 1-Buy | 20,000 | 20.3847 | ($407,694) | 5/28/2008 | 9:37 AM | 2-Sell | 20,000 | 21.7466 | $434,932 | $27,238 |
| DELL | 5/22/2008 | 10:05 AM | 1-Buy | 25,000 | 20.4350 | ($510,875) | 5/28/2008 | 11:04 AM | 2-Sell | 25,000 | 21.6558 | $541,395 | $30,520 |
| DELL | 5/22/2008 | 10:05 AM | 1-Buy | 25,000 | 20.4350 | ($510,875) | 5/28/2008 | 3:01 PM | 2-Sell | 25,000 | 21.5384 | $538,460 | $27,585 |
| DELL | 5/22/2008 | 10:10 AM | 1-Buy | 25,000 | 20.5000 | ($512,500) | 5/28/2008 | 3:01 PM | 2-Sell | 25,000 | 21.5384 | $538,460 | $25,960 |
| DELL | 5/22/2008 | 10:38 AM | 1-Buy | 10,000 | 20.5626 | ($205,626) | 5/28/2008 | 3:51 PM | 2-Sell | 10,000 | 21.6800 | $216,800 | $11,174 |
| DELL | 5/22/2008 | 10:38 AM | 1-Buy | 10,000 | 20.5626 | ($205,626) | 5/28/2008 | 3:58 PM | 2-Sell | 10,000 | 21.7000 | $217,000 | $11,374 |
| DELL | 5/22/2008 | 10:38 AM | 1-Buy | 25,000 | 20.5626 | ($514,065) | 5/29/2008 | 4:12 PM | 2-Sell | 25,000 | 23.0600 | $576,500 | $62,435 |
| DELL | 5/22/2008 | 10:38 AM | 1-Buy | 5,000 | 20.5626 | ($102,813) | 5/29/2008 | 4:29 PM | 2-Sell | 5,000 | 23.0600 | $115,300 | $12,487 |
| DELL | 5/22/2008 | 11:06 AM | 1-Buy | 20,000 | 20.4802 | ($409,604) | 5/29/2008 | 4:29 PM | 2-Sell | 20,000 | 23.0600 | $461,200 | $51,596 |
| DELL | 5/22/2008 | 11:06 AM | 1-Buy | 30,000 | 20.4802 | ($614,406) | 5/30/2008 | 9:37 AM | 2-Sell | 30,000 | 23.0600 | $691,800 | $77,394 |
| DELL | 5/22/2008 | 11:20 AM | 1-Buy | 45,000 | 20.5812 | ($926,154) | 5/30/2008 | 9:37 AM | 2-Sell | 45,000 | 23.0600 | $1,037,700 | $111,546 |
| DELL | 5/22/2008 | 11:20 AM | 1-Buy | 5,000 | 20.5812 | ($102,906) | 5/30/2008 | 10:03 AM | 2-Sell | 5,000 | 23.0600 | $115,300 | $12,394 |

**DELL Q1 - FIFO-Matched Newman Trading: May 16, 2008 - June 3, 2008**

| Ticker | Date | Time | Trans | Shares | Price | Purchase Price (outflow) | | Date | Time | Trans | Shares | Price | Sale Price (proceeds) | | Profit |
|--------|------|------|-------|--------|-------|--------------------------|---|------|------|-------|--------|-------|-----------------------|---|--------|
| DELL | 5/22/2008 | 11:47 AM | 1-Buy | 5,000 | 20.5920 | ($102,960) | | 5/30/2008 | 10:03 AM | 2-Sell | 5,000 | 23.0600 | $115,300 | | $12,340 |
| DELL | 5/22/2008 | 11:47 AM | 1-Buy | 10,000 | 20.5920 | ($205,920) | | 5/30/2008 | 10:51 AM | 2-Sell | 10,000 | 23.0600 | $230,600 | | $24,680 |
| DELL | 5/22/2008 | 11:47 AM | 1-Buy | 5,000 | 20.5920 | ($102,960) | | 5/30/2008 | 11:13 AM | 2-Sell | 5,000 | 23.0600 | $115,300 | | $12,340 |
| DELL | 5/22/2008 | 11:47 AM | 1-Buy | 25,000 | 20.5920 | ($514,800) | | 5/30/2008 | 12:50 PM | 2-Sell | 25,000 | 23.0600 | $576,500 | | $61,700 |
| DELL | 5/22/2008 | 11:47 AM | 1-Buy | 5,000 | 20.5920 | ($102,960) | | 5/30/2008 | 2:34 PM | 2-Sell | 5,000 | 23.0600 | $115,300 | | $12,340 |
| DELL | 5/22/2008 | 1:38 PM | 1-Buy | 20,000 | 20.8300 | ($416,600) | | 5/30/2008 | 2:34 PM | 2-Sell | 20,000 | 23.0600 | $461,200 | | $44,600 |
| DELL | 5/22/2008 | 1:38 PM | 1-Buy | 5,000 | 20.8300 | ($104,150) | | 6/2/2008 | 10:21 AM | 2-Sell | 5,000 | 23.0600 | $115,300 | | $11,150 |
| DELL | 5/22/2008 | 3:04 PM | 1-Buy | 25,000 | 20.9400 | ($523,500) | | 6/2/2008 | 10:21 AM | 2-Sell | 25,000 | 23.0600 | $576,500 | | $53,000 |
| DELL | 5/29/2008 | 9:32 AM | 1-Buy | 20,000 | 21.5946 | ($431,892) | | 6/2/2008 | 10:21 AM | 2-Sell | 20,000 | 23.0600 | $461,200 | | $29,308 |
| DELL | 5/29/2008 | 9:32 AM | 1-Buy | 5,000 | 21.5946 | ($107,973) | | 6/2/2008 | 11:26 AM | 2-Sell | 5,000 | 23.0600 | $115,300 | | $7,327 |
| DELL | 5/29/2008 | 9:37 AM | 1-Buy | 20,000 | 21.6633 | ($433,266) | | 6/2/2008 | 11:26 AM | 2-Sell | 20,000 | 23.0600 | $461,200 | | $27,934 |
| DELL | 5/29/2008 | 9:37 AM | 1-Buy | 5,000 | 21.6633 | ($108,317) | | 6/2/2008 | 12:36 PM | 2-Sell | 5,000 | 23.0600 | $115,300 | | $6,984 |
| DELL | 5/29/2008 | 10:01 AM | 1-Buy | 20,000 | 21.6188 | ($432,376) | | 6/2/2008 | 12:36 PM | 2-Sell | 20,000 | 23.0600 | $461,200 | | $28,824 |
| DELL | 5/29/2008 | 10:10 AM | 1-Buy | 25,000 | 21.6260 | ($540,650) | | 6/2/2008 | 1:07 PM | 2-Sell | 25,000 | 23.0600 | $576,500 | | $35,850 |
| DELL | 5/29/2008 | 10:16 AM | 1-Buy | 50,000 | 21.6470 | ($1,082,350) | | 6/3/2008 | 1:56 PM | 2-Sell | 50,000 | 23.0600 | $1,153,000 | | $70,650 |
| DELL | 5/29/2008 | 10:24 AM | 1-Buy | 25,000 | 21.6315 | ($540,788) | | 6/3/2008 | 2:23 PM | 2-Sell | 25,000 | 23.0600 | $576,500 | | $35,713 |
| DELL | 5/29/2008 | 11:38 AM | 1-Buy | 25,000 | 21.5964 | ($539,910) | | 6/3/2008 | 2:23 PM | 2-Sell | 25,000 | 23.0600 | $576,500 | | $36,590 |
| DELL | 5/29/2008 | 12:48 PM | 1-Buy | 25,000 | 21.8200 | ($545,500) | | 6/3/2008 | 2:23 PM | 2-Sell | 25,000 | 23.0600 | $576,500 | | $31,000 |
| | | | | | | | | | | | | | | Total | $987,703 |

**Closing Price on 5/30/2008:**        $23.06

**DELL Q2 - FIFO-Matched Newman Trading August 5, 2008 - September 4, 2008**

| Ticker | Date | Time | Trans | Shares | Price | Purchase Price (outflow) | Date | Time | Trans | Shares | Price | Sale Price (proceeds) | Profit |
|--------|------|------|-------|--------|-------|--------------------------|------|------|-------|--------|-------|-----------------------|--------|
| DELL | 8/5/2008 | 9:39 AM | 3-Short | 20,000 | 25.4900 | $509,800 | 8/11/2008 | 12:05 PM | 4-Cover | 20,000 | 25.0673 | ($501,346) | $8,454 |
| DELL | 8/5/2008 | 9:47 AM | 3-Short | 20,000 | 25.3013 | $506,026 | 8/11/2008 | 12:05 PM | 4-Cover | 20,000 | 25.0673 | ($501,346) | $4,680 |
| DELL | 8/5/2008 | 9:54 AM | 3-Short | 20,000 | 25.2300 | $504,600 | 8/11/2008 | 12:05 PM | 4-Cover | 20,000 | 25.0673 | ($501,346) | $3,254 |
| DELL | 8/5/2008 | 10:17 AM | 3-Short | 20,000 | 25.4737 | $509,474 | 8/11/2008 | 12:05 PM | 4-Cover | 20,000 | 25.0673 | ($501,346) | $8,128 |
| DELL | 8/5/2008 | 1:44 PM | 3-Short | 20,000 | 25.1401 | $502,802 | 8/11/2008 | 12:05 PM | 4-Cover | 20,000 | 25.0673 | ($501,346) | $1,456 |
| DELL | 8/5/2008 | 2:18 PM | 3-Short | 20,000 | 25.0494 | $500,988 | 8/11/2008 | 12:23 PM | 4-Cover | 20,000 | 25.1331 | ($502,662) | ($1,674) |
| DELL | 8/5/2008 | 2:23 PM | 3-Short | 20,000 | 24.8814 | $497,628 | 8/11/2008 | 12:23 PM | 4-Cover | 20,000 | 25.1331 | ($502,662) | ($5,034) |
| DELL | 8/5/2008 | 3:10 PM | 3-Short | 20,000 | 25.0500 | $501,000 | 8/11/2008 | 12:23 PM | 4-Cover | 20,000 | 25.1331 | ($502,662) | ($1,662) |
| DELL | 8/5/2008 | 3:29 PM | 3-Short | 20,000 | 24.8801 | $497,602 | 8/11/2008 | 12:23 PM | 4-Cover | 20,000 | 25.1331 | ($502,662) | ($5,060) |
| DELL | 8/6/2008 | 9:48 AM | 3-Short | 20,000 | 25.0495 | $500,990 | 8/11/2008 | 12:23 PM | 4-Cover | 20,000 | 25.1331 | ($502,662) | ($1,672) |
| DELL | 8/6/2008 | 12:53 PM | 3-Short | 10,000 | 25.1000 | $251,000 | 8/11/2008 | 12:42 PM | 4-Cover | 10,000 | 25.2185 | ($252,185) | ($1,185) |
| DELL | 8/7/2008 | 1:30 PM | 3-Short | 20,000 | 25.2106 | $504,212 | 8/11/2008 | 12:42 PM | 4-Cover | 20,000 | 25.2185 | ($504,370) | ($158) |
| DELL | 8/7/2008 | 1:36 PM | 3-Short | 10,000 | 25.2000 | $252,000 | 8/11/2008 | 12:42 PM | 4-Cover | 10,000 | 25.2185 | ($252,185) | ($185) |
| DELL | 8/7/2008 | 1:41 PM | 3-Short | 10,000 | 25.1600 | $251,600 | 8/11/2008 | 12:42 PM | 4-Cover | 10,000 | 25.2185 | ($252,185) | ($585) |
| DELL | 8/7/2008 | 1:41 PM | 3-Short | 10,000 | 25.1600 | $251,600 | 8/11/2008 | 1:29 PM | 4-Cover | 10,000 | 25.3951 | ($253,951) | ($2,351) |
| DELL | 8/7/2008 | 2:32 PM | 3-Short | 15,000 | 25.0597 | $375,895 | 8/11/2008 | 1:29 PM | 4-Cover | 15,000 | 25.3951 | ($380,926) | ($5,031) |
| DELL | 8/7/2008 | 2:32 PM | 3-Short | 5,000 | 25.0597 | $125,299 | 8/12/2008 | 9:31 AM | 4-Cover | 5,000 | 25.3200 | ($126,600) | ($1,302) |
| DELL | 8/7/2008 | 2:47 PM | 3-Short | 20,000 | 24.9150 | $498,300 | 8/12/2008 | 9:31 AM | 4-Cover | 20,000 | 25.3200 | ($506,400) | ($8,100) |
| DELL | 8/7/2008 | 3:24 PM | 3-Short | 20,000 | 24.9150 | $498,300 | 8/12/2008 | 9:31 AM | 4-Cover | 20,000 | 25.3200 | ($506,400) | ($8,100) |
| DELL | 8/8/2008 | 11:10 AM | 3-Short | 5,000 | 25.2585 | $126,293 | 8/12/2008 | 9:31 AM | 4-Cover | 5,000 | 25.3200 | ($126,600) | ($307) |
| DELL | 8/8/2008 | 11:10 AM | 3-Short | 5,000 | 25.2585 | $126,293 | 8/12/2008 | 9:36 AM | 4-Cover | 5,000 | 25.2277 | ($126,138) | $154 |
| DELL | 8/8/2008 | 11:19 AM | 3-Short | 20,000 | 25.2000 | $504,000 | 8/12/2008 | 9:36 AM | 4-Cover | 20,000 | 25.2277 | ($504,554) | ($554) |
| DELL | 8/8/2008 | 11:38 AM | 3-Short | 20,000 | 25.1200 | $502,400 | 8/12/2008 | 9:36 AM | 4-Cover | 20,000 | 25.2277 | ($504,554) | ($2,154) |
| DELL | 8/8/2008 | 12:33 PM | 3-Short | 5,000 | 25.0076 | $125,038 | 8/12/2008 | 9:36 AM | 4-Cover | 5,000 | 25.2277 | ($126,138) | ($1,100) |
| DELL | 8/8/2008 | 12:33 PM | 3-Short | 5,000 | 25.0076 | $125,038 | 8/14/2008 | 9:43 AM | 4-Cover | 5,000 | 25.3740 | ($126,870) | ($1,832) |
| DELL | 8/8/2008 | 12:47 PM | 3-Short | 20,000 | 24.9830 | $499,660 | 8/14/2008 | 9:43 AM | 4-Cover | 20,000 | 25.3740 | ($507,480) | ($7,820) |
| DELL | 8/11/2008 | 2:55 PM | 3-Short | 10,000 | 24.9050 | $249,050 | 8/14/2008 | 9:45 AM | 4-Cover | 10,000 | 25.4173 | ($254,173) | ($5,123) |
| DELL | 8/11/2008 | 2:55 PM | 3-Short | 15,000 | 24.9050 | $373,575 | 8/14/2008 | 10:00 AM | 4-Cover | 15,000 | 25.3767 | ($380,651) | ($7,076) |
| DELL | 8/11/2008 | 2:55 PM | 3-Short | 25,000 | 24.9050 | $622,625 | 8/18/2008 | 3:39 PM | 4-Cover | 25,000 | 24.5500 | ($613,750) | $8,875 |
| DELL | 8/11/2008 | 3:11 PM | 3-Short | 25,000 | 24.9631 | $624,078 | 8/18/2008 | 3:56 PM | 4-Cover | 25,000 | 24.6356 | ($615,890) | $8,188 |
| DELL | 8/14/2008 | 1:46 PM | 3-Short | 25,000 | 25.4619 | $636,548 | 8/18/2008 | 3:56 PM | 4-Cover | 25,000 | 24.6356 | ($615,890) | $20,658 |
| DELL | 8/15/2008 | 10:24 AM | 3-Short | 25,000 | 25.2267 | $630,668 | 8/19/2008 | 10:58 AM | 4-Cover | 25,000 | 24.4976 | ($612,440) | $18,228 |
| DELL | 8/15/2008 | 3:13 PM | 3-Short | 25,000 | 25.3000 | $632,500 | 8/19/2008 | 10:58 AM | 4-Cover | 25,000 | 24.4976 | ($612,440) | $20,060 |
| DELL | 8/15/2008 | 3:17 PM | 3-Short | 25,000 | 25.2757 | $631,893 | 8/19/2008 | 11:14 AM | 4-Cover | 25,000 | 24.4629 | ($611,573) | $20,320 |
| DELL | 8/15/2008 | 3:23 PM | 3-Short | 25,000 | 25.2832 | $632,080 | 8/19/2008 | 11:40 AM | 4-Cover | 25,000 | 24.4780 | ($611,950) | $20,130 |
| DELL | 8/15/2008 | 3:23 PM | 3-Short | 25,000 | 25.2832 | $632,080 | 8/19/2008 | 12:09 PM | 4-Cover | 25,000 | 24.4637 | ($611,592) | $20,488 |
| DELL | 8/15/2008 | 3:29 PM | 3-Short | 20,000 | 25.2650 | $505,300 | 8/19/2008 | 12:14 PM | 4-Cover | 20,000 | 24.4750 | ($489,500) | $15,800 |
| DELL | 8/15/2008 | 3:29 PM | 3-Short | 15,000 | 25.2650 | $378,975 | 8/19/2008 | 12:31 PM | 4-Cover | 15,000 | 24.5267 | ($367,901) | $11,075 |

**DELL Q2 - FIFO-Matched Newman Trading August 5, 2008 - September 4, 2008**

| Ticker | Date | Time | Trans | Shares | Price | Purchase Price (outflow) | Date | Time | Trans | Shares | Price | Sale Price (proceeds) | Profit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DELL | 8/15/2008 | 3:29 PM | 3-Short | 15,000 | 25.2650 | $378,975 | 8/19/2008 | 12:38 PM | 4-Cover | 15,000 | 24.5849 | ($368,774) | $10,202 |
| DELL | 8/15/2008 | 3:31 PM | 3-Short | 5,000 | 25.2504 | $126,252 | 8/19/2008 | 12:38 PM | 4-Cover | 5,000 | 24.5849 | ($122,925) | $3,327 |
| DELL | 8/15/2008 | 3:31 PM | 3-Short | 10,000 | 25.2504 | $252,504 | 8/19/2008 | 1:29 PM | 4-Cover | 10,000 | 24.4717 | ($244,717) | $7,787 |
| DELL | 8/15/2008 | 3:31 PM | 3-Short | 20,000 | 25.2504 | $505,008 | 8/19/2008 | 1:33 PM | 4-Cover | 20,000 | 24.4900 | ($489,800) | $15,208 |
| DELL | 8/15/2008 | 3:31 PM | 3-Short | 15,000 | 25.2504 | $378,756 | 8/29/2008 | 10:37 AM | 4-Cover | 15,000 | 21.7300 | ($325,950) | $52,806 |
| DELL | 8/15/2008 | 3:37 PM | 3-Short | 50,000 | 25.2229 | $1,261,145 | 8/29/2008 | 10:37 AM | 4-Cover | 50,000 | 21.7300 | ($1,086,500) | $174,645 |
| DELL | 8/15/2008 | 3:42 PM | 3-Short | 25,000 | 25.1981 | $629,953 | 8/29/2008 | 10:37 AM | 4-Cover | 25,000 | 21.7300 | ($543,250) | $86,703 |
| DELL | 8/15/2008 | 3:44 PM | 3-Short | 10,000 | 25.1193 | $251,193 | 8/29/2008 | 10:37 AM | 4-Cover | 10,000 | 21.7300 | ($217,300) | $33,893 |
| DELL | 8/15/2008 | 3:44 PM | 3-Short | 15,000 | 25.1193 | $376,789 | 8/29/2008 | 10:51 AM | 4-Cover | 15,000 | 21.7300 | ($325,950) | $50,839 |
| DELL | 8/15/2008 | 3:59 PM | 3-Short | 25,000 | 25.0600 | $626,500 | 8/29/2008 | 10:51 AM | 4-Cover | 25,000 | 21.7300 | ($543,250) | $83,250 |
| DELL | 8/18/2008 | 9:37 AM | 3-Short | 10,000 | 25.0712 | $250,712 | 8/29/2008 | 10:51 AM | 4-Cover | 10,000 | 21.7300 | ($217,300) | $33,412 |
| DELL | 8/18/2008 | 9:37 AM | 3-Short | 15,000 | 25.0712 | $376,068 | 8/29/2008 | 2:44 PM | 4-Cover | 15,000 | 21.7300 | ($325,950) | $50,118 |
| DELL | 8/18/2008 | 12:26 PM | 3-Short | 25,000 | 24.7843 | $619,608 | 8/29/2008 | 2:44 PM | 4-Cover | 25,000 | 21.7300 | ($543,250) | $76,358 |
| DELL | 8/18/2008 | 12:42 PM | 3-Short | 10,000 | 24.6095 | $246,095 | 8/29/2008 | 2:44 PM | 4-Cover | 10,000 | 21.7300 | ($217,300) | $28,795 |
| DELL | 8/18/2008 | 12:42 PM | 3-Short | 25,000 | 24.6095 | $615,238 | 8/29/2008 | 3:08 PM | 4-Cover | 25,000 | 21.7300 | ($543,250) | $71,988 |
| DELL | 8/18/2008 | 12:42 PM | 3-Short | 15,000 | 24.6095 | $369,143 | 8/29/2008 | 3:20 PM | 4-Cover | 15,000 | 21.7300 | ($325,950) | $43,193 |
| DELL | 8/19/2008 | 9:45 AM | 3-Short | 10,000 | 24.5166 | $245,166 | 8/29/2008 | 3:20 PM | 4-Cover | 10,000 | 21.7300 | ($217,300) | $27,866 |
| DELL | 8/19/2008 | 9:45 AM | 3-Short | 15,000 | 24.5166 | $367,749 | 8/29/2008 | 3:29 PM | 4-Cover | 15,000 | 21.7300 | ($325,950) | $41,799 |
| DELL | 8/19/2008 | 9:47 AM | 3-Short | 10,000 | 24.4600 | $244,600 | 8/29/2008 | 3:29 PM | 4-Cover | 10,000 | 21.7300 | ($217,300) | $27,300 |
| DELL | 8/19/2008 | 9:47 AM | 3-Short | 15,000 | 24.4600 | $366,900 | 8/29/2008 | 3:44 PM | 4-Cover | 15,000 | 21.7300 | ($325,950) | $40,950 |
| DELL | 8/20/2008 | 10:39 AM | 3-Short | 10,000 | 24.6500 | $246,500 | 8/29/2008 | 3:44 PM | 4-Cover | 10,000 | 21.7300 | ($217,300) | $29,200 |
| DELL | 8/20/2008 | 10:39 AM | 3-Short | 10,000 | 24.6500 | $246,500 | 8/29/2008 | 3:53 PM | 4-Cover | 10,000 | 21.7300 | ($217,300) | $29,200 |
| DELL | 8/21/2008 | 1:45 PM | 3-Short | 10,000 | 25.0500 | $250,500 | 8/29/2008 | 3:53 PM | 4-Cover | 10,000 | 21.7300 | ($217,300) | $33,200 |
| DELL | 8/21/2008 | 2:58 PM | 3-Short | 5,000 | 25.2000 | $126,000 | 8/29/2008 | 3:53 PM | 4-Cover | 5,000 | 21.7300 | ($108,650) | $17,350 |
| DELL | 8/21/2008 | 2:58 PM | 3-Short | 5,000 | 25.2000 | $126,000 | 9/2/2008 | 11:11 AM | 4-Cover | 5,000 | 21.7300 | ($108,650) | $17,350 |
| DELL | 8/22/2008 | 12:05 PM | 3-Short | 20,000 | 25.1135 | $502,270 | 9/2/2008 | 11:11 AM | 4-Cover | 20,000 | 21.7300 | ($434,600) | $67,670 |
| DELL | 8/22/2008 | 2:10 PM | 3-Short | 25,000 | 24.9904 | $624,760 | 9/2/2008 | 1:34 PM | 4-Cover | 25,000 | 21.7300 | ($543,250) | $81,510 |
| DELL | 8/25/2008 | 12:46 PM | 3-Short | 10,000 | 25.2401 | $252,401 | 9/2/2008 | 3:15 PM | 4-Cover | 10,000 | 21.7300 | ($217,300) | $35,101 |
| DELL | 8/25/2008 | 1:01 PM | 3-Short | 10,000 | 25.1802 | $251,802 | 9/2/2008 | 3:15 PM | 4-Cover | 10,000 | 21.7300 | ($217,300) | $34,502 |
| DELL | 8/25/2008 | 1:08 PM | 3-Short | 5,000 | 25.1849 | $125,924 | 9/2/2008 | 3:15 PM | 4-Cover | 5,000 | 21.7300 | ($108,650) | $17,274 |
| DELL | 8/25/2008 | 1:08 PM | 3-Short | 5,000 | 25.1849 | $125,924 | 9/3/2008 | 9:53 AM | 4-Cover | 5,000 | 21.7300 | ($108,650) | $17,274 |
| DELL | 8/25/2008 | 1:15 PM | 3-Short | 10,000 | 25.1400 | $251,400 | 9/3/2008 | 9:53 AM | 4-Cover | 10,000 | 21.7300 | ($217,300) | $34,100 |
| DELL | 8/25/2008 | 1:43 PM | 3-Short | 10,000 | 25.1600 | $251,600 | 9/3/2008 | 9:53 AM | 4-Cover | 10,000 | 21.7300 | ($217,300) | $34,300 |
| DELL | 8/25/2008 | 1:51 PM | 3-Short | 10,000 | 25.1602 | $251,602 | 9/3/2008 | 9:58 AM | 4-Cover | 10,000 | 21.7300 | ($217,300) | $34,302 |
| DELL | 8/25/2008 | 2:07 PM | 3-Short | 15,000 | 25.1171 | $376,757 | 9/3/2008 | 9:58 AM | 4-Cover | 15,000 | 21.7300 | ($325,950) | $50,807 |
| DELL | 8/25/2008 | 2:07 PM | 3-Short | 5,000 | 25.1171 | $125,586 | 9/3/2008 | 1:19 PM | 4-Cover | 5,000 | 21.7300 | ($108,650) | $16,936 |
| DELL | 8/25/2008 | 2:40 PM | 3-Short | 15,000 | 25.0767 | $376,150 | 9/3/2008 | 1:19 PM | 4-Cover | 15,000 | 21.7300 | ($325,950) | $50,200 |
| DELL | 8/25/2008 | 3:01 PM | 3-Short | 5,000 | 25.0223 | $125,112 | 9/3/2008 | 1:19 PM | 4-Cover | 5,000 | 21.7300 | ($108,650) | $16,462 |

**DELL Q2 - FIFO-Matched Newman Trading August 5, 2008 - September 4, 2008**

| Ticker | Date | Time | Trans | Shares | Price | Purchase Price (outflow) | Date | Time | Trans | Shares | Price | Sale Price (proceeds) | Profit |
|--------|------|------|-------|--------|-------|--------------------------|------|------|-------|--------|-------|-----------------------|--------|
| DELL | 8/25/2008 | 3:01 PM | 3-Short | 5,000 | 25.0223 | $125,112 | 9/3/2008 | 1:36 PM | 4-Cover | 5,000 | 21.7300 | ($108,650) | $16,462 |
| DELL | 8/26/2008 | 11:16 AM | 3-Short | 10,000 | 25.2875 | $252,875 | 9/3/2008 | 1:36 PM | 4-Cover | 10,000 | 21.7300 | ($217,300) | $35,575 |
| DELL | 8/26/2008 | 1:20 PM | 3-Short | 10,000 | 25.2241 | $252,241 | 9/3/2008 | 1:36 PM | 4-Cover | 10,000 | 21.7300 | ($217,300) | $34,941 |
| DELL | 8/27/2008 | 1:03 PM | 3-Short | 10,000 | 25.7300 | $257,300 | 9/3/2008 | 2:36 PM | 4-Cover | 10,000 | 21.7300 | ($217,300) | $40,000 |
| DELL | 8/27/2008 | 1:21 PM | 3-Short | 10,000 | 25.6516 | $256,516 | 9/3/2008 | 2:36 PM | 4-Cover | 10,000 | 21.7300 | ($217,300) | $39,216 |
| DELL | 8/27/2008 | 1:52 PM | 3-Short | 10,000 | 25.5300 | $255,300 | 9/3/2008 | 2:36 PM | 4-Cover | 10,000 | 21.7300 | ($217,300) | $38,000 |
| DELL | 8/27/2008 | 2:00 PM | 3-Short | 20,000 | 25.5550 | $511,000 | 9/3/2008 | 2:36 PM | 4-Cover | 20,000 | 21.7300 | ($434,600) | $76,400 |
| DELL | 8/27/2008 | 2:35 PM | 3-Short | 10,000 | 25.7000 | $257,000 | 9/3/2008 | 3:38 PM | 4-Cover | 10,000 | 21.7300 | ($217,300) | $39,700 |
| DELL | 8/27/2008 | 2:58 PM | 3-Short | 10,000 | 25.6910 | $256,910 | 9/3/2008 | 3:38 PM | 4-Cover | 10,000 | 21.7300 | ($217,300) | $39,610 |
| DELL | 8/28/2008 | 10:41 AM | 3-Short | 5,000 | 25.2700 | $126,350 | 9/3/2008 | 3:38 PM | 4-Cover | 5,000 | 21.7300 | ($108,650) | $17,700 |
| DELL | 8/28/2008 | 10:41 AM | 3-Short | 15,000 | 25.2700 | $379,050 | 9/3/2008 | 3:40 PM | 4-Cover | 15,000 | 21.7300 | ($325,950) | $53,100 |
| DELL | 8/28/2008 | 11:09 AM | 3-Short | 10,000 | 25.0897 | $250,897 | 9/3/2008 | 3:40 PM | 4-Cover | 10,000 | 21.7300 | ($217,300) | $33,597 |
| DELL | 8/28/2008 | 11:09 AM | 3-Short | 20,000 | 25.0897 | $501,794 | 9/4/2008 | 10:09 AM | 4-Cover | 20,000 | 21.7300 | ($434,600) | $67,194 |
| DELL | 8/28/2008 | 12:24 PM | 3-Short | 10,000 | 25.1700 | $251,700 | 9/4/2008 | 10:09 AM | 4-Cover | 10,000 | 21.7300 | ($217,300) | $34,400 |
| DELL | 8/28/2008 | 12:28 PM | 3-Short | 10,000 | 25.1600 | $251,600 | 9/4/2008 | 10:09 AM | 4-Cover | 10,000 | 21.7300 | ($217,300) | $34,300 |
| DELL | 8/28/2008 | 1:53 PM | 3-Short | 10,000 | 24.9900 | $249,900 | 9/4/2008 | 10:09 AM | 4-Cover | 10,000 | 21.7300 | ($217,300) | $32,600 |
| DELL | 8/28/2008 | 1:53 PM | 3-Short | 10,000 | 24.9900 | $249,900 | 9/4/2008 | 11:54 AM | 4-Cover | 10,000 | 21.7300 | ($217,300) | $32,600 |
| DELL | 8/28/2008 | 2:09 PM | 3-Short | 20,000 | 25.0054 | $500,108 | 9/4/2008 | 11:54 AM | 4-Cover | 20,000 | 21.7300 | ($434,600) | $65,508 |
| DELL | 8/28/2008 | 2:11 PM | 3-Short | 20,000 | 25.0100 | $500,200 | 9/4/2008 | 11:54 AM | 4-Cover | 20,000 | 21.7300 | ($434,600) | $65,600 |

**Total  $2,495,559**

**Closing Price on 8/29/2008:**     **$21.73**

**NVIDIA - FIFO-Matched Newman Trading: April 27, 2009 - May 9, 2009**

| Ticker | Date | Time | Trans | Shares | Price | Purchase Price (outflow) | Date | Time | Trans | Shares | Price | Sale Price (proceeds) | Profit |
|--------|------|------|-------|--------|-------|--------------------------|------|------|-------|--------|-------|-----------------------|--------|
| NVDA | 4/27/2009 | 11:05 AM | 3-Short | 25,000 | 11.5091 | $287,728 | 4/28/2009 | 9:32 AM | 4-Cover | 25,000 | 10.8943 | ($272,357) | $15,370 |
| NVDA | 4/27/2009 | 11:05 AM | 3-Short | 25,000 | 11.5091 | $287,728 | 4/28/2009 | 9:33 AM | 4-Cover | 25,000 | 10.8822 | ($272,055) | $15,673 |
| NVDA | 4/27/2009 | 11:14 AM | 3-Short | 50,000 | 11.4973 | $574,865 | 4/28/2009 | 9:33 AM | 4-Cover | 50,000 | 10.8822 | ($544,110) | $30,755 |
| NVDA | 4/27/2009 | 11:19 AM | 3-Short | 25,000 | 11.4199 | $285,498 | 4/28/2009 | 9:38 AM | 4-Cover | 25,000 | 10.8855 | ($272,138) | $13,360 |
| NVDA | 4/27/2009 | 11:22 AM | 3-Short | 25,000 | 11.4185 | $285,463 | 4/28/2009 | 9:38 AM | 4-Cover | 25,000 | 10.8855 | ($272,138) | $13,325 |
| NVDA | 4/27/2009 | 11:27 AM | 3-Short | 25,000 | 11.4114 | $285,285 | 4/28/2009 | 9:39 AM | 4-Cover | 25,000 | 10.9374 | ($273,435) | $11,850 |
| NVDA | 4/27/2009 | 11:34 AM | 3-Short | 25,000 | 11.3335 | $283,338 | 4/28/2009 | 9:39 AM | 4-Cover | 25,000 | 10.9374 | ($273,435) | $9,903 |
| NVDA | 4/27/2009 | 11:36 AM | 3-Short | 25,000 | 11.3272 | $283,180 | 4/28/2009 | 9:47 AM | 4-Cover | 25,000 | 11.0063 | ($275,158) | $8,022 |
| NVDA | 4/27/2009 | 11:41 AM | 3-Short | 25,000 | 11.3015 | $282,538 | 4/28/2009 | 9:51 AM | 4-Cover | 25,000 | 11.1128 | ($277,820) | $4,718 |
| NVDA | 4/27/2009 | 12:16 PM | 3-Short | 25,000 | 11.2950 | $282,375 | 4/30/2009 | 10:04 AM | 4-Cover | 25,000 | 11.3986 | ($284,965) | ($2,590) |
| NVDA | 4/27/2009 | 12:29 PM | 3-Short | 25,000 | 11.2502 | $281,255 | 4/30/2009 | 10:04 AM | 4-Cover | 25,000 | 11.3986 | ($284,965) | ($3,710) |
| NVDA | 4/27/2009 | 1:02 PM | 3-Short | 25,000 | 11.1800 | $279,500 | 4/30/2009 | 10:31 AM | 4-Cover | 25,000 | 11.4514 | ($286,285) | ($6,785) |
| NVDA | 4/27/2009 | 1:56 PM | 3-Short | 25,000 | 11.0001 | $275,003 | 4/30/2009 | 10:31 AM | 4-Cover | 25,000 | 11.4514 | ($286,285) | ($11,283) |
| NVDA | 4/27/2009 | 3:34 PM | 3-Short | 25,000 | 11.0086 | $275,215 | 4/30/2009 | 11:15 AM | 4-Cover | 25,000 | 11.6700 | ($291,750) | ($16,535) |
| NVDA | 4/28/2009 | 11:03 AM | 3-Short | 25,000 | 11.2101 | $280,253 | 4/30/2009 | 11:15 AM | 4-Cover | 25,000 | 11.6700 | ($291,750) | ($11,498) |
| NVDA | 4/28/2009 | 11:17 AM | 3-Short | 15,000 | 11.1963 | $167,945 | 4/30/2009 | 11:16 AM | 4-Cover | 15,000 | 11.7100 | ($175,650) | ($7,706) |
| NVDA | 4/28/2009 | 11:17 AM | 3-Short | 10,000 | 11.1963 | $111,963 | 4/30/2009 | 2:20 PM | 4-Cover | 10,000 | 11.5734 | ($115,734) | ($3,771) |
| NVDA | 4/28/2009 | 12:37 PM | 3-Short | 25,000 | 11.1395 | $278,488 | 4/30/2009 | 2:20 PM | 4-Cover | 25,000 | 11.5734 | ($289,335) | ($10,847) |
| NVDA | 4/28/2009 | 1:10 PM | 3-Short | 25,000 | 11.1100 | $277,750 | 5/1/2009 | 11:12 AM | 4-Cover | 25,000 | 11.8500 | ($296,250) | ($18,500) |
| NVDA | 4/28/2009 | 1:59 PM | 3-Short | 25,000 | 11.0417 | $276,043 | 5/1/2009 | 1:41 PM | 4-Cover | 25,000 | 11.9319 | ($298,298) | ($22,255) |
| NVDA | 4/29/2009 | 9:37 AM | 3-Short | 25,000 | 10.8117 | $270,293 | 5/6/2009 | 9:49 AM | 4-Cover | 25,000 | 11.6956 | ($292,390) | ($22,098) |
| NVDA | 4/29/2009 | 9:48 AM | 3-Short | 25,000 | 10.7681 | $269,203 | 5/6/2009 | 9:53 AM | 4-Cover | 25,000 | 11.7138 | ($292,845) | ($23,643) |
| NVDA | 4/30/2009 | 3:17 PM | 3-Short | 25,000 | 11.4100 | $285,250 | 5/6/2009 | 9:56 AM | 4-Cover | 25,000 | 11.7665 | ($294,163) | ($8,913) |
| NVDA | 4/30/2009 | 3:18 PM | 3-Short | 25,000 | 11.3697 | $284,243 | 5/6/2009 | 11:50 AM | 4-Cover | 25,000 | 11.5663 | ($289,158) | ($4,915) |
| NVDA | 5/1/2009 | 2:58 PM | 3-Short | 25,000 | 11.7292 | $293,230 | 5/6/2009 | 11:50 AM | 4-Cover | 25,000 | 11.5663 | ($289,158) | $4,073 |
| NVDA | 5/5/2009 | 1:44 PM | 3-Short | 25,000 | 11.6149 | $290,373 | 5/6/2009 | 11:51 AM | 4-Cover | 25,000 | 11.6050 | ($290,125) | $248 |
| NVDA | 5/6/2009 | 2:56 PM | 3-Short | 25,000 | 11.5908 | $289,770 | 5/7/2009 | 12:45 PM | 4-Cover | 25,000 | 10.8708 | ($271,770) | $18,000 |
| NVDA | 5/6/2009 | 3:07 PM | 3-Short | 25,000 | 11.5530 | $288,825 | 5/7/2009 | 1:11 PM | 4-Cover | 25,000 | 10.8950 | ($272,375) | $16,450 |
| NVDA | 5/6/2009 | 3:29 PM | 3-Short | 10,000 | 11.4200 | $114,200 | 5/7/2009 | 2:07 PM | 4-Cover | 10,000 | 10.6423 | ($106,423) | $7,777 |
| NVDA | 5/6/2009 | 3:29 PM | 3-Short | 15,000 | 11.4200 | $171,300 | 5/7/2009 | 2:48 PM | 4-Cover | 15,000 | 10.6696 | ($160,044) | $11,256 |
| NVDA | 5/6/2009 | 3:37 PM | 3-Short | 10,000 | 11.3890 | $113,890 | 5/7/2009 | 3:26 PM | 4-Cover | 10,000 | 10.7500 | ($107,500) | $6,390 |
| NVDA | 5/6/2009 | 3:37 PM | 3-Short | 10,000 | 11.3890 | $113,890 | 5/7/2009 | 3:39 PM | 4-Cover | 10,000 | 10.7715 | ($107,715) | $6,175 |
| NVDA | 5/6/2009 | 3:37 PM | 3-Short | 5,000 | 11.3890 | $56,945 | 5/7/2009 | 3:49 PM | 4-Cover | 5,000 | 10.7829 | ($53,915) | $3,030 |
| NVDA | 5/6/2009 | 3:48 PM | 3-Short | 5,000 | 11.4402 | $57,201 | 5/7/2009 | 3:49 PM | 4-Cover | 5,000 | 10.7829 | ($53,915) | $3,287 |
| NVDA | 5/6/2009 | 3:48 PM | 3-Short | 20,000 | 11.4402 | $228,804 | 5/7/2009 | 4:51 PM | 4-Cover | 20,000 | 10.2682 | ($205,364) | $23,440 |
| NVDA | 5/7/2009 | 10:26 AM | 3-Short | 19,300 | 10.9181 | $210,719 | 5/7/2009 | 4:51 PM | 4-Cover | 19,300 | 10.2682 | ($198,176) | $12,543 |
| NVDA | 5/7/2009 | 10:26 AM | 3-Short | 2,200 | 10.9181 | $24,020 | 5/7/2009 | 5:21 PM | 4-Cover | 2,200 | 10.3000 | ($22,660) | $1,360 |
| NVDA | 5/7/2009 | 10:26 AM | 3-Short | 3,500 | 10.9181 | $38,213 | 5/8/2009 | 9:30 AM | 4-Cover | 3,500 | 10.4561 | ($36,596) | $1,617 |

**NVIDIA - FIFO-Matched Newman Trading: April 27, 2009 - May 9, 2009**

| Ticker | Date | Time | Trans | Shares | Price | Purchase Price (outflow) | | Date | Time | Trans | Shares | Price | Sale Price (proceeds) | Profit |
|--------|------|------|-------|--------|-------|--------------------------|--|------|------|-------|--------|-------|-----------------------|--------|
| NVDA | 5/7/2009 | 11:10 AM | 3-Short | 25,000 | 10.8543 | $271,358 | | 5/8/2009 | 9:30 AM | 4-Cover | 25,000 | 10.4561 | ($261,402) | $9,955 |
| | | | | | | | | | | | | | Total | $73,528 |

**Position closed within one day of announcement**

# Exhibit B



John ████

████ Needham, MA ████ ████ *

Date: February 13, 2013

The Honorable Richard J. Sullivan
United States District Court Judge
Southern District of New York
500 Perl Street
New York, New York 10007

Dear Judge Sullivan:

I am a forty-seven year old married father of three children, and I work as a sales executive for Comcast Corporation. I have known Todd Newman for six years and my middle child, ████, eleven years old, is best friends with Todd's daughter ████.

As long as I have known Todd, I have known him to be a very devoted father to ████. He is the type of Dad that is present at every one of ████'s sporting events. He is very generous with giving the kids rides to and from their practices and games. He is friendly and personable with the other parents. Todd is well liked among this peer group.

Todd is also very helpful to those around him in his community. At ████ and ████'s basketball games, we always need parent to help run the clock and keep the scorebook. Todd has always been the first to volunteer in this regard, and the coaches have come to rely on Todd to perform these duties at the games.

Todd has always been very kind to my daughter ████. He has welcomed her into his home and created an atmosphere that feels like a second home to ████. He has always been very generous with the time and energy that he commits to ████ and her friends. I am aware that Todd has been convicted of a crime, but I am still very comfortable entrusting my daughter ████ to Todd's care, on an almost daily basis.

I know Todd Newman to be a kind, generous, and caring father. He is extremely devoted to his daughter ████; they have a very close relationship. In my opinion, the closeness they share is uncommon in this day and age.

Sincerely,

John ████

# Exhibit C

Honorable Richard J. Sullivan

United States District Court Judge

Southern District of New York

500 Pearl Street

New York, NY 10007


December 21, 2012

Dear Judge Sullivan,

      My name is Chip ███████. I am a 49 year-old freelance producer, and a stay-at-home Dad in Needham, Massachusetts. I have known Todd Newman locally for seven years, and I'm happy to call him my friend.

I first met Todd when he & I coached a girls' basketball team in town (he was the head coach), and we have paced many a sports sideline together since, while watching our girls play soccer and other sports. My daughters ██████████████ have been in school with his daughter ████ for the past seven years, and of course we have gotten to know Jill as well through numerous school functions.

I know Todd to be a soft spoken, smart, modest, funny and caring person. He is a dedicated and passionate father and he has a very strong bond with his daughter ████ who is an excellent athlete and a very capable student.

In the course of managing a basketball team together with twelve little energetic girls and their enthusiastic parents, over a three month period, Todd as head coach was always a quiet, calm and fair presence. If & when things got intense-or just plain loud in a crowded Saturday morning gym-my recollection was he always had a good sense of humor about things, and was very accommodating and kind to a broad range of little and big personalities!

I have had numerous small conversations with Todd over the years at school functions and sporting events where he was a regular presence for his daughter and family. Over the course of seven years we probably covered a lot of ground on many subjects and many people, and he was always a gentleman, and an independent ethical man.

I am obviously fond of him and saddened by the news of the trial.

Sincerely,

Chip ██████

# Exhibit D

January 25, 2013

The Honorable Richard J. Sullivan
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Dear Judge Sullivan,

My name is Jason ▮▮▮▮ and I am an Executive Vice President and Partner at a successful digital marketing firm (Zemoga, Inc) in the New York Metro area. I have been in this field for the past 25 years and have amassed an impressive list of accomplishments and skills that I am very proud of. My experiences have established me as a well-known and respected member of my industry. I am now a mentor and a writer with goals to also be a teacher to a new generation of digital marketers. I am a hard, diligent worker, who lives a comfortable, but modest life in Connecticut with my wife and two children.

I am writing this letter with knowledge that Todd Newman has been convicted of a crime and would like to provide some details on how Todd's friendship has had an impact on my life.

Todd and I grew up Wilton CT, went to high school together and later attended the same college where we were apartment mates for two years. Post college we remained in communication with each other for many years through direct personal contact, shared friends/colleagues and the traditional holiday correspondence.

Todd influenced my life in many significant ways that he may not even realize. Growing up I was very interested in creating art. I was good, but not sure if college was right for me. I needed someone to help me make a decision and choose a path that that I could follow with confidence and purpose. Todd encouraged me to attend Skidmore College, and after his help and support, I applied and was accepted. To this day, attending Skidmore College was perhaps one of the most significant and positive decisions I have ever made in my life – and thank god, Todd was there to directly influence me. To this day, I don't think Todd even realizes this.

Once in the school, Todd looked after me as an under classman, made sure I integrated well within the social structure of the campus culture, introduced me to his friends, accepted my new-found friends that were outside of his circle and generally looked after me. His help extended into studies. As an art major, I was not comfortable with business courses though I understood the importance of taking those classes. Todd helped me when I struggled understanding business concepts that came naturally to him. He was patient and always generous with his time.

His generosity extended into outside of the classroom and into everyday life. On many occasions, he was selfless in lending me his car when I needed to get around, invited me to dinners when his family visited, bought groceries for the house when it was not his turn, loaned money when I was short. Todd never asked for anything in return and was always happy to help. No questions asked.

Todd was a good friend to me, but also to those around him. On more than several occasions, Todd helped our other roommates and friends in many of the same ways. Helping with course work, being a leader on Skidmore's baseball team, lending advice when we were having issues coping with separation with our home and families.  These are just a few examples where I saw Todd's friendship directly influence his friend's lives.

After school, we entered the world and did our best to earn a living, learn skills, and become confident in our chosen fields.  From 1989-1995, I was living in New York City with my girlfriend (and future wife) where Todd visited us on more than one occasion. We always opened our home to Todd, looked forward to his visits, and enjoyed hearing about his life in Boston. In time, Todd married and like us started a family. In reciprocation, on multiple occasions Todd opened his home up to my wife and I – along with many of our friends – when we were in town.

Despite the distance, keeping in touch was always important to Todd – and whether it was me or others in our High School or college circle – Todd was great at getting folks together. He organized attendance at running races, rollerblading and would host friends at his house when weddings were local. He also tried to teach me how to ride a motorcycle which despite his best efforts – did not stick.  And though our communication and socializing became less frequent over time, I always felt a close tie to Todd and his generous nature. To this day, I consider Todd one the best friends I have ever had and consider myself lucky and proud to be a part of his life.

With respect,

Jason ████

# Exhibit E

The Honorable Richard J. Sullivan
United States District Court Judge
Southern District of New York
500 Pearl Street
New York,New York 10007

Dear Judge Sullivan,

My name is Neil M. ████ and I am fully aware Todd Newman has been convicted of a crime. I have worked for the last 31 years on the trading floor of the NYSE. Currently I am CEO of MND Partners and serve as both a Floor Governor and a Director on the Fair Markets Subsidiary of NYSE-Euronext.

I have had the pleasure of knowing Todd Newman for 7 years, his passion ,dedication and professionalism has never escaped me. Todd has always shown me an uncanny sense of fairness and reason.

Todd has always held his relationship with his daughter paramount. He would  travel to Boston on Friday night to spend the weekend with his daughter the travel back on Mondays.I cant remember a time that he didn't follow this routine.

Your Honor, it is very difficult to express the essence of someone in a few short sentences. My judgment in people has always been one of my strength's, I would not have offered to write this letter if I didn't think Todd was worth it.

Sincerely

Neil M ████

# Exhibit F



Nassib G. ████
Maureen P. ████
Needham, MA ████

2/15/2013

The Honorable Richard J. Sullivan
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Dear Judge Sullivan:

We are writing knowing Todd Newman has been convicted of a crime and we
wanted to speak to you on his behalf. We live directly next door to the Newman
family, our yards abut and we enjoy both a neighborly and a personal relationship.
Initially, in 2005 we got to know Todd through our children. His only daughter
████ at age 12 is very friendly with our two younger children. All four of our
children know Todd, and have nicknamed him "Tnew." They describe him as "such
a fantastic guy" they are drawn to his sincere, calm and active style.

Todd is a cheerful easy-going relaxed neighborhood Dad who regularly plays or
coaches outdoor games with his daughter and our children, in all four seasons.
Early on when the kids were quite young the favorite game was "kickball" and Todd
would be actively engaged in orchestrating the fun for several neighborhood kids.
Back then, all four of our children loved to play, and would go running outside
immediately when they saw Todd come out with his daughter ████ and now ex-
wife Jill. His gentle personality, smiling face and sincere genuine interest in the kids
as individuals has caused all of our children to hold him in high regard. Also, the
games usually ended with an invitation to ice cream or to play a board game inside.

Todd is an extremely devoted father to ████ and an active volunteer in several
capacities for several of her sports teams. Todd has been head coach of ████'s
soccer and basketball teams for years. He volunteers constantly on her behalf and
Todd is always the first to keep score, time or lend a hand as needed. To that end,
People around Needham that know Todd is my neighbor are always quick to say
"what an awesome coach, really excellent." Todd is reliable, consistent and you can
count on him to help in whatever means necessary.

Todd has remained a constant presence outdoors playing sports with ▮▮▮ and our kids. As the children got older basketball, lacrosse, football, baseball and cycling were added to the activity roster. Weather never deters an activity or event, Todd is an optimist when it comes to physical activity and that is true of Jill as well. We joke that living next to the Newman's is excellent for our health. Todd was extremely patient with our children on family ski trips, as he likes to teach. Todd is a patient and talented instructor and the kids respond well to his encouraging calm style.

Our youngest son is quite an active talented athlete; we credit Todd for taking the time to regularly include him in the outdoor sports circuit with his own daughter and patiently teaching him several necessary skills. Specifically, our son and ▮▮ enjoy both professional football and professional basketball. Todd explains and discusses the intricacies of the game with them as we all frequently enjoy watching sports together. We never were athletes and have gaps in our knowledge for several sports. We can't keep up with our youngest son and Todd has become his surrogate "sports loving Dad." Our eleven-year old son has definitely benefited from Todd's patience and reliability. We reciprocate by cooking meals and enjoy Todd's helpfulness as a guest in our home.

The entire Newman clan is family to us, we are very close to Jill as well. Todd's mom Irene frequently visits from Connecticut and we look forward to her coming as much as Todd does. Our children go running to greet her as if she were their own Grandma. Visits from "Nanny I" are a treat for all. Todd's small family has embraced our large one and our neighborly relationship has transformed into a strong friendship, fostered by Todd's engaging, active style. Devoted describes Todd Newman well.

Some background about ourselves is as follows: Nassib ran a medical device company through 2009, he was CEO and founder of Aspect Medical Systems. After a brief retirement he is pursuing a second venture in the money management arena using the same algorithms he used in his first venture. Maureen is a Speech-Language Pathologist for a neighboring school system-servicing students with language based learning disabilities. We have lived in Needham, since 1997 with our four children who are now 11,13,15 and 17.

It has been our pleasure to write on behalf of Todd Newman, as he has become our good friend. He is a man of solid character, who is gentle, patient, drawn to teaching, reliable and consistently kind in all settings. Please consider our thoughts when sentencing Todd. Thank you very much for taking the time to read our comments.

Sincerely,

Nassib ▮▮▮        Maureen ▮▮▮

# Exhibit G



January 15, 2013


The Honorable Richard J. Sullivan
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007


Dear Judge Sullivan:

I'm writing in support of Todd Newman, who was my college roommate at Skidmore College from 1984-1986. While I'm aware that Todd has been convicted of charges related to insider trading, I am writing to express my experience with Todd which has been as a close friend for over 25 years.

As a friend and confidant I have always found Todd to be trustworthy, reliable and empathetic. Over the years, we have remained in touch and seen each other when either of us was in the other's City or more frequently when Todd and Jill where living in New York a few years ago. At that time, we coincidently lived in the same neighborhood and worked out at the same gym so we spent time together frequently. We discussed everything from marriage, fatherhood, career and family and I have always admired his ideals and generosity.

In composing this letter, I thought deeply about what significance a letter from a college roommate could have in helping you perceive Todd from my perspective. As the Owner/Director of a Private School and Camp for the past 20 years, I write and read letters of recommendation and character references on a continuous basis. Primarily, our job here is to grow and nurture good people with good character. Our slogan is *Excellence in Education. Quality of Character.* Having said that, I have seen thousands of children grow and develop under my care either directly or through my staff. Todd was always a hard worker, who was well liked by his classmates. Besides being able to throw a snowball more accurately than anyone I have ever met, Todd showed maturity beyond his years and was a good contributor as a roommate.

SMITHTOWN · NY ███

PHONE ███████

FAX ██████

 

Respectfully Submitted,



Noah ████

# Exhibit H

On Feb 20, 2013, at 1:12 PM, Carol ███████ < ████████████ > wrote:

Dear Judge Sullivan,

My name is Carol ██████████████ and I presently live in Yardley Pa. I am self employed and the mother of two teenage beautiful girls. I grew up in Wilton Connecticut, a lovely little town in southern Connecticut. This is where I had the pleasure of meeting the Newman family. We were all very young back then still only in elementary school. I like to remind myself of how much the Newman family played such a huge, positive part in my formative years.

I was instantly best friends with Kelly Newman I wanted to be with her and around her family as much as time allowed. Her brother Todd was only a year behind us in age and in school so needless to say we all spent a great deal of time together. What I loved and admired most about the Newmans was their love and respect that they had for each other and other people. Mr. and Mrs. Newman taught their children about honesty, integrity and loyalty at a very young age and it is still something that I witness to this day when I am with them.

I remember when we were all up in Vermont skiing and Todd was accused of " Zig - Zagging" in the rope tow line and his season pass was taken away. Mr. Newman was furious and Todd was very upset he said "Dad, what should I do?" and Mr. Newman told him to "go confess what you did and tell them it will not happen again". Todd did not argue back he did just as his father said and later told me that he will never do that again. The Newmans always stressed to do the right thing.

Another example I remember and have recalled all through the years because, Todd showed such maturity at such a young age. It was prom season and myself being a very typical teenager I asked Todd if he knew of anyone that could get me alcohol for the prom. I could tell that he was uncomfortable with the transaction and he said to me "Carol, I CAN NOT give this to you, it is wrong and I do not feel right". Of course I was in shock, but he did the right thing he did not care about peer pressure, he cared about what is right and what is wrong.

I am aware that Todd has been convicted of a crime and my purpose for this letter is to shed a tiny bit of light on who this man was and is. From the bottom of my heart I know that Todd Newman is a high quality, hardworking, ethical, loving, son, brother, father and friend this has been taught to him from a toddler. I ask the court to please show mercy on him.

Thank you,
Carol ███████
████████████
Yardley, Pa. ████
████████



# Exhibit I

The Honorable Richard J. Sullivan                                    January 15, 2013
United States District Court Judge
Southern District Of New York
500 Pearl Street
New York, New York 10007

Dear Judge Sullivan

We are Marge and Erwin ████, aunt and uncle  of Todd Newman. We are writing this letter to
provide an insight into the background of Todd and his family relationships.

I am Marge, Todd's father was my late older brother Thomas Newman. I am an employee of the
United States Department of the Interior with thirty years of employment as a National Park Ranger
at the Vanderbilt Mansion located at Hyde Park in the Hudson River Valley.

My husband of over fifty years is Erwin ████ who had over thirty years with IBM in the computer
field dealing with both hardware and software development.  He held management and technical
positions in Poughkeepsie, Kingston and Raleigh, North Carolina retiring over twenty years ago from
his last position working on super computer design and development.

We have known Todd since his birth into a very close and loving family. He is very much involved not
only in the raising of his own child, ████, but has always engaged himself with his siblings and their
children. I know that he and his family have always attended the entire Newman family events, such as
recitals, graduations, birthdays, sport activities, etc. Todd, his mother Irene and his sister and
brother drew even closer with the unexpected and devastating death of his father Thomas Newman.
Since then, Todd and his family have been involved even more so in a mutual support system with
his mother, sister and brother and other family members such as ourselves

We were honored to attend his mother's 75th birthday celebration a few years ago, a weekend
celebration that was hosted by Todd, his brother and brother-in-law and sister, a weekend that
honored not only his mother but the memory of his father. To see all the family together, to see the
love that all had for another - we will never forget. My husband has a photo he took at the Sunday
brunch of Todd and ████, one where both were unaware of being photographed. It shows ████
sitting in Todd's lap playing with one of those hand held video games. Todd has his arms around
████, his head bent forward gently kissing the back of her head - a pure expression of the love that
they share!

We realize that our comments concerning Todd's close family ties are from the perspective of his
parent's generation. That is precisely why we know it is important for you to understand that we have
a lifetime of interaction with Todd. In over forty-five years, exact dates and places may be hard to
recall but it is effortless to acknowledge the spirit and love that Todd, ████ and his family share.

We feel that this period of Todd's life will affect his only child, ████, more than anyone. She is an
adolescent at a very vulnerable stage. The presence of her father is so vital to her at this time as
events in the next few years will have a lasting impact on her life.

We sincerely appreciate this opportunity to express our knowledge of Todd as a devoted father and
family member.

Regards,



Marge and Erwin

Woodstock, NY

# Exhibit J

The Honorable Richard J. Sullivan

United States District Court Judge

Southern District of New York

500 Pearl Street

New York, NY 10007

My name is Richard ▓▓▓▓▓. I have lived in Amagansett, New York

for almost thirty years. I have a little carpentry business-- I

renovate and restore old houses. My business is not like running

Google or anything, but at least I'm the captain of my own ship. I've

also been a member of the Amagansett Fire Department for fifteen

years. On the third Sunday of every August, I dress up as a chicken

(part of my obligations as a firefighter, since I am the only member

of the Department who will willingly wear a chicken suit), and I dance

around in front of the firehouse, enticing passersby to stop in and

enjoy a good meal for a good cause. The money raised goes toward the

purchase of new equipment and protective gear for the 60 members of

the Department and the Ambulance Corps. The AFD was founded in 1913,

is entirely volunteer, and takes great pride in never, in all those

decades, of having lost a civilian to a fire. So, despite the fact

that I dress as a chicken, it's serious business. Since Amagansett is

such a small town, this barbeque qualifies as the gala event of the

year, and all kinds of people - hipsters, locals, old people, even

hedge fund types-- look forward to this little slice of Americana.

It's the kind of thing that most people think went out in the 1950's.
I'm glad to say that the event is authentic in every way and entirely
free from irony.

It was on one of those Sundays five or six years ago that I first
met Todd Newman, through a mutual friend. He stopped by with his
daughter, ███. I was glad to take a break from my dancing - it gets
hot in that chicken suit in August- and show Todd and his daughter
around the firehouse. She was then at that age when kids are
fascinated by firetrucks. Every kid gets a free plastic toy fireman's
hat-- when you're eight or so, that's quite a thrill. I joined Todd
and ███ for lunch-- grilled chicken, corn on the cob, roast
potatoes, homemade coleslaw, watermelon; beer and wine extra-- is
anyone getting hungry? In any case, on that Sunday, Todd and I became
friends, and have been friends ever since.

Let me stress that, as a carpenter, I know nothing about Wall
Street, or hedge funds, or derivitives, or swaps, or any of those dark
subjects. Every time that I have ever invested money in the stock
market, I've lost. I would have better off going to Las Vegas-- at
least that way, they would have given me a nice tour of Hoover Dam
before taking all my money. I am, sadly, one of those antiquated
people who makes his living from the sweat of his brow. What Todd may
or may not have done is beyond my understanding. What I do know is how
devoted Todd is to his child. Many times I have joined them in the
backyard to throw the football, or the frisbee. I've joined them for
dinners out, and I see the respect and good manners with which Todd's

daughter treats the waiter or waitress. That knowledge of how to treat

people well doesn't just come from nowhere-- it's handed down from one

generation of decent people to the next. Of course, all fathers love

their children. If I am ever fortunate enough to have kids of my own

some day, I can only hope that I will be as good a dad to my kids as

Todd is to his.


Sincerely,


Richard

Wainscott, NY

# Exhibit K

Thursday, February 27, 2013

The Honorable Richard J. Sullivan
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Dear Judge Sullivan,

I am writing on behalf of Todd Newman who was convicted of conspiracy to commit securities
fraud and securities fraud in December, 2012. I first met Todd five years ago when we coached
a girls basketball team together in Needham, MA. The qualities that I saw in Todd then –
kindness, patience, graciousness, and a genuine concern for the girls are the same qualities he has
displayed every time I've seen him since.  Todd had a very easy going manner and never put
pressure on the girls to win, but instead focused on their development and enjoyment. I also took
note of Todd's relationship with his daughter, ███ Todd and ███ were very close and in all
the times I've seen Todd over the last five years at various gyms, courts and fields in town I
don't ever recall ███ not being with him. When we coached together, he always gave ███
and the other players positive reinforcement and never highlighted any of their shortcomings.

Just to provide some background, I'm a forty three year old father of two daughters, ages eleven
and eight and have been married to my wife for thirteen years. I live in Needham, MA and work
for Santa Buckley Energy as the Director of Operations and Risk Management.  I got my
undergraduate degree from Union College and my MBA from Boston College.

What impresses me most about Todd is his easy going manner and kindness. Todd is the type of
person who never has a bad thing to say about people, and always has a smile. When we
coached together, I was amazed at how positive Todd always was, and how he never changed his
laid back, helpful manner right through the championship game. Todd always realized that
youth sports was supposed to be about fun, and never put pressure on the girls to win even when
the girls, fans, and other coaches ratcheted up the pressure and tension. Todd treated the worst
girl on the team the same way as the best girl on the team, and probably focused more on the
lesser skilled players so they'd have a more positive experience.

The sincerity and graciousness Todd displayed five years ago has been on display every time
I've seen him since.  If someone asked me to describe Todd I'd simply say, "He's just a nice
guy". Every time I see Todd the first thing we discuss is our children – Todd always asks about
my girls and how they're doing and he always talks glowingly about ███ It's in these
discussions that I can really see how much of a bond he has with her.

I can't speak to the professional side of Todd, but I can say, without hesitation, that Todd has
been a positive role model as a coach and an upstanding member of our community. I hope this
information gives you more insight into Todd as you consider his sentencing.

Sincerely,

David ███

# Exhibit L

# JANTZEN & ASSOCIATES, P.C.
### ATTORNEYS AT LAW

**4 LIBERTY SQUARE**
**SEVENTH FLOOR**
**BOSTON, MASSACHUSETTS 02109**

TELEPHONE (617) 457-1919
FACSIMILE (617) 574-5050

January 16, 2013

The Honorable Richard J. Sullivan
United States District Court
Southern District of New York
500 Pearl Street
New York, NY  10007

RE:  <u>U.S. v. Todd Newman, et al</u>

Your Honor:

Please allow this letter to express my support for my friend, Todd Newman. Though I am a member of the Massachusetts Bar and the United States District Bar for the District of Massachusetts since 1985, I have never written such a letter on behalf of anyone, so please excuse any errors attendant, herewith.

By way of background, I am a resident of Needham, Massachusetts and a graduate from Boston College and Boston College Law School 1984. I am also the managing partner of a small civil litigation boutique located in the heart of the financial district in Downtown Boston, specializing in insurance litigation, small business litigation, commercial litigation and a very small degree of criminal work in the Massachusetts state courts. Over the last three years, in particular, I have also acted as personal counsel to former United States Senator Scott Brown, who is a close, personal friend from our time together at BC Law School in the early 1980s.

With respect to Todd Newman, I met him approximately 4-5 years ago when our daughters were playing on the same basketball team in Needham, Massachusetts. Todd's only child and daughter, ███, has grown into a beautiful 12½ year old girl, who continues to play ball on my 12½ year old daughter, ███'s, "Metrowest" basketball team. Together, they have achieved great success, turning their team into one of the best in the Commonwealth of Massachusetts. I say this because I have spent countless hours with my own daughter teaching her the game of basketball, which I dearly love, since I played 2

JANTZEN & ASSOCIATES, P.C.

Page 2
January 16, 2013

years as a varsity basketball player at Boston College. Therefore, I am acutely aware of which parents are devoted to their children and actually spend the time teaching them the game of basketball. I also recognize which parents could not be bothered. In my opinion and observation, Todd Newman falls into the former category and is probably the only parent, who is as devoted to his daughter in teaching her the game of basketball, as I am.

Indeed, basketball is my main area of contact with Todd, since I have little, if any, contact with Todd regarding his business enterprises. Therefore, I was quite surprised when I learned of his Federal Indictment and recent conviction, since it was completely out of character.

Previously, Todd and I coached our daughters' basketball team approximately 4-5 years ago. He demonstrated extraordinary patience, generosity and sportsmanship in teaching the girls in his unique and kind manner. I felt he was an excellent co-coach, since my approach to basketball is, shall we say, a "little different." Todd was instrumental in coaching our team that year and in tempering my "enthusiasm." He demonstrated extraordinary patience, not only with the children, but also with their parents, who through the advent of e-mail, can be exceedingly difficult to deal with. Todd was always in good humor and optimistic with the children and frequently gave of his own money to buy basketballs and equipment for the team. Todd was consistently able to calm the parents, in a pleasant and supportive manner and was always leading the way with his own donations of time and money towards equipment for the kids.

Though I did not socialize with Todd and his ex-wife, I know that both of them are doting parents towards ▮▮▮▮, who looks much like Todd. She has an extraordinary quiet and deferential personality towards adults, which I think is a sign of good breeding.

At 54 years of age and having grown up in an Irish/Catholic household with a father who had seen active combat in World War II, I understand the adage that children are best "seen but not heard." Yet, Todd seems to have balanced out ▮▮▮▮ such that she is a deferential yet confident, little girl, who worships her Dad. Over the last 5 years, Todd and I have kept in touch through the basketball arena and through our daughters' participations in various basketball programs. Extraordinarily devoted to his only child, Todd is always the first person to arrive for every game, which surprises me, because as an AAU coach, I usually arrive 45 minutes early. I am always incredulous to find that Todd is already there, rebounding for his daughter and giving her a few pointers. One can see that she is

**JANTZEN & ASSOCIATES, P.C.**

Page 3
January 16, 2013

rapt with attention when he speaks and that their bond is both extraordinary and inextricable.

Although I am stoic by nature, to think that Todd would be separated from his only child, ██████, for several years, literally brings tears to my eyes. Without expressing any commentary on the conviction at hand, I hope you will bear this separation in mind and judiciously consider that Todd Newman has been an extraordinary father and consistent pillar of support for his 12 year old daughter, ██████. Given the unfortunate reality of the present situation, little ██████ will truly be the person most impacted by any sentence imposed by this Honorable Court. Truly, the old aphorism applies, in that "the children shall inherent the sins of their fathers." I recognize that you are faced with a difficult task in sentencing and I am acutely aware of the gravity of such a task, since several of my law school classmates are now Massachusetts State Court Judges. However, your extraordinary record of achievement bespeaks of a fairness which flows from the fountain of true wisdom, not the artificial wisdom, which we find in our hypercritical media today.

Thank you for taking the time to read and consider my commentary. Thank you, also, for serving as a Judge in our Federal Court System, which I know can be an extraordinarily difficult task. When I was a 3rd year law student at Boston College Law School, my trial practice teacher was Judge William G. Young, a well-respected U.S. District Court Judge here in Massachusetts. Through his neighbors, I came to know him socially over the years. In essence, Judge Young was a pillar of virtue and a fountain of wisdom, who contemplated mightily over his decisions, fully cognizant of their great impact.

With due regard for you and your task at hand, I remain,

Very truly yours,

Christopher M. ████

CMJ/pk

# Exhibit M



JOSEPH V. ███

Wilton, CT ███

February 5, 2013

The Honorable Richard J. Sullivan
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Sullivan:

My name is Joseph ███, I am Todd Newman's brother-in-law and someone who has known Todd for the last 18 years. I am currently the managing member of a private investment firm that I founded approximately two years ago.

In the many years that I have had the good fortune of knowing Todd, he has, among other things, always impressed me with his incredibly strong sense of family, his extraordinary kindness and support of his mother, brother and sister and his deep love of, adoration for and commitment to his daughter ███. I think in many ways, Todd's emphasis on and watchful eye over his family is an outgrowth of the loss of his father Tom more than twelve years ago. The void that was left by the passing of Todd's father was large and I very much believe Todd took it upon himself to do whatever he could for his mother and siblings to ease the burden of that difficult loss. Accordingly, Todd found himself regularly traveling between his home outside Boston, where he was providing for his own growing family, to Connecticut to stay with and support his mother (both emotionally and financially) and visit with his sister (and my wife) and spend time with our young children. Todd also has made countless trips to his brother's home north of Boston to visit with his brother and his family and spend time with his niece watching and encouraging her many talents in track meets and field hockey matches. As with my children, I can not remember the last time Todd missed a birthday or an important milestone in the lives of his nieces and nephew.

Todd's closeness of family and very healthy perspective on life is no better demonstrated than the priority he has placed on properly raising, spending time with and learning from his daughter ███. Todd's life was forever altered when ███ came into this world as has ███'s life been similarly impacted by her father's constant presence and deep involvement in her upbringing. As his only child, ███ has always been the focal point of Todd's attention, as he worked hard to provide ███ with a well balanced upbringing that was rich in education, culture, community and athletics. I remember well, in ███'s very early years, observing Todd while on vacation sitting for hours with ███ reading to her, playing games with her and encouraging her budding intellectual curiosity. To this day, Todd regularly makes trips into Boston and New York with ███ to expose her to museums, theaters, concerts and athletic events. But perhaps Todd's greatest joy, however, has been his tireless work with ███ in nurturing her love of athletics and developing her impressive abilities in basketball, lacrosse and skiing. From the moment ███ could walk and throw a ball, Todd was in full training mode, exposing her to many different sports and encouraging her all along the way to embrace the concepts of teamwork and the competitive spirit of athletics. Todd's incredible work with ███ and his constant presence and encouragement on the sidelines, as both a spectator and a coach, not only served to further ███s love of sports and of her father but it also has greatly nourished the enviable bond that exists between the two. A bond and support system for ███ that has only grown stronger, and become more relied upon, since Todd and his wife Jill divorced last year.

The Honorable Judge Richard J. Sullivan
February 5, 2013
Page 2

As with all couples who make the very difficult decision to end a marriage, Todd and Jill's divorce impacted ▇▇ greatly as it marked the unraveling of this wonderful family unit that she had grown to love, rely on and expect. The deep sadness and concern rightfully felt by ▇▇ continues to this day, mitigated only but the untiring love, support and encouragement provided by both Todd and Jill as they each attempt to provide ▇▇ with as much day-to-day normalcy as possible. Clearly, the strength of Todd's presence and fatherly wisdom provides incredible comfort and cover for ▇▇ as she adjusts to the life changing reality that divorce brings to a young child.

Throughout the 18 years that I have known Todd, he has never swayed from his commitment to his family and selfless involvement with the lives of those most important to him. Todd's "down-to-earth" mindset very much reflects the healthy outlook and priorities he has on and in life. Todd has always been amazingly generous with his time, as my children's abilities in baseball and lacrosse can attest to, and his mother and siblings know all too well from his constant presence and untiring support throughout his father's illness. Todd's deep and longstanding friendships with high school and college classmates as well as newer but strong relationships with neighbors and members of his community, are further testaments to the strength of his character and the substance of his actions. This is a wonderful individual who has, from what I have seen, always conducted himself with great thoughtfulness, caring and kindness and, as a result, has become over the years a beacon of strength and support for his family and, in particular, his mother Irene and daughter ▇▇.

Judge Sullivan, thank you for taking the time to read and consider my letter. I am both aware that Todd has been convicted of a crime and very appreciative that you have given me this opportunity to provide you with my perspectives on this very good man.

Sincerely Yours,



# Exhibit N



KELLY N.

Wilton, CT

February 10, 2013

The Honorable Richard J. Sullivan
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Dear Judge Sullivan,

My name is Kelly ▮▮▮▮▮ and I am Todd's only sister, mother of two children and the wife of Joseph ▮▮. How I love my brother Todd. Each time I press a key I burst into tears. My mind goes back to the days, as we once were, normal. A time not too long ago when our biggest worry was trying to hold on to special moments with each other and our children. We were a normal everyday family and now a family suffering beyond all that is imaginable. We have been paralyzed over the last two years, worrying, praying and hoping for the right outcome for my brother and his family. All of our lives, and especially Todd's, have been put on hold. Unfortunately time does not stop and wait and the years keep going by. And as much as you try to preserve a moment of happiness that cloud of bad is there. It is unimaginable that our family could potentially have to face further sadness and destruction. Our grief is beyond words.

Let me try and best describe my brother Todd. Twelve years ago we lost my Dad to a brain tumor. Todd and I were basking in the joy of having our first children around the same time. None of us would have believed it possible that my athletic vibrant father would be rushed in to the hospital the same day I was leaving with my newborn baby. The next day our entire family gathered in a conference room at Norwalk Hospital where we were told my father had a brain tumor and he had 4 to 6 weeks to live. Our lives have never been the same. Todd's child ▮▮ was born two months later. We watched my Dad who we loved so much and who had given us the love of sports and the drive to succeed in our adult lives, merely fade away. That changed us forever. I remember that Todd's ex wife Jill swore that the day our father was diagnosed Todd was never the same again. I don't think anyone can understand the sorrow both my brothers and I still live with. Neither Todd nor I were ever able to know the joy of having our first children brought into the world with happiness around us. It just wasn't in the cards for us.

We grew up in a loving family where we were taught right from wrong and where we were given the tools to be all we could. Todd, however, was not like me or my other brother Tom. He knew what he wanted and worked hard to enter into an industry that fascinated him. He graduated from Skidmore College, got his CPA and then worked his way into Graduate School at Babson College. I remember years of him studying and poring over books and was always amazed at his focus and drive. Neither my other brother Tom nor I had a quarter of the work ethic Todd had and still has. After graduation he went on to the world of finance. Todd worked hard. He worked hard at everything in his life. But he worked hardest at what he loved most, his family. He has always been the one that has worked to keep us in line to follow through with keeping our families tight. He is the glue that keeps our three families together.



Todd and I are one year apart. I know who my brother was, is and who he has become as an adult. Our first-born girls are the same age and we are together as families constantly despite us in Connecticut and he in Massachusetts. I don't have to tell you what an amazing, and I mean amazing, father he is to his daughter ▮▮▮. They redefine the father daughter relationship. They are pals. ▮▮▮ like Todd is quite a little athlete and at the age of 12 plays on several basketball, soccer and lacrosse teams. And like most good fathers, Todd attends every game and has in the past coached many of her teams. But ▮▮▮ is not skilled only because she is a natural; she is skilled as a result of her father's love of playing with her. You can drive by my brother Todd's home and see him playing soccer, basketball, baseball, riding bikes with his daughter and the neighborhood kids, until the sunsets. Todd is the Pied Piper of his neighborhood and really loved by ▮▮▮'s friends and their families. Despite all that has been read in the papers and all that has been said on the streets, they have all stuck by him. ▮▮▮ still plays with her same friends and they still socialize with the same families. They know who Todd really is. What an incredible testament to Todd's character. Most importantly they know he would never jeopardize his daughter's life. And that is why none of this makes sense. She comes first and last in his life. Todd not being there, in that neighborhood, in that community, in ▮▮▮'s everyday life would create an enormous void in the lives of many.

Todd's daughter ▮▮▮ is who she is because of Todd. Respectful, happy and a pure delight because of the fathering of my brother and the loving care of Jill. He showers her with love and the perfect amount of guidance and discipline. I have always secretly been jealous of the parenting of my brother and Jill. They just do it right. When we are together, I am always amazed at the parents they are. And in a world where parents have over spoiled, Todd and Jill have raised ▮▮▮ based on pure love and commitment of a proper upbringing. And despite the misconception of how a person in finance lives, they live a life of modesty. They live in a small beautiful home in a middle-income town and rarely travel  A yearly trip to the New Jersey Shore is what he enjoys the most. It gives him time to spend with ▮▮▮ riding bikes and swimming in the ocean. Quiet and unpretentious, just like Todd. His daughter ▮▮▮ has been brought up to appreciate what she has been given. Todd has always worked hard because it is in his fiber and because he loves the industry. Todd's primary motivation has never been for financial reward. The truth is Todd was always someone who disapproved of those that made their wealth a priority. He always surrounded himself with friends who, like him, lived life in a virtuous way. What was important to Todd was to provide a home for his family filled with love and honesty and he expected the same from family and friends.

Jill and Todd's divorce is not a typical situation. They have done everything physically imaginable to keep life the same for ▮▮▮. But despite their wonderful parenting ▮▮▮ has become a more vulnerable child knowing her family structure is not the same. Todd, Jill and ▮▮▮ really still operate like a family that is not one of divorce; for ▮▮▮ to lose her father, to lose his presence in her life it would be devastating. Two lives would be ruined. Please try and imagine such a thing. ▮▮▮ being an only child, Todd is everything to her. She only has Jill and Todd. How could we ever take that away from this innocent child? ▮▮▮ deserves more. If all that is going on with Todd wasn't enough, Jill 's father has taken very ill and it appears the process of recovery will take months. As a result Jill has been spending an enormous time in Pennsylvania caring for her Dad. In her absence, Todd has really taken on the role of mother and father to ▮▮▮. I know very few men who would be able to care for a child full time as Todd does.

The Honorable Judge Richard J. Sullivan
February 10, 2013
Page 3

Todd spends every available moment he can with this child. A typical weekend day for the two of them would be Todd preparing breakfast for ▮▮ and out they go to spend their day doing what they love doing best, being together, going to ▮▮'s basketball or lacrosse game, catching a sporting event on TV and occasionally sneaking in Dance Moms. I have wonderful summer memories of ▮▮ with Todd waking up as the sun rose and them riding their bikes up and down the streets of the Jersey Shore talking, giggling and just enjoying life. I have never seen the relationship with a father and daughter like they have. It is not the one that we had with our father or the one my husband has with our children, it is something to behold. He is tender and attentive and interested in all that ▮▮ is. I know that ▮▮'s world would end without her father. He is everything to her. And she is everything to him. They are the best of friends (I would be honored to share videos I have of Todd with his daughter and family). Todd is a dad like no other; he finds so much joy in experiencing and showing his daughter ▮▮ how to live a full life, and for that matter her friends and neighborhood pals. It is not unusual for Todd to spend a weekend taking the neighbors' children with him and ▮▮ skiing or to a baseball game. Todd is a just a great guy who enjoys the simplicity of being with his child.

We as a family are together more often then most. I think more than my brother Tom and me, Todd has always made it a priority for the family and children to be together. Never has there been a birthday, dance recital or holiday without most of us being together. When we are together as a family, some of us take advantage of my poor brother. My children never leave his side and what tired parent doesn't love that. Todd literally plays with them night and day. Months ago we were visiting Todd, Jill and ▮▮ and after three hours of playing basketball (which would be typical) with my children, Todd took it upon himself to take out the bike and began to teach my son how to ride a bike. The temperatures were in the teens. This is not unusual for Todd. He is just that kind of guy. He loves them like they are his own children and they love him like they would a father. I cannot imagine how my children could ever understand Uncle Todd not being there. How in the world can we or should we have to explain this to a 9 and 12 year old?

Todd, Tom and I are everything my mother has left. My mom is turning 80 in April and you may or may not be aware of the fact that while Todd was at Diamondback he spent his weeknights in our childhood home to keep a watchful eye on mom. His love for my mother along with his nature not to live an extravagant lifestyle kept him at home. My mother, like most in her generation, is now on a fixed income and was unable to stay in our family home, which she sold. She has been living with us for over a year and is now moving into a small cottage in our town. She is a woman that has stayed strong for my brother so as to not cause him more stress. I know if my dear sweet brother were not allowed to remain with his family she will not survive. She has already been through too much. Please take pity on my mother. Please allow her to enjoy her later years with her child.

Judge Sullivan, I am asking you to see my brother Todd Newman for the man he really is. He is good and he is honest. He is a dad, he has a young daughter who like any child should be given a chance to have a life filled with innocence and happiness. Todd is a loving brother, and a responsible and caring son to his mother and has always lived a life that was ethical and pure.

The Honorable Judge Richard J. Sullivan
February 10, 2013
Page 4

Todd has always set a wonderful example for his friends and family. He is an individual who has brought so much joy to his family, friends and neighbors. What a disservice this would be if Todd was taken from us. Todd has lost all he has worked so hard for over the last 25 years. Please do not take him from what he has left, his daughter. He and we have suffered enough.

Thank you Judge Sullivan,

Kelly

# Exhibit O

# JAMES D. █████████

Wilton, CT █████

Dear Judge Sullivan,

My name is Jim Matera. I own a Point-of–Purchase display company located in Norwalk Connecticut and live one town over in Wilton, CT with my wife Katarina and our son██████████.

I met Todd Newman on the first day of third grade in 1972. We both continued through the Wilton Connecticut school system until the time of graduation in spring of '82 and have remained close friends ever since.

I think we both really hit it off because we had so many common interests. For the most part, we both had a passion for all sports and outdoor activities. Plus there was a common thread which brought our parents together. It was apparent early on that we had both come from lesser beginnings and hard working family backgrounds. Todd's dad worked his way up from the ground floor with the Mobil corporation to become one of there senior executives and my father started in a similar fashion as a messenger boy with largest typesetting company in NYC working his way up to Vice President of Sales. Our mothers were both "stay at home" moms so it's easy to see the common thread. While mom was taking great care of us, both dads instilled the importance of hard work in order to succeed in life.

It was when I was first informed of the allegations against Todd that all of these fond memories and important life lessons learned with him flooded my mind. They were simply inconsistent with my knowledge of Todd for over forty years.

A great example to support this would have been during our college years when I would get the phone call to come and visit Todd and some of our other friends in the Boston area. I would make trips to Boston for special events and vividly remember that Todd would show great discipline and restraint from attending such events because he was too busy staying focused on his studies for graduate school. I remember (like it was yesterday) saying to myself, "wow talk about dedication!". Todd always focused on the slow road to success and was a great friend when it came to mentoring and helping myself and others who had similar goals. When I would see him during that period, he would always spend time with me to reinforce the importance of getting a strong education in order to succeed in life. In my experience, Todd has never looked for shortcuts. It's not in his DNA to take the easy way out. He's spent too much time and has too much pride in the effort he's given towards his own success and the success accomplished by others through his mentoring and guidance.

Unfortunately, lately Todd and I haven't had the opportunity to spend as much time together as we would like because we both have young families which require most of our love and attention. That being said, we were recently looking forward to finding ways (his family in the Boston area and mine still in Wilton, CT) to spend more time with each other and our families together.

Judge Sullivan, please take this note into consideration when deciding the fate and future of a really good man and my life long dear friend.

Sincerely,



Jim ███████

# Exhibit P

███████

Wilton, Ct. ███

January 13, 2013

Dear Judge Sullivan,

  I am writing on behalf of Todd Newman a long time friend of the family and the best friend since childhood of my son, Jack. I am Ann ████████, married for 50 years and mother of 3 grown children. I am presently retired after 18 years teaching at Our Lady of Fatima School in Wilton, Ct. My husband, Jack & I have been residents here in Wilton, Ct. for 42 years and have raised our family here.  The Newman family has been friends & neighbors during this time.

  I have known Todd during these many years and have watched him grow up since he was a Pop Warner football player at age 8. Our sons were team mates and good pals from the earliest years. Todd's Mom, Irene and I would carpool the boys to and from their many activities. Todd loved sports and always gave his best. He was a good and generous team player.  Driving the boys from football, to baseball and later to parties and friends' houses, I observed Todd as a quiet & polite young man but also funny and an extremely loyal friend. Todd was in my sons' wedding and Jack was in Todd's. The bond of friendship is strong.

  The Newman family was solid and Todd's parents raised him to be a loving son and brother to his siblings. His Dad died 12 years ago which was a blow, but made the family ties even stronger as the 3 adult Newman children became closer to support their Mom. Todd spent many nights at his Mom's home in Wilton. He is a good son and generous; helping with expenses, paying taxes on the home and giving his mom a car when hers was not operable. Todd and his family will still make the trip from Massachusetts to be here for family birthdays, holidays etc.  During these events I have observed him as a good and loyal family man whose priorities are with his little daughter and the extended family.

  His daughter, ████ is a lovely child, quiet and thoughtful like her Dad and a good athlete as well. She is happy and well adjusted, having had a careful, loving upbringing by her Dad and Mom. She is the apple of her Dad's eye and ████ reciprocates that love. Beside the everyday love a father can demonstrate to his daughter, Todd goes the extra mile and coaches ████ in her many sports. He never misses a game or an event at school. The two have a close relationship which has become a lifeline for each, particularly since the divorce. ████ depends on her dad for the love, respect and guidance only a Father can give. If Todd were not present in her life for a period of time, the effect could be devastating to ████ and her Dad as well as the whole family who depend on Todd for emotional and financial support.

  I realize that Todd has been convicted of a crime. Thank you for considering my letter on behalf of  this good man.

Very truly yours,

Ann ████████

# Exhibit Q



Wilton, Ct. █████

January 26, 2013

Dear Judge Sullivan,

This letter is on behalf of Todd Newman.

I met Todd over 40 years ago. He is a dear friend of our son Jack who was an usher in Todd's wedding. We interfaced with Todd quite often over time. He is without doubt a kind, honest, reliable, considerate, and trustworthy young man. When he told you something you could take it to the bank. His devotion to his wife, his daughter, his mother, and his siblings is exemplary and total. His character is flawless and he is my fox hole type -which is a plaudit I don't cite frivolously. My prayers are with Todd in this terribly difficult time in his life and I pray that the Good Lord's peace and strength and comfort are with him.

I pray for you as well that the Good Lord is with you in your deliberations.

Respectfully,



John ████████

# Exhibit R

February 28, 2013

The Honorable Richard J. Sullivan
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Dear Judge Sullivan,

This letter is respectfully submitted for consideration regarding the sentencing of Todd Newman.
I understand Todd has been convicted of a crime.

I am a lawyer and resident of Needham, Massachusetts, where Todd lives. I have known Todd
for approximately four years.

I first met Todd in, I believe, 2008, when he coached my child's first grade basketball team. His
daughter was also on the team. I have seen him regularly over the last four years, at various
kid's sporting and dance events.

I have not encountered Todd in any other setting other than at children's sporting events and
dances, although I have spoken to him at length at them, many times.

I find Todd to be kind, sincere, decent, helpful, and totally committed to the team and
supporting his daughter. As a youth coach he was fun, kind, knowledgeable, balanced, and even-
tempered. He had a great demeanor and made the team and season enjoyable for the kids and
parents.

Although clearly supportive of the teams and his daughter, I have never observed him raise his
voice or conduct himself in anything other than an appropriate manner. As an example, in the at
times heated courts and fields of youth sports, Todd watches quietly, offers only positive
feedback and support, and never gets heated or carries himself in any way other than in a
respectful manner.


I hope this information is helpful.

Gordon E.

# Exhibit S

The Honorable Richard J. Sullivan
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Aaron 

New York, NY

2/26/2013

Dear Judge Sullivan,

My name is Aaron ▮▮▮ and I am writing this letter on behalf of my friend Todd Newman.

I met Todd three years ago in Amagansett, NY. I met him through a mutual friend and immediately liked him.

We started spending a lot of time together. I also met his daughter, ▮▮▮, who is very nice and warm.

I noticed that Todd was very good to ▮▮▮ and was always going off to see her. Todd treated her very well when she was around not in the sense of buying her things but just being very present and attentive to her needs. They really like playing lacrosse together, which they both taught me one afternoon.

Todd was also very nice to me when we just met and we weren't good friends. We became good friends later. Todd has a way of making the people around him feel comfortable and needed, Todds a low-key person, unlike me, and we seemed to hit it off. He really appreciated my sense of humor which, to some can take a little getting used to.

I would like to ask the court to take into consideration the fact that Todd Newman is a great father and a good friend to many, and even though this letter might sound a little contrived I really do mean it.

I would also like to see Todd have the opportunity to raise his daughter and spend as much time possible with her I'm sure this whole ordeal has been very hard on everybody concerned especially ▮▮▮.

I recently saw Todd three weeks ago in Manhattan and was happy to see him since it had been a couple of months since we spent time together. We talked about the fun times we had as well as the holidays and family.

I hope this letter describes how I feel about Todd Newman.

I really do wish him the best, and am glad that we became good friends over the last couple of years.

Thank you for listening to my feelings on behalf of Todd.

Sincerely,



Aaron ▮▮▮

# Exhibit T

# Morris Law Office, PLLC

400 Lafayette Road
P.O. Box 804
Hampton, NH 03843-0804

TEL: 603.929.1700
FAX: 603.929.5049

Edward F. ████*
Christos J. Valhouli**

Of Counsel:
Eugene R. Geary*

*Admitted in NH and MA
**Admitted in NH, MA and CA

March 7, 2013

The Honorable Richard J. Sullivan
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York  10007

Dear Judge Sullivan,

I am writing this letter on behalf of Todd Newman.

Todd is the brother-in-law of my sister, Erin ████, and I have had the pleasure of knowing him for well over twenty years. Throughout that time, I have gotten to know Todd as a hardworking family member, dedicated son and brother, and an incredibly proud and devoted father to his only daughter. I am proud to call him a friend.

In addition to Todd's clear commitment to his immediate family, he has always demonstrated a genuine interest in the lives of his extended family. When I first met him in the mid-1980s, Todd went out of his way to connect with my parents, my siblings and me. That connection evolved over the years, and I have enjoyed spending time with him during holiday celebrations, school graduations and family gatherings. I especially appreciated his support during the more difficult times when he travelled to the wakes and funerals of both of my parents and offered such deep compassion and support to my family. I am forever grateful for that kindness.

My children have also enjoyed getting to know Todd over the years, and they have always appreciated his interest in their lives -- joining in their birthday celebrations and cheering them on from the sidelines at their track meets and field hockey games.

I thank you in advance for your consideration as you finalize his sentencing. Please know I would be happy to provide you any further information you may need.

Sincerely,

Edward ████

# Exhibit U

Feb 27, 2013

The Honorable Richard J. Sullivan
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Dear Judge Sullivan,

My name is Sharon ████ and I reside in New Hampshire with my husband, Jim. I have been employed for the last 33 years as a school counselor in a Catholic Preparatory School. I have known Todd Newman for the past 26 years – my sister, Erin ████████, is married to Todd's older brother, Thomas Newman. We have often shared holidays, family celebrations, as well as family tragedies. During this time period I have always found Todd to be a trustworthy, honest, and committed man. He has revealed his deep sense of commitment and responsibility in his care for his only daughter ████. They share a bond of respect and understanding. He has served as a solid foundation in her young life.

In addition, Todd has revealed this deep sense of trustworthiness and commitment in the events surrounding his Dad's diagnosis, illness, and subsequent death from a brain tumor. The difficulties and turmoil that such a serious illness has upon a close family is self-evident. Todd was able to provide loving support and care for both his Dad and his Mom during this extremely difficult time. Likewise he was a solid source of emotional strength for both of his siblings during the time of his Dad's illness and death. Todd has continued to provide comfort, compassion and genuine care to his Mom who is now in her late seventies.

Todd Newman is a good, caring, and honest man. He is a man who has provided and continues to provide emotional support to his immediate and extended family. His daughter ████ and mother Irene are extremely important recipients of his care and support. His presence in their lives is an extremely important one. They are very much in need of Todd's care, companionship, and emotional support.

If you need to have further insight I respectfully invite you to contact me at ████████ (home phone) or at ████████ (cell). I thank you for your time.

Sincerely,

Sharon M. ████

Hampton, NH ████

# Exhibit V

January 2013

The Honorable Richard J. Sullivan
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Sullivan,

My name is Erin Morris Newman and I am writing on behalf of my brother-in-law, Todd S. Newman. I
am a Kindergarten Teacher at the Immaculate Conception School, a parochial school, in Newburyport,
MA. I am married to Todd's older brother, Thomas R. Newman and we have a fifteen year old
daughter. We've been married for twenty six years. I grew up in Andover, MA and attended a
parochial elementary school and a public middle and high school. Tom and I met at St. Michael's College
in Winooski, VT where I received my undergraduate degree in Psychology and a graduate degree in
Education. I worked in College Admissions prior to returning to school for teacher certification.

I met Todd in 1984 when he was 15 years old and have known him for thirty two years. Todd was the
best man at our wedding and is our daughter ████'s godfather. We have always spent a great deal of
time together. In addition to celebrating family birthdays and holidays, through the years we have spent
many weekends at each other's homes, at my in-law's home, at my parent's home and on weekend trips
before our children were born and with our children. Since 1997, when Todd and Jill moved to
Needham, MA, we've been fortunate that our two families have been in closer proximity to one another
and that our daughters have been able to spend a lot of time together.

Todd is a loyal and consistent friend who is committed to his family. Through the years, and during the
joyful as well as the difficult times in our lives, Todd has always been a constant presence. He is a
person of integrity and concern. When our daughter was born, Todd traveled to meet his godchild
when she was just three days old. When my husband was laid off a few years ago, Todd offered Tom
and our family a great deal of emotional support. Todd guided Tom through this very challenging period
of time.

During times of illness and death, Todd has always been strong and a voice of reason. When my father-
in-law was sick with brain cancer several years ago, Tom, Todd and their sister, Kelly worked together as
a flexible and cohesive team to guide and support their mother and family. When my father passed
away unexpectedly from cardiac arrest, Todd was on the phone with me immediately. When my
mother passed away recently after a brief illness, Todd was again a constant support.

My daughter ████ has benefited from her Uncle Todd's presence in her life. He is a caring and fun
uncle who has always taken the time to really listen to ████ and to embrace and celebrate whatever it
is that's important to her. Her major and minor milestones have always included Uncle Todd. He and
my husband speak on the phone often, discussing sports, their families and sharing details of their
daughter's lives.

Todd is first and foremost a loving, committed and very present father to his daughter, ████, who is twelve years old.  He is involved in every aspect of her social, emotional, academic and athletic development.  ████ loves to dance and to play soccer, basketball and lacrosse.  Todd has coached ████'s youth teams for as long as I can remember.  Todd and Jill's commitment to their daughter and to their family, in spite of their recent divorce, is admirable and quite extraordinary.  They exemplify and in turn have taught ████ the values of respect, hard work and thankfulness.  They are a parental team whose primary purpose in life is to provide a full and emotionally secure life for their daughter.  Todd provides ████ with the unwavering love and security that only a father can give.

I am cognizant of the results of Todd's court proceedings.  Thank you for giving me the opportunity to share my perspective relative to his character and to communicate to you the depth of my love and respect for him.  Thank you for your time.

Sincerely,

*Erin M. Newman*

Erin M. Newman

Newburyport, MA ████

# Exhibit W

February 26, 2013

The Honorable Richard J. Sullivan
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Dear Judge Sullivan,

I am Irene ▮▮▮▮▮, Todd Newman's mother. I live in Wilton, Connecticut, the town where Todd grew up. This is a letter I would never have thought I would be writing in my lifetime, so forgive me if I write with heavy heart.

I can tell you, without reservation, that Todd, as a man and boy, has lived his life with the highest level of honesty and integrity. I do not say this lightly. I love him dearly, but my level of respect for Todd has no bounds. He is the moral compass of our family. Todd has lived a low-key, modest life and has always rejected the trappings of elitism. He has worked hard through the years and, during his tenure at Diamondback in Stamford he stayed at my home in Wilton on weekdays.

Todd's devotion to family and particularly to his daughter ▮▮▮ is well known. She is the light of his life. Although divorced, Todd and former wife Jill have brought up a lovely child and have both handled the situation well. However, ▮▮▮ is devoted to her dad and he, to her. They are a team and do everything together. It is a joy to watch. ▮▮▮ is twelve years old and in her formative years and a separation from her dad would be disastrous for her. Todd has coached her sports teams and is the major participant in every phase of her life. As ▮▮▮ recently said to me, "my dad is the best thing in my life". I might say the same.

Todd's sensitivity, honesty and generosity to me is legendary. He has been more than supportive emotionally through the illness and death of his dad and through my two surgeries. He has helped me financially but was firm on my having to sell our large family home because it was too expensive to keep up. I referred to Todd as being our family's moral compass in a past paragraph. He sees things clearly and will advise with that clarity and truthfulness. At a time in my marriage there were infidelity issues. Todd was the one to confront his dad, taking a strong stand and guiding me and all of us through some very tough times. Tom, my oldest son, lost his job and was unemployed for a two-year period. Todd was the one there for him with strong support and advice to help him get back on his feet. As I have, his sister and brother have always relied on him for a direct and honest response to family matters and otherwise.

1

Todd is very child oriented and I think of the many happy occasions when he has been the Pied Piper with dear ▇ and her cousins, my other grand children. We all love him so much. He has set a fine example in fair play for all.

I am turning eighty in a few months. My grand daughter ▇, as I have said, is twelve. We are at different ends of life's spectrum but we so need this loving dad and son in our lives.

With great respect,

*Irene*

Irene ▇

# Exhibit X

January 27, 2013

The Honorable Richard J. Sullivan
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Sullivan,

I am writing this letter to you fully aware, and deeply saddened, that Todd Newman has been convicted of a crime.

My name is Jill ████. I am Todd's ex-wife. I am 47 years old. I have a daughter, ████ ████, from my marriage to Todd. ████ is 12 years old, and is in the 6th Grade of the public school system in our town of Needham, Massachusetts.

I am currently not working outside the home, though I volunteer a great deal of my time. I was ████'s Girl Scout troop leader for 5 years, her soccer coach for 4 seasons, an elected member of the School Council for 2 years, an Executive Board member of the Parent Teacher Association for 5 years, a weekly school library volunteer for 7 years, a preschool and elementary school room parent for 8 years, and chairperson of many school committees. Prior to all that, I was in marketing and promotions for 14 years.

Judge Sullivan, please allow me to enlighten you on the kind of person I believe Todd Newman to be. Please note that regardless of the differences that Todd and I experienced as husband and wife that led to our divorce, I can still speak with clarity and conviction regarding Todd's character as a father and family member.

Todd and I met and began dating in 1989. We became engaged in 1992, and we were married in 1993. We made the decision to divorce 14 years later, in 2007.

Todd and I have always led a simple, quiet life. We spend all of our time with our daughter, our immediate families, and a very small inner circle of close friends. Todd has a loving relationship with his mother, brother and sister, and their respective families. Todd is also still close with my immediate family. Todd has had the same small group of friends for years. In fact, many of Todd's closest friends he has had since early childhood.

Todd does not drink, smoke, abuse prescription drugs, take illegal drugs, or gamble. Todd rarely, if ever, swears. Todd is respectful of people and does not speak ill of others.

Neither Todd or I live in an extravagant house, or own a vacation home, belong to a country club, own a boat, wear expensive clothing or jewelry, or posses high-end furnishings or artwork.

Bi-annual family vacations have always been important for us to spend with ████ and our parents and siblings. In 12 years, ████ has only been on an airplane on 3 occasions, and has

never been out of the country. Instead we chose to spend time with our immediate family in Connecticut and Pennsylvania, as well as ski in New England and vacation on the New Jersey shore.

We have devoted the last 12 years of our life to raising our daughter in a thoughtful and conservative manner. Despite our divorce, we have continued to provide a loving home life for ████. We have done our best to spend quality time together, as the 3 of us, even after Todd and I decided to divorce, in addition to our individual time with her. In fact, Todd is currently residing with ████ and I in the original family home. We have an atypical divorce in that both Todd and I still attend every basketball, lacrosse and soccer game, dance recital, school concert, parent-teacher conference, and holiday dinner with ████. Neither one of us could ever bear to exclude the other from partaking in any part of ████'s life, even though our divorce agreement technically outlines a different kind of custody arrangement. It may seem unusual to people that we behave in this manner, but it is what works for our daughter.

Having an only child is a special circumstance. Only children tend to be extremely close and dependent on their parents. Without siblings around, parents of only children take on the role of friend, sibling and parent. ████ is extremely close with Todd. In fact, out of all of her cousins and friends, she has the tightest bond with her father, by far.

Todd has always been completely devoted to ████ regarding all aspects of her life: school, sports, and friends. He coached her basketball team for 3 seasons. In grades K-2, he volunteered in ████'s classroom. He always helps her with her homework. He often takes ████ and her friends to the movies, arcade, mall, and out for lunch or dinner. He goes with ████ to watch her friend's games. Todd spends countless hours practicing basketball, lacrosse and soccer with ████ and her friends in the yard.

It is my strong belief that Todd's only source of joy and happiness is gained through time spent parenting our daughter. His love and commitment to her far surpasses that of a typical father-daughter relationship.

In the 24 years that I have known Todd, I have never witnessed anything untoward about his behavior regarding his work, our daughter, or our friends and family. I simply cannot reconcile with the fact that Todd would ever do anything to jeopardize his well being or his life with ████.

I fear for the irrevocable harm that a long incarceration will do to ████ and her remaining 6 years of childhood, as well as the rest of her life. I implore you to please consider everything I have shared in this missive when making your sentencing decision.

Thank you for your valuable time and consideration.

Respectively yours,

Jill A. ████

# Exhibit Y

January 27, 2013

The Honorable Richard J. Sullivan
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Dear Judge Sullivan:

My name is _____, I am 15 years old, and I live in Newburyport, Massachusetts with
my Mom and Dad. I am a student at Newburyport High School and graduated from The
Immaculate Conception School in my town. I am Todd's niece and Godchild.

My Uncle Todd is one of the most caring, nonjudgmental people I know. He's always supported
and encouraged me in everything I've done. He's been to every dance recital, birthday party,
sporting event and graduation in my life. Whenever I see him he goes out of his way to ask me
about school, sports and life in general. I remember when I was younger Uncle Todd would
always come and play with me and my cousins. He makes me giggle and instantly puts me in a
happy mood no matter what else is happening in my life at the time. He helped to teach me how
to ride a bike and has helped to shape me into the person I am. He's a great role model. I love
the days that I get to see him.

Uncle Todd's an awesome uncle to me and a loving father to his daughter and my cousin, ____.
____ and I have grown up together and she's one of my best friends. ____ loves her Dad and
Mom more than anything in the world. Uncle Todd and ____ have a close relationship. From
talking about sports non-stop to helping and talking with her about friends, school and
everything else, he's there for her.

I love my Uncle Todd so much and hope that he will stay as big a part of my cousin's and my
life as he is today.

Sincerely,



Newburyport, MA ____

# Exhibit Z

January 25, 2013

The Honorable Richard J. Sullivan
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Dear Judge Sullivan:

My name is Tom████, I am 52 years old, and reside in Newburyport, Massachusetts with my wife, Erin and daughter, ████. I am a Sales Manager for a local food company, and am Todd's older and only brother.

Todd and I have a very close and personal relationship that has maintained its strength throughout the years. As children, we shared many memorable and fun times such as playing in Little League baseball and football together and rooting for our favorite teams (me the Red Sox, Todd the Yankees). I am thankful to have such a loyal and caring brother. When I was out of work a few years ago, Todd would call me often to offer his support, visit me to keep my spirits up and ask me to sporting events. He was very supportive to me during those tough times.

Todd is also a big part of my immediate and extended family. He is always interested in what's going on with my wife and my daughter. He is an important part of my fifteen year old daughter's life; ever present at family events such as birthday parties, her first communion, sporting events and family parties. Whenever we're together, some kind of game involving Todd, myself and the kids usually ensues, whether it's basketball, kickball, run the bases or a game of catch.

Todd is a devoted son to our mother, Irene, as he was to my late father, Thomas. My mother recently had to move out of our family home in Connecticut after thirty two years, and it has been tough on her. Todd visited her on weekends, helping out around the house with any maintenance that was needed, delivering her coffee in the morning, or just spending time with her to provide emotional support. A year or so ago her car was no longer operable, and Todd gave her his car to use without any hesitation. For a number of years, Todd and Jill rented a home at the New Jersey shore in August for a couple of weeks. They have always welcomed anyone in the family who's able to come. My Mom and Jill's parents have joined them for many years. Todd was a rock when my late Father was ill and passed away from cancer in 2001. He would make trips to the hospital with my mother, stay with her on weekends, again offering unconditional support to her and to our family.

I now see Todd as a father to his twelve year old daughter, ████. He is very close to ████ and extremely involved in her upbringing. I have joined Todd to many of ████'s activities, from dance recitals to sporting events. Todd has helped ████ thrive and develop into a great young lady. He has taught her how to ski, how to throw a ball, how to kick a soccer ball, and most importantly has given her the confidence to do so.

I am aware of Todd's situation, and hope that he will be able to continue to be a big part of ████'s life as well as our lives. He is a great person, family man, brother, and friend.

Thank you,



Tom████
Newburyport, MA ████
████

# Exhibit AA

Charles F. 

Hollis, NH

January 18, 2013

The Honorable Richard J. Sullivan
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Dear Judge Sullivan:

I am an Account Manager for an Information Technology company, called IT Guardian,
in Nashua, New Hampshire. Although I've worked with IT Guardian for only two years,
I've worked in this industry since 1999. I was an Account Manager for Hewlett Packard
in Marlborough, Massachusetts for ten years. Prior to that, I owned my own real estate
sales, management, and appraisal firm. I've lived in our home in Hollis, New Hampshire
with my wife, Kristin, since 1992. We have three daughters, Katie (19),       (13),
and      (11). Katie is a freshman in the Whittemore School of Business at the
University of New Hampshire.                       are in middle and elementary school,
respectively.

I grew up in Wilton, Connecticut with Todd Newman. We lived only a few streets away
from one another, and I've known him since our first years in elementary school. I
understand that he's been convicted of a crime, but hoped to share a little about the
man that I've known for more than forty years. Todd and I have always played sports
together. In fact, in 1975, our All-Star Little League Baseball Team made it to the State
Championship. My father was one of the coaches of that team. It would be impossible
to make it to that level of play without 100% commitment from each player and their
families. Thinking back, that was one of the first times that I realized how committed
Todd was, not only to the game and his own success, but to his team. Even at that
young age, Todd knew how important it was to be a team player and what sacrifice
meant. As my father and I remember, he never missed practice or a game. Even when
we weren't practicing, Todd would ask me to grab a glove, so we could practice on our
own.

Over the years, our friendship grew. Even though we were separated at college, (Todd
went to Skidmore and I went to Franklin & Marshall in Lancaster, PA), we never missed

an opportunity to get together when back home. I visited him twice in Saratoga Springs, and we spent most of our time during vacations together.

In 1987, after graduating college and earning money over the summer, Todd and I travelled to Europe with several other young men from Wilton. We brought backpacks, took trains, and stayed at youth hostels as we absorbed the cultures of France, Holland, Austria, Switzerland, and Germany. About 2 weeks into the adventure, Todd suggested that we separate from the rest of the group (whose focus was more party-oriented), and head back to Switzerland and Germany on our own. The two of us were able to further appreciate the countryside and culture, focusing our time on truly appreciating the opportunity we'd been given, to learn.

I was extremely happy when he decided to move to Massachusetts to complete his Master's Degree at Babson. We had already settled in New Hampshire and I was excited that we would be able to see him on a regular basis.

Growing up in a small community led to some very close relationships with friends. As someone new to the group, my wife always felt most comfortable talking with Todd. He was always open and kind to her, and made her feel welcome in the group. I know Todd's long been her "favorite" friend from Wilton. When I got married in 1989, Todd was one of my 4 groomsmen. When Todd got married to Jill, I was in his wedding as well. Our spouses got along, as well as we did, and the four of us have spent many happy days together.

When our first daughter, Katie, was only 6 months old, my wife Kristin was asked to attend a sales award weekend on the Cape. We had never left our child alone with anyone other than her daycare provider, but knew that we could feel completely comfortable leaving her with the Newmans. We joke about it now, because at the time, they didn't have any children, and didn't have a lot of experience with babies. Kristin and I knew that they would go to the ends of the earth to make sure our little girl was happy and safe. Out of all of our friends and family members, we chose to ask Todd to care for her – even chose him above our parents! That's the level of trust I have in Todd.

Todd's father became very ill about 10 years ago. One way of judging a person's character is to see how they react in a family crisis. Todd did what he had to, to make sure that he was by his father's side in the hospital as much as possible. I went to visit Mr. Newman at Norwalk Hospital, and when I walked in the room, Todd had been sitting by his father's side even while he slept. When his father passed away, Todd was right

by his mother's side to help her in every way. He even began working closer to her in Connecticut so she wouldn't have to be alone for long stretches of time.

Todd's been the glue that's kept our childhood friends close all of these years. It was he who would initiate the weekend get-togethers for all of our families. He wouldn't give up either. If someone didn't return his email or call, Todd would persist until he was sure that everyone would have an opportunity to participate. Every year he would invite us all to his daughter ██████ 's birthday party – not as much to celebrate the birthday, as to make sure that we had another opportunity to see and spend time with one another. Every Labor Day, he arranged for get-togethers at the beach in Gloucester, MA. I could see during these meetings that Todd is an excellent father. He is constantly engaged with ██████ , either playing Frisbee on the beach, or more recently, tossing the lacrosse ball with her. He makes our kids feel truly special, always engaging them in conversation about what they're doing and what they're interested in. It was these times we spent together, when I realized how truly fortunate I was to know Todd and what a great father, husband, and friend Todd had become. He is genuinely interested in everyone's lives and never boasts about his professional accomplishments or his family.

Simply put, being friends with Todd all of these years has made me a better person. His loyal and caring friendship is something I will always cherish.

Very Sincerely,

Chuck ██████

# Exhibit BB

Lisa L. ███

███████

Needham, MA ███

The Honorable Richard J. Sullivan
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Dear Judge Sullivan,

My name is Lisa ███ and I am writing this letter on behalf of Todd Newman. I am
aware that Todd Newman has been convicted of a crime and I would like to offer a letter
on his behalf. I am a 49 year old woman and I am both a mother to one 12 year old child
and a wife to my husband of 18 years. I currently work as a part-time consultant who
provides bookkeeping and accounting services to small business clients. I am a native of
rural Vermont who moved to the Boston area upon the completion of my college degree
at the University of Vermont some 27 years ago.

I met Todd and his ex-wife Jill during 2006 when our daughters attended kindergarten
together. Todd's daughter ███ and our daughter ███ became good friends and since
we both had families with one child we gravitated toward one another. During our
daughters' elementary years we have spent many hours with Todd, Jill and ███. Our
families often celebrate holidays together, go trick-or-treating together, attend school
functions and sporting events together or simply dine and watch TV together. Neither I
nor my husband has family that lives in our locality so we think of the Newmans as our
extended family. We have often called on Todd to watch our daughter if we have a
scheduling conflict or shuttle her to an activity or make sure she has a meal, etc. Indeed,
we trust Todd with the care of our daughter as we would with any family member.

I can most accurately attest to Todd's character as it reflects on his role as a father and
friend. Todd is a dedicated father and spends an abundance of quality time with his child.
Todd worked weekdays in CT and commuted home for the weekends during the time we
have known him. Todd always dedicated his weekend time to his daughter ███.
However, Todd made time for ███'s friends on the weekends. He was aware that
although he may have wanted to spend more private time with ███ it was important
that he share this time with her peers as well. Todd would selflessly give up some of his
quality time with ███ in order to host play dates and entertain ███'s friends. In this
way, Todd certainly put the best interest of his daughter before his own personal interest.

I believe that Todd helped to cultivate a friendship between ███ and a neighborhood
boy which created a support system for ███ during the weeks when he was away at
work. ███ didn't have friends in her neighborhood and I think that it was very

important that Todd helped to create a bond with her neighbors. Todd would spend hours shooting hoops, playing football or taking the kids to the movie theater. I believe this sense of community helped make ███ a stronger and more confident girl. In turn, Todd created an environment that was welcoming and nurturing for the neighbor boy as well.

Although a divorce impacts all members of a family, I think that Todd has always been present and available and he has provided support to his daughter. Todd attends functions and conducts himself as a responsible parent and adult regardless of any disagreements that may exist within the confines of marriage. Both parents have made a super-human effort to put ███'s needs before their own and I am often awed by what they can accomplish together in an effort to give ███ a sense of family and stability.

Todd has helped his daughter ███ develop her interest in all things sports. Todd has spent a myriad of hours with ███ in an effort to practice free throw shots for basketball or corner kicks for soccer. ███ is an avid sports enthusiast and Todd has supported her by fostering and developing her interest in Lacrosse, Basketball and Soccer. Todd consistently plays an important role in ███'s athletic pursuits whether he volunteers to coach, manage the scoreboard, keep the time clock, or simply cheer from the sidelines. I should state that athletics is ███'s interest and I think that Todd does everything in his power to build her self-esteem and confidence in this area. I might also add that Todd is very quick to congratulate all the girls and takes particular time to congratulate or support our daughter who may not be as skilled or confident in a sport.

Todd is always available as a homework helper to his daughter and friends. Todd is quick to offer a ride or coverage for any friend who is in need. Todd attends ███'s games and school functions and he is an active participant and supporter of her academic accomplishments.

As a transplant from rural Vermont who lives in a suburb of Boston that is relatively more affluent, I believe that I have a unique perspective of our neighborhood and community. Todd has always shown great regard for all individuals and treats everyone with respect and integrity. Todd does not appear to differentiate between those who "have" and those who "have not." I have always found Todd to be gracious and kind to other children and families in our community. I believe that although many children in our community have the benefit of material things it important that they realize the world is bigger and more diverse then their small world. I think Todd works to give ███ balance in her life. ███ is quick to volunteer or offer support to those in need and I know that this is a result of the guidance and support of both her parents.

In conclusion, Todd is a trusted friend and a loving father. He has always acted with great integrity and kindness in my presence. I feel fortunate that our paths have crossed with Todd and I consider him to be an integral part of our family and community.

Sincerely,
Lisa ███

*Lisa* ███

# Exhibit CC

February 11, 2013

The Honorable Richard J. Sullivan
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Dear Judge Sullivan;

My name is Brian         and I am in writing on behalf of Todd Newman, a good friend of mine, who has been recently convicted of a crime. I have been a commercial real estate broker in downtown Boston for the last 18 years. In that I have known Todd since midway through high school, I thought I should share some positive attributes of Todd worth providing the court.

In 1979, my father was promoted within Xerox and it meant moving our family from suburban Boston to Wilton, Connecticut. This, as you may have guessed, was not particularly easy to uproot four kids from their comfortable surroundings to start over again in an unfamiliar town. I was 15 years old and going into my sophomore year and fortunately played soccer. Through soccer I made many friends and was introduced to people like Todd, who befriended me and got me actively involved in school activities that I otherwise would have had a difficult time knowing about. Junior assembly dances and joining the Key club were two, good examples. We went on ski trips together either through the school or me being invited to spend a weekend at his family's ski house in New Hampshire. Todd and his family became good friends with mine and we routinely got together socially throughout the remainder of high school and through our college years. The one thing that happened in high school however, that clearly defined our friendship, was when he had the respect to ask me whether I would be okay with him asking my younger sister Susanne (a sophomore at the time), to a high school dance. What high school friend does this? For that matter, we know of plenty of guys that never bothered asking their future father-in-laws' permission to marry their daughter.

In our post college years, we continued to build on our friendship that is now going on 35 years. I was in his wedding and he would have been in mine, but I was married outside of the country and he would have missed an important exam for a financial certification course he was already two years committed. As much as I respected that, we were sorry he could not be part of our celebration. Some years later when the last of my two were born (twins), there was only one name that came to mind in naming the Godfather for our only son. Todd Newman. He has been as much family as the rest of my immediate family and in fact, more so in some respects. More recently and despite some marital difficulties and work-related issues, he has remained a close friend and engaged in following my son        as he develops into a young man. For Todd to have these kinds of issues swirling around in his life, and to still be able to step back and genuinely care about others, continues to say a great deal about his character. Lastly, I hope that if I ever am tested the way he has been, I hope I am able to demonstrate the same personal strength and integrity that he has exhibited over his lifetime.

Regards,



Brian G.

# Exhibit DD

The Honorable Richard J. Sullivan
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Dear Judge Sullivan,

I am writing in behalf of my classmate, acquaintance and friend Todd Newman whom I am aware has been convicted of a crime in your court. Todd and I came from different places and took very different paths. I have spent my career working in the non-profit sector in Finance for Hospital systems (currently at Partners HealthCare) and institutions of higher education (formerly at Harvard Medical School.)

I first met Todd on a beautiful Fall day in the Summer of 1989 when both he and I were enjoying our first semester in the MBA program at Babson College's Olin School of Business in Wellesley, Massachusetts. Todd and I clearly came from different backgrounds, but at our first meeting I found him an unpretentious and affable fellow who treated his classmates with respect, and in an open minded manner. I really cannot explain why, but I will never forget my interaction with Todd early on in my first semester at Babson on the day I learned that I had passed the Certified Public Accountancy exam, and became certified in the Commonwealth of Massachusetts. I bumped into Todd on campus and told him my news. Todd was so genuinely happy for me, I was struck by the authenticity of his reaction to my professional accomplishment; he helped me to appreciate the importance of what I had achieved.

By virtue of sitting in close proximity to one another, Todd and I ended up working together on a semester-long, group project with three young, successful, cosmopolitan women. Todd was the level-headed, peace-making facilitator of the group. Having been raised with five older brothers by a divorced, second generation immigrant mother, I have somewhat of a "cut to the chase" personality, and have little interest in process for its own sake. From the start, I recognized that I was going to have great difficulty surviving the semester, but thankfully there was Todd to mediate disputes, ease us through misunderstandings, and help chart a productive course forward. I recall challenging group "discussions" where I found the positions of my colleagues particularly intractable, and felt that I was in the wrong program, and considered leaving. Todd was the voice of reason with a hand on my shoulder and slap on the back, enabling me to get through the day. He was a good friend with a ready smile, and sympathetic ear.

Whereas I tended towards cutting corners, focused on getting the 'B', and shooting pool at the campus pub with the undergrads; Todd seemed to give it his all for the sake of learning. I occasionally would skip lectures and assignments, but Todd never took the short cut; he did all the reading, and all the work. In absolutely every experience I shared with Todd in the MBA program at Babson, I found him to operate with the highest level of integrity, and commitment to the process. I learned a lot from the way Todd interacted with others, and the effort he put into his education. We moved forward through the program occasionally working together in other classes but veering off in our own direction. We traveled in different circles, but Todd was liked and respected by everyone who knew him.

Life took us in different directions, and unfortunately, I am not one who puts a lot of effort into maintaining relationships. Many years passed before I saw Todd again. I married a single mom from Somerville MA. with a lovely, little girl, and we went on to have three more beautiful daughters and a precocious, little boy now nine years old. I was at my daughter's 4th grade youth basketball game and spied Todd coaching the team across the court, though lucky for him they weren't competing against my daughter's team! I went over to speak with him and was delighted to see that despite great professional success, he hadn't changed. He introduced me to his beautiful daughter ▮▮▮ whose team he was coaching; a delightful young lady who clearly worships him. So different from the relationship I have with my strong-willed daughter ▮▮▮ of the same age, who loves me but doesn't necessarily respect my advice! I saw Todd from time to time around town but have really become reacquainted with him watching our daughters play basketball together, for ▮▮▮ and ▮▮▮ ended up on the same 5th and now 6th grade basketball teams.

I didn't really have a chance to speak with Todd much early on, as he is the Dad who is always willing to run the scoreboard and keep track of fouls, ensuring the game is played fairly. I have since spent much time picking his brain trying to learn how this game of basketball is played, and understand why he calls out to my daughter "nice play ▮▮▮" and "good game ▮▮▮". ▮▮▮ has grown to really like Todd and respect his opinion and sense of the game, and ▮▮▮ is a good judge of character. Todd has been very patient with me, and my inability to learn the game. He will often lean over sensing my perplexity, and quietly explain what just happened, and why the referee blew the whistle.

I have gotten to know ▮▮▮ just a bit, offering a smile and a "good game" when it seems like I can. I marvel at the way she responds to Todd when he softly calls out to her, offering advice at practice and during games. From my limited perspective, ▮▮▮ is a player who exhibits many of her Dad's traits; while perhaps not gifted, she is skilled and hard working, friendly and kind. She is quick to offer a hand to a friend or competitor who has fallen, and plays the game with the utmost integrity and good sportsmanship.

I do not understand how we have come to the place we are at as I type. I do know that life has been challenging for me, and so it seems for Todd as well. I recall and suspect I always will, a quiet conversation with Todd on that day when we became reacquainted while he was coaching ▮▮▮ and I was watching ▮▮▮. We discussed our careers and our families and I came away with the certainty that Todd in the way that only a truly loving father could, fully appreciated how wildly successful in life I have been to be blessed with five beautiful children.

Respectfully,

*Brian C.*

Brian C. ▮▮▮
▮▮▮▮▮▮
Needham, Massachusetts ▮▮▮

# Exhibit EE

January 22, 2013


The Honorable Richard J. Sullivan
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

RE:    Todd Newman

Dear Judge Sullivan,

My name is Kimberly ▮▮▮▮ and I am writing in support of my former colleague and friend,
Todd Newman. I worked with Todd for more than three years and I have been fortunate enough
to have developed both a professional and personal relationship with him over the years. By way
of background, I am a Chartered Market Technician (CMT) and in the most simplistic terms, I
analyze charts (i.e., stock price patterns) of individual stocks as well as the market as a whole.
Until 2011, I worked at a small brokerage firm that has an entrepreneurial spirit. The role I
created for myself as a technician at this firm was to work closely with my clients who are
portfolio managers to help them with their respective portfolios.

At my small brokerage firm, I was responsible for my own business generation, and accordingly,
I was always trying to develop business by identifying new prospective portfolio manager
clients. It is very difficult to develop clients as a CMT because I generally have to persuade
portfolio managers that analyzing charts could be helpful to their overall portfolio strategy since
most managers rely primarily on fundamental analysis. About six years ago, my friend invited
me to a charity event because he wanted me to meet a portfolio manager who my friend thought
would be open-minded to incorporating technical analysis. That is when I met Todd Newman.
A mere introduction to a portfolio manager however certainly does not mean he/she will become
a client and certainly does not mean he/she will give you a business opportunity. Todd gave me
that chance. He was willing to learn what it is that I do and how I can add value to his day-to-
day performance.

What was particularly significant about Todd giving me a chance is that I was a double minority
in the financial industry – both as a chart analyst and as a woman in an industry that is still very
much a man's world (as an example from my own small part of the financial industry, about 6%
of active CMT's are women). What I needed was for one person to see past the industry's
prejudices and believe in me and give me that one opportunity. Todd took the time to get to
know me and what I did, and did not dismiss me simply because I was a woman. I would like to
share with you the countless ways Todd has truly helped me grow professionally. It took time
for me to prove myself as a technician to him and prove that I was capable of being an asset to
his overall performance. It was Todd's commitment to me that made me strive to be the very
best technician I could possibly be. What I really value about Todd is that he wanted to know
my process and what I actually visually saw on the charts. He is a very patient human being and
he is always willing to help others. I cannot even count the endless ways Todd would try to help

me grow my business. He is understanding and attentive. He always would work with me to make me a better analyst and I learned countless valuable professional lessons from him over our time working together.

On a more personal level, over the last six years I have come to know Todd well as a human being. I have tremendous respect and admiration for Todd because he is a good natured, caring individual. The selflessness that exudes from him is immeasurable. Even though he was going through the hardest time in his life over the past two years, he would always encourage me to move onward and upward. As just one example of Todd's character, when hurricane Sandy devastated our metropolitan area, Todd used his time when the trial was delayed and went to Brooklyn and volunteered to help the victims of the hurricane. Specifically, he made sandwiches for people who were displaced in Far Rockaway as well as gathered, stored and separated donated clothes from the Salvation Army for people in need during that time. Todd is the kind of person who picks up litter off the streets. Todd is the kind of person who at Christmas time serves food to the homeless. Todd is the kind of person who has given money to help a complete stranger whose car ran out of gas. What surpasses all else is that Todd is an amazing and remarkable father to his little girl. Todd was my client, he is still my friend and he will always be someone I look up to. Thank you Your Honor for taking the time to read my words.


Respectfully Submitted,

Kimberly

# Exhibit FF

The Honorable Richard J. Sullivan

United States District Court Judge

Southern District of New York

500 Pearl Street

New York, New York 10007


Dear Judge Sullivan,

My name is Tom        , I live at                          in Needham, Massachusetts and am a friend of Todd
Newman. I have known Todd for 4-5 years. I met Todd through family - as his daughter       and my
daughter       have been very good friends for that time. They both went to the same elementary
school in Needham and now go to the same Middle School. I am Chief Executive Officer of a consulting
engineering company in Boston, Howard/Stein-Hudson Associates.

Through the years that I have known Todd, both our daughters have played together on numerous
soccer teams in the Needham Soccer Club. I am currently the coach of two teams that our daughters
play on together – one an in town team and an additional tournament team. Todd has been very
supportive of the teams. He encourages, not only those he knows but the entire team. Todd has been in
attendance at most all the games that the teams have played. Todd has always offered to help before
games and his interest and support have been very helpful to me. To the end of last season where our
in town team lost on penalties in the final, Todd couldn't have been nicer with a nice note of thanks. I
was very grateful for that note.

I understand that Todd has been convicted of a crime.

Todd and I have spent some time together in a variety of occasions that I will outline. I have always
found Todd to be social, interested in others, thoughtful and helpful.

Our families have spent some holidays together. A couple of years ago, we shared Thanksgiving Day
together in Todd's home with his family – including his mother. Todd was very generous and thoughtful
throughout the day. It was an enjoyable day.

We have also spent the most recent Halloweens together – our daughters have trick or treated together
and we have followed along. We have done so in Todd's neighborhood and it is apparent to me that
Todd knows and is liked by many neighbors in the area. He has frequent easy going chats with many of
the neighbors.

On occasion over the past few years, we have played pick-up games of soccer and basketball in front of
Todd's house and these games have included our daughters and a neighbor friend. In addition, our
families have skied together in ski areas in Massachusetts.

It is clear that Todd is a sports fan, with particular interest in football and basketball. As a soccer fan I
have had frequent discussions about soccer both in the US and in Europe. Todd has always been
interested in the sport and we have gone to New England Revolution (Boston Professional Soccer)
games together with our daughters.

Todd's daughter, ███ is a sports enthusiast and plays not only soccer but also lacrosse and basketball. Although I am not involved with these teams – I have attended some games over the past few years. In a similar way to soccer, Todd has always been on the sideline encouraging not only ███ but the entire team to do well. I also know that ███ has been playing on an out of town Lacrosse team and that Todd attends these tournaments and training.

A couple of years ago, I was out of town visiting family – there was a snow storm that resulted in a heavy accumulation of snow on roofs throughout our town. My wife Lisa was concerned about this. On that night Todd and Jill arrived over to the house – it was dark and cold – they proceeded to chip away at ice on the gutters and helped the condition greatly. It was a very kind, generous and thoughtful act and I was very appreciative.

In summary I have always found Todd to be a kind, decent, generous and helpful friend.

Sincerely,

Tom ███

# Exhibit GG

The Honorable Richard J. Sullivan
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Dear Judge Sullivan,

My name is Kim ████. I am Jill ████'s sister and Todd Newman's "former" sister-in-law. I am currently a stay at home mom to my three year old son ████. Prior to this, I worked for many years as an office manager and executive assistant for several companies in the Philadelphia area.

I am writing this letter knowing that Todd has been convicted of a crime.

I have known Todd for 24 years. For the past 12 years, he has been a loving, committed father to his daughter ████. He always attends her sporting events, dance recitals and school activities. He has also coached her basketball teams and always showed a strong commitment to her and her teammates. He has also taken the time and effort to know her friends and their families as well.

Todd shows a similar commitment and love with my son ████. Even though we live 6 hours away and ████ does not see him often, he always has so much enjoyment with him. Todd is patient and caring with ████.

Todd and my sister have been and continue to be very supportive and generous to my family and me in times when I needed it. Prior to marrying my husband Tom, on two separate occasions when I was in between jobs, Todd had offered for me to live with he and my sister and support me until I could find another job. I will be forever grateful for his support and generosity.

Todd has always welcomed my family, including my parents, on family vacations, holidays and special celebrations. We still have a strong relationship with Todd and his immediate family.

Todd's strong commitment to his family and friends comes through in his work ethic as well. He has always worked hard to provide a comfortable life for his family.

Through the divorce, both Todd and my sister have shown a strong commitment to their daughter ████. Every decision they make is to ensure that she is in a kind, supportive and loving environment. I am also the parent of an only child, so I know first hand how much more attached children are to their parents when there are no siblings. ████ needs both her father and her mother as she continues her childhood.

I hope this gives you some insight into how I feel about Todd, and what kind of person he is.

Thank you for taking the time to read my letter.

Warm Regards,

Kim ████

# Exhibit HH



**JEREMIAH** ▮

RUTLAND, VERMONT ▮

The Honorable Richard J. Sullivan
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Dear Judge Sullivan:

I write this to you with a heavy heart, for I have known Todd
Newman for over 16 years, ever since our families intertwined by
marriage. Throughout that time, both by reputation and by personal
experience, I have found him to be honorable, caring and dedicated
to the welfare of his immediate and extended family.

I am a retired executive from a family-owned retail enterprise
in Rutland, Vermont. I have been an employer of many, and I do
feel qualified to judge a person's intent and character.

I am well aware of the fact that Todd has been convicted of a
crime in a court of law. The seriousness of this, however, does not
diminish my regard for him as a serious and well-intentioned
young man with what otherwise would have been a very promising
future.

Most sincerely yours,

Jeremiah ▮

# Exhibit II

The Honorable Richard J. Sullivan                                    1/30/13
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York  10007

Dear Judge Sullivan,

We are Bill and Joan ▮▮▮▮▮▮▮ of West Chester, Pennsylvania.  We are both 73
years old.

We have two daughters and two grandchildren.  Our oldest child is Jill ▮▮▮▮▮ and
her daughter, ▮▮▮ Newman, was our first grandchild.  Kimberly ▮▮▮▮▮ was our
second child and her son ▮▮▮ was our second grandchild.

Bill is a retired DuPont executive and Joan left her job, as an executive assistant, in
order to raise our children.  We are both currently retired.

Our daughter, Jill ▮▮▮▮▮, is Todd Newman's ex-wife.

We are writing this letter to you knowing that Todd Newman has been convicted of
a crime.

We have known Todd for 23 years, since 1989.  In 1992, Todd approached us to ask
for our permission to marry Jill.  We gave our wholehearted consent.

Over the years, we got to know Todd and his family very well.  We shared birthdays,
holidays, special events and many vacations together.  Todd always had Jill include
us in their summer vacation plans.  We discovered that Todd is very intelligent.  He
is also athletic and loves a wide variety of sports.

Todd worked at several companies to advance in his field.  We have witnessed that
he is a hard worker and very dedicated to his career.

We found Todd to be very polite, courteous and generous with his family and with
us.  He does not swear, drink, or smoke.  Todd has been there for his Mother when
she needed help.  As another example, Todd offered to get Bill the medical help he
needed, at Mass General Hospital, to treat his small cell lung cancer, if we could not
find the help we needed in Philadelphia.

On weekends, Todd devotes all his time to ▮▮▮  He goes to every one of her games
and has even coached ▮▮▮'s basketball team.  He also plays a variety of sports with
▮▮▮ and her friends in the yard and around town.  He also takes ▮▮▮ to the
movies and out shopping to the mall.  He has always been a hands-on Dad.

Todd is liked by people. He still has friendships with guys that he went to grade school with. Todd is good with young people. They enjoy his company and love to watch sports on TV, or play outside with him. He is down-to-earth and a good person.

Our granddaughter, ▮▮▮▮▮▮▮▮, is one of the most important things in our lives. We cherish her and love her with all our hearts. Even though Jill and Todd are divorced, they have worked very hard to provide ▮▮▮ with as normal a family life as possible. We are so proud of Jill and Todd in how they have handled themselves over the past several years, since their divorce, and what wonderful parents they are to our darling ▮▮▮▮ Todd is extremely close to his daughter and it is very apparent to us, that he loves her very, very much. We have watched him grow as a father over the past 12 years of her life.

Todd still spends holidays and vacations with us. We enjoy having him with the whole group and we all still have a wonderful time together. He has always made us feel welcome. We still see him when we travel to Massachusetts to visit our daughter and granddaughter. We could not imagine not having him with us during special occasions like birthdays, holidays, or ▮▮▮'s dance recitals and basketball, lacrosse and soccer games.

We also cannot even begin to comprehend how difficult it will be for our daughter and granddaughter if he is incarcerated. The devastation this could potentially cause our granddaughter is too difficult for us to handle. She is so young, only 12 years old. Our daughter Jill and Todd's mother, Irene, will also be irreversibly damaged by this. Todd is still such a big part of all of our lives.

Judge Sullivan, we hope this gives you some insight into our relationship and understanding of Todd Newman. We thank you for your time in reading this letter.

Sincerely,

*Bill*

*Joan*

Bill and Joan ▮▮▮▮▮▮