UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | ) <br> ) <br> ) <br> ) |
| v. | ) No. 12-CR-00121 (RJS) <br> ) |
| TODD NEWMAN, | ) <br> ) |
| Defendant. | ) <br> ) <br> ) <br> ) |

## DIAMONDBACK CAPITAL MANAGEMENT, LLC'S
## MEMORANDUM IN SUPPORT OF ITS REQUEST FOR RESTITUTION

Peter G. Neiman
Martin E. Gilmore
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
New York, NY 10007
Telephone:  212-230-8800

*Attorneys for*
*Diamondback Capital Management, LLC*

April 26, 2013

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

I.     INTRODUCTION ................................................................................................ 1

II.    FACTS ................................................................................................................ 2

       A.    Costs of the Investigation ......................................................................... 2

             1.    Legal Fees ....................................................................................... 2

             2.    Legal Fees for Employees and Former Employees ......................... 3

             3.    Document Management Expenses .................................................... 3

       B.    Compensation ........................................................................................... 3

       C.    Damage To Diamondback's Goodwill And Business Reputation ............. 4

III.   DISCUSSION ..................................................................................................... 5

       A.    Diamondback Is a Victim Under the MVRA ............................................ 5

       B.    The Legal Fees Expended in the Course of the Investigation Are Subject
             to Restitution ............................................................................................ 9

       C.    Newman Should Be Required to Return 25% of His Compensation ........ 10

       D.    The Direct Injury to Diamondback's Goodwill and Business Reputation Is
             Subject to Restitution ............................................................................... 12

IV.    CONCLUSION .................................................................................................. 17

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Marrero v. City of Hialeah,*
    625 F.2d 499 (5th Cir. 1980) ...................................................................12

*United States v. Amato,*
    540 F.3d 153 (2d Cir. 2008)........................................................................9

*United States v. Archer,*
    671 F.3d 149 (2d Cir. 2011)............................................................5, 6, 7, 13

*United States v. Bahel,*
    662 F.3d 610 (2d Cir. 2011)......................................................................10

*United States v. Battista,*
    575 F.3d 226 (2d Cir. 2009)...................................................................1, 12

*United States v. Boccagna,*
    450 F.3d 107 (2d Cir. 2006).....................................................................13

*United States v. Catoggio,*
    326 F.3d 434 (2d Cir. 2003).....................................................................14

*United States v. Milstein,*
    481 F.3d 132 (2d Cir. 2007)................................................................12, 14

*United States v. Paul,*
    634 F.2d 668 (2d Cir. 2011)...........................................................6, 7, 8, 13

*United States v. Sapoznik,*
    161 F.3d 1117 (7th Cir. 1998) .................................................................10

*United States v. Skowron,*
    839 F.Supp.2d 740 (S.D.N.Y. 2012)................................................6, 8, 10, 11

*Webster v. Moquin,*
    175 F. Supp.2d 315 (D. Conn. 2001) ..........................................................12

**FEDERAL STATUTES**

18 U.S.C. § 3663A(b)(1)....................................................................................10

18 U.S.C. § 3663A(a)(2).....................................................................................6

18 U.S.C. § 3663A(b)(4)....................................................................................12

18 U.S.C. § 3663(b)(4) ...........................................................................................................12

**OTHER AUTHORITIES**

Black's Law Dictionary (9th ed. 2009)....................................................................................14

Diamondback Capital Management, LLC ("Diamondback") respectfully submits this memorandum in support of its request for $39 million in restitution pursuant to the Mandatory Victims Restitution Act ("MVRA").

## I.   INTRODUCTION

The goal of restitution is to restore a victim "to the extent money can do so, to the position he occupied before sustaining injury." *United States v. Battista*, 575 F.3d 226, 229 (2d Cir. 2009). It is impossible to return Diamondback fully to the position it was in prior to November 22, 2010, when Todd Newman's insider-trading scheme led to an FBI raid on Diamondback's office. As is explained in the attached declaration from Vickram P. David, Diamondback's head of investor relations (the "David Decl."), Newman's criminal conduct (exposed by the search) led immediately to investor withdrawals of approximately $1.3 billion, more than 30% of Diamondback's assets under management. Despite tremendous effort to survive that blow, the firm ultimately was unable to do so, announcing late last year that it would shut down. More than 130 employees are losing their jobs.

While Diamondback cannot be made fully whole, it is entitled to substantial restitution for the damage Newman inflicted upon it. Under settled law, and as the Government agrees, Diamondback is entitled to the legal fees and expenses incurred during its participation in the investigation and prosecution of the offense, and a portion of the compensation paid to Newman.

Diamondback is also entitled to recover for the direct damage Newman's criminal conduct inflicted on its goodwill and business reputation. While we recognize the lack of precedent squarely on point on this element of restitution, there is no real dispute that Diamondback had an intangible property interest in its goodwill and business reputation,

1

Newman's crime severely, directly and predictably impacted the value of that property interest, and the restitution statute does not distinguish between intangible and tangible property. To the contrary, the Second Circuit has squarely held that restitution is available for damage to an analogous intangible property interest, and it follows that restitution is also available here.

## II.   FACTS

Newman's criminal conduct is described in the Government's submission. Set forth here are the facts pertinent to restitution.

### A.   Costs of the Investigation

#### 1.   Legal Fees

To cooperate fully with the criminal investigation of Newman, Diamondback retained Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale") to conduct an internal review, to share results with the prosecution, and to respond to the prosecution's requests. Diamondback learned of a parallel Securities and Exchange Commission investigation when it received a subpoena in February 2011, and retained WilmerHale to address that inquiry as well. WilmerHale performed the following activities in connection with cooperating with the two investigations:

- Responded to the Government's grand jury subpoena, with 18 broad topics, and to numerous informal requests through the course of Newman's trial and continuing until the present;

- Responded to a subpoena from Commission with 12 requests;

- Collected and analyzed over 4.5 million documents, including emails, IMs, and trading records;

- Produced to the Office and the Commission approximately 2 million documents in 49 separate productions;

- Made multiple presentations to the Office and the Commission;

- Responded to numerous discovery requests from Newman in connection with the SEC's civil action;

- Represented multiple witnesses in pre-trial meetings with the Office;

- Represented a former Diamondback employee in connection with his preparation for and testimony at Newman's trial; and

- Represented two Diamondback employees when called by Newman as witnesses for deposition in the Commission's civil action against Newman.

WilmerHale legal fees for the criminal investigation and parallel SEC investigation amounted to $7,174,382.64. That amount does not include WilmerHale's fees incurred in pursuing restitution, which through February 28, 2013, are $18,279.05.

### 2.   Legal Fees for Employees and Former Employees

Diamondback provided counsel for other employees and former employees who were potential witnesses or otherwise required counsel for the investigation. These expenses amounted to $742,046.52.

### 3.   Document Management Expenses

In order to organize, review, and produce the documents required both for its internal investigation and those of the Government and the Commission, Diamondback engaged the services of vendors to collect those documents from its servers and to host them. In addition, Newman eventually returned the Diamondback electronic devices he had used as a part of his job, and Diamondback paid to collect, and in some cases, restore those documents. Diamondback incurred expenses of $2,306,190.46 for these services.

### B.   Compensation

Between 2007 and 2010, Diamondback paid Newman $10,692,955. During that time, he lied relentlessly to Diamondback to conceal his criminal scheme. Those lies included repeatedly falsely certifying his compliance with Diamondback's policies against insider trading and regarding consultants. They also included improperly certifying in writing to Diamondback's

3

chief compliance officer that certain payments were for legitimate consulting provided by Ruchi Goyal, when in fact, as the trial evidence established Newman well knew, Ruchi Goyal provided no consulting work but was instead a conduit for rewarding her husband, Sandy Goyal, for sharing material non-public information about Dell.  But for those lies, which were integral to his criminal scheme, Diamondback would have paid Newman nothing.  Newman's criminal conduct deprived Diamondback of the benefit of the employment bargain it had struck with Newman – he promised to manage his portfolio within the confines of the law and repeatedly represented that he had done so, when in fact he had not.

### C.    Damage To Diamondback's Goodwill And Business Reputation

When Newman's conduct was exposed to the public, many investors lost confidence in Diamondback and withdrew their money from Diamondback en masse.  *See* David Decl. ¶ 7. The damage to Diamondback's reputation ultimately forced Diamondback – which to that point had been growing rapidly – to instead close.  *See* David Decl. ¶¶ 2, 5-6.  A reasonable way to estimate the value of that loss of goodwill and business reputation is by considering the 2% annual management fees investors were willing to pay Diamondback in connection with their investment, prior to the exposure of Newman's crimes.  At the first opportunity following the search, investors controlling $1.3 billion decided they were no longer willing to pay Diamondback that fee to manage their money, and withdrew their funds.  It is therefore reasonable to value the business reputation and goodwill lost due to Newman's misconduct as

being roughly equal to the decreased fee income Diamondback received – 2% of $1.3 billion, or $26 million.[1]

## III.   DISCUSSION

Newman contests Diamondback's right to restitution on a number of grounds.  First, he argues – against the weight of authority in this Circuit and in this District – that Diamondback is not a "victim" under the MVRA.  This argument ignores the facts that (a) Newman misappropriated Diamondback's facilities to commit his offense and to profit from it; (b) Newman repeatedly lied to Diamondback to conceal his offense; and (c) Diamondback suffered the most immediate harm from his actions.  Second, Newman states that he is without sufficient information to determine whether Diamondback's legal fees were "reasonable" and related to the Government's investigation of Newman's actions, but Newman has identified no evidence challenging the reasonableness of the amounts spent.  Third, Newman argues that he should be permitted to keep all the compensation Diamondback paid him during the course of his scheme, an argument which again ignores the weight of caselaw in this Circuit and District.  Fourth, he claims that Diamondback cannot receive restitution for the damage Newman inflicted upon its reputation and goodwill, incorrectly labeling that amount as "consequential damages."

### A.      Diamondback Is a Victim Under the MVRA

Under the MVRA, restitution is mandatory  in fraud cases like this one to any "identifiable victim" who "has suffered a physical injury or pecuniary loss."  *United States v.*

---

[1]       This is a conservative estimate – it considers only the first year of lost management fees on the funds withdrawn, and does not include (a) management fees lost in subsequent years; (b) management fees lost on funds withdrawn in subsequent quarters as more information became public regarding Newman's crimes; (c) management fees lost when Diamondback reduced its fees to investors willing to remain following the search; or (d) lost incentive fee income on the money withdrawn.

*Archer*, 671 F.3d 149, 169 (2d Cir. 2011). A victim is someone "directly and proximately harmed as a result of the commission of an offense," including, in a conspiracy case like this one, anyone "directly harmed by the defendant's criminal conduct in the course of the scheme." 18 U.S.C. § 3663A(a)(2). The Second Circuit has squarely held, twice, that someone whose payment of money to the defendant is the "mechanism through which [the defendant] profited from his conspiracy," and who "would not have made the payment" had they known of the scheme, is a victim for restitution purposes. *Archer*, 671 F.3d at 172; *United States v. Paul*, 634 F.2d 668, 676 (2d Cir. 2011). And Judge Cote, relying on these authorities, held in materially indistinguishable circumstances that a hedge fund was a victim entitled to restitution from a portfolio manager who engaged in insider trading with the firm's funds. *United States v. Skowron*, 839 F.Supp.2d 740 (S.D.N.Y. 2012).

On that settled standard, Diamondback plainly qualifies as a victim. Newman constructed his scheme on the misappropriation of Diamondback resources. He used Diamondback's facilities and capital to trade on the inside information, Diamondback's email and instant message system to communicate with his co-conspirators, and the soft dollars of the funds Diamondback managed to pay his corrupt source. Moreover, Diamondback's payments to Newman were the "mechanism through which" he profited from his insider trading. *See Archer*, 671 F.3d at 172. Newman made his insider trades in his Diamondback fund portfolio, and Diamondback in turn paid him a share of the profits earned on the unlawful trades. Had it known the truth, Diamondback would not have paid Newman a penny for his services. Instead, because Newman repeatedly lied to the firm to conceal his insider trading, it paid him more than $10 million. Diamondback was thus directly and materially victimized by Newman's criminal conduct, and is entitled to restitution.

Newman suggests that only the "known or intended targets" of the scheme are victims under the MVRA (Br. 38), but that assertion finds no support in the text of the MVRA, which requires that the harm be direct and proximate, rather than known or intended. And no case has limited victims to the "known or intended target" of the crime. Such a rule would prevent recovery in circumstances where it is plainly warranted (*e.g.*, the right to restitution of an innocent bystander injured by the unlawful discharge of a firearm or bomb plainly cannot turn on whether the defendant knew the bystander or intended to target him). The settled law is squarely to the contrary. In *Archer*, the government was the "intended target" of an immigration lawyer's scheme to submit fraudulent visa applications. But the Second Circuit ruled that the lawyer's innocent clients – who had paid for his services – were victims entitled to restitution, since their payments were the method by which the lawyer hoped to profit from the scheme. Similarly, in *Paul*, the defendant's securities fraud targeted investors in a stock whose price the defendant inflated. But the Second Circuit found that financial institutions that had lent the defendant money, secured by that inflated stock, were victims entitled to restitution. So too here, even if one viewed Newman's scheme as "targeting" Dell or Nvidia, it was Diamondback who Newman hoped would pay him a share of the profits from his misuse of the Dell and Nvidia information, it was Diamondback whose resources Newman misappropriated to further his scheme, and it was Diamondback to whom Newman repeatedly lied in order to conceal and further his scheme. Diamondback was thus a victim of Newman's insider trading scheme within the meaning of the MVRA.

Nor does it matter that had the scheme never been discovered, Diamondback would have profited, rather than suffered, from the scheme. (Br. 39.) The same was surely true of the clients in *Archer*, who would have obtained the visas they desired had their lawyer's fraud not been

discovered. And it was true of the lenders in *Paul*, who would have been fully secured had the stock manipulation never been revealed. But the Second Circuit recognized that both sets of claimants were victims for restitution purposes.

Indeed, Judge Cote has already considered and rejected arguments nearly identical to Newman's in *Skowron*. *See* 839 F.Supp.2d 740 (S.D.N.Y. 2012). There, the defendant had argued (just as Newman does here) that harming Morgan Stanley (which owned the investment manager of the fund in which he traded) was not an "integral part" of his scheme, and therefore that Morgan Stanley was not a victim. Judge Cote wrote "[e]ven assuming the [integral part] language which Skowron emphasizes marks the outermost bounds of what it means to be a victim under the MVRA, Morgan Stanley would still qualify." *Skowron*, 839 F.Supp.2d at 746. She noted that "[t]he substantial costs Morgan Stanley incurred in responding to the SEC investigation, launching its own internal investigation, and providing for the defense of Skowron and other employees were a necessary, direct, and foreseeable result of Skowron's offense of conviction." *Id.*

Newman seeks to distinguish *Skowron* because the defendant there was convicted both of insider trading and of obstruction (for lying during Morgan Stanley's internal investigation). But Judge Cote did not rely exclusively on this obstructive conduct in awarding restitution, stressing that Skowron's scheme required deceit from the start: "Deceiving his employer . . . was an integral part of Skowron's scheme. Without that deceit, the scheme would not have been undertaken nor could it have succeeded for any period of time." *Skowron*, 839 F.Supp.2d at 746. The same is true here. That Newman declined to speak to Diamondback following the search – rather than lying – does not erase his deceit of Diamondback from the beginning of the scheme, and it does not preclude restitution.

8

**B.     The Legal Fees Expended in the Course of the Investigation Are Subject to Restitution**

Newman does not dispute that if Diamondback is a victim, its attorneys' fees are compensable under the MVRA.  Br. 48-49; *see also United States v. Amato*, 540 F.3d 153, 159 (2d Cir. 2008) (attorneys' fees for an internal investigation qualify as "other expenses incurred during participation in the investigation or prosecution of the offense" under the MVRA).  He merely quibbles with the amount of fees incurred here.  Newman speculates that some portion of the fees may be attributable to unrelated misconduct by a former Diamondback employee (Anthony Scolaro) that became public during the course of the investigation, or may have related to assessing whether other employees engaged in the same misconduct as Newman.  As to Scolaro, we can assure the Court that no more than a *de minimis* portion of the fees related to him.[2]  And assessing whether other employees were involved in a conspiracy with Newman is squarely part of Diamondback's cooperation with the investigation and prosecution of Newman, and any such expenses are therefore properly included.  Indeed, in *Amato*, the Second Circuit case establishing that internal investigation expenses are recoverable in restitution, the internal investigation related to many people who had conspired with the defendant, and the Court approved restitution for the full investigation.

Finally, Newman questions whether all the legal expenses were reasonably necessary and notes that he has "not been afforded" an opportunity to review the relevant legal bills.  But there is no reason to think that Diamondback would have been willing to pay for legal expenses that were not "reasonably necessary."  The Government has suggested that we provide "additional

---

[2]     An electronic search for references to Scolaro in WilmerHale's voluminous billing records for the relevant matters found entries totaling $71,105, and a substantial percentage of those entries also include work related to Newman.

billing information" to Newman, and Newman's counsel today for the first time asked to see the relevant bills.  Producing the more than 1,000 pages of legal bills will require substantial redaction for privilege, and the expense of the necessary review and redaction will plainly be chargeable to Newman (along with Diamondback's other costs in pursuing restitution).  We would of course be happy to provide the Court under seal the bills (redacted for privilege), should the Court wish to examine them.

### C.   Newman Should Be Required to Return 25% of His Compensation

The Second Circuit has recognized that an employer has a property interest in the compensation paid to an employee, and may recover a portion of that compensation under the MVRA where, as a result of the employee's criminal conduct, the employer has received less than he paid for.  *See, e.g., United States v. Bahel*, 662 F.3d 610 (2d Cir. 2011).  In *Skowron*, Judge Cote applied that settled law to award the owner of a hedge fund 20% of the salary paid to a portfolio manager convicted of insider trading.  839 F.Supp.2d at 749.  Newman argues that *Skowron* is wrongly decided and that *Bahel* should be limited to cases of honest services fraud.  (Br. 43-44.)  But one of the cases relied upon in *Bahel, United States v. Sapoznik*, 161 F.3d 1117 (7th Cir. 1998), was charged as a RICO case, not an honest services fraud.  And once again, Newman's argument finds no support in the plain language of the MVRA.  The MVRA requires full restitution for all direct injuries to a victim's property, *see* 18 U.S.C. § 3663A(b)(1), and provides but a single rule for all cases in which a victim suffered a "pecuniary loss." *Id.* at (c)(1)(B).  There is no basis, therefore, for treating honest services cases differently from all other fraud cases.

As discussed *supra*, Newman performed at least some of his duties as an employee in violation of Diamondback's policies and Newman's written representation that he would follow

those policies.  As a result, Diamondback received something less than the work for which it

bargained, and it is entitled to restitution for the difference.  Because Newman's criminal conduct

was substantially more extensive than in *Skowron*, which involved insider trading in only a

single stock and over a much shorter time period, restitution of 25% of his total compensation,

rather than the 20% awarded in *Skowron*, is appropriate.[3]

Newman argues that Diamondback is not entitled to recover any portion of his

compensation because Diamondback received a portion of the profits from Newman's illegal

trades.  Newman concludes that restitution of a portion of his salary would put Diamondback "in

a better position than it would have been absent Mr. Newman's profitable trading."  (Br. 45.)

There is no risk of that.  But for those crimes, Diamondback would still be a thriving ongoing

business and its more than 130 employees would still have jobs.  Instead, it is shutting down.

Moreover, Diamondback has already disgorged to the SEC and the U.S. Attorney's Office the

full profits of Newman's charged illegal trades (including both the portion it received, and the

portion it paid to Newman as compensation).  Diamondback has thus effectively paid out

Newman's compensation related to the charged trades twice, once to Newman and once to the

Government.  Requiring Newman to return a portion of his compensation would go but a short

distance toward putting Diamondback in the position it would have occupied but for Newman's

crimes and would not lead to any excessive recovery.

---

[3]      Newman's oblique attempt at an offset for deferred compensation he claims was earned
but not paid is without merit.  (*See* Br. 43 n.19.)  As noted in Diamondback's initial request for
restitution, *see* Letter to Antonia Apps dated February 27, 2013, Diamondback's calculation of
how much of Newman's compensation should be subject to restitution is based on the
compensation that Newman actually received, and thus any disputed amounts that have not been
paid are irrelevant to the analysis.  A post-conviction proceeding for restitution is not the
appropriate forum for Newman to address any claim he believes he has for additional
compensation.

**D.     The Direct Injury to Diamondback's Goodwill and Business Reputation Is Subject to Restitution**

The MVRA does not distinguish between tangible and intangible property.  Injuries to intangible property are compensable on the same terms as injuries to tangible property.  Where the victim's injury is a direct and proximate result of the defendant's criminal scheme, restitution is mandatory.  *See United States v. Milstein*, 481 F.3d 132 (2d Cir. 2007) (affirming award of restitution for injury to victim's trademarks).

Newman does not dispute that Diamondback has a property interest in its business goodwill and reputation.  Such a property interest has been recognized in other contexts, *see, e.g., Marrero v. City of Hialeah*, 625 F.2d 499 (5th Cir. 1980); *Webster v. Moquin*, 175 F. Supp.2d 315 (D. Conn. 2001), and Newman identifies no reason to treat restitution differently. Newman's suggestion that the Second Circuit in *Battista* had the "opportunity" to recognize reputation as protected property but did not do so is doubly wrong.  First, *Battista* involved a defendant's appeal of a restitution award that did not include recovery for reputational injury. 575 F.3d at 229.  There was no cross appeal from the Government or the victim, and thus no "opportunity" for the Court to award restitution for the separate reputational injury the victim suffered.  Nor did the *Battista* Court express even in *dicta* disapproval of restitution for reputational injury.  Rather, the *dicta* cited by Newman related to legal and public relations fees incurred post-offense, which were potentially recoverable not on a lost-property theory, but under a separate provision authorizing recovery of other expenses incurred during participation in the investigation or prosecution of the offense.  *Battista*, 575 F.3d at 234 (applying *Amato's* holding to the Victim and Witness Protection Act, 18 U.S.C. § 3663(b)(4), for which the language is "almost verbatim" to that of the MVRA, 18 U.S.C. § 3663A(b)(4)).  The *Battista*

12

Court thus did not discuss at all whether goodwill or business reputation are property for which restitution is available when directly injured by the defendant's crimes.[4]

Nor was the injury to Diamondback's goodwill and business reputation merely a matter of "consequential" damages, for which Newman argues restitution is unavailable. "Consequential losses are losses beyond those which naturally and directly flow from the defendant's criminal acts." *United States v. Boccagna*, 450 F.3d 107, 120 (2d Cir. 2006) (internal citations omitted). It is hard, however, to imagine what would flow more naturally and directly from criminal insider trading by a hedge fund portfolio manager than severe damage to the business reputation and goodwill of the fund. Reputation is everything in the financial world, and nothing tarnishes reputation more quickly or predictably than allegations of fraud. Indeed, nearly all of the hedge funds who had employees charged in the current series of insider trading cases went out of business, as did some that were merely investigated.[5]

Newman suggests that Diamondback's injury stemmed not from his conduct, but rather from the Government's disclosure of that conduct. But getting caught flows naturally and directly from committing a crime, and injuries that would have been avoided had the defendant never been caught are therefore recoverable in restitution, as *Archer* and *Paul* make clear. *See supra* at 6-8. Similarly, Newman's argument that the injury to Diamondback might have been lesser had the Government proceeded by way of subpoena rather than search warrant is off point.

---

[4]    Newman also cites *United States v. Hucks*. There, the sentencing court denied restitution because it found no monetary loss for the damage to the claimant's intangible property, not that intangible property was exempt from the MVRA. *See* No. 11 Cr. 326, 2013 WL 654397 at *4 (E.D. Pa. Feb. 20, 2013).

[5]    So too, Goldman Sachs lost more than $10 billion in market value in the immediate wake of an SEC fraud accusation. *See* http://www.nytimes.com/2010/04/17/business/17goldman.html?pagewanted=all&_r=0

The criminal, rather than the victim, appropriately bears the risk that the Government's method of investigating or exposing the crime attracts attention.

Because the injury to Diamondback's property interest in its reputation and goodwill followed directly from Newman's criminal conduct, restitution is mandatory. That leaves only the question of how much restitution is appropriate for this particular injury to property. All that is required is a "reasonable estimate." *United States v. Catoggio*, 326 F.3d 323, 329 (2d Cir. 2003) ("restitution could be based on a reasonable estimate of losses when it would be impossible to determine the precise amount") (*citing United States v. Futrell*, 209 F.3d 1286, 1292 (11th Cir. 2000)).

One reasonable way to calculate the value of the property injured is by how much income that property would reasonably have been expected to generate, but for the injury. That is how the Court measured the value of the injury to the intangible property interest at issue in *Milstein*. 481 F.3d 132. Using the same valuation method is reasonable here, because the intangible property here is quite analogous to the trademark at issue in *Milstein*. Indeed, "trademark infringement," the crime at issue in *Milstein*, is a "form of theft of goodwill." Black's Law Dictionary (9th ed. 2009) (defining goodwill as "A business's reputation, patronage, and other intangible assets that are considered when appraising the business, esp. for purchase . . . . Because an established business's trademark or servicemark is a symbol of goodwill, trademark infringement is a form of theft of goodwill.")

Here, $26 million is a *very* conservative estimate of the income that Diamondback's goodwill and business reputation would have generated. The Government executed its search warrant on November 22, 2010. Prior to the search, Diamondback was growing rapidly, returns were good, existing investors were pleased, and assets under management were at an all-time

14

high. David Decl. ¶ 3. Diamondback believed at the time there was a reasonable prospect of growing assets under management as high as $8 billion in the near term. *Id.* But investor reaction to the search was "immediate." *Id.* ¶ 5. Investors expressed enormous concern at the suggestion that "Newman had engaged in insider trading," with multiple investors demanding their money back and advising Diamondback that they "could not be associated with a fund under investigation" for this offense. *Id.* ¶ 6. Ignoring Diamondback's continued strong performance – Diamondback was up approximately 3% for the period from November 15, 2010, through February 15, 2011 (the next available redemption date), the equivalent of a 12% return on an annual basis – sophisticated investors swamped Diamondback with redemption requests for $1.3 *billion,* approximately 30% of its assets under management at that time. *Id.* ¶ 7. In lost management fees alone, the immediate loss of $1.3 billion in assets under management cost Diamondback $26 million.

The Government's submission opposes an award of this amount on the "present record," noting the absence of "any proof, such as affidavits from former investors, establishing that investors withdrew their funds because of Newman's (at that time alleged) criminal conduct, or for some other reason." (Gov. Br. 28.) But the Government took that position without the benefit of the David Declaration. That declaration provides direct insight into the thinking of Diamondback's investors, since Mr. David, as the head of investor relations, spoke to nearly all investors in the wake of the search, and learned directly how it impacted them. The David declaration thus provides a clear basis for concluding that the withdrawals were "entirely driven" by Newman's misconduct, as revealed by the Government's search. David Decl. ¶ 2.

The Government also questions whether it would have been foreseeable to Newman at the time of the offense that his insider trading would lead to "large-scale withdrawal of investor

funds." (Gov. Br. 28.) But that is not the relevant question. The relevant question is whether his criminal conduct – a multi-year fraud – was the direct and proximate cause of serious damage to Diamondback's property interest in its business goodwill and reputation. So long as that *harm* is direct and proximate (as it plainly was here), restitution for the full extent of that harm is mandatory under the MVRA. Put differently, the precise consequence here – investor withdrawals – is a useful way to measure how much Newman harmed Diamondback's goodwill and business reputation. But it is for that harm – not the withdrawals – that Diamondback seeks restitution, and that harm was plainly foreseeable to Newman. In any event, it hardly requires a great imaginative leap to foresee that engaging in a multi-year securities fraud with the funds investors have entrusted to your employer to manage might severely damage investors' confidence and your employer's reputation, and thus lead to withdrawals.

The Government blithely suggests that the "need to provide [this element of] restitution" is "outweighed by the 'burden on the sentencing process.'" (Gov. Br. 29.) But the Government provides no reason to discount the importance of providing meaningful restitution to a victim whose business was destroyed by the offense, and the indisputable factual record here – massive investor flight from a previously thriving fund following the revelation via the Government's search of insider trading allegations – is hardly burdensome to understand. And Diamondback is the sole party seeking restitution from Newman: fairly adjudicating its claims will not delay or add burden to other wounded parties that might otherwise obtain justice more quickly or easily.

Finally, such an award would be the opposite of a windfall. Prior to the FBI raid triggered by Newman's crimes, Diamondback had over $5 billion in assets under management; it earned a 2% management fee on that money ($100 million annually) as well as 30% of any profits earned by its traders, and it employed more than 130 people. Newman's crimes destroyed

all of that. The amounts that Diamondback and its innocent employees actually lost as a result of Newman's criminal conduct dwarf the amount of money that Newman is being asked to pay.

## IV.   CONCLUSION

Diamondback respectfully requests that the Court enter an order awarding Diamondback $39 million in restitution.

Respectfully submitted,

Dated:  April 26, 2013

Peter G. Neiman
Martin E. Gilmore
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
New York, NY 10007
Telephone:  212-230-8800

*Attorneys for*
*Diamondback Capital Management, LLC*