UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
                            :

UNITED STATES OF AMERICA      :

      v.                  :

                            :      Case No. 12 Cr. 121 (RJS)

TODD NEWMAN and         :
ANTHONY CHIASSON,     :

                            :

                            :

          Defendants.     :
------------------------------------------------------x

# MEMORANDUM IN AID OF SENTENCING ON BEHALF OF ANTHONY CHIASSON

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT................................................................................2

FACTUAL BACKGROUND................................................................................4

I.    ANTHONY CHIASSON'S PERSONAL HISTORY AND CHARACTER............4

A.  Anthony's Chiasson's Upbringing.....................................................4

B.  Anthony's Education at Cheverus High School and Babson College...............6

1.  Cheverus High School....................................................6

2.  Babson College............................................................7

C.  Anthony Chiasson's Professional Background..........................................9

1.  The Early Professional Years...........................................9

2.  Raising Level Global....................................................12

D.  Anthony Chiasson's Dedication to Family, Friends, and his Community.........16

1.  Anthony is Devoted to his Family......................................16

2.  Anthony's Acts of Generosity and Community Service.....................18

a.  Anthony's Service as a Cheverus Trustee...........................19

b.  Anthony's Dedication to Babson College...........................21

i.  Anthony Funds an Alumni Scholarship for Students in Need....................................................................21

ii. Anthony's Time as a Babson Trustee.......................22

iii. Anthony Helped Create Babson's Summer Venture Program...........................................................23

II.   THE OFFENSE CONDUCT................................................................25

A.  The Insider Trading Scheme....................................................25

1.  The Charged Trading in Dell............................................27

2.  The Charged in Nvidia Corporation Securities............................29

3.  Level Global Terminated Adondakis......................................30

ARGUMENT................................................................................31

I.    GUIDELINES CALCULATION................................................................31

II.   GAIN CALCULATION................................................................32

A. The Court Should Calculate Gains Using the Price 24-Hours Post-
Announcement..........................................................................32

B. Profits on Charged Trades Executed by Mr. Chiasson...............................35

C. The Fund's Profits based on All Trades Leading Up to the Quarterly
Announcements........................................................................37

    1. May 2008 Dell Trades.........................................................37

    2. August 2008 Dell Trades......................................................38

    3. May 2009 Nvidia Trade.......................................................38

III. SENTENCING ANALYSIS......................................................39

A. The Mandated Avoidance of Disparate Sentences Counsels in Favor of a Sentence
Significantly Below the Guidelines..................................................40

    1. Mr. Chiasson is Comparable to Kimelman, Fleishman, and Gupta.........41

        a. Michael Kimelman's Conduct and Resultant Sentence.............41

        b. James Fleishman's Conduct and Resultant Sentence..............43

        c. Rajat Gupta's Conduct and Resultant Sentence.....................44

    2. Mr. Chiasson Compared to Contorinis and Whitman.......................46

        a. Contorinis' Conduct and Resultant Sentence.......................46

        b. Douglas Whitman's Conduct and Resultant Sentence..............47

    3. Mr. Chiasson's Conduct is Not Comparable to that of Rajaratnam and
Goffer............................................................................49

        a. Raj Rajaratnam's Conduct and Resultant Sentence.................48

        b. Zvi Goffer's Conduct and Resultant Sentence.......................50

    4. Mr. Chiasson's Liability for the Dell Trades is Derivative of the Dell
Insider, Rob Ray, Who Has Never Been Charged...........................52

B. The Guidelines Place Disproportionate Emphasis on Profits.......................53

C. Anthony Chiasson's Family, Personal History, and Ability to Contribute to
Society in the Future Warrant Leniency.............................................57

    1. Mr. Chiasson's Family Circumstances Warrant Leniency.................58

    2. Anthony's History of Charitable Works Warrant Leniency................60

D. Mr. Chiasson's Conduct is Aberrant in the Context of His Life...................64

E. A Non-Guideline Sentence is Sufficient to Satisfy the Need for Deterrence......66

IV.    FORFEITURE...............................................................................68

    A. Anthony Chiasson's Personal Gains.........................................................68

        1.    Forfeiture Should Be Limited to Gains Based on the Trades Executed by
            Mr. Chiasson.........................................................................69

        2.    Forfeiture Should Be Limited to Gains Mr. Chiasson Personally
            Acquired.............................................................................69

        3.    Mr. Chiasson Should Not Be Required to Forfeit Gains of
            Coconspirators....................................................................70

                i.    Zvi Goffer's Coconspirators.........................71

                ii.    Rajaratnam's Coconspirators.........................71

                iii.    PGR Conspiracy.......................................72

        4.    Mr. Chiasson Has Not Received Certain Compensation.....................72

V.    CONCLUSION...............................................................................74

## TABLE OF AUTHORITIES

**Page**

### CASES

Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299 (1985)................................53

Kimbrough v. United States, 552 U.S. 85 (2007)...................................39, 40

Koon v. United States, 518 U.S. 81, 113 (1996) ........................................39

Libretti v. United States, 516 U.S. 29, 49 (1995)...................................... 69

Pepper v. United States, 131 S.Ct. 1229 (2011) ........................................39

United States v. Crosby, 397 F.3d 103 (2d Cir. 2005) ................................38

United States v. Adelson, 441 F. Supp. 2d 506 (S.D.N.Y. 2006)..................54, 55, 67

United States v. Alba, 933 F.2d 117 (2d Cir. 1991)...................................57

United States v. Canova, 412 F.3d 331 (2d Cir. 2004) ................................60

United States v. Cavera, 550 F.3d 180 (2d Cir. 2008) (en banc) .....................38

United States v. Contorinis, 692 F.3d 136 (2d Cir. 2012) ............................70

United States v. Dura Pharmaceuticals, 544 U.S. 336 (2005)........................33

United States v. Fruchter, 411 F.3d 377 (2d Cir. 2005)............................... 69

United States v. Gaind, 829 F.Supp. 669 (S.D.N.Y. 1993) ...........................67

United States v. Galante, 111 F.3d 1029 (2d Cir. 1997) ..............................58

United States v. Kluger, 2011 U.S. Dist. LEXIS 145054 (D.N.J. 2011)...............72

United States v. Libera, 989 F.2d 596 (2d Cir. 1993) .................................33

United States v. Mehta, 307 F.Supp.2d 270 (D. Mass 2004)..........................61

United States v. Nacchio, 573 F.3d 1062 (10th Cir. 2009) ............................33

United States v. Oakford Corp., 79 F.Supp.2d 357 (S.D.N.Y. 2005).................................56

United States v. Rajaratnam, No. 09 CR 1184 (RJH),

      U.S. Dist. LEXIS 14961 (S.D.N.Y. Jan. 31, 2012)..............................................33

United States v. Rutkoske, 506 F.3d 170 (2d. Cir. 2007) ..........................................33

United States v. Serafini, 233 F.3d 758 (3d Cir. 2000) .............................................61

United States v. Shuster, 331 F.3d 294 (2d Cir. 2003) ...........................................57

United States v. Yeaman, 248 F.3d 223 (3d Cir. 2001) ............................................68

United States v. Zolp, 479 F.3d 715 (9th Cir. 2007) ...............................................33

SEC v. Patel, 61 F.3d 137 (2d Cir. 1995)..........................................................34

SEC v. Rajaratnam, 822 F. Supp. 2d 432 (S.D.N.Y. 2011)..............................................34

**STATUTES**

18 U.S.C. § 3553(a)..................................................................passim

18 U.S.C. § 3553(a)(6)...............................................................passim

**UNITED STATES SENTENCING GUIDELINES**

U.S.S.G. § 2B1.1......................................................................31

U.S.S.G. § 2B1.4...............................................................4, 31, 32

U.S.S.G. § 3D1.2......................................................................31

**OTHER AUTHORITIES**

United States v. Chiesi, 09 Cr. 1184 (RJH), 7/20/11 Sentencing Tr...................................72

United States v. Contorinis, 09 Cr. 1083 (RJS), 12/17/10 Sentencing Tr.......................46, 47

United States v. Drimal, 10 Cr. 56 (RJS), 8/31/11 Sentencing Tr................................... 36, 37

United States v. Emanuel Goffer, 10 Cr. 56 (RJS), 10/7/11 Sentencing Tr....................36, 37

United States v. Fleishman, 11 Cr. 32 (JSR), 12/21/11 Sentencing Tr....................43, 57, 72

United States v. Gupta, 11 Cr. 907 (JSR), 10/24/12 Sentencing Tr...........................44, 45, 61

United States v. Kimelman, 10 cr. 56 (RJS), 10/12/11 Sentencing Tr. .........................passim

United States v. Newman, Government's Sentencing Memorandum (4/25/13)....................35

United States v. Poteroba, 10-cr-649 (PAC), 3/21/11 Sentencing Tr................................58

United States v. Whitman, 12 Cr. 125 (JSR), 1/24/13 Sentencing Tr. .........................passim

United States v. Zvi Goffer, 10 Cr. 56 (RJS), 9/21/11 Sentencing Tr.......................36, 50, 51

United States v. Zvi Goffer, S1 10 Cr. 56,

      Government's Sentencing Memorandum, Docket No. 266 ..................................36

United States v. Rajaratnam, 09 Cr. 1184 (RJH), 10/13/11 Sentencing Tr.....................49, 56

United States v. Rajaratnam, 09 Cr. 1184 (RJH)

      Government's Reply Sentencing Memorandum Regarding Calculating Raj Rajaratnam's

      Gain, Docket No. 318.................................................................................34

Anthony's "respect for family, church, friends and community can be measured by the response you will hear if someone asks you if you know Anthony Chiasson. The family will always respond that he is the one to follow. His friends will respond that I am glad he is my friend. The church will be happy that he is one of their supporters. The communities where he has resided advised that they are better off for having a citizen like Anthony participating in the well being of their community."

Letter of Richard McArdle, attached hereto as Ex. A.

Anthony Chiasson, through his undersigned counsel, submits this memorandum for the Court's consideration in determining a just and appropriate sentence.

## PRELIMINARY STATEMENT

Anthony Chiasson is an extraordinary man. But for the conduct that brings him before the Court, Anthony has led an exemplary life. As each individual letter submitted to the Court attests, he has lived his life devoted to family, work and improving the lives of those in his community, whether personally known to him or not. He has truly embraced the teachings of his Jesuit upbringing by living his life in the service of others.

As the Court well knows, Anthony Chiasson stood trial for approximately six weeks in a criminal insider trading case. The jury convicted him just before Christmas last year. Yet his six weeks before this Court and the conduct at issue in this matter are not who Anthony Chiasson is at his core.

As this memorandum will demonstrate, Anthony Chiasson accomplished more in the first 37 years of his life than most people could in an entire lifetime. His boundless energy and the

lengths to which he has continually gone to give of himself makes it seem like he must live 25

hours a day. Since he graduated college, Mr. Chiasson has: built a career and then a multi-

billion dollar business from the ground-up; created valuable employment opportunities for many;

started a scholarship fund for financially disadvantaged students from his home state of Maine;

served on the board of trustees for both his high school and college; donated millions to charity

and community projects; helped prevent the closure of his high school; started an entrepreneurial

summer program for business-minded college students; and much more. In short, Mr. Chiasson

can truly say that, by the time he was 37, he helped make the world a better place.

    All of this is, of course, secondary to what Mr. Chiasson considers his greatest

accomplishment—his family. Anthony is husband to Sandra and father to ▇ (age 8) and

▇ (age 1). They are the most important parts of his life. Indeed, it is for their sake,

more so than his own, that he implores the Court to grant him leniency on the day of sentencing.

    The advisory United States Sentencing Guidelines (the "Guidelines"), as the government

and the Pre-Sentence Report ("PSR") have calculated them, suggest a sentence of between 121-

157 months incarceration in this case. Simply put, a sentence anywhere near that range would be

as draconian as it would be unwarranted. There is only one reason the range is so high: the

Guidelines' unrelenting predisposition to punish profit. Profit, and profit alone, drives the

advisory Guidelines range. For that reason, the Guidelines in this case totally fail to contemplate

the entirety of Anthony Chiasson and his actual conduct. They should be rendered toothless in

this process. If ever there was a case that called for a non-Guidelines sentence and a substantial

downward variance from the applicable range, it is this one.

    With that as background, what follows is a discussion of why the Court should grant Mr.

Chiasson substantial leniency. First, under 18 U.S.C. § 3553(a), Mr. Chiasson should receive a

sentence that is consistent with, but not greater than, those defendants whose conduct and character are similarly situated to his own. Second, the advisory Guidelines range considerably overstates the egregiousness of Mr. Chiasson's conduct. Third, his family circumstances, including the impact a lengthy period of incarceration will have on his young children, warrant consideration. Fourth, Mr. Chiasson's extraordinary charitable, community and personal good-deeds demonstrate that his long history and vast capacity for giving are the true measure of this man. Finally, as so many of the letter writers have articulated, the community is better served with Anthony Chiasson working for it, rather than removed from it.

Thus, Mr. Chiasson respectfully submits that his character, conduct, family circumstances and history of good-deeds should drive this sentencing rather than a pro forma calculation of § 2B1.4 and its attendant charts, which have no ability to take the measure of a man. In the end, Anthony Chiasson asks the Court for and hopes the Court will afford him leniency.

## FACTUAL BACKGROUND

## I.    ANTHONY CHIASSON'S PERSONAL HISTORY AND CHARACTER

### A. Anthony Chiasson's Upbringing

Anthony Chiasson was born on August 27, 1973. Anthony's parents, Louis and Lucille Chiasson, "have four children of which Anthony is the youngest." Letter of Lucille Chiasson, attached hereto as Ex. B. Anthony—now age 39—has two brothers; Joe (age 49) and Louis (age 47), and a sister, Michelle (age 46).

The Chiassons were "a very ordinary family from Portland, Maine." Id. Louis founded and managed a payroll processing company that served the greater Portland community. Lucille stayed home to care for the children.

4

Anthony's parents valued education, hard work, and commitment to community. They endeavored to "teach [their] children certain lessons: work hard and things will often turn out for the best, keep God in your life, treat others as you would want to be treated, and remain humble in any success you are blessed with." Id. As a result of their upbringing, each of the Chiasson children "believes in hard work and responsibility. [They] were all brought up to have a great work ethic, respect for others, and to be thankful for whatever opportunities came [their] way." Letter of Stephanie Haddad, attached hereto as Ex. C.

Anthony's parents divorced when he was six years old. Anthony lived with his mother and saw his father mostly on weekends. Louis Chiasson remarried when Anthony was ten years old. Even so, Louis remained in young Anthony's life, mentoring him and coaching his sports teams from little league through middle school.

After the divorce, Anthony and his brothers took on more substantial family responsibilities. Among other duties, they helped manage five rental properties for their aging grandparents. When other young boys played sports or took "trip[s] to the Dairy Queen" with friends, Anthony instead helped his older brothers shovel snow, perform yard work, and other property maintenance. Letter of Louis Chiasson, attached hereto as Ex. E.

> Looking back, I cannot remember even 1 occasion where Anthony, then 8 years old, was not with Joe and me [age 18 and 16] as we ventured out to shovel snow from driveways and sidewalks, remove snow from roofs or simply throw ice melt. . . . What sticks out the most in my mind was Anthony's involvement in these chores and his never ending presence during these activities always looking to assist myself and my brother Joe. . . . [E]ven when the jobs were too big for him he still wanted to take on the challenge and from this he learned the value of hard work.

Id. Even as a child, Anthony embodied the values passed down from his parents. "His sense of responsibility and attention to detail was evident at a very young age." Id.

### B. Anthony's Education at Cheverus High School and Babson College

#### 1. Cheverus High School

Anthony entered Cheverus High School as a freshman in Fall 1987. Cheverus is a Jesuit school that equally values spiritual and academic development. The school "taught its students a message of service, and Anthony took that message to heart . . .." Lucille Chiasson Letter, Ex. B.

By any measure, Anthony was a model student at Cheverus. He excelled academically, qualifying early as a member of the National Honor Society, and becoming its president in his senior year. See Letter of Josh Whipple, attached hereto as Ex. F. He also made time to play sports, participate in many school activities, and work a part-time job at a local bagel shop.

In fulfilling Cheverus' Jesuit philosophy that its students become "men and women for others," Anthony joined the Key Club, Cheverus' primary service organization. See Whipple Letter, Ex. F. One of the Key Club's largest service projects focused on feeding disadvantaged people in the Portland community. "[T]he Key Club . . . leads a Turkey Drive each Thanksgiving feeding several hundred less fortunate families in the city of Portland. This requires an incredible time commitment . . . The number of families that were fed each year expanded and the impact on the community was significant." Louis Chiasson Letter, Ex. E. Anthony helped lead the extensive fundraising and organizational efforts required to make the event a success each fall.

Cheverus students typically spend one full month in their senior years working in the community. Anthony chose to teach "in a lower grade in an elementary school filled with economically disadvantaged children." Whipple Letter, Ex. F. Anthony's friend "remember[s] vividly the impact this experience had on Anthony from his thesis he was asked to share with the

6

senior class at the end of his community service project.  I think this experience, along with others, fortified his belief in the importance of giving back to the community and assisting those in this world who, through no fault of their own, need help."  Id.

Anthony graduated seventh in his class from Cheverus in 1991.  His achievements at Cheverus caused his brother Louis to recognize in Anthony a special quality:  "His uniqueness since a young age was his ability to excel in many facets of life always being a leader and making time to give back to improving the fabric of his schools and others less fortunate."  Louis Chiasson Letter, Ex. E.

### 2.  Babson College

In September 1991, Anthony entered college to study economics and finance.  Anthony chose Babson because of its unique focus on entrepreneurship.  He earned a 3.9 cumulative grade point average and "volunteered in numerous ways on campus ... He wanted to make a difference on campus and in the residence halls for his peers . . . Anthony helped in [Babson's] admission efforts, became involved in student government, and volunteered his time in community service."  Letter of Carol Hacker, attached hereto as Ex. G.  In addition, he helped organize and led Babson's extensive freshman orientation program, and each year he adopted certain freshmen mentees who seemed to need a little extra assistance.

In his junior year, the Babson administration selected Anthony as one of a handful of students to participate on a curriculum review committee tasked with redesigning, modernizing and improving Babson's curriculum.  The committee analyzed and proposed methods of creating and implementing significant changes to better each student's academic experience.  Only a select group of students participated in this project.  Anthony was, of course, proud to serve.

That same year, the Babson administration and students elected Anthony as a member of the College Judicial Board ("CJB"), which worked closely with Babson administrators to evaluate charges involving academic and social integrity and violations of school policies. Anthony's CJB service became the "most notable in his collegiate years" because he willingly bore responsibilities that were "heavy burdens for an undergraduate." Hacker Letter, Ex. G. "During this time, Anthony's decision making and commitment to a fair and just outcome was unrelenting. . . . Whilst always intense in his pursuit of ethics, Anthony was concurrently compassionate, reasonable and an advocate for lesser punishments." Letter of Jude Colangelo, attached hereto as Ex. H. In addition, the CJB "led the entire community in creating an honor code that focused on academic honesty and integrity. It was a first . . . and helped shape the honor code [used] today." Hacker Letter, Ex. G. "To say that Anthony conducted himself and the CJB in a manner that upheld the institution's values and kept the students' interests paramount would be an understatement. Perhaps even more impressive was that students, from all classes and from all corners of the world, sought Anthony out for advice." Id.; see also Louis Chiasson Letter, Ex. E ("[M]any of the students seemed to recognize that he had their and Babson's best interest at heart . . . Anthony was willing to ask his fellow students to reach higher. In doing so, Anthony gained their respect."). Anthony's CJB peers elected him Chairman in his senior year.

Through all of Anthony's dedicated work on Babson's behalf, he never lost sight of his post-graduate goals. Between his junior and senior years, Anthony interned at Kidder Peabody & Company, a New York investment firm. Kidder Peabody hired very few college student each summer, and in 1994 the firm chose Anthony. His internship started him down the path to becoming a research analyst on Wall Street.

8

Anthony graduated from Babson in 1995. His four years culminated in numerous honors. "At his Babson graduation weekend, Anthony again showed our family what a strong work ethic can do and was selected as the Roger Babson [A]ward winner as the top senior.[1] He was again in the top ten of his class and graduated Summa Cum Laude ... That was such an important weekend for our family and he made us all very proud." Louis Chiasson Letter, Ex. E.

### C. Anthony Chiasson's Professional Background

#### 1. The Early Professional Years

Before graduating from Babson, Anthony applied for a research analyst position at Salomon Brothers. This job was highly sought-after and rarely, if ever, awarded to a recent college graduate. Nevertheless, Anthony got the job. In Fall 1995, Anthony moved from Maine to New York to begin his new career on Wall Street.

The beginning of Anthony's career was a whirlwind because his research acumen put him in high demand. He started at Salomon Brothers as a junior research analyst covering the automotive industry, but soon moved to the more forward-thinking technology sector. In 1996, his senior analyst left Salomon Brothers to join Deutsche Bank and took Anthony with him. Anthony then moved to San Francisco with Deutsche Bank in 1997. Shortly thereafter, Deutsche Bank promoted Anthony to cover his own telecommunications companies. "Anthony moved up the ranks of sellside research quickly . . . Most associates in banking and research return to grad school for an MBA or law degree after their first few years on the Street. Anthony was

---

[1]   The Roger Babson Award is a forty-year-old honor bestowed on the senior who most significantly impacted the growth and development of Babson and its students. Additionally, Anthony received the Financial Executive Award from the Finance Department faculty for excellence in financial study. He also received the Ralph Z. and Charlotte R. Sorenson Scholarship during his junior year for excellence in both academics and student life. See Hacker Letter, Ex. G.

promoted up and invited to become a senior analyst without going back for his degree. Clearly, his work ethic and commitment to conducting timely, well-written research was being recognized by his peers." Louis Chiasson Letter, Ex. E.

In 1998, Anthony returned to New York when his Deutsche Bank research group moved to Credit Suisse. Soon after, however, Merrill Lynch recruited Anthony to cover more companies and manage his own research team. Anthony expected this to be a long-term position, but he did not remain at Merrill for long. After just a few months at Merrill, Anthony received an opportunity to work at SAC Capital as a research analyst for portfolio manager David Ganek. Ganek told Mr. Chiasson that if he worked harder than he ever had before, one day Mr. Chiasson could achieve his goal of becoming a portfolio manager. In addition, the SAC job presented Anthony with the opportunity to work closely with and learn from preeminent investors and finance minds.

Working at SAC was an entirely different experience for Anthony. He lived in New York City and commuted to Stamford, Connecticut every day, rising at 5:00 a.m. to begin work by 6 a.m. He covered numerous companies across widely expanded market sectors. The hours were long and the pressures great; it was grueling work, and Anthony loved it. Others at SAC recognized Anthony's dedication, and he built a lasting reputation for his "respect for and willingness to help others." Letter of Parag Patel, attached hereto as Ex. I.

Anthony largely focused on companies across all areas of technology, with an emphasis on the booming Internet sector. He spent extensive time studying and understanding the inner-workings of Internet companies. Consequently, he concluded that the general model was unsustainable. As the Internet bubble neared its peak in late 1999, Anthony recommended taking

10

significant short positions across much of the Internet industry—a counter-trend investment strategy.

Many finance professionals decried their strategy as foolish and, initially, the skeptics were right. In March 2000, however, the market saw its first overt sign that the Internet bubble would burst, and Anthony's recommendation began to pay off. Anthony's continued research gave him deeper confidence in his negative view of the entire sector, so Ganek held their short positions through 2002. Along the way, Mr. Chiasson and Ganek persuaded SAC management to adopt the short strategy. SAC Capital thus produced 40-50% returns based in large part on Anthony's research, while the majority of other money managers sustained substantial losses. As a result, Mr. Chiasson and Ganek achieved industry-wide acclaim as the team that had successfully traversed the deflation of the Internet bubble.

Given their consistently strong investment performance through a turbulent time, Mr. Chiasson and Ganek made plans to open their own hedge fund. "Not many 29 year-olds . . . leave a lucrative, secure position in any industry and choose to 'build it from scratch' just when an internal reputation for excellence has been established. But this is Anthony—an entrepreneur, a builder, a creator . . .." Louis Chiasson Letter, Ex. E.

## 2. Raising Level Global

Mr. Chiasson and Ganek built Level Global from the ground up. They invested a significant portion of their own capital in the Fund to demonstrate confidence in their ability to provide strong returns for investors. [2] Thereafter, in April 2003, they embarked on a 5-month

---

[2]  In January 2003, Mr. Chiasson and Ganek founded Level Global Investors LP (the "Fund") and the Level Global Management Company ("Level Global" or the "Management Company"). Anthony Chiasson owned approximately twenty percent of the Management Company and was an investor in the Fund; Ganek owned approximately eighty percent of the Management

road show to raise institutional capital by promoting a strategy dedicated to fundamental research and a balanced long/short portfolio to minimize risk. Their fundraising efforts yielded approximately $1 billion in interest, but they accepted only $500 million because they wanted to select investors whose businesses aligned with Level Global's goals as an institutional fund. Early investors included university endowments (like Cornell, Tufts, and Ohio State University), insurance companies (like Aetna), and significant family offices (like Hunter-Douglas).

From the beginning, Level Global also sought to raise capital from non-profit organizations. "Anthony felt compelled to have the firm involved with numerous nonprofit organizations." Louis Chiasson Letter, Ex. E. Level Global managed assets for, among other non-profits, the American Red Cross, the Sisters of Mercy, the World Wildlife Foundation, various state pension funds including New York and New Jersey, and numerous museums and other cultural institutions. See J. Chiasson Letter, Ex. D. Many of these non-profit organizations invested in Level Global because of the conservative approach to downside risk and the integrity of the portfolio managers. Id. ("Investments by organizations such as these are made as much on the character of the fund manager as the manager's investment performance.").

Anthony also ensured that the concept of supporting non-profit organizations became a part of Level Global's philosophy. Each year, Level Global made substantial commitments to

---

Company and was also an investor in the Fund. Throughout the Fund's operation, there were different sub-funds established for a variety of purposes, such as a sector trading focus or compliance with investment restrictions for pension funds. For purposes of this memorandum, all such sub-funds are included in each collective reference to the Fund.

the Robin Hood Foundation and the Michael J. Fox Foundation.[3]  See Louis Chiasson Letter, Ex.
E.  Indeed, the Fund contributed approximately $1 million just to the Robin Hood Foundation.

Level Global launched its Fund from Greenwich, Connecticut on August 1, 2003.
"Anthony took satisfaction in Level Global because he believed the firm represented in part
everything he had been taught about hard work, perseverance, honesty, and integrity." Lucille
Chiasson Letter, Ex. B.

Anthony also served as Level Global's Director of Research.  He stressed research
transparency by "plac[ing] a high requirement on analysts to document their research and
recommendations and then make that work available electronically to the firm broadly." J.
Chiasson Letter Ex. D.  To accomplish this goal, Level Global created a patentable data
management system called IDEA 2.0 that created a common investment language and resource
repository for employees and provided transparency for investors regarding Level Global's
investment themes and ideas.  IDEA 2.0 was an acronym for Identify, Develop, Expand,
Analyze; it was "one of the aspects of Level Global that drew the most praise from investors
[because] all of the firm's collective work on an investment idea/position could be recalled via a
single keystroke and investors could see this full detail when auditing or visiting the firm." Id.

In 2003 and 2004, Level Global earned its first profits.  Over the next two years, the
Fund's reputation for maintaining balance for investors grew:  it earned smaller profits in boom

---

[3]  The Robin Hood Foundation is New York's preeminent poverty-fighting organization and
deploys 100% of its donations to helping individuals and partner-organizations serve New
Yorkers in need.  See http://www.robinhood.org.  The Michael J. Fox Foundation is dedicated to
curing Parkinson's disease and to taking care of the disease's victims and loved ones.  See
https://www.michaeljfox.org.  Anthony hand-picked these foundations for Level Global's
charitable efforts because of their focus on maximizing each dollar for the benefit of their
respective causes.

times, but carried less risk in down times. Its reputation for protecting investors helped the Fund grow to approximately $2.6 billion by early 2006. More assets under management meant more opportunities to create jobs; this appealed to Anthony's entrepreneurial spirit. See Letter of Douglas Day, attached hereto as Ex. J (Anthony was proud "to have gradually grown the business . . . to have created over 40 jobs [and] manage the money of college endowments and multiple nonprofit organizations."). In 2006, Level Global opened its New York City office.[4] During the remainder of 2006 and 2007, Level Global posted strong returns for its investors.

No matter how large the Fund became or how much money it managed, Anthony approached the business with the same devotion and effort. "Despite the fact Level Global and Anthony himself, as an owner of a multi-billion dollar hedge fund, were very well established, Anthony firmly believed there was no substitute for hard work and dedication in the investing business and that the effort involved with researching potential investments was substantial and ongoing. . . . Anthony never wanted to say to a client we made a poor investment decision due to insufficient effort." J. Chiasson Letter, Ex. D. To that end, Anthony continued to be one of the first people in the office each morning and one of the last to leave each night. Id.

In 2008, Wall Street experienced significant turbulence as the global economy teetered on the proverbial brink. Level Global was no exception; the Fund lost money for investors. In the wake of Fund losses, Level Global did not collect an incentive fee.[5] Nonetheless, Anthony

---

[4]   The trading desk and back office functions remained in Connecticut, while the portfolio managers and the research analysts moved to New York City. Ultimately, the entire firm relocated to the New York City office.

[5]   Level Global's fee policy provided for the collection of incentive fees, i.e., 20% of profits, only if it made money for investors. In years it was not profitable, Level Global did not collect incentive fees. In the year following a loss of investor monies, Level Global had to recoup approximately 175% of its losses; until it did, the incentive fee on profits was 10%, not 20%.

14

still rewarded his employees for their hard work. He "[p]rovid[ed] annual bonuses from his own compensation for the firm's non-management employees in a year in which they were not otherwise entitled to them because of a tumultuous year in the overall stock market." J. Chiasson Letter, Ex. D. What is more, "none [of the Level Global employees] were put out of work as a result of the crisis." Day Letter, Ex. J.

Because Level Global remained committed to its balanced approach through the financial crisis, Goldman Sachs' Petershill Fund expressed an interest in becoming a minority owner in Fall 2009. After agreeing in principle to Goldman's minority stake purchase, Level Global opened its books and operations to the banking giant for inspection. Starting in late 2009 through early 2010, Goldman conducted intense due diligence on the Fund and the Management Company, including operations, research process, accounting and risk management. On April 1, 2010, Goldman officially purchased a minority ownership position in Level Global.

Level Global performed well in 2010. The Fund grew to $4.2 billion in assets and approximately 75 employees. On November 22, 2010, however, the FBI served a search warrant on Level Global. In January 2011, Ganek notified investors that he would unwind the Fund and return 99% of all assets.[6] The closure resulted in job losses for most of Level Global's employees. "[I]t continues to haunt Anthony that the closure of Level Global put 75 individuals out of work." J. Chiasson Letter, Ex. D; see also Letter of Sandra Chiasson, attached hereto as Ex. K.

---

Although the Fund did generate some incentive fees in 2008 (totaling $785,574), these fees were earned on accounts that began their relationship with the Fund at the end of the year (post the trades and quarters at issue in 2008).

[6]   Level Global retained 1% of investor assets for business purposes.

### D. Anthony Chiasson's Dedication to Family, Friends, and his Community

#### 1. Anthony is Devoted to his Family

In 2001, Anthony met Sandra Janson, the woman who later became his wife. They met at SAC Capital, where Sandra worked as the assistant controller. Their relationship began when Anthony wandered into her office and playfully complained about the lack of quality candy in the dish Sandra kept on her desk. The next time Anthony visited the accounting department, the dish contained tiny, single-serving boxes of Junior Mints—Anthony's favorite candy.

Their courtship began in earnest in 2002. It was clear to Sandra "almost from the beginning that [they] were going to be together forever." S. Chiasson Letter, Ex. K. Because Anthony valued his experience at SAC and the relationships he developed with senior management, "Anthony proactively went to upper management to disclose our relationship because he did not want to cause any problems with the business or our jobs." S. Chiasson Letter, Ex. K. The young couple continued to work together at SAC for a short time before Anthony left to start Level Global. Sandra stayed at SAC until 2003 before becoming the controller of a different Greenwich-based hedge fund.

After Anthony launched Level Global, he and Sandra married. Sandra is "the love of [Anthony's] life," and Sandra "refers to [Anthony] as her backbone." Louis Chiasson Letter, Ex. E; Letter of Vanda and Alfred Janson, attached hereto as Ex. L. They "are best friends." Id.

In May 2004, Anthony and Sandra welcomed their first child—a son named ███ ██████████. Anthony and his new family settled in New York City because it allowed him to maximize time with his wife and new baby while attending to the needs of his burgeoning business. Nearly seven years later, the Chiassons learned that they were expecting their second child. In March 2012, Sandra gave birth to ███████████████.

Anthony loves being a father. Indeed, "Anthony's dedication and love for his children ██ ([almost] 9) and ████ (1) is like no other." Louis Chiasson Letter, Ex. E. Anthony "rarely misses ████ sporting events, is relentless with the nightly homework reviews and has imbued in ██ a clear understanding about the importance of hard work and respecting your peers and elders." Id. "██ is Anthony's treasure and Anthony is ████ favorite person and hero." S. Chiasson Letter, Ex. K.

Equally evident is his love for 13-month-old ████. "Anthony is the only man she will go to." Id. "Whether it is to calm his daughter in the middle of the night, marvel at each new milestone she hits or simply sit with the kids and watch them interact, Anthony's children are his life." Louis Chiasson Letter, Ex. E.

Anthony has tried not to allow the tumult of the past two years impact his children. He "has done his best to insulate his family from feeling too much turbulence during this trying period. Indeed, he tried to make life as normal for ████, especially, as possible." Louis Chiasson Letter, Ex. E. Anthony's brother noted, "[t]here were several nights during the trial when I invited Anthony to dinner to relax a little and he said he wanted to see ████ and check in on his homework." Id.

Anthony's devotion to family is not limited to his household. His watchful eye on his family reaches all the way to Maine where his mother and extended family still reside. Anthony has always "devoted his energies to his single parent mother. . . . He is always on the lookout for her and has never once forgotten his roots." McArdle Letter, Ex. A; see also Day Letter, Ex. J (Anthony's "commitment to his wife, children, mother and siblings [is] inspirational."). Anthony makes "frequent trips to visit his mother in Maine, ████████████████ ████████████████." Janson Letter, Ex. L. Even

17

"[m]ore importantly," according to Anthony's mother, he speaks with her "by phone almost daily." Lucille Chaisson Letter, Ex. B.

Anthony also spends considerable time with his siblings, cousins, and other extended family—watching out for them, counseling them, providing for them, and simply being there for them. See McArdle Letter, Ex. A; Haddad Letter, Ex. C; J. Chiasson Letter, Ex. D; Louis Chiasson Letter, Ex. E. To be sure, Anthony attends to the "needs of all our family, we are his number one priority." Haddad Letter, Ex. C.

### 2. Anthony's Acts of Generosity and Community Service

Anthony has spent a considerable part of his 39 years working for the betterment of his community. "Giving back to the community and staying grounded have always been [Anthony's] greatest attributes." Day Letter, Ex. J. Anthony's good works are driven by his belief that education, commitment, and guidance can change lives. His uncle, Richard McArdle, praises "Anthony's ability to be a person willing to give to others—his time, his talents, and his treasure." McArdle Letter, Ex. A.

### a. Anthony's Service as a Cheverus Trustee

Anthony appreciates that he received more than just an education from Cheverus High School; he received a blueprint for how to live his life. Because he is so grateful, he has spent the last 20 years giving back to his alma mater.

Initially, Anthony supported his school financially, making whatever donations he could afford. As he matured, however, he contributed to Cheverus in ways beyond his finances. In 2008, Anthony met Cheverus' then-new president, Reverend William Campbell. Reverend Campbell describes Anthony as "someone whose sincere and gentle demeanor immediately put me at ease, whose professional accomplishments I admired and whose commitment to his faith,

his family and his community I respected." Letter of Rev. William Campbell, attached hereto as

Exhibit M. In short order, Reverend Campbell "sought to deepen these bonds and moved to have

Anthony appointed as a member of the Board of Trustees of Cheverus." Id.

Anthony began his elected term as the youngest Cheverus trustee by 20 years. Despite

his comparative youth, "Anthony's penchant for an insightful analysis of various Cheverus

'issues' (an analysis born of his focused, disciplined and respectful research) and his willingness

to 'roll up his sleeves' and engage the challenging work that can guarantee success immediately

earned him the trust and respect of his Trustee peers." Id.

As with all of his endeavors, Anthony embraced his position on the board and was an

active trustee. He took time to travel to Maine three times per year for lengthy board meetings.

He assumed responsibility for committee projects with specific emphases such as finance,

curriculum, or student life. Whether his tasks entailed studying financial reports related to the

school's endowment, reviewing the effectiveness of the curriculum, participating in conference

calls with other board members, or identifying methods of reaching the Cheverus community and

alumni to encourage school involvement and fundraising efforts, Anthony took special time and

care to benefit the school. Indeed, "Anthony helped the Trustees to set a standard of

involvement that is still referenced by current Trustees who served with him." Id.

In 2008, Anthony served on a special committee formed to address Cheverus' ongoing

stability. At the time, the governing body of Jesuit schools in New England contemplated

closing Cheverus. They were willing to consider investing money to revitalize the school if it

could develop a five-year plan to regain financial stability. Anthony was passionate about

Cheverus' continued survival, so he helped craft a plan to save the school. See Rev. Campbell

Letter, Ex. M ("That a 'new' Trustee was asked to serve on this committee is further testament to

the respect the other Trustees had—*have*—for Anthony."). He travelled to Boston to meet with the senior priest overseeing the school's governance and persuaded him that Cheverus was worthy of investment and ongoing support because of its importance to students and to the Portland community. Anthony then worked for months in conjunction with Cheverus administrators to develop the requisite five-year plan. In 2009, Cheverus convinced the diocese that the committee's plan could turn the school around. Anthony's "thoughtful input was essential in helping the Board to craft a plan that is successfully shaping our strategic efforts to this day." Id. The school is currently flourishing at peak enrollment.[7]

In the wake of the FBI raid and attendant publicity, Anthony contacted Cheverus' president "and offered . . . his resignation" because he feared he would "embarrass the school." Id. Reverend Campbell "refused" because "we all thought—and think—so highly of Anthony that we wanted to retain his counsel for as long as we could." Id.[8] Anthony continued to serve as a Cheverus trustee until the government filed its criminal complaint in January 2012. Anthony "again submitted his resignation." This time, Reverend Campbell "reluctantly accepted it, hoping to lighten the burdened load of my friend . . .." Id. Reverend Campbell hopes that someday Anthony will "be in a position to rejoin the Board and assist the school...." Id.

### b.   Anthony's Dedication to Babson College

Anthony abides by a deep love and profound sense of gratitude toward Babson College. Since graduation, he has maintained strong ties to Babson and has taken almost every

---

[7]  Anthony is also financially charitable toward Cheverus. He has been a top-tier benefactor since 2006, and in 2009 he committed to being a top-tier benefactor in conjunction with the rescue plan. See Rev. Campbell Letter, Ex. M.

[8]  Reverend Campbell was "impressed that in a moment of professional crisis, Anthony thought to place the needs of Cheverus above his own." Rev. Campbell Letter, Ex. M.

opportunity to give back to his alma mater. "Whether it was a career networking event, an opportunity to speak to students interested in finance, or a chance to review a resume for a student applying for a position in his company or others, Anthony was readily available.. . . Anthony demonstrated early on that giving back was going to continue to be his mantra for years to come." Hacker Letter, Ex. G; see also Letter of Len Schlesinger, attached hereto as Ex. N.

### i.  Anthony Funds an Alumni Scholarship for Students in Need

In early 2000—at the age of 26—Anthony sponsored a scholarship through which he helped Babson students hailing from Maine who were in need of financial aid. Anthony committed $20,000 per student. See Hacker Letter, Ex. G. Anthony participated personally in the selection process, and took great pride in helping to choose the student recipients.

Anthony often received letters of thanks from the students he supported. One such student sent Anthony a letter in each of her four years. Rachael Plummer, from a small island off the coast of Maine, wrote to Anthony during her freshman year: "In the summer I lobster with my Dad and waitress in a local family restaurant . . . The scholarship that was given to me through your generous donation helps significantly in covering my financial responsibilities from the school. Without it, I am not sure that I would be able to receive this exceptional education." Attachment 1 to the Hacker Letter, Ex. G. Three years and three letters later, Ms. Plummer wrote again: "Your help has truly enabled me to achieve an education here, both inside and outside of the classroom. Once again, my family and I cannot thank you enough for the contribution you have made towards my education." Id.

### ii.  Anthony's Time as a Babson Trustee

In 2008 Babson appointed a new president with a modern vision for the school. President Len Schlesinger sought to inject new life and ideas into Babson; he thus began a search to "bring

younger, exceptionally qualified alumni onto the Board of Trustees." Schlesinger Letter, Ex. N.

Anthony's dedication as an alumnus and "great reputation extending back to his time on campus

when he had been active in a portfolio of leadership activities," caused Mr. Schlesinger to seek

Anthony's views on certain challenges confronting the college. Id. President Schlesinger noted

that, after meeting Anthony, "he exceeded even my high expectations, based on all that I had

heard about him." Id.

President Schlesinger invited Anthony to join Babson's Board of Trustees in Summer

2008. Among the 40 trustees, Anthony was the youngest by a decade. "It is rather notable that a

very young alum such as Anthony was invited to become a trustee by the president of both [his

educational] institutions." McArdle Letter, Ex. A.

Being a Babson Trustee required a significant commitment. Anthony attended three

four-day-long meetings per year in Boston. He further participated in "extensive post-meeting

work, phone calls, emails . . . offering ideas, immediate feedback on reports, and taking the lead

with fellow trustees." Schlesinger Letter, Ex. N. In addition, he made time to attend

commencement and awards ceremonies so that he could witness first-hand the college's

development. All told, Anthony was "the trustee who has spent the most time on the strategy

and positioning of the school—not only in the context of the huge changes that are going on in

higher education, but also in terms of the transformations taking place in the global economy."

Id. Indeed, whenever President Schlesinger asked for trustee input or participation, "Anthony

was invariably one of the first, if not the first, to respond." Id.

The Chairman of the Board asked Anthony to serve on the Investment Committee

overseeing Babson's endowment, which put hundreds of millions of dollars to work for the

school and its students. He approached the Investment Committee with the same philosophy he

employed at Level Global: balance and conservatism to protect and grow the school's endowment. Despite his expertise in the field, Anthony never suggested that Level Global manage any portion of Babson's endowment. Instead, Anthony managed the relationships with Babson's independently-selected investment advisors and ensured that the endowment funds were appropriately invested. Babson's endowment flourished under his management of the Investment Committee.

### iii.   Anthony Helped Create Babson's Summer Venture Program

While Anthony found his board service fulfilling, he wanted to reach Babson students more directly. Thus, Anthony and President Schlesinger created Babson's Summer Venture Program. See Schlesinger Letter, Ex. N. The Summer Venture Program is a competition that offers Babson students the opportunity to submit plans to develop and grow businesses they have already created.[9] The winners live cost-free at Babson for the summer and study the building and operating of businesses through Babson's Arthur M. Blank Center for Entrepreneurship. In addition, the program makes available legal resources, marketing specialists, advertising opportunities, and other such specialists to shape and grow the students' businesses. See id. In January 2010, Anthony committed $1 million to initially fund the Program. Id.

The Summer Venture Program combines academics with real world possibilities. It culminates in Demo Day during which students present their businesses to 50-60 potential

---

[9]   The Summer Venture Program, now approaching its fifth year, includes students from Babson's Olin College of Engineering and women from Wellesley College. See Schlesinger Letter, Ex. N. The Program began including students from other disciplines to foster entrepreneurship in non-profit and government entities.

23

investors from around the country who come to learn about the students' businesses.[10]  Anthony

has attended Demo Day in the summers to witness first-hand what the students accomplish with

the Program's help and encouragement.  President Schlesinger believes that Anthony has "given

Babson the opportunity to build a significant position in entrepreneurship which has become an

important part of [the school's] arsenal of activities designed to help people create better and

longer lasting businesses."  Id.

*     *     *

The FBI raided Level Global in November 2010.  Because Anthony "has always put the

interests of the school ahead of his own personal interests . . . he immediately offered to step

down from seeking reelection" out of concern that the negative publicity regarding Anthony

would impact the school.  Schlesinger Letter, Ex. N.  He then resigned following the indictment

in February 2012.  See id.  President Schlesinger noted that he has "great respect for the

dedication to the school that these actions demonstrated.  [He has] seen these qualities in

Anthony many times—and his resignation underscored the selflessness that is inherent in his

character."  Id.  Even more, President Schlesinger is "hopeful that at some point in the not too

distant future there will be an opportunity . . . to welcome Anthony back for a significant

ongoing relationship with the institution because we have missed his insights sorely during this

period ...."  Id.  Anthony, too, hopes there is a path for him that will allow him to meaningfully

contribute to Babson again in the near future.

---

[10]   See Noer, Michael: Tiny Babson College is an Entrepreneurial Powerhouse, FORBES,
August 1, 2012, available at http://www.forbes.com/sites/michaelnoer/2012/08/01/tiny-babson-
college-is-an-entrepreneurial-powerhouse/.

## II.  THE OFFENSE CONDUCT[11]

### A.  The Insider Trading Scheme

In July 2006, Level Global hired Sam Adondakis as a research analyst.  Unbeknownst to

Mr. Chiasson, prior to joining Level Global, Adondakis had been part of a small team of

colleagues in the equity research division of Prudential Securities that he was aware was using

material, nonpublic information from company insiders in publishing research reports.  See Trial

Tr. at 1663:20-1668:2.  Adondakis' colleagues at Prudential included many of the individuals

who became part of the criminal conspiracy at issue in this case, including Jesse Tortora and

Sandeep "Sandy" Goyal.  Id.

As Adondakis' testified, however, it was not until 2007, when he struggled to generate

investment ideas, that he approached Mr. Chiasson with improperly obtained information.  See

Trial Tr. at 1677:17-1680:11.  In other words, Adondakis testified that *he* brought the scheme to

Mr. Chiasson, not the other way around.  Though Adondakis testified that he received and passed

to Mr. Chiasson improperly obtained information starting in 2007, the record is unclear what, if

any, trades the Fund executed based on this information.  Nor was Mr. Chiasson charged with

any substantive counts stemming from this time period.

In 2008, Adondakis agreed to exchange both legitimate market research and improperly

obtained information with a group of analysts working at different hedge funds.[12]  See Trial Tr. at

---

[11]  Mr. Chiasson intends to appeal the jury's verdict; however, for purposes of sentencing only, Mr. Chiasson is not contesting the verdict.  All statements herein are drawn from the testimonial and documentary evidence at trial and do not represent and should not be considered to be admissions by Mr. Chiasson.

[12]  It is undisputed that Adondakis received a voluminous number of emails containing information on various securities from his analyst coconspirators, which did not include Mr. Chiasson.  Adondakis chose what, if any, information to forward to Mr. Chiasson.  The record reflects that Adondakis was very careful about what he chose to share with Mr. Chiasson and

1673:7-1674:9.  Thereafter, and through 2009, upon receipt of information, Adondakis first determined whether there existed an investment opportunity for the Fund; if so, he decided whether to relay the information to Mr. Chiasson.[13]  See Trial Tr. at 1672:15-23.  Adondakis testified that Mr. Chiasson, alone or in consultation with others, decided whether to execute trades in the relevant securities.  Id.  Importantly, Mr. Chiasson and others at Level Global traded significant shares of Dell and Nvidia securities prior to Adondakis' employment with the Fund and after his termination.

Though Adondakis provided some information, he often edited or held parts of it back. Adondakis did not tell Mr. Chiasson the names or positions of the Dell or Nvidia insiders, or what, if anything, they received in exchange for the information.  Although Adondakis testified that he conveyed that the initial source of the Dell information was a company insider, with respect to Nvidia, Adondakis acknowledged that he never specified that the source worked for the company.[14]  Adondakis further testified that he controlled the flow of information to Mr. Chiasson through his "protocol" for sharing limited information so that he could "take down [the] expectations" of his portfolio managers because he "didn't want to be on the hook for the full information."  Trial Tr. at 1990:10-12.

---

that he altered much of the information before he shared it via email.  See Trial Tr. at 2023:3-2024:6.  In other words, Adondakis had hundreds of emails containing improperly obtained information and chose to share only a fraction of it with Mr. Chiasson.  Adondakis never forwarded to Mr. Chiasson any email that contained the material nonpublic information at issue regarding Dell or Nvidia, including any emails Adondakis received from Goyal (through Tortora) or from Kuo.  See, e.g., Trial Tr. at 2334:1-14; 2023:3-6.

[13]   See Trial Tr. at 2097:24-2098:9 ("Q.  And isn't it true that you made the decision for many of these stocks simply not to share the information with your boss?  A.  In situations where I didn't think that it would be relevant, yes.").

[14]   See Trial Tr. at 1878:14-1879:16.

26

### 1. The Charged Trading in Dell

The trial evidence demonstrated that Adondakis began obtaining material, nonpublic information regarding Dell in spring 2008. Goyal testified that the tipping chain began with Rob Ray, an employee in Dell's investor relations group. The record reflects that Ray provided Dell information to Goyal, his former Dell colleague. Goyal testified that he passed the information to Tortora, who had arranged for Diamondback Capital to pay Goyal, even though Goyal worked for Neuberger Berman at the time. In turn, Tortora passed the Dell information to Adondakis. See generally Trial Tr. at 1704:13-1705:25. According to Adondakis, all of the people along the tipping chain knew the information came from a company insider.

Adondakis obtained material nonpublic information relating to Dell's quarterly performance, including but not limited to gross margin percentages, which he received prior to the relevant Dell quarterly announcements. While Adondakis testified that he could not recall specific conversations on specific dates including when he first told Mr. Chiasson about the Dell information, he testified that his general practice was to pass the Dell information to Mr. Chiasson and another analyst at Level Global, Greg Brenner. See Trial Tr. at 1711:1-16; 1717:21-24; 1719:24-1720:19; 1721:2-19. The record reflects that Messrs. Chiasson, Ganek and Brenner executed trades in Dell securities on behalf of the Fund around the time Adondakis received the Dell information. See, e.g., Trial Tr. at 1772-1780. The jury determined that, at least in part, the information Adondakis obtained caused the Fund to execute the charged Dell trades in May and August of 2008.

Adondakis' lack of awareness of certain facts highlights Mr. Chiasson's siloed role. For instance, Adondakis testified that Adondakis himself never learned certain facts about the Dell information, including: (1) the identity or position of the Dell insider; (2) the Dell insider's

relationship to coconspirator Sandy Goyal; (3) that Diamondback Capital paid Goyal more than $100,000 in exchange for the Dell information;[15] or (4) what, if any, personal benefit the Dell insider received in exchange for sharing the Dell information. See Trial Tr. at 2210:7-2212:4. Because Adondakis served as Mr. Chiasson's only conduit for the Dell information, Mr. Chiasson was also unaware of these facts.

In sum, the jury convicted Mr. Chiasson of receiving from Adondakis certain material nonpublic information regarding Dell's quarterly results in May and August 2008, and then, along with Messrs. Ganek or Brenner, executing trades on the basis of this information.[16] In the weeks preceding the relevant Dell quarterly earnings announcements, the Fund built positions in Dell stock that resulted in profits for its investors.

### 2. The Charged Trading in Nvidia Corporation Securities

The trial evidence demonstrated that, through a tipping chain similar to the Dell chain, Adondakis acquired material nonpublic information regarding Nvidia Corporation ("Nvidia") beginning in early 2009. The record reflects that Nvidia insider Chris Choi tipped an individual named Hyung Lim, who passed the information to his friend from church, Danny Kuo. Kuo, a research analyst for an investment firm in California and an analyst coconspirator, provided the same to Adondakis. See Trial Tr. at 1869:7-1870:12.

---

[15]   Mr. Chiasson never participated in any effort to compensate or benefit anyone in the tipping chain (other than to participate in setting Adondakis' normal compensation as a Level Global employee).

[16]   The jury concluded that Mr. Chiasson caused Level Global to execute certain trades based on improperly obtained information. It is worth noting that the majority of the Dell trades underlying Counts 6-9 were Ganek-directed: Ganek directed the August 11, 2008 short sale of 100,000 shares of Dell; the August 18, 2008 short sale of 650,000 shares of Dell; and the August 20, 2008 purchase of at least 2,500 put option contracts in Dell. See Trial Tr. at 2741:11-2745:3.

Adondakis received information relating to Nvidia's quarterly performance, including, but not limited to gross margin percentages, prior to Nvidia's quarterly announcement in May 2009. Id. Consistent with his practice, Adondakis shared within Level Global only those portions of the Nvidia information that he deemed relevant. In fact, Adondakis testified that he never told Mr. Chiasson that the source of the Nvidia information was an Nvidia company insider: "I explained to him that a friend of Jesse Tortora would be getting information from Nvidia through a friend . . . I didn't specifically say at Nvidia, but based on contacts that we had at other companies, I assumed . . . [that Mr. Chiasson knew]." Trial Tr. at 1878:16-1879:5.[17]

Nonetheless, the jury concluded that the information passed was sufficient to cause Mr. Chiasson to knowingly trade Nvidia stock in violation of federal securities laws.

Adondakis' unawareness of additional facts concerning the Nvidia tipping chain highlights the same for Mr. Chiasson. Specifically, Adondakis did not know: (1) the identity of the Nvidia insider; (2) the Nvidia insider's relationship to his initial tippee, Hyung Lim; or, (3) the benefit conferred on either the Nvidia insider or Lim.[18] See Trial Tr. at 2333:2-2334:14. Because Adondakis served as Mr. Chiasson's only conduit for the Nvidia information, Mr. Chiasson was similarly unaware of these facts.

---

[17] While Adondakis continued to testify that he had a "course of dealing" with Mr. Chiasson when "talking about sources of information" that he "referred to in a specific way," Adondakis simply stated that: "When I would refer to contact I would refer to them as those that worked at companies," which he clarified to mean "that that contact worked at the company[.]" Trial Tr. at 1879:7-16. While the government may argue that "contact" is a nefarious term or that Mr. Chiasson and Adondakis had an established code of communication, Adondakis' testimony is vague at best: he only testified about his conduct—not Mr. Chiasson's understanding.

[18] The record demonstrates that Mr. Chiasson never participated in any effort to compensate or benefit anyone in the Nvidia tipping chain.

The jury convicted Mr. Chiasson of receiving from Adondakis certain material nonpublic information regarding Nvidia's quarterly results in May 2009, and then, along with Ganek, executing trades on the basis of this information.[19]  In the weeks preceding the relevant Nvidia quarterly earnings announcement, the Fund built a position in Nvidia stock that resulted in profits for its investors.

### 3. Level Global Terminated Adondakis

The record reflects that the charged conspiracy ended, at the latest, in mid-2010.  After sending Adondakis to compliance on multiple occasions and to outside counsel at least once— where the record reflects that he lied to both internal and external counsel—Level Global terminated Adondakis' employment in May 2010 for, among other things, sharing Level Global's proprietary information with people outside the firm in derogation of his duties to his employers.  See Trial Tr. at 1968:4-1969:2.  Adondakis testified that he continued to exchange information via his personal email account with his circle of analyst coconspirators well after Level Global terminated him.  See Trial Tr. at 2019:7-11; 2260:8-14.  There are no allegations that Mr. Chiasson engaged in any improper conduct post-2009.

In sum, the jury convicted Mr. Chiasson—a fourth level tippee—of receiving material nonpublic information regarding Dell and Nvidia on several occasions between 2008 and 2009, and, along with other Level Global partners, executing or participating in the execution of trades based, at least in part, on the information.  The record is nonetheless clear that Mr. Chiasson

---

[19]   Notably, Ganek directed a portion of the charged Nvidia trade: Ganek caused the Fund to trade a minimum of 250,000 shares of the May 4, 2009 short sale of 1,000,000 Nvidia shares, and a maximum of 650,000 shares.  See Trial Tr. 2745:5-23.

never independently pursued this information, forced his analyst to obtain it, or made corrupt payments to anyone in Dell or Nvidia tipping chains in exchange for it.

## ARGUMENT

### I. GUIDELINES CALCULATION

On December 17, 2012, a jury convicted Anthony Chiasson of one count of conspiracy and five substantive counts of securities fraud. Pursuant to § 3D1.2 of the Guidelines, the counts are grouped together.[20] Under § 2B1.4, the base offense level for insider trading is eight. This level is increased by the "gain resulting from the offense," using the table in § 2B1.1. While the government and the presentence report (the "PSR") contend that Level Global's total profit from the trades at issue is approximately $68 million, the amount of Fund profits from Mr. Chiasson's charged trades attributable to the material nonpublic information at issue is approximately $11.7 million. Mr. Chiasson respectfully submits that this is the proper gain for Guidelines purposes.[21]

A gain of approximately $11.7 million adds 20 points (corresponding to a gain of more than $7 million but less than $20 million) to the base offense level. No additional enhancements should be added to the Guidelines calculation. Because Mr. Chiasson has no criminal history, his Criminal History Category is I. Thus, the appropriate Guidelines calculation is level 28 equaling an advisory range of 78–97 months imprisonment.

---

[20] Grouping is proper either subparagraphs (b) or (c) of § 3D1.2 because the counts were part of a common scheme and the calculation is guided by loss amount.

[21] Mr. Chiasson is aware that his letter to probation listed that the proper gain for Guidelines purposes as approximately $40 million; however, subsequent research revealed that this Court applied a different methodology in other recent insider trading cases. Accordingly, Mr. Chiasson and his counsel apologize for any resulting confusion.

31

## II.    GAIN CALCULATION

The government's gain calculation is vastly overstated for three reasons.  First, the gains should be calculated from the time Mr. Chiasson initiated the position through the time at which the information at issue became public (within 24 hours of the public announcement).  Second, the Court should calculate the guidelines only based on those charged trades Mr. Chiasson executed himself (and not trades made by Ganek).  Third, assuming arguendo that the Court calculates profit for sentencing purposes on all the pre-announcement trades (and not just those Mr. Chiasson executed or that were charged), a calculation inclusive of all profits is improper because it includes stock price movements unrelated to the information at issue (in opposition to the 24 hour rule).

### A.    The Court Should Calculate Gains Using the Price 24-Hours Post-Announcement

The gain under § 2B1.4 should reflect the gain based on the inside information and not any gain due to other market events.  Therefore, the Court should calculate profits as the difference between the purchase price of each individual share (or sale price, if shorting) and the price when the information became absorbed into the market place.  See United States v. Nacchio, 573 F.3d 1062, 1072-1087 (10th Cir. 2009); United States v. Rajaratnam, No. 09 CR 1184 (RJH), U.S. Dist. LEXIS 14961, at *9-43 (S.D.N.Y. Jan. 31, 2012) (following Nacchio in relevant part).[22]

---

[22]   The Rajaratnam court followed this approach, attributing to the offense the trader's profits calculated from the time of trades made while in possession of inside information, up through the time that the information became public and embedded in the share price: "Rajaratnam's 'gain' for purposes of Section 2B1.4 of the Guidelines is equal to . . . (the increase in the price of a company's shares form the time that Rajaratnam purchased them to the time that the public learned the inside information) x (the number of shares that Rajaratnam traded)." Id. at *43.

When calculating illegal profits in criminal securities cases, courts count profits that are the result of the fraud. United States v. Rutkoske, 506 F.3d 170, 179 (2d. Cir. 2007). Losses from "causes other than the fraud must be excluded . . . ." Id. (internal citations omitted.) For instance, "other factors, such as changed economic conditions, might also contribute to a stock's decline in price" and should be excluded from profit calculations. Id. (explaining the Supreme Court's loss causation in Dura.); accord United States v. Zolp, 479 F.3d 715, 719 (9th Cir. 2007). Similarly, profits from trading that occurred after inside information is impounded in a stock's price should be excluded because "[o]nce the information is fully impounded in price, such information can no longer be misused." United States v. Libera, 989 F.2d 596, 601 (2d Cir. 1993).

The best benchmark for when information is absorbed into the marketplace is 24 hours after its release.[23] See, e.g., Rajaratnam, 09 cr. 1184, Government's Reply Sentencing Memorandum Regarding Calculating Raj Rajaratnam's Gain, Docket No. 318 (stating that the government included calculations revised at Judge Holwell's request to calculate gain based on the price at which the relevant security closed within the 24-hour period and not the prices at which the positions were eventually exited as initially proposed by the government); Rajaratnam, 09 cr. 1184, 10/13/11 Sentencing Transcript, at 26 (measuring profits as "estimated actual gains based on the increase in the price of the company's shares from the date of the defendant's

---

[23]   In the context of SEC forfeiture, courts in the Second Circuit have held that 24 hours is a reasonable period to calculate when information has been absorbed into the stock price. See, e.g., SEC v. Patel, 61 F.3d 137, 140 (2d Cir. 1995) ("[I]t was reasonable to use July 25, the day following the announcement, rather than July 26, in making the calculation.")  In SEC v. Rajaratnam, 822 F. Supp. 2d 432, 435 (S.D.N.Y. 2011), the court noted that the SEC offered a calculation of profits "utilizing a 24-hour period after the dissemination of the inside information as a 'reasonable period.'" Id. (internal citations omitted) (noting the parties' agreement that "within a day of the announcement is generally [a reasonable period]").

purchases to a time shortly after the public learned of the inside information."). This is consistent with the Supreme Court's instruction that in determining loss or gain resulting from securities fraud, courts must exclude changes in price that result from factors unrelated to the offense. See Dura, 544 U.S. at 342-43; Rutkoske, 506 F.3d at 179 (applying Dura's loss causation principles in criminal sentencing).

It would be unjust, for example, to calculate the profits for the short position relating to the August 2008 Dell trades based on the Fund's trading from July 8 through September 16, 2008. Such a calculation would include charges in Dell's stock price 19 days after Dell's August 28 earnings announcement and would double the amount of profit incurred as of August 29, 2008 (24-hours post announcement) from approximately $26 million to approximately $53 million in profit. This extended period coincides with one of the worst points in the financial crisis of 2008, including the collapse of Lehman Brothers, where the entire stock market—not just Dell—was in steep decline. During that extended time period, the NASDAQ composite index fell 8.5% from 2,412 on August 28, 2008 to 2,208 on September 16, 2008. The drop in Dell's stock price during that extended period is not properly attributable or even causally related to the nonpublic information at issue here because that information was made public (and thus, incorporated into the price) weeks earlier.[24]

---

[24] Indeed, in the government's sentencing memorandum in relation to Todd Newman, the government stated that "Newman does not identify any particular stock movements in the days following the announcement due to factors other than the release of the inside information" and the fact that "Newman closed out his positions within three and five days of the public announcement" in support of its argument that the 24-hour rule is unnecessary in his case. United States v. Newman, Government's Sentencing Memorandum (4/25/13), at 15-16. However, Level Global's profits—where unrelated market events caused vast stock price movements following the announcement—illustrates precisely the reason that such a rule should be and has been applied to avoid unfair profit calculations.

Although the government urges the Court to find that Level Global realized profits of $68 million, for the reasons articulated above, the government's calculation is unreasonable and should not form the basis for Mr. Chiasson's Guidelines calculation.

### B.  Profits on Charged Trades Executed by Mr. Chiasson

Mr. Chiasson respectfully requests that the Court measure the Fund's gains for purposes of his Guidelines calculation only from the charged trades that Mr. Chiasson directed.  The most analogous situation to the one at hand involves the sentencing of Zvi Goffer's coconspirators. Except for the "ring leader," Zvi Goffer, who was held responsible for the profit of all trades because he was the tipper, this Court based the coconspirator-tippees' Guidelines calculations on the fund's profit from their individual trades.

Michael Kimelman, Emanuel Goffer and Craig Drimal each received Guidelines calculations (and forfeiture amounts) based on the profits for trades that they individually executed and not any aggregated profits.  See United States v. Kimelman, 10 Cr. 56 (RJS), 10/12/11 Sentencing Tr., at 5, 33 (Guidelines calculation based on profit of approximately $288,000 from Kimelman's trades); United States v. Emanuel Goffer, 10 Cr. 56 (RJS), 10/7/11 Sentencing Tr., at 9, 28 (Guidelines calculation based on profit of $761,000 from E. Goffer's trades); United States v. Drimal, 10 Cr. 56 (RJS), 8/31/11 Sentencing Tr., at 27, 54 (Guidelines calculation based on profit over $7 million from Drimal's trades); [25]  United States v. Zvi Goffer, S1 10 Cr. 56, Government's Sentencing Memorandum, Docket No. 266 at 8-9 (setting forth coconspirator's gains in Ropes & Gray tips totaling over $10 million, including Kimelman's gains of $289,079, E. Goffer's gains of $761,623, and Drimal's gains of $6,286,454).  Notably,

---

[25]  Drimal's profit included trades based on tips regarding Hilton which were not included in the coconspirator Ropes & Gray tips profit calculations referenced in the Government's Zvi Goffer Sentencing Memorandum.

Kimelman and Emmanuel Goffer were partners in the same fund as Zvi Goffer, but profits for all trades executed by the fund were <u>not</u> attributed to them for Guidelines calculations (or forfeiture, as discussed below).

Mr. Chiasson urges the Court to apply the same method here and calculate his Guidelines based only on trades Mr. Chiasson directed.  There is ample evidence in the record to denote which trades Mr. Chiasson ordered and which Ganek or Brenner ordered.  While the Court can saddle Mr. Chiasson with Ganek's trades, calculating Mr. Chiasson's Guidelines based on his trades alone is consistent with this Court's approach in <u>Kimelman</u>, <u>Drimal</u>, and <u>Emmanuel Goffer</u>.

Level Global profited approximately $11.7 million from the charged trades Mr. Chiasson executed, as demonstrated by the chart at Exhibit 1 (Counts 6 through 10).  In contrast, the Fund profited approximately $21.6 million on the trades Ganek directed for those same counts.  <u>Id.</u> Ganek's profits are nearly double Mr. Chiasson's profits.  Accordingly, Mr. Chiasson's Guidelines calculation will increase dramatically if this Court deems Mr. Chiasson liable for trades Ganek ordered.

## C.  The Fund's Profits based on All Trades Leading Up to the Quarterly Announcements

Mr. Chiasson believes the above-discussed Guidelines calculation is the fairest approach. Should the Court, however, reject Mr. Chiasson's position, it should not accept the government's overly-expansive profit calculation—the more appropriate method is to calculate the Fund's profits for all pre-announcement trades limited by the 24-hour rule.  Employing this approach, the calculations broken down by the three trading quarters at issue are as follows:

### 1. May 2008 Dell Trades

During May 2008, Level Global built a substantial position in Dell stock. Dell announced its earnings after the close of the market on May 29, 2008. Within the first 24 hours, the Fund sold 670,000 Dell shares, realizing a profit of approximately $2.1 million. Based on the share price as of the close of market on May 30, 2008, the Fund had unrealized profits of approximately $3 million because it still held 1,075,000 shares of stock and 350,000 options. Taken together, the Fund's realized and unrealized gains as of May 30, 2008, equal approximately $5.1 million.

### 2. August 2008 Dell Trades

Throughout July and August 2008, Level Global shorted Dell stock. Dell announced earnings after the close of business on August 28, 2008. Within the first 24 hours, the Fund had covered short positions in 1,971,100 shares and exercised 2,830,000 options, realizing profits of approximately $4.6 million.[26] Based on the share price at the market close on August 29, 2008, the Fund had unrealized profits of approximately $21.6 million because it held a 7,028,900 share short position as well as 1,400,000 options. Taken together, the realized and unrealized profits as of August 29, 2008, were approximately $26.2 million.

### 3. May 2009 Nvidia Trade

In May 2009, Level Global shorted Nvidia stock. Nvidia announced its earnings after the close of the market on May 7, 2009. Within the first 24 hours, the Fund covered approximately 1.3 million shares, realizing a profit of approximately $3.5 million. Based on the share price as of close of business on May 8, 2009, the Fund had unrealized profits of approximately $5.6

---

[26]   Note that the realized profit figure takes into account approximately $1 million in losses incurred due to covering short positions pre-announcement (on July 31, 2008 and August 8, 2008).

million because it maintained a short position of 2,590,000 shares.  Taken together, the realized and unrealized profits as of May 8, 2009, were approximately $9.1 million.

*     *     *

Mr. Chiasson respectfully requests that the Court calculate his Guidelines range based only on the charged trades he executed.  If not, he requests that the Court apply the 24-hour rule rather than the government's suggested calculation.

## III.     SENTENCING ANALYSIS

Sentencing in criminal cases is controlled by 18 U.S.C. § 3553(a).  As part of the Court's analysis, it must consider the Guidelines.  See U.S. v. Crosby, 397 F.3d 103, 103 (2d Cir. 2005). As the Court well knows, "the Guidelines are guidelines—that is, they are truly advisory." United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (en banc).  Accordingly, the Court has wide latitude in determining that a "Guidelines sentence should not apply, perhaps . . . because the Guidelines sentence itself fails to properly reflect § 3553(a) considerations, or perhaps the case warrants a different sentence regardless." Kimbrough v. United States, 552 U.S. 85, 113 (2007) (concur, Scalia, citing Rule 32(f)).  For those reasons, among others, the Court must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Koon v. United States, 518 U.S. 81, 113 (1996).  "Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime." Pepper v. United States, 131 S.Ct. 1229, 1240 (2011) (internal citations omitted).

Even taking into account the appropriate Guidelines calculation set forth above in Argument Section I (78-97 months), Mr. Chiasson's personal history and conduct call for a non-Guidelines sentence and a substantial downward variance.  Under the § 3553(a) factors there are

38

at least four separate grounds on which the Court should grant a downward variance to Mr. Chiasson: (1) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; (2) the Guidelines' misplaced reliance on trading gains that are unrelated to the nature of the offense conduct; (3) Mr. Chiasson's family circumstances; and (4) Mr. Chiasson's history of charitable work.[27]  Independently and collectively, these reasons demonstrate that only a non-Guidelines sentence can accomplish the objectives of § 3553(a). See Kimbrough, 552 U.S. at 101 (internal citations omitted) (the overarching objective is determining a sentence that is "sufficient, but not greater than necessary" to meet the ends of justice).

### A. The Mandated Avoidance of Disparate Sentences Counsels in Favor of a Sentence Significantly Below the Guidelines

In determining the appropriate sentence, the Court must consider "the need to avoid unwarranted sentenc[ing] disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6) (emphasis added).[28]  Sentencing Mr. Chiasson at or near his Guidelines range will create significant sentencing disparities between him and other insider trading defendants with similar offense conduct.  What follows is a comparison of similarities and differences between Mr. Chiasson and other recently-sentenced

---

[27]  In fashioning a sentence that is "sufficient, but not greater than necessary," 18 U.S.C. § 3553(a) requires to the Court to consider, among other factors: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to, among other goals, reflect the seriousness of the offense, provide just punishment, and afford adequate deterrence; (3) the kinds of sentences available; and . . . (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.  The foregoing analysis will not address the additional factors because they are either not applicable to Mr. Chiasson or are not substantively at issue here.

[28]  This section deals only with conduct. There is no discussion of profits here because § 3553(a)(6) requires an assessment of conduct, and the amount of profit is unrelated to any of Mr. Chiasson actions that, according to the jury, violated the law.

defendants convicted of insider trading following jury trials.  In light of these comparisons and the "the need to avoid unwarranted sentenc[ing] disparities," Mr. Chiasson respectfully submits that a sentence substantially below the applicable Guidelines range is warranted.  Id.

There are seven recent insider trading sentences that merit consideration in relation to Mr. Chiasson.  The sentences of Michael Kimelman, James Fleishman, and Rajat Gupta—who received terms of 24 months (Gupta) and 30 months (Kimelman and Fleishman)—are the best comparisons of like conduct and circumstances among defendants.  There are, however, noteworthy points of contrast between the conduct at issue in those cases and the instant one.  The Court may also compare Mr. Chiasson and his conduct to Joseph Contorinis and Douglas Whitman.  Contorinis and Whitman received sentences of 72 and 30 months, respectively.  But again, there are meaningful differences between Mr. Chiasson's conduct and circumstances and those of Contorinis and Whitman.  Finally, Raj Rajaratnam and Zvi Goffer received the longest insider trading sentences in history at eleven and ten years, respectively.  Though the PSR calculation suggests that Mr. Chiasson serve as much time as Rajaratnam or Goffer, Mr. Chiasson's circumstances, conduct and character are diametrically opposed to those defendants.

### 1. Mr. Chiasson is Comparable to Kimelman, Fleishman, and Gupta

#### a. Michael Kimelman's Conduct and Resultant Sentence

Mr. Chiasson respectfully submits that Michael Kimelman's 30-month sentence is perhaps the most instructive for purposes of formulating an appropriate sentence here.

A jury convicted Kimelman of participating in a multi-layered insider trading conspiracy, which involved obtaining inside information from lawyers and trading on it in violation of federal securities laws.  Kimelman, a former lawyer himself, received inside information from

his partner, Zvi Goffer, and executed trades on the basis thereof. <u>See generally</u>, <u>United States v.</u> <u>Kimelman</u>, 10 cr. 56 (RJS), 10/12/11 Sentencing Tr.

Kimelman did not participate in some of the more egregious conduct in the conspiracy, which appears to have inured to his benefit at sentencing. This Court noted that "Kimelman didn't have a prepaid phone, he didn't pay bribes, he didn't breach his own duties as an attorney. . . . It distinguishes him from other defendants who have been sentenced in the case." <u>Id</u>. at 14:7-10. The government also conceded: "If you took away the Ropes & Gray insiders, you wouldn't have had the insider trading activity. If you took Mr. Kimelman out of it I think you still would have had that activity." <u>Id</u>. at 17: 6-9. In other words, even without Kimelman, the scheme would still have existed.

Similarly, there is no evidence that Mr. Chiasson bribed anyone in the Dell or Nvidia tipping chains, used subversive tactics like pre-paid cell phones or alternate email addresses, personally sought or obtained information from insiders, or induced anyone to breach a fiduciary duty to Dell or Nvidia. And, this conspiracy would have happened with or without Anthony Chiasson. Thus, like Kimelman, Mr. Chiasson did not participate in the more aggravated activities of his coconspirators.

Compelling similarities exist between Mr. Chiasson and Kimelman that arise from their personal lives as well. In fashioning an individualized sentence, the Court found that "Mr. Kimelman clearly has, by all accounts from the balance of his life, really, been a good person, a good son, good father, good husband, a good friend to many, many people from all different aspects and periods of his life who speak to his character. They all speak admiringly about him, about his humor, about his generosity, about his maturity and intelligence." <u>Kimelman</u>, 10 cr. 56 (RJS), 10/12/11 Sentencing Tr. at 21: 13-19.

41

In the end, this Court granted Kimelman a downward variance based, at least in part, on the above-discussed facts. See id. at 22:17-23:1; 30:15-22. Many of the Court's favorable comments about Kimelman are equally applicable to Mr. Chiasson, as the letters indicate. The letters characterize Mr. Chiasson as a good son, father, husband, and brother. More importantly, they describe him as a man of compassion and charity. As the Court will read below, Mr. Chiasson's substantial societal contributions and family circumstances are, respectfully, deserving of equal or greater weight in determining his sentence.

### b. James Fleishman's Conduct and Resultant Sentence

James Fleishman's and Anthony Chiasson's conduct and personal circumstances also make Fleishman's case a fair comparison. In essence, a jury convicted Fleishman of selling inside information for profit as part of a multiple insider trading conspiracies. The court imposed a 30-month term of imprisonment.

In determining his sentence, the court considered Fleishman's lack of aggravated conduct. See United States v. Fleishman, 11 Cr. 32 (JSR), 12/21/11 Sentencing Tr. at 39:19-40:14 ("If you look at Mr. Fleishman as a human being overall, he has, for example, no record of the almost pathological manipulativeness that characterized [Winifred] Jiau. And, as counsel points out, he did not engage in the obstruction that was typical of [Donald] Longueuil."). In addition, the court expressed sympathy for Fleishman's obligations to his young children and ailing mother. Id. at 26:20. Comparing Mr. Chiasson to Fleishman is reasonable because of the similar absence of aggravated conduct like obstruction or targeted manipulation, and because of Mr. Chiasson's strong character and obligations to his young children and extended family. See Argument Section III(C), supra.

Despite these similarities, the differences between Mr. Chiasson's and Fleishman's conduct are significant. Fleishman ran "a totally corrupt business, whose business consisted in meaningful part of providing insider information . . . and distribut[ing] [it] to their clients." Fleishman, 11 Cr. 32 (JSR), 12/21/11 Sentencing Tr. at 17:7-11. He took an aggressive role in recruiting the clients to whom he and other PGR representatives passed inside information. Id. at 22:18-23:2. "[T]he entire business was designed so that [company insiders] would breach their duties . . . ." Id. at 28:9-15. The record is devoid of this type of provocative conduct in relation to Mr. Chiasson.

The government further stated at sentencing that Fleishman was "arguably more culpable [than] the hedge funds" to which he sold inside information. Id. at 27:18-21 (emphasis added). This concession is significant in terms of how the government claimed to view and value tipper versus tippee culpability. Mr. Chiasson's sentence thus should reflect the difference in this assessment of culpability.

### c.  Rajat Gupta's Conduct and Resultant Sentence

Rajat Gupta also presents a valuable comparison for determining Mr. Chiasson's sentence. A jury convicted Gupta of essentially stealing confidential information from Goldman Sachs and giving it to Raj Rajaratnam in breach of Gupta's fiduciary duties. Gupta's Guidelines calculation advised 78-97 months though the court did not appear to give the Guidelines much weight in sentencing Gupta to 24 months imprisonment. See, generally, United States v. Gupta, 11 Cr. 907 (JSR), 10/24/12 Sentencing Tr.

In focusing on Gupta's conduct and personal history, the court "turned to what was much more important [than the Guidelines calculation] . . . the factors under Section 3553(a) of Title 18 and what sentence should result from an analysis of those factors." Id. at 9:19-22.  In

43

assessing these factors, the court granted Gupta a 4.5 year downward variance. The court

determined that Gupta's role in the conspiracy was less extensive than Rajaratnam's by an order

of magnitude. Accordingly, a sentence near Rajaratnam's would have been disproportionately

punitive. Id. at 46-48. The court weighed heavily Gupta's "extraordinary . . . good deeds."

Id. at 16:16-18. Gupta received credit for his substantial financial support of major global health

organizations, among others, but the court appeared most moved by his emotional support of

"every day folks, who were in distress at various crisis points in their life. [These acts were]

very revealing of the good side of his character." Id. at 16:22-24. In sum, the court granted

leniency because "Mr. Gupta's personal history and characteristics starkly contrast[ed] with the

nature and circumstances of his crimes." Id. at 50:18-20. Similarly, Mr. Chiasson's conduct was

less aggressive than many of his coconspirators who paid bribes, induced fiduciary breaches, and

trafficked in large amounts of illicit information—Mr. Chiasson engaged in none of this conduct.

And, Mr. Chiasson has exhibited similar community-mindedness on both a broad scale and for

"every day folks," particularly for one so young.

 Despite these factors, the court found Gupta's breach of duty to be grave compared to the

average tipper. Indeed, the court characterized Gupta's actions as "the functional equivalent of

stabbing Goldman Sachs in the back." [29] Gupta, 11 cr. 907 (JSR), 10/24/12 Sentencing Tr. at

52:15-16. Moreover, the court agreed with the government's view that Gupta went "out of his

way to insure that Mr. Rajaratnam was able to profit from that information." Id. at 33:10-12.

And, the government noted that "it is difficult to identify any other corporate insider who has

been convicted of insider trading who held such an extraordinary position of trust." Id. at 31:15-

---

[29]  See SEC v. Tome, 638 F. Supp. 596, 617 (S.D.N.Y. 1986) (internal citations omitted) ("the
tipper's conduct, almost invariably, is more culpable than that of the tippee.").

18. Mr. Chiasson is arguably less culpable than Gupta because he neither breached his fiduciary duties nor encouraged anyone to breach their fiduciary duties, such breach being the "heart" of insider trading cases.[30] Id. at 43:7-8.

Considering the above-discussed similarities between their limited scope of conduct in relation to their coconspirators and their exemplary community works, Mr. Chiasson warrants consideration for a similar downward variance.

## 2. Mr. Chiasson Compared to Contorinis and Whitman

### a. Contorinis' Conduct and Resultant Sentence

A jury convicted Joseph Contorinis of trading on inside information received from one individual on a limited number of occasions. At trial, Contorinis took the stand and, as the Court concluded, testified falsely. His offense conduct and a 2-point obstruction enhancement yielded an advisory range of 97-121 months imprisonment. This Court sentenced him to 72 months.

Notwithstanding his false testimony, the Court granted Contorinis a two year downward variance. In weighing the 3553(a) factors, this Court considered Contorinis' non-aggravated offense conduct, his otherwise law-abiding life and that the Guidelines are as a "clumsy tool for measuring loss or gain or the seriousness of the crime." Contorinis, 09 cr. 1083 (RJS), 12/17/10 Sentencing Tr. at 58:1-6.

At first blush, Mr. Chiasson and Contorinis may seem similarly situated for purposes of § 3553(a)(6). Contorinis was a tippee who traded on information that he received from one individual over a finite period of time. The same can be said for Mr. Chiasson. Though

---

[30]   It is true that Gupta tipped Rajaratnam over a shorter period of time than the period for which Mr. Chiasson was convicted. Mr. Chiasson respectfully suggests that comparing the time period encompassing the offense conduct with the breach to a company who shared it secrets with a trusted advisor tips in his favor or, at the least, balances the culpability scale.

Contorinis was a direct tippee and Mr. Chiasson was a fourth-level tippee, the basic conduct at issue renders them similarly situated under § 3553(a)(6).

However, Mr. Chiasson's post-arrest conduct is distinguishable from Contorinis' because Mr. Chiasson did not commit perjury. This Court determined that, while accused of one crime, Contorinis knowingly committed another. The chasm that exists between defendants who lie and seek to mislead fact-finders and those who do not is large and should be reflected in the attendant sentences. This Court seemingly agreed by finding that Contorinis deserved to be "punished more harshly than those who don't [commit perjury]." Contorinis, 09 Cr. 1083 (RJS), 12/17/10 Sentencing Tr. at 57:9-22. In addition, Contorinis lacked Mr. Chiasson's family concerns and philanthropic endeavors.

Both Mr. Chiasson and Contorinis had high Guidelines ranges, but Mr. Chiasson carries none of the "obstructing justice" baggage while presenting weightier family concerns and a more substantial charitable history. Accordingly, under all of the § 3553(a) factors, they are not similarly situated and Mr. Chiasson's sentence should reflect the differences between them.

### b. Douglas Whitman's Conduct and Resultant Sentence

A jury convicted Douglas Whitman of seeking, receiving and trading on inside information from multiple tippers. At trial, Whitman testified falsely on his own behalf. His offense conduct and obstruction enhancement resulted in an advisory range of 51-63 months imprisonment. The court sentenced Whitman in January 2013 to a 24-month prison term.

Despite his false testimony, the court granted Whitman a downward variance of over two years. In determining Whitman's sentence, the court weighed heavily the § 3553(a) factors rather than the Guidelines. The court considered that Whitman had two children whose lives would be negatively impacted by his sentence, and that "there's nothing but positive things to be

46

said about Mr. Whitman, and he gets credit for them on this day of judgment, because they were part of the man too." United States v. Whitman, 12 Cr. 125 (JSR), 1/24/13 Sentencing Tr., at 29:1-5. In particular, Whitman's "private acts" or societal contributions "that no one [knew] about" were most compelling to the court. Id., at 17:17-19 (commenting on defense counsel's description of Mr. Whitman's organization of memorial services for community members' families and actions as a "surrogate father" to one of the boys whose father had passed).

Like Whitman, the letters submitted to the Court on behalf of Mr. Chiasson show him to be an equally good and caring man. Mr. Chiasson's "private acts" for the betterment of his community cause him to stand out above many others. The letters submitted on his behalf paint a picture of a kind, giving person who is devoted to family and community.

That said, the primary factor that sets Mr. Chiasson apart from Whitman is that Whitman committed perjury. The court concluded that Whitman "perjured himself . . . frankly, he repeatedly perjured himself. [He was] blatantly aware that he was trading on inside information every step of the way." Whitman, 12 Cr. 125 (JSR), 1/24/13 Sentencing Tr. at 5:11-17.

Nonetheless, Whitman received a 24-month sentence. Importantly, the aggravating perjury factor is not present in Mr. Chiasson's case. While Mr. Chiasson's and Whitman's offense conduct is close enough in nature that § 3553(a)(6) mandates treating them similarly, the notion that Whitman committed perjury and yet received a 2-year sentence for conduct not unlike Mr. Chiasson's should cause this Court to question the Guidelines' applicability and consider whether Mr. Chiasson warrants a sentence below Whitman's term.

47

### 3. Mr. Chiasson's Conduct is Not Comparable to that of Rajaratnam and Goffer

#### a. Raj Rajaratnam's Conduct and Resultant Sentence

A jury convicted Raj Rajaratnam of multiple conspiracies and substantive counts of insider trading. Rajaratnam's illegal conduct spanned more than a decade, involved over 19 public companies, and at least 20 corrupt insiders and traders across multiple interlocking conspiracies. See United States v. Rajaratnam, 09 Cr. 1184 (RJH), 10/13/11 Sentencing Tr. at 2-13. Rajaratnam received a prison term of eleven years.[31]

At sentencing, the government referred to Rajaratnam as "arguably the most egregious insider trader to face sentencing in a federal courthouse in the United States." Id. at 10:19-21. In comparing Rajaratnam to recent cases like Goffer and Contorinis, the government said they "didn't even come close to what Mr. Rajaratnam committed." Id. at 19:14-23. Indeed, "there is no one who is [his] equal in terms of breadth and scope of his insider trading crimes." Id. at 23:1-2.

Anthony Chiasson's conduct cannot fairly be compared to Rajaratnam's. Rajaratnam corrupted numerous insiders and induced individuals to breach their fiduciary duties. He bribed people to obtain inside information on dozens of companies. He established secret, overseas schemes to disguise payments to tippees. He engaged in deceptive and extensive steps to disguise his conduct and avoid detection by creating phony research trails and lying during his SEC testimony. Indeed, the court imposed a two-level enhancement for his "specified intent to obstruct the SEC's investigation." Id. at 27:11-12. Mr. Chiasson engaged in no such conduct;

---

[31] Even considering Rajaratnam's egregious conduct, he received 11 years imprisonment—nearly half of the lower end of his Guidelines range of approximately 19-24 years.

therefore, under no fair assessment of the facts is Mr. Chiasson's conduct remotely similar to Rajaratnam's.

It is necessary to distinguish Mr. Chiasson from Rajaratnam because the government's Guidelines calculation suggests that Mr. Chiasson should serve a prison term close to or greater than the term Rajaratnam received. This is, quite simply, preposterous. When assessing conduct alone, there is no comparison between Mr. Chiasson and Rajaratnam. Indeed, it would be a miscarriage of justice to treat Anthony Chiasson as if he committed the same acts as Rajaratnam when there are manifest differences in terms of deception, aggression, subornation, and repetition. Thus, to fulfill the purpose of § 3553(a)(6), Mr. Chiasson should receive a substantial variance from the sentence meted out to the most egregious insider trader in history.

### b. Zvi Goffer's Conduct and Resultant Sentence

A jury convicted Zvi Goffer of organizing and leading an elaborate insider trading conspiracy aimed at corrupting lawyers in exchange for inside information. Goffer played the part of both tippee and tipper, and he was the organizer and leader of the corrupt scheme. This Court sentenced Goffer to ten years in prison.

At sentencing, the government described Goffer's conduct as the "leadership of a fraudulent enterprise that happened to be insider trading . . . ." United States v. Zvi Goffer, 10 Cr. 56 (RJS), 9/21/11 Sentencing Tr. at 28:13-15. Goffer organized and led the conspiracy by "set[ting] up an entire infrastructure for insider trading activity." Id. at 29:19-20. The Court even found Goffer's tactics at trial and sentencing to be manipulative, thereby demonstrating that he was a deceptive "gambler" through and through. See id. at 38:21-22; 40:16-18; 41:5-13. For these reasons, among others, this Court found that Goffer was the instigator who was "making it

49

clear [he] would pay for the information, that [he] would make it worth their while to breach their duties." Id. at 34:19-23.

The Goffer conspiracy is among the most insidious in recent history. Goffer bribed lawyers to obtain material nonpublic information and, in doing so, induced them to violate their duties to their firms and their clients. He also made deception an integral part of his scheme. In recognition of the blatant illegality of his acts, Goffer purchased multiple sets of pre-paid cell phones and encouraged his coconspirators to switch phones to avoid detection. Id. at 28:16-21; 37:8-16. Recorded telephone conversations revealed that Goffer purposefully created fraudulent research trails to justify his trades. Id. at 37:17-25. He manipulated others—including his own brother—into breaking the law. See id. at 34:11-23.

Anthony Chiasson's conduct was nothing like Zvi Goffer's conduct. Mr. Chiasson was not the organizer or leader of the conspiracy; he did not induce anyone to break the law or to breach their duties; he did not use pre-paid cell phones to avoid detection. Rather, the jury concluded that Mr. Chiasson received information from his analyst and traded on it on a limited number of occasions. His conduct thus is strikingly different Zvi Goffer's conduct.

However, a pro forma Guidelines calculation suggests that Mr. Chiasson and Goffer are the same. This is a stark example of the Guidelines' inability to measure particular and distinct conduct. Mr. Chiasson participated in none of the manipulative, deceptive activity that caused this Court to impose a 120-month sentence upon Goffer. Because Messrs. Chiasson's and Goffer's conduct are not remotely similar, sentencing Mr. Chiasson in a similar range to Goffer would undermine the purpose of § 3553(a)(6). Accordingly, Mr. Chiasson's sentence should reflect the vast differences between Goffer's conduct and his own.

*    *    *

Section 3553(a) focuses on the individual and his conduct. In the instant case, Mr. Chiasson's conduct is less egregious than each of the above-discussed defendants. Thus, the reasons warranting a downward variance are equal if not more compelling than those articulated in these other sentences. Of equal import is the notion that some of these defendants whose conduct was far more egregious with reasonably high Guidelines ranges received dramatic downward variances. Measuring Mr. Chiasson based on his conduct and the life he has led, a sentence below any and all of the above-discussed defendants is both warranted and reasonable. As Judge Rakoff articulated:

> There is, in the common sense of it . . . a huge difference between a person who is essentially a grasping, evil, crooked, despicable human being and someone who is basically a good person but has made some intentional mistakes. And the notion, if our legal system ever ceases to recognize that distinction, we will have lost our own humanity. We will be a system without justice, without mercy, without feeling for the complexity of human experience.

United States v. Whitman, 12 Cr. 125 (JSR), 1/24/13 Sentencing Tr., at 27:25-28:8.

### 4. Mr. Chiasson's Liability for the Dell Trades is Derivative of the Dell Insider, Rob Ray, Who Has Never Been Charged

Mr. Chiasson's criminal liability for the charged Dell trades is derivative of the liability of former Dell insider, Rob Ray. Though Ray did not appear at trial, the jury must have concluded that he breached his fiduciary duty to Dell by passing along material nonpublic information in exchange for a personal benefit. It is noteworthy that the Dell insider trading aspect of the scheme would not have happened without Ray; but that the conspiracy would have continued, virtually unchanged, without Mr. Chiasson.

In insider trading cases, tippers are generally considered more culpable than tippees. See Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 312-13 (1985); see also Tome, 638

51

F. Supp. at 617 (internal citations omitted). Indeed, in the context of insider trading, "we do not believe that a person whose liability is solely derivative can be said to be as culpable as one whose breach of duty gave rise to that liability in the first place." Bateman, 472 U.S. at 313. Mr. Chiasson's conduct should be considered in sharp contrast to the tipper who leaked the information in the first place, and yet the tipper has not been charged.

Though the government has not charged Ray, the comparison between Mr. Chiasson and Ray goes beyond highlighting the government's charging decisions. Ray continues to work as the Director of Finance at a large publicly-traded company. While the comparison to an uncharged tipper does not violate the letter of § 3553(a)'s directive to avoid disparate sentences, such an unfair result certainly runs afoul of the statute's spirit. Mr. Chiasson simply requests that the Court consider the fact that the primary tipper in the charged conspiracy has gone and will go uncharged. When fashioning an appropriate sentence, the Court should account for the disparity between a prison sentence for Mr. Chiasson and the absence of any criminal charges or incarceratory sentence for the tipper.

## B. The Guidelines Place Disproportionate Emphasis on Profits

The trading gains in this case primarily drive Mr. Chiasson's advisory Guidelines calculation. The government's calculation vastly over-inflates the punishment warranted by the conduct for which the jury convicted Mr. Chiasson. And while an incarceratory period of between 10 and 13 years overstates the nature of his conduct so as to raise serious questions about the continued viability of the Guidelines for insider trading cases, we are concerned only with how the calculation impacts Mr. Chiasson's sentence. Simply put, Mr. Chiasson's conduct does not warrant a sentence where, at the low end of the Guidelines range, he would receive the same sentence as Goffer and, at the high end, two years more than Rajaratnam. Perhaps the most

vivid illustration of the Guidelines' misplaced emphasis on gain is that, under the government's calculation, Mr. Chiasson would serve one year more than the prison terms of Kimelman, Fleishman, Whitman, and Gupta combined.

In Mr. Chiasson's case, the Guidelines measure only money. Courts have agreed that, in financial fraud cases, the Guidelines place an "inordinate emphasis" on "putatively measurable quantities, such as . . . the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors." United States v. Adelson, 441 F.Supp.2d 506, 509 (S.D.N.Y. 2006). The Guidelines' "arithmetic approach" is particularly ill-suited to insider trading cases where the calculated gain is often—as in this case—far attenuated from the defendant's actual conduct. Id. at 512. Indeed, this Court has described the gains calculation as a "clumsy tool for measuring [...] the seriousness of the crime." Contorinis Sentencing Tr. at 58:1-6; see also Whitman Sentencing Tr. at 9:9-18 ("the guidelines . . . place too much emphasis, irrational emphasis on the monetary portion of the determination of sentence . . . [t]he guidelines are skewed irrationally in this respect.").

No case in recent history illustrates this point as clearly as the instant one. Mr. Chiasson's case presents several reasons to conclude that the gain is detached from culpability.

First, the undue emphasis on trading gain disproportionately impacts Mr. Chiasson because of Level Global's substantial assets under management and the relative large positions he, Ganek, Brenner, and others were able to build in numerous stocks—including Dell and Nvidia.[32] At its height, the Level Global Fund managed approximately $4 billion in assets; with

_____

[32] As the evidence established during trial, the Fund's positions in Dell and Nvidia during the charged quarters were not unusually large positions. See generally Trial Tr. at 2675-2680. The Fund's Dell position in August 2008 was its seventh largest position in terms of gross market value for the period 2008-2009. See Def. Ex. 39. The May 2008 Dell position and the May

leverage, Level Global routinely traded amounts in excess of $7 billion. Thus, it is not surprising that the Fund's positions and associated gains would be large.[33] It is simply not the case that Level Global received material nonpublic information regarding Dell and Nvidia and then made outsized, irregular trades in those securities.[34] No matter how great Level Global's buying power, it should not impact Mr. Chiasson's sentence in such an inflated manner absent other egregious behavior. Considering the related nature of the size of the Fund and the size of the trades, the resultant gains should not be used as a measuring stick for Mr. Chiasson's culpability. Indeed, Mr. Chiasson's gain calculation is a prime example of "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic . . . ." Adelson, 441 F. Supp.2d at 512.

Second, the misplaced reliance on profits in the Guidelines calculation could lead to sentences at odds with the defendant's actual conduct. For instance, a tippee who paid cash in exchange for improper information, or traded in secret accounts purely for personal profit, or actively sought inside information and corrupted additional participants in the process could have a lower Guidelines range than a remote tippee who traded primarily for the benefit of his investors, and neither bribed nor corrupted anyone. Tying length of sentence to size of profits could lead to heinous conduct being punished less severely than aberrant conduct.

---

2009 Nvidia position were not included within the Fund's top 25 largest positions during the same period. Id.

[33]   Indeed, the profits from investments in Dell accounted for less than 3.5 percent of all profits made by the Fund in 2008. Def. Ex. 37. Dell was only the Fund's 10th most profitable investment during the period 2008-2009. Def. Ex. 38.

[34]   The top 14 largest positions (by gross market value) held at the Fund from 2008-2009 were all above $200 million dollars, ranging from approximately $204 million to approximately $350 million. Def. Ex. 39. The August Dell position, at roughly $255 million, falls in between but was by no means vastly outsized in terms of trades during this time period. Id.

In the instant case, Mr. Chiasson was a fourth-level tippee who traded for his Fund and not for personal or secret accounts. Moreover, Mr. Chiasson did not compensate anyone in the Dell or Nvidia tipping chains, nor did he seek to corrupt anyone or breach a fiduciary duty to a public company. However, despite the absence of the above-referenced aggravating factors, Level Global's substantial gains—many of which resulted from Ganek-directed trades—inflate Mr. Chiasson's Guidelines calculation in a manner that puts him on par with or above those whose conduct includes these aggravating factors.[35]

Finally, relying on the trading gains in calculating the Guidelines range subjects the sentencing process to uncontrollable and unrelated market forces, such as the "vagaries of stock price movements." See Rajaratnam Sentencing Tr. at 31:4-11 (criticizing the Guidelines because they "particularly in financial crimes can point to widely disparate sentences that very similar offenses reflect depending on the vagaries of stock price movements and other factors that can ratchet up or down the guideline gain calculation."); see also Adelson, 441 F.Supp.2d at 509 ("the precipitous decline in stock price that typically accompanies a revelation of fraud generates a multiplier effect that may lead to guideline offense levels that are, quite literally, off the chart."). For instance, in the second quarter of 2008 during which the Level Global Fund built its significant Dell short position, the entire global economy went into a downward spiral. See infra, Section II(A). Indeed, Lehman Brothers collapsed only two weeks after Dell's 2008 second quarter earnings announcement that saw its stock price drop approximately 15%. Here,

---

[35] Under analogous circumstances in a pre-Booker case, a sentencing court found that a downward departure was warranted where the offense level for each defendant was increased based on a $15 million gain calculation, but where the defendants personally realized only a small portion of the overall profits. See United States v. Oakford Corp., 79 F.Supp.2d 357, 358-60, 368-69 (S.D.N.Y. 2005).

the unprecedented market events of Fall 2008 present precisely such disparate impact. Thus, the Guidelines calculation is unfairly impacted and over-inflated.

The unknowables surrounding such economic phenomena and market events should not drive the Guidelines calculations. By extension, circumstances outside of Mr. Chiasson's control should not control his recommended period of incarceration or, worse still, start the Court's deliberative process at such a steep number that it would take an extraordinary downward variance for Mr. Chiasson to receive a sentence in the range of defendants who exhibited similar conduct. As a court recently observed in a related case, "the guidelines fetish with the calculation of loss"—and also gain—"poorly fits this situation." Fleishman Sentencing Tr. at 4:18-20.

### C. Anthony Chiasson's Family, Personal History, and Ability to Contribute to Society in the Future Warrant Leniency

Courts within the Second Circuit have granted downward variances for both family reasons and extraordinary charitable works. See United States v. Shuster, 331 F.3d 294, 296 (2d Cir. 2003) (affirming the sentencing court's downward departure of 42 months "based upon the 'combined effect of extraordinary family circumstances; charitable works; and age.'"); United States v. Alba, 933 F.2d 117, 1122 (2d Cir. 1991) (affirming downward variance where defendant had "a close-knit family whose stability depends on [his] continued presence."). Mr. Chiasson's family commitment, strong character, and community-minded actions over the course of his life more accurately define him than the aberrant conduct for which he stands convicted. Accordingly, the "combined effect" of Mr. Chiasson's family circumstances and his charitable works warrant a downward variance. Id.

### 1. Mr. Chiasson's Family Circumstances Warrant Leniency

Courts in the Second Circuit may exercise discretion in fashioning non-Guidelines

sentences for family circumstances, particularly where young children are concerned. See

United States v. Galante, 111 F.3d 1029, 1034 (2d Cir. 1997) (affirming downward departure

where "removal of the father from this unit at this particular point in time would have a

disastrous effect on the [8 and 9 year old] children in terms of possibilities of their education and

upbringing.") (quoting district court opinion); Poteroba, 10-cr-649 (PAC), 3/21/11 Sentencing

Tr. at 18:16-19 (granting a downward departure in part because defendant had "a compelling

need to take care of his family.").

A lengthy term of incarceration will undoubtedly harm the Chiassons' young children.

Mr. Chiasson requests that this Court determine a sentence that accounts for undue impact on his

family. See Galante, 11 F.3d 1029, at 1035 (acknowledging "it is the families of defendants that

are the intended beneficiaries of downward departures" for family circumstances).

Right now, Anthony's son ████ is "a well adjusted young boy who adores his mother and

idolizes his father." Janson Letter, Ex. L; see also Louis Chiasson Letter, Ex. E. The Chiassons

and their family members are extremely concerned about the ramifications to the children—

especially ████—if Anthony is removed from their immediate lives for a lengthy period of time:

> ████ eight year old world, as he knows it, will be turned upside
> down . . . There is no doubt in our minds that his life will be
> changed forever by the absence of his father for any period of time
> and the scars that will result will not heal for him. An innocent
> child with so much promise will be broken down. [And], Sandra
> and Anthony's one year old child, ████ will have the
> misfortune of spending the first and arguably formative years of
> her life without a father . . . I can only imagine the void she will

feel without Anthony in her life for this time, and all of the consequences that will bring for her.

Janson Letter, Ex. L; see also S. Chiasson Letter, Ex. K; Louis Chiasson Letter, Ex. E.

Anthony's brother, Louis, echoes this sentiment:

> [W]hat will happen to Anthony's relationship with ██ and ████ if he is removed from his family for any length of time[?] The children are so young and so in need of their father's attention and guidance that if he is not present they will surely suffer for it. Sandra too will suffer as she faces the prospect of being a single parent of two very young children.

Louis Chiasson Letter, Ex. E; see also J. Chiasson Letter, Ex. D. And, naturally, no one understands the pain the Chiasson children will feel when separated from their father more than Sandra:

> I especially worry about ██. As a mother, I can tell you that I am worried that any prison sentence will have a devastating impact on him because he is so attached to his father. And, of course, there is ████. I know that our 13-month-old will not understand the absence of her father at such a young age. I also know she would miss so much of the interaction that Anthony had with ██ and would be far worse off for it. . . . My concern is what will happen to ████ throughout her developmental stages and if she does not have her father to help guide her as he did with our son.

S. Chiasson Letter, Ex. K.

Mr. Chiasson recognizes that many defendants who come before the Court for sentencing have children, and that his family circumstances may not fit squarely within the Guidelines' definition of "extraordinary." But in reality—in the lives of ██ and ████—a lengthy separation from their father is extraordinary. Truth be told, young children have very little interest in what the law considers extraordinary, nor should they. They can only know what is extraordinary in their own lives and how their lives will forever change should their father be

58

removed from them for any significant period.  In that way, the impact a lengthy period of incarceration will have on ███████ and ████████████████—the circumstances of the only family they know—are 100% extraordinary.

Mr. Chiasson thus implores the Court to fashion a sentence that sufficiently punishes him without unnecessarily punishing his children.

## 2. Anthony's History of Charitable Works Warrant Leniency

It has been well detailed above that, even from a young age, Anthony Chiasson has worked tirelessly and extensively for the broader community and the individuals therein. "This speaks to a commitment . . . and a willingness to make a sacrifice to causes bigger than himself." McArdle Letter, Ex. A.  It is equally true that Mr. Chiasson has given of himself to the many people in his life who have needed his help.  His donations of time and energy, combined with his fiscal generosity stand him apart from most.  Indeed, "[g]iving back to the community and staying grounded have always been his greatest attributes." Day Letter, Ex. J.

Courts are permitted to impose lenient sentences in cases of extraordinary community or charitable service similar to Mr. Chiasson's life-long service to his community and the individuals therein.  See United States v. Canova, 412 F.3d 331, 358-59 (2d Cir. 2004) (affirming downward departure based on defendant's service with the Marine Corps and as a volunteer firefighter, in addition to acts of good samaritanism); United States v. Serafini, 233 F.3d 758, 772 (3d Cir. 2000) (affirming downward departure based on defendant's "generosity" and the manner in which he "extended himself to [others] in unique and meaningful ways during times of serious need.").

The letters to the Court document Mr. Chiasson's dedication to his community over the past 20 years.  He served as a trustee for both Cheverus High School and Babson College,

awarded scholarship funds to needy students, helped create and fund a new entrepreneurial program at Babson to encourage American ingenuity, gave generously to globally-impactful organizations like the Robin Hood Foundation, Michael J. Fox Foundation, and more. Importantly, he achieved all of this by the time he was 37 years old. Perhaps Cheverus President, Reverend Campbell, said it best: "Anthony has truly had a positive impact . . . and it is this impact that, in my opinion, is the true measure of this good man . . .." Campbell Letter, Ex. M. Mr. Chiasson should receive credit for these acts at sentencing.

In instances where the defendant's conviction is truly at odds with the defendant's life works and character, courts have granted downward variances substantially below the applicable advisory ranges. Recently, in <u>United States v. Gupta</u>, the court sentenced Gupta to a term of 24 months in prison rather than the Guidelines calculation of 78-92 months based on part on his extraordinary decades of community service. <u>See</u> <u>Gupta</u>, 11 Cr. 907 (JSR), 10/24/12 Sentencing Tr. at 55. The court believed that Gupta would return to a life of good works, as evidenced by his history and character, and should be given the chance to do so. <u>Id.</u>

Similarly, many of the letter writers here independently suggest that Anthony has much more to give to his community, and will indeed continue to do so if given the chance. "Many people may express [the] desire" to serve their communities, "but Anthony has shown that he has the determination to act on it. <u>He has the potential to continue to make a difference</u> . . .." Schlesinger Letter, Ex. N (emphasis added); <u>see also</u> Hacker Letter, Ex. G ("[Anthony] is truly a man of his word, his faith, and his family. I firmly believe <u>Anthony has more to contribute to society. If given the chance, he will continue to contribute to the community.</u>") (emphasis added); McArdle Letter, Ex. A. (His communities are "better off for having a citizen like Anthony participating in the well being of their community.").

In addition to substantial and generous charitable acts like those discussed herein, Courts recognize that smaller acts of kindness are equally extraordinary. See United States v. Mehta, 307 F.Supp.2d 270, 277 (D. Mass 2004) (internal citation omitted) ("[T]he focus should be on the defendant's activities . . . particularly those that go beyond the kind of 'impersonal writing of checks' that characterized many wealthy individuals." (emphasis added)); Serafini, 233 F.3d at 773-75 (3d Cir. 2000) (upholding a downward variance based on defendant's establishment of a fund to defray the cost of a bone marrow transplant, assistance to pay an individual's electric bill so that service would not be discontinued, and more). Judge Rakoff recently noted in United States v. Whitman that financial contributions, while important indicators of a defendant's "civic and charitable instincts," do not carry as much weight in evaluating character: it is the "private acts that are done as [the person] . . . that reveal something about the heart and conscience of the human being." Whitman, 12 Cr. 125 (JSR), Sentencing Tr., at 17:6-23.

Mr. Chiasson's more substantial philanthropic efforts and contributions toward educational institutions are well documented here, but Mr. Chiasson's past is filled with many small acts of kindness of the type that the Serafini, Mehta, and Whitman courts found compelling. He has assisted many individuals and smaller organizations—often without their knowledge. For example, Mr. Chiasson's eldest brother explains: "Unbeknownst to me . . . nearly ten years ago Anthony established an educational trust for the benefit of my two children. Moreover, he funded it so generously that it should serve to cover both their entire four-year college costs. . . . Anthony requested that my children never know the source of their college tuition." J. Chiasson Letter, Ex. D. And, without being asked, Mr. Chiasson "paid substantial outstanding personal debt for a cousin who had made some questionable life choices but then subsequently made a discernible effort to turn her life in a more positive direction" and also

"purchased a new automobile and paid the outstanding balance on another for an aunt whose family was confronting a chronic illness and in turn a reduced ability to work." Id. In both of these instances, "Anthony insisted his involvement and assistance remain anonymous." Id.[36]

Many of the letter-writers referenced herein explained to the Court other meaningful ways through which Mr. Chiasson touched their lives:

- "[U]nbeknownst to me [Anthony] setup a life insurance trust for my benefit. . . . This trust was set up many years ago at a time when many thirty year olds are just starting to figure life out and not considering building out life insurance trusts for the benefit of an older sibling." Louis Chiasson Letter, Ex. E.

- "A few days after Anthony had decided to close [Level Global], I received a call from him. He had been charged with wrongdoing, lost his livelihood, and I'm certain was near the low point of his life. . . . [H]e had *two* inquiries and one request. They were, and I remember this vividly: How was I? How was my Mom? (then recently widowed)... And could I think of anyone who might have a job for Jackie, his administrative assistant? That was all; nothing for himself. No proclamations of self-pity—just empathy for my family and a selfless request for someone to whom he felt a personal obligation." J. Salter Letter, Ex. O (emphasis in original).

- "[J]ust before turning 40 I decided to move [from Maine] to Virginia in hopes of a career change and to try something different . . . [Anthony] has always encouraged me to go above and beyond and if I didn't try I would regret it . . . while I was there Anthony made it a point to call me and e-mail me week after week even if it was late at night to make sure I was happy and reassure me . . . ." Haddad Letter, Ex. C.

- "[A] few years following our graduation, I was beset with an unfortunate financial circumstance. With few resources to rely upon, I reluctantly called Anthony and explained the situation. He was travelling at the time, but in a matter of minutes Anthony instructed a personal, interest free loan for me." Colangelo Letter, Ex. H.

---

[36] In contrast to the language of Mehta, cited above, these are not examples of "impersonal" writing of checks. Indeed, these are deeply personal actions wherein Mr. Chiasson assisted someone, provided for someone, or rescued someone using precisely what they needed at the time: financial assistance. This should in no way diminish the impact on the recipient of the kindness.

- "As my entrepreneurial desire grew [Anthony] fully supported and became actively involved with my real estate investing. . . . [H]e provided demographic studies to assist in selecting the location of the properties, he created an excel model forecasting revenues, operating expenses and cash flows to determine the minimum building size . . . and on numerous occasions he took the time to walk neighborhoods with me to personally talk to and interact with the people who live locally." Louis Chiasson Letter, Ex. E.

- "When Anthony knew that our primary vehicle was becoming old and in need of significant repairs, Anthony surprised me and my husband with a brand new, yet practical, SUV as a Christmas gift." Janson Letter, Ex. L.

- "I believe loyalty and love of family is why Anthony's trips home to Maine always included a phone call to my parents to invite them to dinner or just a casual visit to check in with them to see how they are. He has guided them well in helping them over the years plan their retirement. He would regularly review their quarterly 401k allocations making suggestions when he felt their holdings were poorly suited for the environment . . . in 2007, he moved them into safer investments which saved untold losses . . . I find this level of thoughtfulness and unsolicited advice simply amazing." Haddad Letter, Ex. B.

These are a handful of examples of the "many good works [Anthony] has quietly performed and of the positive impact he has had on so many people, many of them personally unknown to him." Rev. Campbell Letter, Ex. M. Accordingly, Mr. Chiasson's charitable and community-minded conduct warrants substantial leniency from this Court.

### D. Mr. Chiasson's Conduct is Aberrant in the Context of His Life

Mr. Chiasson respectfully submits that his conviction represents an aberration in the context of his life, which he has tried to lead with honesty, integrity, strength of character, faith, and a commitment to the well-being of others. In recently recommending a sentence for Rajat Gupta, the presentence report found that the "instant offenses were aberrant behavior—not aberrant as defined by the U.S. Sentencing Guidelines, but rather as defined by Merriam-Webster: '...Atypical.'" Gupta Sentencing Tr. at 53:15-18. Mr. Chiasson respectfully submits that the same is true here. As described above in Section __, the offense conduct represents a

relatively short period in Mr. Chiasson's professional career, and it is atypical, to say the least, in light of his lifetime of hard work and good deeds.

The fairest reading of the trial evidence also supports the characterization of Mr. Chiasson's conduct as aberrant, in the "atypical" meaning of the word. First, Adondakis testified that he—not Mr. Chiasson—introduced the conspiracy to Level Global, and there were no prior allegations of wrongdoing. Second, Adondakis acknowledged that Mr. Chiasson, of his own volition, ceased to trade on Adondakis' inside information. Finally, Mr. Chiasson terminated Adondakis in 2010.

The Court should not consider the conduct associated with Mr. Chiasson's conviction to be the sum total of his life—it is the Anthony Chiasson from his childhood through today who should be weighed and measured. Mr. Chiasson's community-mindedness and generosity began in the first decade of his life when he served as an altar boy and assisted his older brothers in managing their elderly grandparents' properties. His community service continued through high school and college where he served both educational institutions in numerous ways. And, as Mr. Chiasson grew into adulthood, his generosity carried on as he served both his high school and college as a trustee and activist, as an entrepreneur in building a business that employed numerous people, and as a philanthropist who supported many worthy causes—all while being a dedicated husband and father. As this Court found compelling when sentencing a recent insider trading defendant, Mr. Chiasson is "so much more than just the black dot" of his conviction; "there [is] an entire page full of white unblemished by any mark." Kimelman Sentencing Tr. at 10:1-19. Mr. Chiasson respectfully requests that the Court consider the otherwise unblemished, and indeed superlative, record of his life in totem in fashioning a just and appropriate sentence.

### E.  A Non-Guidelines Sentence is Sufficient to Satisfy the Need for Deterrence

Section 3553(a) contemplates the need for specific and general deterrence in fashioning a sentence.  Both have already been accomplished in the instant case.  In addressing the need for specific deterrence, courts deem the requirement satisfied when the "[e]limination of the defendant's ability to engage in similar or related activities . . . and the substantial loss of assets and income resulting from [his crime] have decreased for the foreseeable future his ability to commit further crime of the type he was tempted to undertake . . . constitutes a source of both individual and general deterrence." United States v. Gaind, 829 F.Supp. 669, 669 (S.D.N.Y. 1993).

The trial record makes it clear that Anthony Chiasson is unlikely to engage in any of the conduct for which the jury convicted him.  The most compelling evidence is Sam Adondakis' termination.  As Adondakis testified, Mr. Chiasson distanced himself from Adondakis and subsequently fired him.  See Trial Tr. at 1968-69.  Accordingly, well before any investigation, Mr. Chiasson ceased whatever conduct he had engaged in with Adondakis.  This is strong evidence that the Court need not worry about repeated conduct.

Moreover, Mr. Chiasson's hedge fund career is over.  Therefore, there is no risk that he will repeat any of the instant conduct.  See Gaind, 829 F.Supp. at 669.  As the Gaind court discussed, Mr. Chiasson is likely facing substantial loss of assets after forfeiture, fines, the related SEC matter, the potential clawback of legal fees, and the possible repayment of funds to Goldman Sachs in connection with their partnership purchase.  Thus, the criteria set out in Gaind have been met here, and the goals of specific deterrence have been satisfied.

For a sentence to accomplish general deterrence, it must be a message sent to the entire community of potential violators.  There is, however, "considerable evidence that even relatively

short sentences can have a strong deterrent effect on prospective 'white collar' offenders."
United States v. Adelson, 441 F. Supp. 2d, 506, 514 (S.D.N.Y. 2006) (internal citation omitted);
see also United States v. Yeaman, 248 F.3d 223, 238 (3d Cir. 2001) (Nygaard, J. dissenting) ("It
is widely recognized that the duration of incarceration provides little or no general deterrence for
white collar crimes."). Importantly, "no one knows how much jail time is necessary to
materially deter insider trading; but common sense suggests that most business executives fear
even a modest prison term to a degree that more hardened types might not. Thus, a relatively
modest prison term should be 'sufficient, but not more than necessary' for this purpose." Gupta
Sentencing Tr. at 54:19-24.[37]   Accordingly, a lengthy sentence in this case is unnecessary to
achieve industry-wide deterrence.

Moreover, the deterrent message has been sent. Mr. Chiasson is the 67th person
convicted as a result of "Operation Perfect Hedge," which focused on conduct that occurred
during approximately the same time period. The sentences handed out by the district courts are
as varied as they are widely publicized. Any Wall Street insider who has not received the
message by now is one who is unreachable no matter the circumstances. Thus, the need for
general deterrence has long since been met, by far more publicized trials and the historically
lengthy sentences of Rajaratnam and Goffer.

---

[37]   In considering this argument during Gupta's sentencing, the court also noted that there "is a
widespread belief supported by some studies . . . that because a typical high-level business
person would live in fear of actually having to go to prison, that relatively short prison terms, as
long as they are consistent . . . can achieve a substantial general deterrence effect." Gupta
Sentencing Tr. at 34:14-21.

## IV.    FORFEITURE[38]

Mr. Chiasson traded on the Fund's behalf for the benefit of its investors. Thus, the

profits did not go to line Mr. Chiasson's pockets. Any forfeiture amount should be limited to the

amount of money that Mr. Chiasson actually received from the trades that he executed.

### A.  Anthony Chiasson's Personal Gains

The proceeds of the questioned trades went to Level Global's investors—not to Mr.

Chiasson personally. Like most hedge funds, the Fund charged a management fee of 2% of

assets under management and an incentive (also known as a performance fee) of 20% of profits.

Mr. Chiasson, as an approximately 20% partner in the Fund, received only 20% of the incentive

fees and management fees (the latter extant costs paid by the management company). From the

portion of the management fees he received, Mr. Chiasson paid his employees, and then himself.

Though the Fund earned approximately $11.7 million on the charged trades executed by Mr.

Chiasson, he only received approximately $478,700 on these trades. See Exhibit 2 (Chiasson's

Portion of Profit on Charged Trades Executed by Chiasson). Although forfeiture in this case

should be limited to this amount, we note that Mr. Chiasson received only approximately $1.15

million of the approximately $40.4 million figure (representing the profits earned by all trades

made at the fund prior to the quarters at issue—including both non-charged trades and those

---

[38]   We recognize that the Supreme Court held in Libretti v. United States, 516 U.S. 29, 49
(1995), that defendants do not have a constitutional right to a jury determination on forfeiture in
a criminal case, and that the Second Circuit has held that criminal forfeiture is not subject to the
Apprendi line of cases. See United States v. Fruchter, 411 F.3d 377, 383 (2d Cir. 2005).
Nonetheless, because Libretti pre-dated Apprendi and Fruchter pre-dated the Supreme Court's
decision in S. Union Co. v. United States, 132 S. Ct. 2344 (2012), which undermines Fruchter's
reasoning, the continuing validity of both Libretti and Fruchter are subject to question.
 Accordingly, Mr. Chiasson preserves for any appeal the right to argue that any forfeiture order
based on facts not found by the jury beyond a reasonable doubt violated his constitutional right
to a jury trial.

charged trades executed by Ganek).  See Exhibit 3 (Chiasson's Portion of Profit on All Pre-Announcement Trades of Fund).

### 1. Forfeiture Should Be Limited to Gains Based on the Trades Executed by Mr. Chiasson

As explained above in the Guidelines calculation section, the most analogous situation to the one at hand involves the sentencing and forfeiture determinations of Zvi Goffer's coconspirators.  With the exception of the "ring leader" Goffer, the coconspirator-tippees, only forfeited profits of those charged trades that they executed.  See infra Argument Section II(B). Despite the fact that some of the coconspirators—including Emanuel Goffer and Michael Kimelman—executed trades for the same fund, they were only required to forfeit profits for those trades that they executed (or ordered be executed).[39]  Mr. Chiasson should similarly only have to forfeit the proceeds he received on the trades that he executed.

### 2. Forfeiture Should Be Limited to Gains Mr. Chiasson Personally Acquired

The Court should require Mr. Chiasson to forfeit only the profits he personally received. He should not have to forfeit all profit received by the Fund.  In United States v. Contorinis, 692 F.3d 136, 145-48 (2d Cir. 2012), the Second Circuit held that a forfeiture amount properly reflects only gains acquired by the defendant or others acting in concert with him (and not the entirety of the profit attributable to the fund as a whole).  Moreover, Mr. Chiasson respectfully submits that his forfeiture should be limited to that which he benefited—and he should not have to forfeit money obtained and controlled by his coconspirators.

---

[39]  It appears that the profits in these sentences were calculated based on the account's profit of the trade—and not the personal profit received by each defendant on the trade.  Following the Second Circuit's decision in Contorinis, the calculation should be based on personal profits.

### 3. Mr. Chiasson Should Not Be Required to Forfeit Gains of Coconspirators

This Court should not include Ganek's personal gains in Mr. Chiasson's forfeiture amount even though the Court held there was evidence sufficient to find Ganek a coconspirator. First, fundamental fairness dictates that Mr. Chiasson should not have to forfeit money Ganek obtained while Ganek gets to keep it. Second, the Court's determination that Ganek was a coconspirator was made in the context of whether certain documents were admissible under the coconspirator exception to the hearsay rule and was not (a) determined by the jury; (b) subject to scrutiny on which trades were knowingly made by Ganek based on the inside information; or (c) subject to scrutiny on when Ganek became a coconspirator.

Moreover, no Court or jury has determined when Ganek joined the conspiracy. Indeed, Adondakis testified that he never provided Ganek with the source of the material nonpublic information he acquired. See Trial Tr. at 1955:17-19; 2017:9-14; 2630:14-18. Assuming for the sake of argument that Ganek joined only as of August 27, 2008, the trades that he executed before then would not be subjected to forfeiture because they would have been made by him pre-conspiracy. Without any determination as to when Ganek joined the conspiracy, holding Mr. Chiasson liable for Ganek's profits could result in Mr. Chiasson forfeiting Ganek's legitimately earned money.

Finally, if, despite Adondakis' testimony, the government still believes that Ganek is a coconspirator, it can get any monies it believes to be tainted from Ganek himself. If it wished to obtain Ganek's illicit proceeds, it has now and has always had the power to charge him, prove his guilt, and require him to forfeit the monies. There is no allegation that Mr. Chiasson had any

claim to or control over Ganek's money; thus, to make him forfeit it is to defy fundamental fairness.

### i.   Zvi Goffer's Coconspirators

As explained above, the forfeiture determinations of Zvi Goffer's coconspirators provide an apt analogy to the instant circumstances. With the exception of the "ring leader" Goffer, the coconspirator-tippees only forfeited profits from the trades that they personally directed. See infra Argument Section II(B). Despite the fact that they were found to be coconspirators, they were not required to forfeit the profits received by each other, even where some of the coconspirators worked at the same fund.[40] Id.

### ii.   Rajaratnam's Coconspirators

Additionally, the forfeiture from certain of Rajaratnam's coconspirators did not include Rajaratnam's improperly obtained profits where such gains vastly outweighed the gain received by individual defendants.

In Danielle Chiesi's sentencing, the Court did not require forfeiture because it gave Chiesi credit for disgorging approximately $540,000 to the SEC. United States v. Chiesi, 09 Cr. 1184 (RJH), 7/20/11 Sentencing Transcript, at 16, 24. Notably, the Court did not determine—for purposes of sentencing or forfeiture—that Chiesi's "gain" should include the profits of her coconspirators, such as Rajaratnam, who made over $22 million. Indeed, despite the fact that her fund, NewCastle, made approximately $1.6 million on the unlawful trades that she and her boss

---

[40]   Similarly, a recent insider trading forfeiture determination required the coconspirators to only forfeit the proceeds that they had personally received. United States v. Kluger, 2011 U.S. Dist. LEXIS 145054, at *5 (D.N.J. 2011) (ordering defendant to forfeit $415,000). Kluger was ordered to forfeit $415,000, id., even though the gain to his coconspirators from his tips netted approximately $37 million. DOJ Press Release No. 11-502, December 14, 2011, available at http://www.justice.gov/usao/nj/Press/files/Kluger,%20Matthew%20Plea%20News%20Release.html.

Mark Kurland executed based on tips she received, Chiesi did not have to forfeit (or disgorge) this amount; nor did the government argue she should. Chiesi, 09 Cr. 1184 (RJH), Government's Sentencing Memorandum, Docket No. 284, at 6-7.

### iii.   PGR Conspiracy

The case of the PGR conspiracy is also consistent with not using coconspirator gains for the purposes of guidelines and forfeiture. In United States v. Fleishman, despite that the gain that hedge funds made from the trades was $3.7 million, Fleishman forfeited the commissions that he personally made on each of the phone calls of his coconspirators, which totaled $49,100. 11 Cr. 32 (JSR), 11/21/11 Sentencing Tr., at 15; Defendant James Fleishman's Reply Memorandum Re: Forfeiture, Docket No. 163, at 6-8; Fleishman, Order of Forfeiture, Docket No. 165, at 2. Notably, Fleishman's forfeiture calculation did not include any of the salary, commissions or payments made by or to his coconspirators.

### 4. Mr. Chiasson Has Not Received Certain Compensation

As the Court is considering whether forfeiture or fine is appropriate, the Court should be aware that certain compensation figures relied on by the government at trial do not reflect money Mr. Chiasson actually possessed. At trial, the government called former Level Global CFO Lawrence Canzoneri who testified that, as of the end of 2009, Mr. Chiasson had $37,393,644.00 in deferred compensation invested in the Fund. Trial Tr. at 2665-66 (GX 96). However, Mr. Chiasson never received any of this money—nor is it being held for his future benefit. On April 17, 2012, Ganek, in his capacity as the senior managing member of the general partner of Level Management, L.P., caused Level Global Management to inform Mr. Chiasson via letter that his deferred fees were "conditionally forfeited" to the Management Company. Consequently, Mr. Chiasson's deferred compensation was reallocated to Ganek's capital account, and Ganek

recognized income and paid taxes on this money in 2011. The majority of this money was earned in 2005, 2006 and 2007—before the charged conspiracy. Yet Ganek and Level Global stripped Mr. Chiasson of almost $40 million of his net worth. To date, the Management Company has not returned any portion of this money. Instead, the Management Company indicated that it has been and will continue to spend the money on Level Global legal and other expenses.

Mr. Chiasson believes that, despite their 12-year partnership that grew their team from 2 people to more than 70 employees and a $4 billion enterprise, Mr. Ganek improperly converted Mr. Chiasson's fully-vested deferral monies. No provision of Level Global's governing documents authorized Ganek to deprive Mr. Chiasson of this compensation. Although Mr. Chiasson has not been told what, if any, amount of his deferred compensation remains, he has been told that a substantial sum—and possibly all of it—will go toward paying the defunct entities' expenses.

Mr. Chiasson brings this issue to the Court's attention for informational purposes. In the event the Court chooses to impose forfeiture or a fine, it should do so with a clear understanding that Mr. Chiasson's current financial position does not include the deferred compensation the government saw fit to introduce at trial. The actual state of his finances is far different than the picture presented at trial.

*     *     *

Accordingly, if the Court determines that forfeiture is appropriate, the Court should only order Mr. Chiasson to forfeit the portion of the profits that he personally received. Ordering Mr. Chiasson to forfeit Ganek's profits is inconsistent with recent practice in this district.

72

## V. CONCLUSION

The preceding pages have included quotations from many letters woven through Anthony's story to assist the Court in fashioning a just and appropriate sentence in this case. The overarching message contained in these pages is that Anthony is more than just a decent, good man—he is an extraordinary man; a man who will continue to give to society if given the opportunity. Sandra Chiasson wrote:

> I write to help you better understand the gift of knowing Anthony. In the eleven years I have known Anthony he has, without exception, been a profoundly caring, thoughtful, earnest person. I have never known him to deviate from the values he dearly holds. I do know that, whatever happens, Anthony will forever work to create opportunities for others, to assist those who require help, to care for his loved ones, and to live a purposeful, determined life. Anthony will always hold the vision of possibility for all of us.

S. Chiasson Letter, Ex. K.

\*　　\*　　\*

Anthony Chiasson respectfully requests that, based on his character, family circumstances, community works, and actual conduct, this Court grant him leniency and a substantial downward variance.

Dated: New York, New York
April 29, 2013

Respectfully submitted,
MORVILLO LLP

By:   /s/ *Gregory Morvillo*
Gregory Morvillo

Gregory Morvillo
Savannah Stevenson
Jennifer K. Vakiener
One World Financial Center
200 Liberty Street, 27th Floor
New York, New York 10017
(212) 796-6330

*Of Counsel:*
STEPTOE & JOHNSON, LLP

Reid H. Weingarten
Erik L. Kitchen
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036-1795
(202) 429-3000

Michelle L. Levin
1114 Avenue of the Americas
New York, New York 10036
(212) 506-3900

*Attorneys for Defendant Anthony Chiasson*

74